**Keith A. Ketterling,** OSB No. 913368
Email: kketterling@stollberne.com
**Timothy S. DeJong,** OSB No. 940662
Email: tdejong@stollberne.com
**Jacob S. Gill**, OSB No. 033238
Email: jgill@stollberne.com
**Nadia H. Dahab,** OSB No. 125630
Email:ndahab@stollberne.com
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. Oak Street, Fifth Floor
Portland, Oregon 97204
Telephone:     (503) 227-1600
Facsimile:     (503) 227-6840

**Steve W. Berman** (admitted *pro hac vice*)
Email: steve@hbsslaw.com
**Karl P. Barth** (to be admitted *pro hac vice*)
Email: karlb@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone:     (206) 623-7292
Facsimile:     (206) 623-0594

**Attorneys For Plaintiffs**
[Additional Counsel of Record Listed on Signature Page]


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


| | |
|---|---|
| LAWRENCE P. CIUFFITELLI, for himself and as Trustee of CIUFFITELLI REVOCABLE TRUST; GREG and ANGELA JULIEN; JAMES and SUSAN MACDONALD, as Co-Trustees of the MACDONALD FAMILY TRUST; R.F. MACDONALD CO.; ANDREW NOWAK, for himself and as Trustee of the | Case No. 3:16-cv-00580-AC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

ANDREW NOWAK REVOCABLE LIVING
TRUST U/A 2/20/2002; WILLIAM
RAMSTEIN; and GREG WARRICK, for
himself and, with SUSAN WARRICK, as Co-
Trustees of the WARRICK FAMILY TRUST,
individually and on behalf of all others
similarly situated,

              Plaintiffs,

   v.

DELOITTE & TOUCHE LLP;
EISNERAMPER LLP; SIDLEY AUSTIN
LLP; TONKON TORP LLP; TD
AMERITRADE, INC.; and INTEGRITY
BANK & TRUST,

              Defendants.

Plaintiffs allege the following upon personal knowledge as to themselves and their own

acts, and as to all other matters upon information and belief, based upon the investigation made

by and through their attorneys.

## INTRODUCTION

1.  The Aequitas companies sold securities through their "Private Notes" program

and various Aequitas funds and other investment vehicles.  At the end of 2015, more than 1,500

investors were owed more than $600 million on the securities they purchased from Aequitas.

The Aequitas Securities were sold in violation of the Oregon Securities Law; the securities were

not registered in compliance with Oregon law, and Aequitas sold Aequitas Securities by means

of untrue statements of material fact and omissions of material facts.  Aequitas' auditing firms,

Deloitte & Touche LLP and EisnerAmper LLP, and Aequitas' law firms, Sidley Austin LLP and

Tonkon Torp LLP, participated and aided in the unlawful sales of Aequitas Securities.  TD

Ameritrade, Inc., and Integrity Bank & Trust also participated and aided in the unlawful sales of

Aequitas Securities, and Integrity Bank & Trust successfully solicited the unlawful sales of

PAGE 1 – FIRST AMENDED CLASS ACTION COMPLAINT

Aequitas Securities.  As a result, Defendants are jointly and severally liable to return to all Aequitas investors the money they paid for the securities, plus interest at the rate stated in the security or 9 percent, whichever is greater.

2.      The misrepresentations and omissions by Aequitas are extensive and pervasive. The investments were represented to be secure, stable, and liquid.  Aequitas emphasized "strong asset coverage," and investors were told that the value of the Aequitas collateral backing their securities substantially exceeded the collective amount owed to security holders.  Aequitas represented that it had taken additional steps to reduce risk, including securing guarantees and recourse agreements and monitoring the assets on a monthly basis.  Investors were told that the money they invested would be used to purchase "stable" and valuable assets, primarily consisting of hospital and education receivables, from "financially strong institutions."  Aequitas represented that it maintained "an independent 'Conflicts Review Committee' to review and render opinions on" all inter-company transactions.  Aequitas touted that its investors "have enjoyed consistent quarterly interest payments with no loss of principal since 2003."  And they were told that their securities were liquid, meaning that investors could cash out of their investments if they chose to do so.  Each of those representations was false.

3.      In truth, there was nothing stable or secure about the investments.  For instance, the "financially strong" education institution that originated the student loans in which Aequitas invested was the very unstable, notorious for-profit Corinthian Colleges.  The collateral values reflected on its books and in financial statements provided to investors were highly inflated. Aequitas failed to write down the collateral values even when the assets were severely distressed or worthless.  Aequitas failed to disclose that a significant portion of investors' money was used to fund various Aequitas-related or -sponsored companies, without receiving fair value.  Nor did

PAGE 2 – FIRST AMENDED CLASS ACTION COMPLAINT

Aequitas disclose the substantial commissions it paid to Aequitas employees. Aequitas spent money lavishly, and Aequitas' business operations did not generate sufficient income to pay its obligations. Aequitas manufactured an appearance of financial strength by manipulating the value of assets carried on its books, frequently through inter-company transactions. Aequitas was dependent upon investor money—not to fund purchases of assets, as Aequitas represented, but to satisfy redemptions and interest payments to other investors.

4.      As time went by, Aequitas became increasingly insolvent and dependent upon new investor money. Rather than acknowledge its extensive problems, Aequitas implemented a facade. To the outside world, Aequitas was flying high, throwing lavish parties, opening expensive new offices, hiring new employees, traveling by private plane, and reporting impressive financial results. Aequitas knew, however, that it was increasingly dependent upon new investor money to meet its obligations and upon dissuading existing investors from redeeming their securities. By late 2015, Aequitas could not sell new securities fast enough; it ultimately was forced to admit that it could not satisfy investors' redemption requests or make interest payments, leading to the implosion of Aequitas, the termination of nearly all of its employees, a lawsuit by the Securities and Exchange Commission, and a request to have a receiver appointed to manage the disaster.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this class action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interests and costs; is a class action involving 100 or more class members; and at least one member of the Class is a citizen of a different state than a Defendant.

PAGE 3 – FIRST AMENDED CLASS ACTION COMPLAINT

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants reside in Oregon and in this District and a substantial part of the events and omissions giving rise to the claims occurred in this District.

7.      This Court has personal jurisdiction over Defendants pursuant to Rule 4(k)(1)(a) of the Federal Rules of Civil Procedure because Defendants are subject to the jurisdiction of the courts of general jurisdiction in this district.  Defendant Tonkon Torp LLP is a citizen of Oregon. The activities of Defendants Deloitte & Touche LLP, EisnerAmper LLP, and Sidley Austin LLP in Oregon and the services they each provided to persons in Oregon form the basis of the claims asserted against them in this complaint.  The services that TD Ameritrade, Inc., and Integrity Bank & Trust provided to persons in Oregon form the basis of the claims asserted against them in this complaint.

## PARTIES

### Plaintiffs

8.      Plaintiff Lawrence P. Ciuffitelli, a resident of California, acting for himself and in his capacity as trustee of the Ciuffitelli Revocable Trust U/A 5/1/1996 ("Ciuffitelli"), purchased securities from Aequitas in the total principal amount of $2.5 million.

9.      Plaintiffs Greg and Angela Julien, residents of California, acting in their capacities as trustees of the Gregory and Angela Julien Revocable Trust U/A 7/2/2012 (the "Juliens"), purchased securities from Aequitas in the total principal amount of $375,000.

10.     Plaintiff R. F. MacDonald Co. ("RFMC"), a California corporation with its principal place of business in Hayward, California, purchased securities from Aequitas in the total principal amount of more than $4.7 million.

PAGE 4 – FIRST AMENDED CLASS ACTION COMPLAINT

11.     Plaintiffs James and Susan MacDonald, residents of California, acting as co-trustees of the MacDonald Family Trust U/A 12/05/2000 (the "MacDonalds"), purchased securities from Aequitas in the total principal amount of $2 million.

12.     Plaintiff Andrew Nowak, a resident of Oregon, acting for himself and in his capacity as trustee of the Andrew Nowak Revocable Living Trust U/A 2/20/2002 ("Nowak"), purchased securities from Aequitas in the total principal amount of $2.1 million.

13.     Plaintiff William Ramstein ("Ramstein"), a resident of California, purchased securities from Aequitas in the total principal amount of $1.945 million.

14.     Plaintiffs Greg and Susan Warrick, residents of California, acting as co-trustees of the Warrick Family Trust, and plaintiff Greg Warrick, acting for himself, purchased securities from Aequitas in the total principal amount of $151,200.

**Defendants**

15.     Defendant Deloitte & Touche LLP ("Deloitte") is a Delaware limited liability partnership registered to do business in Oregon.  Deloitte performed auditing and accounting services for Aequitas in connection with securities that are at issue in this action.  Deloitte prepared audited financial statements for Aequitas for the years 2013 and 2014.  These audited financial statements were provided to prospective investors and existing investors deciding whether to invest or re-invest.  The audited financial statements were a material part of the information made available to investors and the existence of an auditor gave Aequitas clout.  Indeed, the offering documents for Aequitas Securities prominently identified Deloitte as Aequitas' auditor.

16.     Defendant EisnerAmper LLP is a New York limited liability partnership registered to do business in Oregon, and the successor by merger to Harb Levy & Weiland LLP

PAGE 5 – FIRST AMENDED CLASS ACTION COMPLAINT

("EisnerAmper").  EisnerAmper performed auditing and accounting services for Aequitas in connection with securities that are at issue in this action.  EisnerAmper prepared audited financial statements for Aequitas for the years 2011 and 2012.  These audited financial statements were provided to prospective investors and existing investors deciding whether to invest or re-invest.  The audited financial statements were a material part of the information made available to investors and the existence of an auditor gave Aequitas clout.  Indeed, the offering documents for Aequitas Securities prominently identified EisnerAmper as Aequitas' auditor.

17.    Defendant Sidley Austin LLP ("Sidley") is an Illinois limited liability partnership.  Sidley is an international business law firm that provided legal services to Aequitas in connection with the sale of securities that are at issue in this action.  On information and belief, Sidley advised Aequitas with respect to the sale of its securities and prepared legal papers necessary for Aequitas to complete the sale of its securities, including offering documents, risk disclosures, and subscription agreements.  Sidley prepared these documents with knowledge that Aequitas would sell the subject securities.  The Aequitas Securities could not have been sold without the legal services that Sidley provided.

18.    Defendant Tonkon Torp LLP ("Tonkon") is an Oregon limited liability partnership.  Tonkon is a law firm with offices in Portland.  At all material times, Tonkon provided legal services to Aequitas in connection with the sale of securities that are at issue in this action.  On information and belief, Tonkon advised Aequitas with respect to the sale of its securities and prepared legal papers necessary for Aequitas to complete the sale of its securities, including offering documents, risk disclosures, subscription agreements and promissory notes.  Tonkon prepared these documents with knowledge that Aequitas would sell the subject

PAGE 6 – FIRST AMENDED CLASS ACTION COMPLAINT

securities.  The Aequitas Securities could not have been sold without the legal services that Tonkon provided.

19.      Defendant TD Ameritrade, Inc. ("TDAmeritrade") is a New York corporation registered to do business in Oregon.  TDAmeritrade served as custodian for certain Aequitas Securities, and TDAmeritrade, as part of its financial advisor referral program, recommended and referred investors to financial advisors for the purpose of purchasing Aequitas Securities. TDAmeritrade began its practice of recommending and referring investors to financial advisors for the purpose of purchasing Aequitas Securities prior to 2011.

20.      Defendant Integrity Bank & Trust ("Integrity") is a Colorado commercial bank. Integrity served as the custodian for certain Aequitas fundraising entities.  Integrity also actively offered and solicited the sale of certain Aequitas Securities on Aequitas' behalf.

## FACTUAL ALLEGATIONS

## I.      THE AEQUITAS ENTITIES

21.      Aequitas conducted its securities and other business activities through various affiliated entities.  The complex organizational structure, consisting of approximately 75 active entities, aided Aequitas in hiding the true nature of Aequitas' business.

22.      Aequitas Management, LLC ("Aequitas Management") is the parent entity of the affiliated Aequitas entities.  Aequitas Management presently owns 84 percent of Aequitas Holdings, LLC ("Holdings"), which presently is the sole owner and member of Aequitas Commercial Finance, LLC, and the sole shareholder of Aequitas Capital Management, Inc.

23.      Aequitas Commercial Finance, LLC ("ACF"), a wholly owned subsidiary of Holdings, owns all or part of numerous Aequitas entities, including Aequitas Income Protection Fund, LLC ("AIPF"), Aequitas Income Opportunity Fund, LLC ("AIOF"), Aequitas Income

PAGE 7 – FIRST AMENDED CLASS ACTION COMPLAINT

Opportunity Fund II, LLC ("AIOF-II"), Aequitas Capital Opportunities Fund, LP ("ACOF"), Aequitas ETC Founders Fund, LLC ("AETC"), Aequitas Enhanced Income Fund, LLC ("AEIF"), and MotoLease Financial, LLC ("AMLF").

24.    Aequitas Capital Management, Inc. ("ACM"), another wholly owned subsidiary of Holdings, is the manager of numerous Aequitas entities, including ACF and AMLF.  As such, ACM oversees the operations and investment decisions of ACF and AMLF in exchange for certain management fees and other interests.

25.    Aequitas Investment Management, LLC ("AIM"), a wholly owned subsidiary of ACM and an SEC-registered investment adviser, is the manager of AIPF, AIOF, AIOF-II, AETC, AEIF, Aequitas Private Client Fund, LLC ("APCF"), and Aequitas Capital Opportunities GP, LLC, the general partner of ACOF ("ACOFGP").  As such, ACM oversees, and at all material times oversaw, the operations and investment decisions of AIPF, AIOF, AIOF-II, AETC, AEIF, APCF, and ACOF (collectively, the "Aequitas Funds") in exchange for certain management fees and other interests.

## II.    THE AEQUITAS SECURITIES

26.    Aequitas raised hundreds of millions of dollars from thousands of investors by selling securities issued by ACF, the Aequitas Funds, and AMLF (collectively, the "Aequitas Securities").  None of the Aequitas Securities were registered under any state or federal securities law.

27.    Aequitas raised investor funds by causing ACF to sell securities (the "ACF Notes") directly to investors through the so-called Aequitas "Private Note" program.  Aequitas generally referred to the ACF Notes as "Secured Subordinated Promissory Notes."  The sale of the ACF Note securities was the primary means by which Aequitas raised investor funds.  As of

PAGE 8 – FIRST AMENDED CLASS ACTION COMPLAINT

December 31, 2015, approximately $312 million in ACF Notes were outstanding to more than

1,500 investors.

28.     Aequitas raised additional investor funds by causing the sale of securities through

other Aequitas entities, including the Aequitas Funds and AMLF.  Aequitas generally referred to

the securities sold through AIPF (the "AIPF Interests") as "Limited Liability Company Interests".

Aequitas generally referred to the securities sold through AIOF (the "AIOF Notes") as "Senior

Secured Promissory Notes".  Aequitas generally referred to the securities sold through AIOF-II

(the "AIOF-II Notes") as "Senior Secured Promissory Notes".  Aequitas generally referred to the

securities sold through AMLF (the "AMLF Notes") as "Senior Secured Promissory Notes".

Aequitas generally referred to the securities sold through AEIF (the "AEIF Interests") as

"Limited Liability Company Interests".  Aequitas generally referred to the securities sold through

APCF (the "APCF Notes") as "Secured Promissory Notes".  Aequitas generally referred to the

securities sold through ACOF (the "ACOF Interests") as "Capital Commitments".  Aequitas

caused the sale of more than $300 million in securities through the Aequitas Funds and AMLF.

29.     Although they were represented by Aequitas as being separate and distinct from

the Aequitas "Private Note" program, the securities sold through the Aequitas Funds and AMLF

were fundamentally integrated with the ACF Notes offering.  ACF owned all of the equity

interests in AIOF, AIOF-II, AEIF, and AMLF, and all of the voting interests in AIPF, and ACF

expressly guaranteed all of the notes sold by AMLF.  Aequitas created ACOF for the purpose of

swapping investor funds for ownership interests in certain Aequitas entities—Aequitas caused

ACF and Holdings to contribute those ownership interests to ACOF at inflated values, and

Aequitas then caused investor funds to be distributed out of ACOF to ACF and Holdings based

on those inflated contributions.  Many of the ACOF portfolio companies were entirely dependent

PAGE 9 – FIRST AMENDED CLASS ACTION COMPLAINT

on ongoing ACF financing.  Furthermore, Aequitas created both AEIF and AIOF-II for the sole

purpose of funneling investor funds to ACF and its affiliates, and that ultimately became the sole

function of AIOF and AIPF as well—as of December 31, 2014, their only assets were

approximately $33 million and $37 million, respectively, in loans to ACF and certain of its

affiliates.  The integrated nature of these offerings was reflected in the audited financial

statements of ACF, which were done on a consolidated basis and encompassed ACF, AIPF,

AIOF, AIOF-II, AEIF, ACOF, and AMLF, as well as numerous other Aequitas entities.

      30.    Defendants were integral to Aequitas' securities offerings.  For example:

      (a)  EisnerAmper acted as the auditor for numerous Aequitas investment vehicles,

including ACF; AIPF; AIOF; AETC; Aequitas Carepayment Founders Fund, LLC; Aequitas

Carepayment Fund, LLC; Aequitas Catalyst Fund, LLC; Aequitas Commodities Fund, LLC;

Aequitas Hybrid Fund, LLC; Aequitas Income Fund, LLC; and Aequitas Insurance Fund I, LLC.

EisnerAmper audited the consolidated financial statements of ACF, which encompassed ACF as

well as the following Aequitas entities: CarePayment, LLC; CP Funding I, LLC; CA Medical,

LLC; ASFG, LLC; CR Funding I, LLC; Destination Capital Equipment Finance, LLC; EC

Hangar, LLC; Aequitas North American Finance, Inc.; Aequitas Equipment Finance, LLC; CP

Leverage I, LLC; Aequitas CarePayment Fund, LLC; Aequitas Income Fund, LLC; AIOF; AIPF;

and AMLF.

      (b)  Deloitte acted as the auditor for numerous Aequitas investment vehicles,

including ACF; AIPF; AIOF; AIOF-II; ACOF; AETC; AEIF; Aequitas Carepayment Fund,

LLC; Aequitas Hybrid Fund, LLC; and Aequitas WRFF I, LLC.  Deloitte audited the

consolidated financial statements of ACF, which encompassed ACF as well as the following

Aequitas entities: CarePayment, LLC; CP Funding I, LLC; CA Medical, LLC; Campus Student

PAGE 10 – FIRST AMENDED CLASS ACTION COMPLAINT

Funding, LLC; Destination Capital Equipment Finance, LLC; The Hill Land Company, LLC; EC

Hangar, LLC; Aequitas North American Finance, Inc.; Aequitas Equipment Finance, LLC; CP

Leverage I, LLC; CSF Leverage I, LLC; Aequitas CarePayment Fund, LLC; Aequitas Income

Fund, LLC; AIOF; AIOF-II; AIPF; AEIF; ACOF; and AMLF.

       (c) Tonkon provided legal services to Aequitas in connection with the sale of its

securities, including through ACF; AIOF; AIOF-II; AIPF; AEIF; ACOF; and AMLF, and

prepared legal papers necessary for Aequitas to complete the sale of its securities, including

through ACF; AIOF; AIOF-II; AIPF; AEIF; ACOF; and AMLF.  Tonkon provided legal services

to AIM in connection with AIM's role as an SEC-registered investment adviser and the manager

of numerous Aequitas investment vehicles, including ACF; AIPF; AIOF; AIOF-II; ACOF

(through its role as manager of Aequitas Capital Opportunities GP, LLC, the general partner of

ACOF); AETC; AEIF; APCF; Aequitas Carepayment Founders Fund, LLC; Aequitas

Carepayment Fund, LLC; Aequitas Catalyst Fund, LLC; Aequitas Commodities Fund, LLC;

Aequitas Hybrid Fund, LLC; Aequitas Income Fund, LLC; Aequitas Insurance Fund I, LLC; and

Aequitas WRFF I, LLC.

       (d) Sidley provided legal services to Aequitas in connection with the sale of its

securities, including through ACOF, and prepared legal papers necessary for Aequitas to

complete the sale of its securities, including through ACOF.  Sidley provided legal services to

AIM in connection with AIM's role as an SEC-registered investment adviser and the manager of

numerous Aequitas investment vehicles, including ACF; AIPF; AIOF; AIOF-II; ACOF (through

its role as manager of Aequitas Capital Opportunities GP, LLC, the general partner of ACOF);

AETC; AEIF; Aequitas Carepayment Fund, LLC; Aequitas Hybrid Fund, LLC; and Aequitas

WRFF I, LLC.  Sidley provided other legal services to Aequitas, including legal opinions and

PAGE 11 – FIRST AMENDED CLASS ACTION COMPLAINT

other legal services that enabled Aequitas to isolate its health care receivable assets from

investors and to pledge those assets as collateral securing Aequitas' $100 million loan facility

with Wells Fargo Bank, NA, which promoted the illusion of success and legitimacy that

Aequitas required in order to perpetuate its ongoing efforts to take money from investors.

(e)  TDAmeritrade served as custodian for certain Aequitas Securities, and

TDAmeritrade as part of its financial advisor referral program, recommended and referred

investors to financial advisors for the purpose of purchasing Aequitas Securities.

(f)  Integrity served as the custodian for certain Aequitas fundraising vehicles,

including ACF; AIOF; AIPF; ACOF; AEIF; AETC; Aequitas Hybrid Fund, LLC; and Aequitas

WRFF I, LLC.  Integrity also actively offered and solicited the sale of AIOF-II Notes and the

ACF Notes on Aequitas' behalf.

### _The ACF Notes_

31.     The ACF Notes were not registered under any state or federal securities law.

32.     ACF Notes were sold pursuant to a private placement memorandum (the "ACF

PPM"), including the ACF PPM dated December 1, 2011, the ACF PPM dated March 1, 2013,

the ACF PPM dated November 30, 2013, and the ACF PPM dated October 16, 2014.  On

information and belief, Tonkon provided legal services to Aequitas and ACF in connection with

the ACF PPM, including drafting portions of the ACF PPM and performing a legal review of the

contents of the ACF PPM.  With Tonkon's knowledge and approval, the ACF PPM prominently

identified Tonkon as legal counsel in connection with the offering and sale of the ACF Notes.

Investors purchased ACF Notes by completing and submitting a form subscription agreement to

ACF.  On information and belief, Tonkon prepared or participated in the preparation or review of

the form subscription agreement completed and submitted by purchasers of ACF Notes as well

PAGE 12 – FIRST AMENDED CLASS ACTION COMPLAINT

as the form of note employed by ACF to evidence the investors' investments.  Aequitas approved

the disclosures contained in the ACF PPM and controlled the distribution of the ACF PPM.

33.    Investors and potential investors received the audited annual financial statements

of ACF for the years ended December 31, 2011 and 2012.  EisnerAmper audited these financial

statements.  With EisnerAmper's knowledge and consent, during at least 2011 to 2013, the ACF

PPM identified EisnerAmper as the auditor as the auditor in connection with the offering and

sale of the ACF Notes.

34.    Investors and potential investors received the audited annual financial statements

of ACF for the years ended December 31, 2013 and 2014.  Deloitte audited these financial

statements.  With Deloitte's knowledge and consent, from 2013 forward, the ACF PPM

identified Deloitte as the auditor in connection with the offering and sale of the ACF Notes.

35.    In addition to the ACF PPM and ACF audited financials, investors and potential

investors received promotional materials, quarterly updates, and other materials and information.

Certain of these materials and information highlighted the role of Tonkon, Deloitte, and

EisnerAmper in providing professional services to ACF and Aequitas.  Aequitas approved the

content and controlled the distribution of such materials.

36.    Integrity successfully solicited the sale of certain ACF Notes.  Investors

purchasing those ACF Notes completed subscription agreements and custody agreements, which

were prepared by and returned to Integrity.  Integrity served and continues to serve as custodian

for those ACF Notes, and receives a fee for doing so.

37.    TDAmeritrade served as custodian for certain ACF Notes.  In that capacity,

TDAmeritrade recommended and referred certain investors to financial advisors for the purpose

PAGE 13 – FIRST AMENDED CLASS ACTION COMPLAINT

of purchasing ACF Notes.  On information and belief, TDAmeritrade provided its custodial

services to Aequitas investors at a discounted rate.

### *The AIPF Interests*

38.     The AIPF Interests were not registered under any state or federal securities law.

39.     AIPF Interests were sold pursuant to a private placement memorandum (the

"AIPF PPM"), including the AIPF PPM dated June 1, 2012.  On information and belief, Tonkon

provided legal services to Aequitas and AIPF in connection with the AIPF PPM, including

drafting portions of the AIPF PPM and performing a legal review of the contents of the AIPF

PPM.  With Tonkon's knowledge and approval, the AIPF PPM prominently identified Tonkon as

legal counsel in connection with the offering and sale of the AIPF Interests.  Investors purchased

AIPF Interests by completing and submitting a form subscription agreement to AIPF.  On

information and belief, Tonkon prepared or participated in the preparation or review of the form

subscription agreement completed and submitted by purchasers of AIPF Interests as well as the

documents employed to evidence the investors' investments in AIPF Interests.  Aequitas

approved the disclosures contained in the AIPF PPM and controlled the distribution of the AIPF

PPM.

40.     At least as early as 2014, Sidley provided legal services to AIM, the manager of

AIPF, who oversaw the operations and investment decisions of AIPF in exchange for certain

management fees and other interests.

41.     Investors and potential investors received the audited annual financial statements

of AIPF for the years ended December 31, 2011 and 2012.  EisnerAmper audited these financial

statements.  With EisnerAmper's knowledge and consent, during at least 2012 and 2013 the

PAGE 14 – FIRST AMENDED CLASS ACTION COMPLAINT

AIPF PPM identified EisnerAmper as the auditor as the auditor in connection with the offering and sale of the AIPF Interests.

42.    Investors and potential investors received the audited annual financial statements of AIPF for the years ended December 31, 2013, and December 31, 2014.  Deloitte audited these financial statements.  With Deloitte's knowledge and consent, from 2013 forward, the AIPF PPM identified Deloitte as the auditor in connection with the offering and sale of the AIPF Interests.

43.    In addition to the AIPF PPM and AIPF audited financials, investors and potential investors received promotional materials, quarterly updates, and other materials and information. Certain of these materials and information highlighted the role of Tonkon, Deloitte, and EisnerAmper in providing professional services to AIPF and Aequitas.  Aequitas approved the content and controlled the distribution of such materials.

### *The AIOF Notes*

44.    The AIOF Notes were not registered under any state or federal securities law.

45.    AIOF Notes were sold pursuant to a private placement memorandum (the "AIOF PPM"), including the AIOF PPM dated March 23, 2010.  On information and belief, Tonkon provided legal services to Aequitas and AIOF in connection with the AIOF PPM, including drafting portions of the AIOF PPM and performing a legal review of the contents of the AIOF PPM.  With Tonkon's knowledge and approval, the AIOF PPM prominently identified Tonkon as legal counsel in connection with the offering and sale of the AIOF Notes.  Investors purchased AIOF Notes by completing and submitting a form subscription agreement to AIOF.  On information and belief, Tonkon prepared or participated in the preparation or review of the form subscription agreement completed and submitted by purchasers of AIOF Notes as well as the

PAGE 15 – FIRST AMENDED CLASS ACTION COMPLAINT

documents employed to evidence the investors' investments in AIOF Notes. Aequitas approved the disclosures contained in the AIOF PPM and controlled the distribution of the AIOF PPM.

46.     At least as early as 2014, Sidley provided legal services to AIM, the manager of AIOF, who oversaw the operations and investment decisions of AIOF in exchange for certain management fees and other interests.

47.     Investors and potential investors received the audited annual financial statements of AIOF for the years ended December 31, 2011 and 2012. EisnerAmper audited these financial statements. With EisnerAmper's knowledge and consent, during at least 2012 and 2013 the AIOF PPM identified EisnerAmper as the auditor as the auditor in connection with the offering and sale of the AIOF Notes.

48.     Investors and potential investors received the audited annual financial statements of AIOF for the years ended December 31, 2013, and December 31, 2014. Deloitte audited these financial statements. With Deloitte's knowledge and consent, from 2013 forward, the AIOF PPM identified Deloitte as the auditor in connection with the offering and sale of the AIOF Notes.

49.     In addition to the AIOF PPM and AIOF audited financials, investors and potential investors received promotional materials, quarterly updates, and other materials and information. Certain of these materials and information highlighted the role of Tonkon, Deloitte, and EisnerAmper in providing professional services to AIOF and Aequitas. Aequitas approved the content and controlled the distribution of such materials.

### *The AIOF-II Notes*

50.     The AIOF-II Notes were not registered under any state or federal securities law.

PAGE 16 – FIRST AMENDED CLASS ACTION COMPLAINT

51.     AIOF-II Notes were sold pursuant to a private placement memorandum (the

"AIOF-II PPM"), including the AIOF-II PPM dated October 1, 2014.  On information and belief,

Tonkon provided legal services to Aequitas and AIOF-II in connection with the AIOF-II PPM,

including drafting portions of the AIOF-II PPM and performing a legal review of the contents of

the AIOF-II PPM.  With Tonkon's knowledge and approval, the AIOF-II PPM prominently

identified Tonkon as legal counsel in connection with the offering and sale of the AIOF Notes.

Investors purchased AIOF-II Notes by completing and submitting a form subscription agreement

to AIOF-II.  On information and belief, Tonkon prepared or participated in the preparation or

review of the form subscription agreement completed and submitted by purchasers of AIOF-II

Notes as well as the documents employed to evidence the investors' investments in AIOF-II

Notes.  Aequitas approved the disclosures contained in the AIOF-II PPM and controlled the

distribution of the AIOF-II PPM.

52.     At least as early as 2014, Sidley provided legal services to AIM, the manager of

AIOF-II, who oversaw the operations and investment decisions of AIOF-II in exchange for

certain management fees and other interests.

53.     Investors and potential investors received the audited annual financial statements

of AIOF-II for the year ended December 31, 2014.  Deloitte audited these financial statements.

With Deloitte's knowledge and consent, from 2014 forward, the AIOF-II PPM identified Deloitte

as the auditor in connection with the offering and sale of the AIOF-II Notes.

54.     In addition to the AIOF-II PPM and AIOF-II audited financials, investors and

potential investors received promotional materials, quarterly updates, and other materials and

information.  Certain of these materials and information identified Tonkon and Deloitte and

PAGE 17 – FIRST AMENDED CLASS ACTION COMPLAINT

highlighted their provision of professional services to AIOF-II and Aequitas.  Aequitas approved the content and controlled the distribution of such materials.

55.    Integrity successfully solicited the sale of certain AIOF-II Notes.  Investors purchasing those AIOF-II Notes completed subscription agreements and custody agreements, which were prepared by and returned to Integrity.  Integrity served and continues to serve as custodian for those AIOF-II Notes, and receives a fee for doing so.

### *The ACOF Interests*

56.    The ACOF Interests were not registered under any state or federal securities law.

57.    ACOF Interests were sold pursuant to a private placement memorandum (the "ACOF PPM"), including the ACOF PPM dated February 2014.  On information and belief, Sidley provided legal services to Aequitas, AIM, ACOF,  and the general partner of ACOF in connection with the ACOF PPM, including drafting portions of the ACOF PPM and performing a legal review of the contents of the ACOF PPM.  Investors purchased ACOF Interests by completing and submitting a form subscription agreement to ACOF.  On information and belief, Sidley prepared or participated in the preparation or review of the form subscription agreement completed and submitted by purchasers of ACOF Interests as well as the documents employed to evidence the investors' investments in ACOF Interests.  Aequitas approved the disclosures contained in the ACOF PPM and controlled the distribution of the ACOF PPM.

58.    Investors and potential investors received the audited annual financial statements of ACOF for the year ended December 31, 2014.  Deloitte audited these financial statements. With Deloitte's knowledge and consent, from 2014 forward, the ACOF PPM identified Deloitte as the auditor in connection with the offering and sale of the ACOF Interests.

PAGE 18 – FIRST AMENDED CLASS ACTION COMPLAINT

59.     In addition to the ACOF PPM and ACOF audited financials, investors and potential investors received promotional materials, quarterly updates, and other materials and information.  Certain of these materials and information identified Sidley and Deloitte and highlighted their provision of professional services to ACOF and Aequitas.  Aequitas approved the content and controlled the distribution of such materials.

### *The AEIF Interests*

60.     The AEIF Interests were not registered under any state or federal securities law.

61.     AEIF Interests were sold pursuant to a private placement memorandum (the "AEIF PPM").  On information and belief, Tonkon provided legal services to Aequitas and AEIF in connection with the AEIF PPM, including drafting portions of the AEIF PPM and performing a legal review of the contents of the AEIF PPM.  With Tonkon's knowledge and approval, the AEIF PPM prominently identified Tonkon as legal counsel in connection with the offering and sale of the AEIF Interests.  Investors purchased AEIF Interests by completing and submitting a form subscription agreement to AEIF.  On information and belief, Tonkon prepared or participated in the preparation or review of the form subscription agreement completed and submitted by purchasers of AEIF Interests as well as the documents employed to evidence the investors' investments in AEIF Interests.  Aequitas approved the disclosures contained in the AEIF PPM and controlled the distribution of the AEIF PPM.

62.     At least as early as 2014, Sidley provided legal services to AIM, the manager of AEIF, who oversaw the operations and investment decisions of AEIF in exchange for certain management fees and other interests.

PAGE 19 – FIRST AMENDED CLASS ACTION COMPLAINT

63.    Deloitte acted as the auditor of AEIF.  With Deloitte's knowledge and consent, from 2014 forward, the AEIF PPM identified Deloitte as the auditor in connection with the offering and sale of the AEIF Interests.

### *Plaintiffs' Purchases of Aequitas Securities*

64.    Plaintiff Ciuffitelli purchased the following securities from Aequitas:

(a)  In May 2013, Ciuffitelli purchased three ACF Notes from Aequitas, each in the total principal amount of $750,000, all with interest at the annual rate of 11 percent, and with maturity dates of May 2016, May 2017, to May 2018, respectively.

(b)  In February 2015, Ciuffitelli purchased ACOF Interests from Aequitas in the total principal amount of $750,000.

(c)  In September 2015, Ciuffitelli purchased an AMLF Note from Aequitas in the principal amount of $1.0 million.  In December 2015, Aequitas induced Ciuffitelli to extend the maturity date of that AMLF Note.

65.    In 2012, plaintiffs the Juliens purchased an AIOF Note from Aequitas in the principal amount of $375,000.  In October 2015, the Juliens used the funds they had invested in that AIOF Note to purchase an ACF Note from Aequitas, again in the amount of $375,000, with interest at the annual rate of 11 percent and an October 2019 maturity date.

66.    Plaintiff RFMC purchased the following securities from Aequitas:

(a)  In March 2013, RFMC purchased an AIOF Note from Aequitas in the total principal amount of $300,000, with interest at the annual rate of 10 percent and an April 2016 maturity date.

PAGE 20 – FIRST AMENDED CLASS ACTION COMPLAINT

(b) In February 2015, RFMC purchased an ACF Note from Aequitas in the total principal amount of $3,134,781.18, with interest at the annual rate of 10 percent and a February 2016 maturity date.

(c) In April 2015, RFMC purchased an additional ACF Note from Aequitas in the principal amount of $300,000, with interest at the annual rate of 11 percent and a maturity date of November 2017.

(d) In September 2015, RFMC purchased an AMLF Note from Aequitas in the principal amount of $1,000,000, with interest at the annual rate of 13 percent to be paid at its December 2015 maturity.  In December 2015, Aequitas induced RFMC to extend the maturity date of that AMLF Note to June 2016.

67.    Plaintiffs the MacDonalds purchased the following securities from Aequitas:

(a) In April 2015, the MacDonalds purchased two ACF Notes from Aequitas in the total principal amount of $1.0 million, with interest at annual rates of 9.5 and 11 percent and maturity dates of December 2015 and November 2017, respectively.

(b) In July 2012, the MacDonalds purchased an AIOF Note from Aequitas in the principal amount of $500,000, with interest at the annual rate of 10 percent and an April 2016 maturity date.

(c) In September 2015, the MacDonalds purchased an AMLF Note from Aequitas in the principal amount of $500,000, with interest at the annual rate of 13 percent and a December 2015 maturity date.  In December 2015, Aequitas induced the MacDonalds to extend the maturity date of that AMLF Note to June 2016.

68.    Plaintiff Nowak purchased the following securities from Aequitas:

PAGE 21 – FIRST AMENDED CLASS ACTION COMPLAINT

(a)  In February 2013, Nowak purchased AIPF Interests in the total principal amount of $500,000.  In May 2015, following the redemption of those AIPF Interests, Aequitas induced Nowak to purchase an ACF Note from Aequitas in the total principal amount of $500,000.

(b)  In May 2014, Nowak purchased an ACF Note from Aequitas in the principal amount of $1.6 million, with interest at the annual rate of 11 percent and a May 2018 maturity date.

69.    Plaintiff Ramstein purchased the following securities from Aequitas:

(a)  In July 2012, Ramstein purchased an ACF Note from Aequitas in the principal amount of $400,000, with interest at the annual rate of 10 percent and a July 2016 maturity date.

(b)  In August 2013, Ramstein purchased an ACF Note from Aequitas in the principal amount of $520,000, with interest at the annual rate of 11 percent and an August 2017 maturity date.

(c)  In March 2014, Ramstein purchased an ACF Note from Aequitas in the principal amount of $400,000, with interest at the annual rate of 10 percent and a March 2018 maturity date.

(d)  In September 2015, Ramstein purchased an ACF Note from Aequitas in the principal amount of $625,000, with interest at the annual rate of 5 percent and a March 2016 maturity date.

70.    Plaintiffs Greg and Susan Warrick purchased the following securities from Aequitas, all of which Integrity solicited on Aequitas' behalf:

PAGE 22 – FIRST AMENDED CLASS ACTION COMPLAINT

(a) In September 2015, Greg and Susan Warrick, acting as co-trustees of the Warrick Family Trust, purchased from Aequitas an interest in an AIOF-II Note in the principal amount of $94,000, with interest at the annual rate of 10 percent.

(b) In September 2015, Greg Warrick purchased from Aequitas an interest in an AIOF-II Note in the principal amount of $57,200, with interest at the annual rate of 10 percent.

## III.    AEQUITAS' MATERIAL OMISSIONS AND MISREPRESENTATIONS IN CONNECTION WITH ITS SALE OF THE AEQUITAS SECURITIES

71.    Aequitas was able to continue to attract investor funds only as a result of shifting investor funds and other assets amongst the numerous affiliated Aequitas companies in order to paint a rosy picture of the financial strength of the Aequitas companies generally, and of ACF, the Aequitas Funds, and AMLF in particular.

### *Omissions*

72.    Aequitas did not disclose that the ACF Notes were required to be registered under the Oregon Securities Law.

73.    Aequitas did not disclose that the AIOF Notes were required to be registered under the Oregon Securities Law.

74.    Aequitas did not disclose that the AIPF Interests were required to be registered under the Oregon Securities Law.

75.    Aequitas did not disclose that the ACOF Interests were required to be registered under the Oregon Securities Law.

76.    Aequitas did not disclose that the AIOF-II Notes were required to be registered under the Oregon Securities Law.

PAGE 23 – FIRST AMENDED CLASS ACTION COMPLAINT

77.     Aequitas did not disclose that the AEIF Interests were required to be registered under the Oregon Securities Law.

78.     Aequitas did not disclose that the AMLF Notes were required to be registered under the Oregon Securities Law.

79.     Aequitas omitted material facts concerning the nature and extent of the commissions and other compensation paid by Aequitas that was directly linked to the sale of ACF Notes.

80.     Aequitas omitted material facts concerning the nature and extent of the commissions and other compensation paid by Aequitas that was directly linked to the sale of AIOF Notes.

81.     Aequitas omitted material facts concerning the nature and extent of the commissions and other compensation paid by Aequitas that was directly linked to the sale of AIPF Interests.

82.     Aequitas omitted material facts concerning the nature and extent of the commissions and other compensation paid by Aequitas that was directly linked to the sale of ACOF Interests.

83.     Aequitas omitted material facts concerning the nature and extent of the commissions and other compensation paid by Aequitas that was directly linked to the sale of AIOF-II Notes.

84.     Aequitas omitted material facts concerning the nature and extent of the commissions and other compensation paid by Aequitas that was directly linked to the sale of AEIF Interests.

PAGE 24 – FIRST AMENDED CLASS ACTION COMPLAINT

85.     Aequitas omitted material facts concerning the nature and extent of the commissions and other compensation paid by Aequitas that was directly linked to the sale of AMLF Notes.

86.     Aequitas did not disclose that repayment of the ACF Notes was largely dependent on Aequitas' ability to bring in new investor funds.

87.     Aequitas did not disclose that repayment of the AIOF Notes was largely dependent on Aequitas' ability to bring in new investor funds.

88.     Aequitas did not disclose that repayment of the AIPF Interests was largely dependent on Aequitas' ability to bring in new investor funds.

89.     Aequitas did not disclose that repayment of the ACOF Interests was largely dependent on Aequitas' ability to bring in new investor funds.

90.     Aequitas did not disclose that repayment of the AIOF-II Notes was largely dependent on Aequitas' ability to bring in new investor funds.

91.     Aequitas did not disclose that repayment of the AEIF Interests was largely dependent on Aequitas' ability to bring in new investor funds.

92.     Aequitas did not disclose that repayment of the AMLF Notes was largely dependent on Aequitas' ability to bring in new investor funds.

93.     Aequitas did not disclose that a substantial portion of the investor funds realized from the sale of ACF Notes would be used to repay other investors in Aequitas Securities.

94.     Aequitas did not disclose that a substantial portion of the investor funds realized from the sale of AIOF Notes would be used to repay other investors in Aequitas Securities.

95.     Aequitas did not disclose that a substantial portion of the investor funds realized from the sale of AIPF Interests would be used to repay other investors in Aequitas Securities.

PAGE 25 – FIRST AMENDED CLASS ACTION COMPLAINT

96.     Aequitas did not disclose that a substantial portion of the investor funds realized from the sale of ACOF Interests would be used to repay other investors in Aequitas Securities.

97.     Aequitas did not disclose that a substantial portion of the investor funds realized from the sale of AIOF-II Notes would be used to repay other investors in Aequitas Securities.

98.     Aequitas did not disclose that a substantial portion of the investor funds realized from the sale of AEIF Interests would be used to repay other investors in Aequitas Securities.

99.     Aequitas did not disclose that a substantial portion of the investor funds realized from the sale of AMLF Notes would be used to repay other investors in Aequitas Securities.

100.    Aequitas omitted material facts concerning the nature and extent of the U.S. Consumer Financial Protection Bureau (the "CFPB") investigation into Aequitas' student loan program and receivables.

101.    Aequitas did not disclose that at least as early as mid-2015, Aequitas was the subject of an investigation by the U.S. Securities and Exchange Commission (the "SEC").

102.    Aequitas omitted material facts concerning the nature and extent of the SEC investigation of Aequitas.

103.    Aequitas did not disclose that its Carepayment Technologies, Inc. affiliate ("CPTI") had no *bona fide* economic function, that all of the operations and functions of CPTI were performed by ACM in exchange for certain fees, and that ACF was the source of the funds used by CPTI to pay those fees to ACM.

104.    Aequitas did not disclose that the claimed value of CPTI was based largely on the health care receivables owned by ACF through its wholly-owned subsidiary Carepayment, LLC ("CPLLC") and its affiliates.  Aequitas did not disclose that the value of ACF's loans to CPTI

PAGE 26 – FIRST AMENDED CLASS ACTION COMPLAINT

depended largely on the health care receivables owned by ACF (through CPLLC and its affiliates) and Aequitas' continued use of CPTI as a means to funnel funds from ACF to ACM.

105.    Aequitas did not disclose that ACF claimed as valuable assets (i) ACF's direct and indirect (through ACOF) ownership interest in CTPI, and (ii) the health care receivables owned by ACF (through CPLLC and its affiliates), in addition to (iii) the amounts outstanding on ACF's direct loans to CTPI.

106.    Aequitas did not disclose that the claimed collateral supporting the Aequitas Securities included (i) ACF's direct and indirect (through ACOF) ownership interest in CTPI, and (ii) the health care receivables owned by ACF (through CPLLC and its affiliates), in addition to (iii) the amounts outstanding on ACF's direct loans to CTPI.

107.    Aequitas did not disclose that it had pledged all of its health care receivables as collateral to secure loans to Aequitas from third party lenders.

108.    Aequitas did not disclose that its EDPlus Holdings, LLC affiliate ("EDPlus") had no *bona fide* economic function, that all of the operations and functions of EDPlus were performed by ACM in exchange for certain fees, and that ACF was the source of the funds used by EDPlus to pay those fees to ACM.

109.    Aequitas did not disclose that Corinthian Colleges, Inc. ("Corinthian") was its sole source of student loan receivables.

110.    Aequitas did not disclose that the claimed value of its EDPlus affiliate was based largely on the Corinthian student loan receivables purchased and owned by ACF through its wholly-owned subsidiary, ASFG, LLC, later renamed Campus Student Funding, LLC ("ASFG"). Aequitas did not disclose that the value of ACF's loans to EDPlus depended largely on the

PAGE 27 – FIRST AMENDED CLASS ACTION COMPLAINT

Corinthian student loan receivables and Aequitas' continued use of EDPlus as a means to funnel funds from ACF to ACM.

111.    Aequitas did not disclose that ACF claimed as valuable assets (i) ACF's indirect (through ACOF) ownership interest in EDPlus, and (ii) the Corinthian student loan receivables owned by ACF (through ASFG), in addition to (iii) the amounts outstanding on ACF's direct loans to EDPlus.

112.    Aequitas did not disclose that the claimed collateral supporting the Aequitas Securities included (i) ACF's indirect (through ACOF) ownership interest in EDPlus, and (ii) the Corinthian student loan receivables owned by ACF (through ASFG), in addition to (iii) the amounts outstanding on ACF's direct loans to EDPlus.

113.    Aequitas did not disclose that it had pledged the Corinthian student loan receivables as collateral to secure loans to Aequitas from third party lenders.

114.    Aequitas did not disclose that the value of the Corinthian student loan receivables depended largely on the ability of Corinthian to meet its recourse obligations to purchase any of the Corinthian student loan receivables owned by ACF (through ASFG) that failed to perform.

115.    Aequitas did not disclose the administrative, regulatory, legal, and public perception difficulties that were undermining and diminishing the viability of Corinthian's business model and Corinthian's ability to meet its resource obligations with respect to the Corinthian student loan receivables, including, for example:

(a) Aequitas did not disclose Congressional hearings and an investigation by the U.S. Government Accountability Office ("GAO") into the recruitment and enrollment practices of for-profit colleges, including Corinthian;

PAGE 28 – FIRST AMENDED CLASS ACTION COMPLAINT

(b) Aequitas did not disclose a GAO report released in 2010 concluding that for-profit colleges such as Corinthian engaged in fraudulent practices designed to recruit unqualified students and overcharge the federal government for their enrollment;

(c) Aequitas did not disclose a review of Corinthian's practices by Corinthian's academic accrediting agency;

(d) Aequitas did not disclose investigations into Corinthian's practices by the U.S. Department of Education, numerous state attorneys general, and the CFPB;

(e) Aequitas did not disclose the announcement of new federal regulations that threatened to cut off the flow of federal aid to Corinthian students--aid on which Corinthian's existence depended;

(f) Aequitas did not disclose the release of a Senate investigation sharply critical of the for-profit education industry, and Corinthian in particular;

(g) Aequitas did not disclose that by June 2013, Corinthian was being investigated by the SEC related to its business practices, including its student loan default rates, and that other governmental regulators were investigating Corinthian as well; and

(h) Aequitas did not disclose that by late 2013, it was clear that federal regulators were going to stop Corinthian's ability to obtain federal student loan financing for its students, which would be the death-knell of the company.

116.    Aequitas did not disclose that the 2014 civil charges brought against Corinthian and Corinthian's 2015 bankruptcy (i) raised the possibility that the entire Corinthian student loan portfolio might be rescinded, thereby wiping out any remaining value it might have; (ii) led to widespread refusals by former students to make loan payments and greatly increased the rates of default, and (iii) eliminated any possibility of recourse against Corinthian.

PAGE 29 – FIRST AMENDED CLASS ACTION COMPLAINT

117.    Aequitas did not disclose that the consumer credit receivables purchased by Aequitas (through ACF and other Aequitas affiliates) were largely subprime C+ and F+ consumer credit receivables (the "Freedom Financial Receivables").  Aequitas did not disclose that the C+ Freedom Financial Receivables comprised debt consolidation loans to persons who were insolvent or otherwise unable to meet their existing financial obligations.

118.    Aequitas did not disclose that it was exposed to the entire credit risk associated with the Freedom Financial Receivables, and that it had no recourse to any third party with respect to any default or nonperformance under the Freedom Financial Receivables.

119.    Aequitas did not disclose that it was leveraging investor funds to secure substantial additional third-party financing for its purchase of the Freedom Financial Receivables.  Aequitas did not disclose the nature, extent, or material terms of the third-party financing underlying its purchase of the Freedom Financial Receivables.

120.    Aequitas did not disclose that it had pledged the Freedom Financial Receivables as collateral to secure all or substantially all of the third-party financing underlying Aequitas' acquisition of the Freedom Financial Receivables.  Aequitas did not disclose that ACF had guaranteed the repayment of the third-party financing underlying Aequitas' acquisition of the Freedom Financial Receivables under certain circumstances.

121.    Aequitas did not disclose that the failure rate for the Freedom Financial Receivables was materially worse than the failure rate assumptions on which the third-party financing was based.  Aequitas did not disclose that the failure rate for the Freedom Financial Receivables was materially worse than the failure rate necessary for the viability of the Freedom Financial Receivables line of business.  Aequitas did not disclose that at least as early as mid-

PAGE 30 – FIRST AMENDED CLASS ACTION COMPLAINT

2015, the failure rate of the Freedom Financial Receivables caused Aequitas to be in default on the third-party financing underlying its purchase of the Freedom Financial Receivables.

122.    Aequitas did not disclose that the claimed value of its wholly-owned subsidiary ACC Holdings 1, LLC ("ACCH-1") and its affiliate ACC Holdings 2, LLC ("ACCH-2"), depended entirely on the performance of the Freedom Financial Receivables.  Aequitas did not disclose that the value of ACF's ownership interest in ACCH-1 depended entirely on the performance of the Freedom Financial Receivables owned by ACF through ACCH-1's wholly-owned subsidiary ACC Funding Trust 2014-1 ("ACCTrust-1").  Aequitas did not disclose that the value of ACF's loans to ACCH-2 depended entirely on the performance of the Freedom Financial Receivables owned by Aequitas through ACCH-2's wholly-owned subsidiary ACC Funding Trust 2014-2 ("ACCTrust-2").

123.    Aequitas did not disclose that it claimed as valuable assets (i) ACF's ownership interest in ACCH-1, and (ii) the Freedom Financial Receivables owned by ACF (through ACCTrust-1), in addition to (iii) the amounts outstanding on ACF's direct loans to ACCH-2.

124.    Aequitas did not disclose that the claimed collateral supporting the Aequitas Securities included (i) ACF's ownership interest in ACCH-1, and (ii) the Freedom Financial Receivables owned by ACF (through ACCTrust-1), in addition to (iii) the amounts outstanding on ACF's direct loans to ACCH-2.

125.    Aequitas did not disclose that the claimed value of its MotoLease, LLC, affiliate ("MotoLease") was based largely on its ability to continue to sell vehicle leases to ACF (through its wholly-owned subsidiary AMLF).

126.    Aequitas did not disclose that the claimed value of AMLF was based entirely on the value of the vehicle leases purchased from MotoLease.

PAGE 31 – FIRST AMENDED CLASS ACTION COMPLAINT

127.    Aequitas did not disclose that it was exposed to the entire credit risk associated with the MotoLease vehicle leases, and that it had no recourse to any third party with respect to any default or nonperformance under any of those leases.

128.    Aequitas did not disclose that ACF claimed as valuable assets both (i) ACF's direct and indirect (through ACOF) ownership interest in MotoLease, and (ii) the vehicle leases owned by ACF (through AMLF and its affiliates).

129.    Aequitas did not disclose that the claimed collateral supporting the Aequitas Securities included both (i) ACF's direct and indirect (through ACOF) ownership interest in MotoLease, and (ii) the vehicle leases owned by ACF (through AMLF and its affiliates).

130.    Aequitas did not disclose that it had pledged MotoLease vehicle leases as collateral to secure loans to Aequitas from third party lenders.

131.    Aequitas did not disclose that the claimed value of its ETC Global Group, LLC affiliate ("ETCGlobal") was based entirely on the continuing operations and performance of its indirect subsidiary Electronic Transaction Clearing, Inc. ("ETC"), a registered broker-dealer, in compliance with applicable laws and regulations.

132.    Aequitas did not disclose the administrative, regulatory, and legal difficulties that were undermining and diminishing the viability of ETC's continuing operations and performance, including, for example:

(a) Aequitas did not disclose (i) that during the period from 2009 to 2015, ETC was operating in violation of exchange rules, NASD Rule 3010, FINRA Rule 2010, and Section 15(c)(3) of the Securities Exchange Act of 1934 and Rule 15c3-5 thereunder by failing to establish and maintain an adequate system of risk management controls and supervisory procedures, and by failing to prevent its market access customers and their traders from

PAGE 32 – FIRST AMENDED CLASS ACTION COMPLAINT

executing thousands of potentially manipulative trades on the exchanges of which ETC was a member despite numerous red flags and repeated notice from regulators, (ii) the regulatory investigation concerning those violations, or (iii) the FINRA complaint filed against ETC with respect to those violations.

(b)  Aequitas did not disclose (i) that at least as early as 2012, ETC was operating in violation of the Bank Secrecy Act, 31 U.S.C. 5311 *et seq*. and the regulations promulgated thereunder by failing to establish and implement adequate anti-money-laundering ("AML") policies, procedures, and controls, or (ii) the regulatory investigation concerning those violations.

(c)  Aequitas did not disclose (i) that over a two-year period, ETC had misreported transactions to FINRA and the SEC in a manner that excluded critical information regarding suspicious transactions, or (ii) the regulatory investigation concerning those violations.

(d)  Aequitas did not disclose (i) that in October 2012 and again in April 2013, ETC was censured and fined for violations of FINRA Rule 7450(a), or (ii) that ETC had been operating in violation of that rule.

(e)  Aequitas did not disclose (i) that in December 2013, ETC was censured and fined for violations of EDGA Exchange rules, or (ii) that ETC had been operating in violation of those rules.

(f)  Aequitas did not disclose (i) that in January 2014, ETC was censured and fined for violations of SEC Rule 200(g) of Regulation SHO and NASDAQ Rules 2110, 3010, and 4755, or (ii) that ETC had been operating in violation of those rules.

(g)  Aequitas did not disclose (i) that in February 2014, ETC was censured and fined for violations of SEC Rule 17a-3, FINRA Rules 2010 and 7450, and NASD Rules 3010 and 3110, or (ii) that ETC had been operating in violation of those rules.

PAGE 33 – FIRST AMENDED CLASS ACTION COMPLAINT

(h) Aequitas did not disclose (i) that in April 2014, ETC was censured and fined for violations of EDGX Exchange rules, or (ii) that ETC had been operating in violation of those rules.

133.    Aequitas did not disclose regulatory and legal issues related to ACF's indirect subsidiary, Strategic Capital Alternatives, LLC, and its affiliates, including Strategic Capital Group, LLC.

134.    Aequitas did not disclose that the claimed value of its SCA Holdings, LLC, affiliate ("SCAH"), depended in part on the successful funneling of investor funds to Aequitas by the direct and indirect subsidiaries of SCAH, including the registered investment advisers Strategic Capital Alternatives, LLC; SAS Capital Management LLC; and Argentus Advisors, LLC.  Aequitas did not disclose that the value of ACF's loans to SCAH depended in part on the successful funneling of investor funds to Aequitas by the direct and indirect subsidiaries of SCAH.

135.    Aequitas did not disclose that ACF claimed as valuable assets both (i) ACF's ownership interest (through ACOF) in SCAH, and (ii) the amounts outstanding on ACF's direct loans to SCAH.

### *Misrepresentations and Omissions Regarding Use of Investor Funds*

136.    Investors received false information regarding the use of the proceeds of their investments.  The written investment materials stated that funds invested would be used primarily to fund the purchase of receivables.  In truth, an increasing majority of funds raised from investors was used to pay redemptions and interest payments to other investors.

137.    For example, the ACF PPM dated November 30, 2013, contained the false statement that "[t]he Company generally pays the principal and interest of Secured Notes from

PAGE 34 – FIRST AMENDED CLASS ACTION COMPLAINT

the proceeds from repayments of loans, leases, subordinated debt investments and similar assets of the Company and sales of Company assets."  The ACF PPM goes on to state, falsely, that new investor money may be used "[f]rom time to time" to pay principal and interest to prior investors. The PPM falsely attributed the use of new investor money to satisfy obligations to prior investors to "the illiquid nature of many of the Company's investments and to the Company's ongoing efforts to reduce its weighted average cost of capital by, in part, replacing Secured Notes bearing higher interest rates with Secured Notes bearing lower interest rates."

138.    The AIOF PPM dated March 23, 2010, contained the false and misleading statement that AIOF intended to use "substantially all of its assets" to "[p]urchase or participate in financing the purchase of portfolios of [healthcare receivables]" or to "[o]riginate, purchase or participate in non-healthcare senior secured loans and receivables" but that "[p]roceeds from the [AIOF] Notes may also be used to pay redemptions of previously issued Notes and to provide for the Fund's working capital needs."  Among other reasons, that statement was false and misleading because AIOF served as a source of unrestricted funds for ACF and Aequitas, and ACF and Aequitas intended to and did use those funds for purposes other than those stated in the AIOF PPM, including paying redemptions of Aequitas Securities other than AIOF Interests. Later AIOF promotional materials make no mention of the use of investor funds to pay redemptions, instead describing an investment strategy of "purchasing, participating in, or originating receivables, loans, and leases at discounted prices."

139.    The AIPF PPM dated June 1, 2012, contained the false and misleading statement that AIPF intended to use "substantially all of its assets" to "[p]urchase or participate in financing the purchase of portfolios [of recourse student loan or healthcare receivables]" or to "[o]riginate, purchase or participate in other senior secured loans, leases and receivables" but that "[p]roceeds

PAGE 35 – FIRST AMENDED CLASS ACTION COMPLAINT

from [AIPF] Interests may also be used to pay for redemptions of previously issued [AIPF] Interests and to provide for the Fund's working capital needs."  Among other reasons, that statement was false and misleading because AIPF served as a source of unrestricted funds for ACF and Aequitas, and ACF and Aequitas intended to and did use those funds for purposes other than those stated in the AIPF PPM, including paying redemptions of Aequitas Securities other than AIPF Interests.

140.    The AIOF-II PPM dated October 1, 2014, falsely omitted from its description of the "Use of Proceeds" any mention of Aequitas' intent to use investor funds to repay other investors.  Instead, the AIOF-II PPM falsely stated that investor funds would be used to finance ACF's "purchase of portfolios of Credit Strategy Receivables", which the AIOF-II PPM defined to include "Consumer loans", "Small business leases or loans", "Real estate financing loans", "Healthcare receivables", "Education receivables", "Corporate loans", and "Transportation-backed leases or loans".  The AEIF PPM dated January 26, 2015, also falsely omitted from its description of the "Use of Proceeds" any mention of Aequitas' intent to use investor funds to repay other investors.  Like the AIOF-II PPM, the AEIF PPM falsely stated that investor funds would be used to finance the acquisition by ACF (or its affiliates) of "of portfolios of Credit Strategy Receivables", which the AEIF PPM defined to include "Consumer loans", "Small business leases or loans", "Healthcare receivables", "Education receivables", "Corporate loans", and "Other programs consistent with the Fund strategy".  The ACOF PPM dated February 2014 also failed to properly disclose Aequitas' intent to use the proceeds of its sales of ACOF Interests to fund the repayment of other investors.  Aequitas made no meaningful disclosures at all in connection with its sale of the AMLF Notes.

PAGE 36 – FIRST AMENDED CLASS ACTION COMPLAINT

141.    Investors were not told by Aequitas that they were sending large sums of money to Aequitas so that Aequitas could meet some of its obligations to prior investors.  As the company's cash flow shortage increased, so did the company's reliance on new investor money to pay principal and interest to prior investors, and on persuading investors to not redeem their investments.  By 2014, virtually all new investor money was used by Aequitas to satisfy obligations to prior investors and to pay Aequitas' operating costs, including lavish expenses and salaries.  Almost no investor money was being used for the stated purpose of the investments—to purchase new receivables assets.

142.    Indeed, an Aequitas sales pitch from August 2014 described the use of note proceeds as follows:

> Proceeds from the sale of Notes are used by ACF to provide capital directly or indirectly to borrowers or niche 3rd party credit providers, and to entities affiliated with Aequitas or wholly owned subsidiaries of Aequitas for the following types of transactions:
>
> - Patient-pay receivables from healthcare providers (for example, in connection with the CarePayment® patient finance program)
> - Other forms of healthcare receivables
> - Student loan receivables through programs with educational providers
> - Acquisition or financing of other commercial and consumer receivables and loan portfolios, or direct collateralized loan and lease obligations
> - Other debt transactions and equity investments in third party private credit strategies and companies
> - Medium term equity investments primarily in private companies (and typically in conjunction with a debt transaction)
>
> In addition, ACF uses Note proceeds to provide working capital and liquidity lines of credit for the benefit of its affiliates, for general corporate purposes and participating in the equity of funds managed by Aequitas Investment Management, LLC.  As of June

PAGE 37 – FIRST AMENDED CLASS ACTION COMPLAINT

30, 2014, Aequitas Commercial Finance, LLC had an [assets under management at book value] of $482.2 million.

143.    Aequitas did not disclose, until late December 2015, via a quarterly update, that "ACF uses proceeds from Private Notes primarily to repay prior investors."

144.    Aequitas also did not disclose that proceeds from the sale of securities were used to pay large bonuses to Aequitas employees, rather than to purchase assets.

145.    Even after it knew that it was insolvent, Aequitas continued selling securities to new investors and persuading prior investors to re-invest.  Aequitas raised approximately $350 million from investors between January 2014 and January 2016.

### *Misrepresentations and Omissions Regarding Student Loan Receivables*

146.    On June 29, 2011, Aequitas caused ACF, through its wholly-owned subsidiary ASFG, LLC, later renamed Campus Student Funding, LLC ("ASFG"), to enter into a Tuition Loan Program Agreement ("TLPA") with Corinthian Colleges, Inc. ("Corinthian"), whereby ASFG agreed to purchase Corinthian student loans at their full face value, but with Corinthian agreeing to immediately pay ASFG a 40% (later increased to 50%) "discount fee", resulting in a net purchase price of 60% of the face value to ASFG.  Further, ASFG retained the right to require Corinthian to repurchase any loans that were more than 90 days past-due (the "Recourse Loan Repurchases").

147.    Accordingly, if ASFG could collect on the purchased loans, it would make the entire amount of the "discount fee" as profit, and any loans on which ASFG could not collect would be purchased by Corinthian.  It was a "no-lose" situation, but only as long as Corinthian could meet its contractual recourse obligations.

PAGE 38 – FIRST AMENDED CLASS ACTION COMPLAINT

148.    In other words, Aequitas used investor funds to bet big on Corinthian.  Indeed, Aequitas acknowledged that by structuring the purchase of student loans on a recourse basis, it was "underwrit[ing] to the balance sheet and liquidity of [the education institution]," Despite this, Aequitas misled investors by omitting to disclose Corinthian as the effective guarantor of the Aequitas student debt portfolio.  Indeed, Aequitas did not disclose the identity of Corinthian until after Aequitas had terminated its purchases of Corinthian debt and Corinthian had defaulted on its contractual recourse obligations.

149.    Aequitas omitted the disclosure of Corinthian's identity in order to prevent investors from discovering the administrative, regulatory, legal, and public perception troubles that were hammering Corinthian's business model during the 2010-2014 period, and undermining Corinthian's ability to continue to honor its contractual recourse obligations.

150.    Aequitas also omitted the disclosure of nearly all material facts relating to the actual cost to Aequitas, ACF, and ASFG of the Corinthian student loan program.

151.    Because of the extraordinarily high default rates of Corinthian student loans, and the ongoing controversies and regulatory issues surrounding the Corinthian schools, Corinthian agreed to pay ASFG a number of significant "fees" in addition to the "discount fee" that would serve to decrease the actual net cost of purchasing these questionable assets, including (i) a "Transaction Fee" of $12 million, with $6 million paid in June 2011, and the remaining $6 million paid in June 2012; (ii) a "Management Fee" of $250,000 per month through June 2012 (later extended through June 2013); (iii) a "Boarding Fee" of $75.00 for each loan; (iv) a "Default Aversion Fee" of $150.00 for each loan that was 61 days past due; and (v) an "Ancillary Fee" consisting of a reimbursement for all fees charged by the loan servicer, Genesis Lending Services, Inc.

PAGE 39 – FIRST AMENDED CLASS ACTION COMPLAINT

152.    Around the same time it entered into the TLPA, Aequitas entered into a Consulting Services Agreement with third parties American Student Financial Group, Inc. ("American"), and TRD Consulting, LLC ("TRD"), pursuant to which Aequitas agreed to make certain payments to American and TRD in connection with the Corinthian loan program, including commission payments of 3% of the face value of all Corinthian loans purchased by ASFG.

153.    Aequitas did not disclose to its investors the Consulting Services Agreement or Aequitas' obligations to American and TRD under the Consulting Services Agreement. Aequitas also omitted to disclose its performance under the Consulting Services Agreement, including its payment of more than $15 million in commissions to American and TRD (as well as the significant litigation resulting from Aequitas' alleged default under that agreement). Aequitas further omitted to disclose the details of the discount fee and the other fees payable to ASFG in connection with its purchase of Corinthian student debt.

154.    By concealing these material facts, Aequitas was able to retain flexibility with respect to the valuation of the Corinthian student loan receivables purchased by ASFG, and the distribution of the various fees amongst the various Aequitas entities, including Aequitas' retention of the $12 million transaction fee due to ASFG.

155.    By late 2013, the writing was on the wall that federal regulators were going to stop Corinthian's ability to obtain federal student loan financing for its students, which would be the death-knell of the company, and with Corinthian's demise a well-reported inevitability, Aequitas finally caused ASFG to stop purchasing loans from Corinthian in January 2014.

156.    By the end of January 2014, ACF (though ASFG) had purchased under the TLPA Corinthian student loan receivables having an approximate face value of $444 million. In

PAGE 40 – FIRST AMENDED CLASS ACTION COMPLAINT

connection with the purchase of those receivables, Corinthian paid ASFG total "discount fees" of approximately $180.7 million. In addition, although Corinthian had paid ASFG about $71.5 million to purchase non-performing loans having a face value of about $120 million, Corinthian had failed to purchase another $70 million in non-performing loans for which Corinthian was obligated to pay about $40.8 million to ASFG.

157.    Separate from the TLPA, ASFG had also acquired four additional portfolios of Corinthian student loan receivables having an approximate total face value of $101.8 million. Although ASFG paid only about $50.6 million for these receivables, they did not have the same profit "upside" as the TLPA receivables. About $31 million of the receivables were non-recourse. And ASFG was obligated to remit to Corinthian any collections on the remaining $70.8 million that exceeded ASFG's purchase price. In other words, these $101.8 million of student loan receivables had very little actual value.

158.    The value of Aequitas' Corinthian student loan portfolio, which was already questionable, decreased even more with the collapse of Corinthian's business in mid-2014. Indeed, by at least July 1, 2014, Aequitas knew and had acknowledged that (i) Corinthian would no longer make any recourse loan purchases, thereby changing the character of the portfolio into a non-recourse portfolio; (ii) the Corinthian student loan portfolio had been further harmed by Corinthian's agreement with the Department of Education to disband its schools; and (iii) Aequitas expected "Lower collections and significant additional expenses" related to this portfolio. Aequitas did not disclose this material information to investors and potential investors.

159.    Instead, on June 23, 2014, Aequitas sent a letter to investors that included numerous false and misleading statements, including that "Aequitas has funded approximately 46% of the current loan portfolios and is sitting on $119 MM of cash equity in these portfolios

PAGE 41 – FIRST AMENDED CLASS ACTION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

from Corinthian as additional collateral".  That statement, which equated the face value of the

Corinthian loans to their "collateral" value, was fundamental to Aequitas' efforts to mislead

investors and potential investors as to the real adverse consequences to Aequitas of Corinthian's

collapse.  That statement also was fundamentally untrue, and Aequitas knew it.

160.    The value of the Corinthian student loan portfolio diminished even more with the

civil charges filed against Corinthian by the CFPB in September 2014, and Corinthian's

bankruptcy filing in May 2015.  Those events (i) raised the possibility that the entire Corinthian

student loan portfolio might be rescinded; (ii) led to widespread refusals by former students to

make loan payments and greatly increased the rates of default, and (iii) eliminated any possibility

of recourse against Corinthian.  Aequitas did not disclose this material information to investors

and potential investors.

### *Misrepresentations and Omissions Regarding Asset Valuation and the Value of Investor Collateral*

161.    Throughout the class period, Aequitas represented to investors that the ACF Notes

were supported by collateral having a market value substantially higher than the total ACF Notes

outstanding.  For example, in a document provided to investors and potential investors dated

November 24, 2014, Aequitas represented that ACF had net assets having collateral value of

$586,087,000, compared to outstanding subordinated debt of $316,829,000.  In a document

provided to investors and potential investors dated April 3, 2015, Aequitas represented that the

ACF Notes were "backed by more than $718.7M of market value collateral supporting $354.3M

of notes outstanding."  These statements were false and misleading.

162.    Similarly, Aequitas repeatedly characterized its "receivables" assets, especially its

student loan receivables, as having "collateral value" substantially greater than their "book

PAGE 42 – FIRST AMENDED CLASS ACTION COMPLAINT

value", which was itself likely inflated.  On information and belief, Aequitas used the face value

of the student loans as their "collateral value" even though Aequitas had acquired the student

loans on a recourse basis and at a steep discount to face value because of the substantial credit

risk.  Indeed, the purchases were based on the assumption that more than half of the student

loans would not perform.  These statements were false and misleading.

163.    Aequitas consistently misrepresented/omitted material information concerning the

"Investment assets" held by ACF.

164.    Aequitas represented that the "Investment" assets were increasing dramatically

over time.  ACF's audited financial statements showed "Investment assets" increasing from

$15.74 million (at the beginning of 2012, to $31.83 million (at the beginning of 2013) to $91.37

million (at the beginning of 2014) to $142.53 million (at the beginning of 2015).

165.    The 2012 financial statements, audited by EisnerAmper, describe the investment

assets as "non-marketable common stock and private equity funds".  The 2013 and 2014

financial statements, audited by Defendant Deloitte, describe the investment assets as "non-

marketable common stock and membership units and private equity funds".  The 2013 and 2014

financial statements do not break out the total by type, nor do they disclose the identity or nature

of the "non-marketable common stock and membership units".

166.    On information and belief, Aequitas created most, if not all, of these investment

assets essentially out of this air through financial engineering conducted outside the consolidated

audited ACF group.   For example, the "non-marketable common stock" disclosed in the 2011

and 2012 financials reflects the consolidated ACF group's ownership of the shares of

CarePayment Technologies, Inc. ("CPTI").  CPTI was a public shell company that Aequitas had

acquired and "capitalized" with debt and illusory "intangible assets" transferred from other

PAGE 43 – FIRST AMENDED CLASS ACTION COMPLAINT

Aequitas entities.  Aequitas created these common stock "investment assets" by causing CPTI to create and distribute to Aequitas stock interests with attributes which Aequitas relied upon to claim a $24 million valuation.

167.    On information and belief, the huge numbers for "non-marketable common stock and membership units" in 2013 and 2014 included illusory ownership interests created outside of the consolidated ACF group using similar financial engineering.

168.    Even if the investment assets were real, Aequitas repeatedly mischaracterized the nature and value of those assets.  Specifically, Aequitas repeatedly represented ACF's investment assets as having "collateral value" equal to their "fair value."  However, the nature of those assets—in particular their status as "Level 3" assets that were either completely or substantially illiquid and valued at "fair value"—makes such a characterization misleading.

### *Misrepresentations and Omissions Regarding Insolvency*

169.    Aequitas concealed that it was insolvent, in part through intercompany loans from ACF to Holdings ("ACF-Holdings Note") and from ACF to other Aequitas entities.  The ACF-Holdings Note and the other Aequitas affiliate loans were identified on ACF's books as highly valuable assets.  In truth, the ACF-Holdings Note and the other Aequitas affiliate loans became less and less valuable.

170.    From the beginning of 2012 to the beginning of 2014, the outstanding balance of the ACF-Holdings Note increased from $62.7 million to $78.8 million, and stated loans to other Aequitas entities outside the consolidated ACF group increased from $15 million to $41.7 million.  But by the end of 2014, the outstanding balance of the ACF-Holdings Note increased to $120.9 million, and loans to other non-ACF Aequitas entities increased to $63.9 million.  And by the end of 2015, the outstanding balance of the ACF-Holdings Note was $180.3 million.

PAGE 44 – FIRST AMENDED CLASS ACTION COMPLAINT

171.    The ACF-Holdings Note was used to move cash from ACF to ACM, to cover the operating expenses of Aequitas.  Those expenses far exceeded the income ACM generated through management fees.  This problem was exacerbated by Aequitas' lavish spending on salaries and other compensation, parties, private planes, renovating existing offices and opening new offices.  Remarkably, in June 2015, near the peak of the company's insolvency, Aequitas leased new office space on Park Avenue in New York City.

172.    Aequitas sought to manipulate the stated outstanding balance of the ACF-Holdings Note through in-kind distributions and transfers of assets at "fair value" as determined by Aequitas.  For example, in July 2013, Holdings (i) made in-kind contributions to ACOF of about $23 million (at "fair value") in exchange for ACOF Interests, and (ii) subsequently transferred $20 million (at "fair value") of ACOF Interests to ACF to pay down the ACF-Holdings Note.  And on December 31, 2013, ACF made an in-kind distribution to Holdings of $7 million (at "fair value") of ACOF Interests, and Holdings immediately transferred those $7 million (at "fair value") of ACOF Interests back to ACF to further pay down the ACF-Holdings Note.  In other words, Holdings pulled cash out of ACF and sought to replace it with illiquid assets of dubious value.

173.    Aequitas knew that ACF's (including the Aequitas Funds and AMLF) ability to pay investors depended on Holdings' ability to pay ACF, and they also knew that Holdings was unable to pay ACF.  Holdings lost $22.2 million in 2014 and $46.7 million in 2015.  Throughout 2014 and 2015, Aequitas received collateral analyses that set forth the value of the assets held by Holdings as compared to the balance of the ACF-Holdings Note.  These collateral analyses showed that Holdings did not have sufficient assets to collateralize its debt to ACF.  This highly material information was not disclosed to investors.

PAGE 45 – FIRST AMENDED CLASS ACTION COMPLAINT

174. As of March 2014, according to the internal collateral analysis, Holdings owed ACF $20 million more than the value of Holdings' assets. This gap grew substantially through 2015: $60 million in February 2015, $82 million in June 2015, and nearly $100 million in October 2015.

175. On top of this, ACF (including the Aequitas Funds and AMLF) paid tens of millions of dollars each year in so-called "management fees" and "program management fees" to ACM and other Aequitas entities.

## III.    THE COLLAPSE OF AEQUITAS

176. On February 2, 2016, ACF sent a letter to investors informing them that ACF had not been able to satisfy redemption requests since November 2015 and was preparing to liquidate ACF's assets.

177. On February 8, 2016, ACM disclosed that it had retained FTI Consulting (a forensic and investigative financial consulting firm) to take over management control of the portfolio and to advise on financial matters and potential restructuring of the Aequitas entities.

178. On February 16, 2016, Aequitas told Oregon state officials that it intended to lay off 80 employees, and told each of these employees that the "layoff is intended to be permanent in nature."

179. On March 10, 2016, the U.S. Securities and Exchange Commission filed suit in this District against Aequitas, Jesenik, and Oliver charging them with securities fraud in connection with their sales of securities.

180. Soon thereafter, the SEC and the Aequitas entity defendants asked the Court to appoint Ronald Greenspan of FTI as receiver for the Aequitas entities.

PAGE 46 – FIRST AMENDED CLASS ACTION COMPLAINT

## CLASS ACTION ALLEGATIONS

181.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased Aequitas Securities on or after June 29, 2011 (the "Class").  The Class does not include: (a) Defendants; (b) the past and present officers and directors of the Aequitas affiliated companies, including without limitation Robert Jesenik, Brian Oliver, Craig Froude, Scott Gillis, Andrew MacRitchie, Olaf Janke, Brian Rice, William Ruh, Steve Hedberg, Brett Brown, Tom Goila, Patricia Brown, Bill Malloy, and Thomas Szabo, and their respective families and affiliates; (c) the past and present members of the Aequitas Advisory Board, including without limitation William McCormick, L. Martin Brantley, Patrick Terrell, Edmund Jensen, Donna Miles, William Glasgow, Keith Barnes, Bob Zukis, and their respective families and affiliates; and (d) registered investment advisers and investment adviser representatives.

182.    Members of these Classes are so numerous that joinder is impracticable. Plaintiffs believe that the Class exceeds 1,500 members.  Further, the Class is readily identifiable from information and records kept in the possession of Aequitas and/or the Class.

183.    Plaintiffs' claims are typical of the claims of the Class in that the claims are based upon a common set of written representations, all Class members were damaged by the same wrongful conduct, and the relief sought is common to the Class.

184.    Numerous common questions of law or fact arise from Defendants' conduct, including:

    (a)    whether the Aequitas Securities were sold in violation of the registration requirements of the Oregon Securities Law;

PAGE 47 – FIRST AMENDED CLASS ACTION COMPLAINT

(b)    whether the Aequitas Securities were sold by means of false statements of fact or omissions of material fact; and

(c)    whether Defendants EisnerAmper, Deloitte, Sidley, Tonkon, TDAmeritrade, and Integrity participated in or materially aided the unlawful sales of Aequitas Securities.

(d)    whether Defendant Integrity successfully solicited unlawful sales of Aequitas Securities.

185.    These common questions of law or fact predominate over any other questions affecting only individual Class members.

186.    Plaintiffs will fairly and adequately represent the interests of the Class in that they are typical persons that purchased Aequitas Securities, and have no conflicts with any other member of either Class. Plaintiffs have retained competent counsel experienced in class action litigation.

187.    A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy, as the burden of individual litigation makes it impracticable for Class members to seek individual redress for the wrongful conduct alleged herein.

188.    Plaintiffs reserve the right to expand, modify, or alter the Class definition in response to information learned during discovery.

## **CLAIM FOR RELIEF**

### **(Violations of Oregon Securities Law - ORS 59.115(3))**

189.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

PAGE 48 – FIRST AMENDED CLASS ACTION COMPLAINT

190.    Securities were sold by Aequitas to Plaintiffs and the Class in violation of ORS 59.115(1).

    (a)    Within three years before this action was commenced, Aequitas sold unregistered securities in violation of ORS 59.055 and 59.115(1)(a).

    (b)    Within three years before this action was commenced, Aequitas sold securities in violation of ORS 59.135(2) and 59.115(1)(a), by making untrue statements of material facts and by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

    (c)    On and after June 29, 2011, Aequitas sold securities by means of untrue statements of material facts and omission to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of ORS 59.115(1)(b).  Plaintiffs and the Class did not know of the untruths or omissions and, in the exercise of reasonable care, could not have known of the untruths or omissions.

191.    Defendants Deloitte, EisnerAmper, Sidley; Tonkon; TDAmeritrade; and Integrity are liable pursuant to ORS 59.115(3) because they participated in and materially aided unlawful sales of securities.

192.    Defendant Integrity is liable pursuant to ORS 59.115(3) because it successfully solicited the unlawful sale of securities.

193.     Pursuant to ORS 59.115(2)(a), upon tender of the securities, Defendants are jointly and severally liable for the consideration paid for the securities, plus interest from the date

PAGE 49 – FIRST AMENDED CLASS ACTION COMPLAINT

of payment equal to the greater of the rate of interest provided in the security or 9%, less any amounts Plaintiffs and the Class received on the securities.

194.    Pursuant to ORS 59.115(10), Defendants should be required to pay the reasonable attorney fees of Plaintiffs and the Class.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray that:

A.    This action may properly be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as class representatives and designating their counsel as counsel for the Class;

B.    Plaintiffs and the Class be awarded relief pursuant to ORS 59.115(2)(a), including the consideration paid for the securities and interest from the date of payment equal to the greater of the rate of interest provided in the security or 9%;

C.    Plaintiffs and the Class be awarded its reasonable attorney fees pursuant to ORS 59.115(10);

D.    Plaintiffs and the Class be awarded their reasonable costs and expenses incurred in this action, including expert fees;

E.    Judgment be entered in favor of Plaintiffs and the Class against Defendants, including interest thereon; and

F.    For such other and further relief as the nature of this case may require or as this Court deems just, equitable, and proper.

///

///

///

PAGE 50 – FIRST AMENDED CLASS ACTION COMPLAINT

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED this 19th day of May, 2016.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.

By: s/Timothy S. DeJong

**Keith A. Ketterling**, OSB No. 913368
**Timothy S. DeJong**, OSB No. 940662
**Jacob S. Gill**, OSB No. 033238
**Nadia H. Dahab,** OSB No. 125630

209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone:    (503) 227-1600
Facsimile:    (503) 227-6840
Email:        kketterling@stollberne.com
              tdejong@stollberne.com
              jgill@stollberne.com
              ndahab@stollberne.com

-And-

**Steve W. Berman** (admitted *pro hac vice*)
Email: steve@hbsslaw.com
**Karl P. Barth** (to be admitted *pro hac vice*)
Email: karlb@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:    (206) 623-7292
Facsimile:    (206) 623-0594

-And-

**Robert S. Banks, Jr.**, OSB No. 821862
Email: bbanks@samuelslaw.com
**Darlene D. Pasieczny**, OSB No. 124172
SAMUELS YOELIN KANTOR, LLP
Email: darlenep@samuelslaw.com
111 SW Fifth Avenue, Suite 3800
Portland, Oregon 97204
Telephone:    (503) 226-2966
Facsimile:    (503) 222-2937

**Attorneys For Plaintiffs**

PAGE 51 – FIRST AMENDED CLASS ACTION COMPLAINT