**Robert C. Weaver, Jr.**, OSB #801350
E-Mail: rweaver@gsblaw.com
**Gary I. Grenley**, OSB #751380
E-Mail: ggrenley@gsblaw.com
**Paul H. Trinchero**, OSB #014397
E-Mail: ptrinchero@gsblaw.com
Garvey Schubert Barer
121 SW Morrison Street, Eleventh Floor
Portland, Oregon 97204-3141
Telephone: (503) 228-3939
Facsimile: (503) 226-0259

**Peter A. Wald (admitted *pro hac vice*)**
**Gavin M. Masuda (admitted *pro hac vice*)**
Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111

**Attorneys for Defendant Deloitte & Touche LLP**
*Additional Counsel of Record Listed on Signature Page*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

LAWRENCE P. CIUFFITELLI, for himself and as Trustee of CIUFFITELLI REVOCABLE TRUST, *et al.*,

Plaintiffs,

v.

DELOITTE & TOUCHE LLP; EISNERAMPER LLP; SIDLEY AUSTIN LLP; TONKON TORP LLP; TD AMERITRADE, INC.; and INTEGRITY BANK & TRUST,

Defendants.

Case No. 3:16-cv-00580-AC

**JOINT MOTION TO DISMISS THE FIRST AMENDED COMPLAINT FILED BY DEFENDANTS DELOITTE & TOUCHE LLP, EISNERAMPER LLP, SIDLEY AUSTIN LLP, AND TONKON TORP LLP AND SUPPORTING MEMORANDUM**

Pursuant to Fed. R. Civ. P. 8, 9(b), and 12(b)(6)

Oral Argument Requested

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....... 2

II. STATEMENT OF FACTS ....... 4

A. The Aequitas Entities And History ....... 4

B. The Securities At Issue And Plaintiffs' Purchases ....... 7

C. Defendants Deloitte, EisnerAmper, Sidley, and Tonkon ....... 9

D. Plaintiffs' Claims ....... 9

III. LEGAL STANDARD ....... 11

IV. ARGUMENT ....... 12

A. Plaintiffs' Claim Based On The Sale Of Unregistered Securities Should Be Dismissed ....... 12

1. The Securities Were Federal Covered Securities And Thus Are Excluded From Any Registration Requirement Under Oregon Law ....... 12

2. Plaintiffs' Non-Registration Claim Is Preempted By Federal Law ....... 14

B. Plaintiffs' Claim Based On The Sale Of Securities By Means Of Alleged Misrepresentations Or Omissions Should Be Dismissed ....... 14

1. Plaintiffs Fail To Connect Any Of Their Securities Purchases With Any False Or Misleading Statement ....... 15

2. Plaintiffs Fail To Plead Actionable "Omissions" ....... 18

3. Plaintiffs Fail To Plead That Any Affirmative Statement Was False When Made ....... 19

4. Plaintiffs Fail to Plead That Aequitas Acted With Scienter, As Required Under ORS 59.135(2) ....... 24

C. To The Extent The Claim Is Based On Sales Made Before April 4, 2013, The Claim Is Barred By ORS 59.115(6)'s Three-Year Statute Of Limitations ....... 25

V. CONCLUSION ....... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aero Marine Engine, Inc. v. Transporter, Inc.*,
No. 05-1469, 2007 WL 3128500 (D. Or. Oct. 23, 2007) ....... 11

*Anderson v. Carden*,
146 Or. App. 675 (1997) ....... 2, 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....... 11, 12, 25

*Badger v. Paulson Inv. Co.*,
311 Or. 14 (1991) ....... 15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....... 11, 16, 25

*Brody v. Transitional Hosp. Corp.*,
280 F.3d 997 (9th Cir. 2002) ....... 21

*United States ex rel. Brooks v. Trillium Cmty. Health Plan, Inc.*,
No. 6:14-cv-01424, 2016 U.S. Dist. LEXIS 57635 (D. Or. Apr. 29, 2016) ....... 23

*Brown v. Earthboard Sports USA, Inc.*,
481 F.3d 901 (6th Cir. 2007) ....... 14

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145, 1163 (D. Or. 2015) ....... 11, 16

*Houston v. Seward & Kissel, LLP*,
No. 07-cv-6305, 2008 WL 818745 (S.D.N.Y. Mar. 27, 2008) ....... 14

*Karsun v. Kelley*,
258 Or. 155 (1971) ....... 11, 15

*Lillard v. Stockton*,
267 F. Supp. 2d 1081 (N.D. Okla. 2003) ....... 14

*Loewen v. Galligan*,
No. A9005-02822, 1992 WL 12582753 (Or. Cir. Ct. Aug. 19, 1992), *aff'd*,
130 Or. App. 222 (1994) ....... 15

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ....... 21

*Mitchell v. Greenough*,
100 F.2d 184 (9th Cir. 1938) ....................26

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
135 S. Ct. 1318 (2015) ....................19, 21, 23

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
96 F.3d 1151 (9th Cir. 1996) ....................15

*Pinnacle Commc'ns. Int'l, Inc. v. Am. Family Mortg. Corp.*,
417 F. Supp. 2d 1073 (D. Minn. 2006) ....................14

*In re Rigel Pharm., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ....................11, 19, 22

*San Diego Cty. Emps. Ret. Ass'n v. Maounis*,
749 F. Supp. 2d 104 (S.D.N.Y. 2010) ....................20

*SEC v. Aequitas Mgmt., LLC*,
No. 3:16-cv-00438-PK (D. Or. filed Mar. 3, 2016) ....................7

*Sparling v. Daou (In re Daou Sys., Inc.)*,
411 F.3d 1006 (9th Cir. 2005) ....................15

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir.) *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001) ....................5

*State v. Marsh & McLenann Cos.*,
269 Or. App. 31 (2015) ....................24

*State v. Marsh & McLennan Cos.*,
241 Or. App. 107 (2011), *rev'd on other grounds*, 353 Ore. 1 (2012) ....................17

*Temple v. Gorman*,
201 F. Supp. 2d 1238 (S.D. Fla. 2002) ....................14

*TRM Corp. v. Paulsell*,
No. CV-02-215, 2002 WL 31549112 (D. Or. June 4, 2002) ....................26

*In re Velti PLC Securities Litigation*,
No. 13-cv-03889, 2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) ....................23

*Vesta Corp. v. Amdocs Mgmt. Ltd.*,
129 F. Supp. 3d 1012, 1021 (D. Or. 2015) ....................13

**Statutes**

15 U.S.C. § 77d(a)(2) ....................12

15 U.S.C. § 77r ....................................................3, 12, 14

ORS 59.055 .................................................... *passim*

ORS 59.115 ....................................................10, 11, 25

ORS 59.135 ....................................................18

**Rules**

Fed. R. Civ. P. 8 ....................................................11, 12, 16, 18

Fed. R. Civ. P. 9(b) .................................................... *passim*

Fed. R. Civ. P. 10b-5....................................................15

Fed. R. Civ. P. 12(b)(6)....................................................11

**Regulations**

17 C.F.R. § 230.501(e)(1)(iv) ....................................................13

17 C.F.R. § 230.506 ....................................................12, 13

SEC Regulation D....................................................3, 12, 13

## LR 7-1 CERTIFICATION

One of counsel for the four moving defendants (Gary Grenley representing Deloitte & Touche LLP) wrote a letter on behalf of all four defendants, emailed to Plaintiffs' counsel on May 16, 2016. The letter advised Plaintiffs of several grounds for dismissal, as well as seven categories of information that the four defendants requested be added or clarified in an amended complaint. The letter also asked for the opportunity to meet and confer about these issues before a motion to dismiss became necessary. Such a meeting was held on May 31, 2016. Plaintiffs' Amended Complaint was filed on May 19, 2016, but it did not attempt to cure any of the defects identified in the May 16 letter or discussed at the subsequent meet-and-confer. As of the date of filing this Joint Motion and the individual motions, none of the claims have been withdrawn, and none of the requested changes have been made or promised.

## MOTIONS

Pursuant to Rules 8, 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, the Order Granting Joint Motion of Stipulation (Doc. #47), and the Order Granting Unopposed Motion Regarding Joint and Individual Motions and Briefing (Doc. #70), Defendants Deloitte & Touche LLP; EisnerAmper LLP; Sidley Austin LLP; and Tonkon Torp LLP (collectively, "Defendants") jointly move to dismiss the claims brought against them under ORS 59.115(3) as follows:

1. Plaintiffs fail to state a claim under ORS 59.115(3) based on the sale of unregistered securities allegedly in violation of ORS 59.055 and 59.115(1)(a).
2. Plaintiffs fail to state a claim under ORS 59.115(3) based on the sale of securities allegedly by means of false or misleading statements in violation of ORS 59.115(1)(b) and 59.135(2).

3. Plaintiffs' claim under ORS 59.115(3) is barred by the three-year statute of limitations set forth in ORS 59.115(6) to the extent that claim is based on sales of securities made before April 4, 2013.

In support of this Joint Motion, Defendants' rely on the Joint Memorandum of Law that follows and the Amended Complaint on file (Doc. #57).

## JOINT MEMORANDUM OF LAW

## I. INTRODUCTION

Plaintiffs are seven sophisticated investors who claim they were defrauded by "Aequitas." The Complaint does not define "Aequitas," but the term apparently refers to a group of legally distinct entities, many of which are under Receivership imposed by the United States Securities and Exchange Commission in a case pending in this District.[1] Yet, instead of filing their claims against Aequitas and with the Receiver, Plaintiffs seek to hold Defendants—lawyers and accountants who provided professional services to certain Aequitas entities—jointly and severally liable for Aequitas' alleged violations of Oregon securities laws. To be clear, Plaintiffs do not allege that any Defendant committed a primary violation of any Oregon securities law. Instead, they claim that Defendants should be held secondarily liable because they "participated or materially aided in" the Aequitas entities' allegedly illegal securities sales. *Anderson v. Carden*, 146 Or. App. 675, 683 (1997) ("The nonseller participant becomes liable under ORS

[1] In what appears to be a strategic choice, Plaintiffs consistently refer to "Aequitas" or "Aequitas Securities"—rather than the individual Aequitas-related entities whose securities sales they are challenging. But the Complaint admits that each Aequitas entity and security is functionally and legally distinct. *See* Compl. ¶¶ 21-25 (describing the legally distinct "Aequitas Entities"); Compl. ¶¶ 31-63 (admitting that each "Aequitas Security" was sold by different entities through different offering documents). As a result, each entity and security must be individually analyzed for purposes of assessing Plaintiffs' claims. Indeed, as explained *infra*, Plaintiffs' refusal to specify the Aequitas entity from which they purchased their securities, and the documents pursuant to which such purchases were made, is one of their fundamental pleading failures.

59.115(3) because it has 'participated or materially aided' in the sale, not because it has violated any law."). In this Joint Memorandum, Defendants show that Plaintiffs have not adequately alleged the threshold element of their claim—that the Aequitas entities committed primary violations of Oregon securities laws, as asserted in ¶ 190 (a)-(c) of the Complaint.

*First*, as a matter of law, Plaintiffs cannot establish that any Aequitas entity sold unregistered securities in violation of ORS 59.055. Compl. ¶ 190(a). Because the Aequitas Securities were sold under an exemption from the federal registration requirements set forth in SEC Regulation D, they are "federal covered securities" exempt from registration under Oregon law. ORS 59.055(3). Further, and in any event, federal law preempts any claim that the securities should have been registered under Oregon law. 15 U.S.C. § 77r(a)(1)(A).

*Second*, Plaintiffs fail to plead that any Aequitas entity sold securities by means of false or misleading statements in violation of ORS 59.135(2) and ORS 59.115(1)(b). Compl. ¶ 190(b) & (c). Plaintiffs purchased six different securities in private transactions involving numerous separate legal entities at different times over a five-year period. Those purchases involved different securities and different offering documents, including different private placement memoranda. The Complaint does not inform Defendants which specific documents or information Plaintiffs reviewed in connection with their purchases. This refusal precludes Defendants from ascertaining whether any of the statements and omissions Plaintiffs identify were made in connection with any sale at issue in the Complaint. Moreover, even if Plaintiffs were to identify a statement or omission in connection with a particular sale, they do not satisfy Rule 9(b)'s requirement that each specific statement alleged to be false—and each statement supposedly rendered misleading by an alleged omission—be identified along with facts sufficient to establish that such statements were false or misleading when made. In addition,

Plaintiffs must—but fail to—allege particularized facts establishing that Aequitas acted with scienter, as required for any theory of primary liability based on ORS 59.135(2).

*Finally*, regardless of the theory of primary liability, to the extent Plaintiffs' claim under ORS 59.115(3) is based on sales of securities made before April 4, 2013, the claim is barred by the three-year statute of limitations set forth in ORS 59.115(6). Plaintiffs apparently believe that, to the extent their claim is based on those pre-April 4, 2013 sales, the claim is subject to a discovery rule, but Plaintiffs have not pled facts excusing their delay in bringing suit. The Court may dismiss the claim to the extent it is time-barred because the untimeliness is apparent on the face of the Complaint.

## II. STATEMENT OF FACTS

### A. The Aequitas Entities And History

"Aequitas" is not a defined term in the Complaint, but apparently refers to a group of related but functionally and legally distinct entities, some but not all of which received professional legal and accounting services from some but not all of the Defendants. At the top of the "Aequitas" organizational chart is Aequitas Management, LLC, the parent company of all Aequitas-related entities. Compl. ¶ 22. Aequitas Management LLC held an 84% interest in Aequitas Holdings, LLC ("Holdings"), which was the sole owner and member of Aequitas Commercial Finance, LLC ("ACF") and sole shareholder of Aequitas Capital Management, Inc. ("ACM"). Compl. ¶ 22. ACF owned interests in a variety of funds (which were organized as limited liability companies), and those funds sold securities. Compl. ¶ ¶ 23, 25, 27, 28.

ACM was a management company that oversaw the operations of ACF and MotoLease Financial, LLC. ACM also owned Aequitas Investment Management, LLC, an SEC-registered investment adviser that oversaw the operations and investment decisions of various Aequitas funds. Compl. ¶ 25.

To the extent that the business of the Aequitas entities can be generalized, such business involved making non-traditional investments. These investments included healthcare receivables (Compl. ¶ 104), loan receivables from students of the Corinthian Colleges (Compl. ¶ 109), subprime consumer credit receivables known as the "Freedom Financial Receivables" (Compl. ¶ 117), and "MotoLease" motorcycle leases (Compl. ¶ 128). These non-traditional investments bore significant risks which were repeatedly disclosed in, among other documents, the Private Placement Memoranda ("PPMs") through which certain Aequitas entities sold securities. Every such PPM appears to have included the warning:

> The [securities or] notes offered hereby are speculative, illiquid and involve a high degree of risk. The [securities or] notes should be purchased only by persons who can afford to lose their entire investment.

*E.g.*, Masuda Decl. Ex. 13 (Nov. 30, 2013 ACF PPM).[2]

Because the various Aequitas entities' investments were largely illiquid, they also cautioned investors that they could use investor funds to pay off other investors, or for operating expenses. For example, as Plaintiffs concede, a PPM from AIOF dated March 23, 2010 warned that "[p]roceeds from the [] Notes may also be used to pay redemptions of previously issued Notes and to provide for the Fund's working capital needs." Compl. ¶ 138. Similarly, an ACF PPM dated November 30, 2013 cautioned that, due to the "illiquid nature of many of the Company's investments," ACF would "replac[e] Secured Notes bearing higher interest rates with Secured Notes bearing lower interest rates." Compl. ¶ 137. In other words, the PPM expressly disclosed that new investor money would be used to repay prior investors.

[2] As explained in Defendant's Request for Judicial Notice filed concurrently herewith, this Court may consider the full contents of these PPMs, which have been incorporated in the Complaint by reference. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.) *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001).

Beginning around 2010, the entire for-profit education industry became the target of intense criticism, including in reports published by the Government Accountability Office. Compl. ¶ 115. Plaintiffs allege that "[b]y late 2013, the writing was on the wall that federal regulators were going to stop Corinthian's ability to obtain federal student loan financing for its students." Compl. ¶ 155. According to Plaintiffs, "Corinthian's demise [was] a well-reported inevitability" that cast substantial doubt on the collectability of Aequitas' large portfolio—over $444 million—of Corinthian student loan receivables. Compl. ¶ 155. While Plaintiffs believe the value of the Corinthian receivables was "already questionable," they contend it "decreased even more with the collapse of Corinthian's business in mid-2014." Compl. ¶ 158. By September 2014, the Consumer Finance Protection Bureau filed civil charges against Corinthian. Compl. ¶ 160. Aequitas discussed Corinthian's troubles in an October 2014 PPM for securities issued by AIOF-II:

> Corinthian is currently under investigation by the Consumer Financial Protection Bureau, the SEC and several states related to its credit support for educational loans offered to borrowers. These investigations have resulted in and may result in a negative impact on Aequitas' ability to receive any recourse from Corinthian on its defaulted student loans. As of the date of this Memorandum, Corinthian is in default of its recourse obligations to Aequitas.

Masuda Decl. Ex. 15 (Oct. 1, 2014 AIOF-II PPM). The government's actions led (among other things) to widespread student refusals to re-pay their loans. *See* Compl. ¶ 160. By May 2015, Corinthian was bankrupt, and the government took the unprecedented step of forgiving the federal loans of all students who were attending Corinthian, or had recently withdrawn, at the time of its closure. Compl. ¶ 160.

At some point in time (the Complaint does not specify when) Aequitas allegedly "became increasingly insolvent and dependent upon new investor money . . . to meet its obligations." Compl. ¶ 4. The Complaint alleges that by some unspecified point in 2014, "virtually all new

investor money was used by Aequitas to satisfy obligations to prior investors and to pay [] operating costs." Compl. ¶ 141. By late 2015, Aequitas "could not sell new securities fast enough" and was forced to admit, on February 2, 2016, that it was preparing to liquidate ACF's assets. Compl. ¶ 176. On March 10, 2016, the U.S. Securities and Exchange Commission filed suit in this District against five Aequitas entities (including the parent company and the primary holdings and management entities), and its CEO, CFO and an Executive Vice President, charging them with securities fraud.[3] *See* Compl. ¶ 179. Unlike Plaintiffs, however, the SEC places the fraud in 2014 and later.

**B. The Securities At Issue And Plaintiffs' Purchases**

Collectively, Plaintiffs claim to have purchased securities from six different Aequitas entities, none of which was publicly traded. These are: (i) ACF, which issued Secured Subordinated Promissory Notes referred to as "ACF Notes"; (ii) AIPF, which issued Series A Preferred Non-Voting LLC interests referred to as "AIPF Interests"; (iii) AIOF, which issued Senior Secured Promissory Notes referred to as "AIOF Notes"; (iv) AIOF-II, which issued Senior Secured Promissory Notes referred to as "AIOF-II Notes"; (v) AMLF, which issued Senior Secured Promissory Notes referred to as "AMLF Notes"; and (vi) ACOF, which unlike the various Note offerings, issued Capital Commitments for participation in a private equity fund referred to as "ACOF Interests." Compl. ¶¶ 27-28. Notably, none of the Plaintiffs claims to have purchased two securities identified in the Complaint. These are the securities referred to as "AEIF Interests" and "APCF Notes," alleged to have been issued by the Aequitas Enhanced Income Fund, LLC ("AEIF") and Aequitas Private Client Fund, LLC ("APCF"), respectively.

[3] *See SEC v. Aequitas Mgmt., LLC*, No. 3:16-cv-00438-PK (D. Or. filed Mar. 3, 2016). The SEC named Aequitas Management, LLC; Aequitas Holdings, LLC; Aequitas Commercial Finance, LLC; Aequitas Capital Management, Inc.; Aequitas Investment Management, LLC; Robert J. Jesenik; Brian A. Oliver; and N. Scott Gillis.

*Compare* Compl. ¶ 28 (identifying AEIF Interests and APCF Notes) *with* ¶¶ 64-70 (identifying purchases but failing to identify any purchase of AEIF Interests or APCF Notes).

Although Plaintiffs refer to all of these securities as the "Aequitas Securities," they differed significantly. Each was sold pursuant to its own set of offering documents, including Private Placement Memoranda ("PPMs") that varied in form and content from one security to the next—and from one year to the next. For example, the ACF PPM dated November 30, 2013 was 48 pages long; it included three appendices, a discussion of risk factors, disclosures of United States Federal Tax considerations, and non-United States disclaimers. *See* Masuda Decl. Ex. 13 (Nov. 30, 2013 ACF PPM). The AIOF-II PPM dated October 1, 2014, by contrast, is 71 pages long; it included an entire additional section on regulatory considerations, and an additional appendix. *See* Masuda Decl. Ex. 15 (Oct. 1, 2014 AIOF-II PPM). The PPMs also varied over time. The ACF Notes, for example, were sold "pursuant to" *at least* four different PPMs, from December 1, 2011 through October 16, 2014. *See* Compl. ¶ 32.

Securities broker-dealers and Registered Investment Advisers played an integral role in selling many of these securities to investors. Indeed, Plaintiffs allege that Defendant TD Ameritrade "recommended and referred investors to financial advisors for the purpose of purchasing Aequitas Securities," and that Defendant Integrity Bank & Trust "actively offered and solicited the sale of certain Aequitas Securities on Aequitas' behalf." Compl. ¶¶ 19-20.

Plaintiffs are seven purported purchasers of various Aequitas Securities, all of whom claim to have purchased securities from at least two different Aequitas entities and either re-invested their original funds, or invested new funds, at various points in time over a several-year period. Compl. ¶¶ 64-70. For example, Plaintiff Ciuffitelli purchased three ACF Notes in May 2013, but increased his overall investment in February and September 2015 by purchasing

ACOF Interests (the only plaintiff to do so) and an AMLF Note, respectively. Compl. ¶ 64. Plaintiffs the Juliens purchased an AIOF Note at some unspecified point in 2012, but in October 2015 "used the funds they had invested in that AIOF Note to purchase an ACF Note." Compl. ¶ 65. *See* App'x A for a chart summarizing the "Accused Securities" and Plaintiffs' alleged purchases.

Despite purchasing different securities at different points in time under different circumstances, *no Plaintiff identifies any of the information or documents he or she reviewed in connection with their purchases*. Plaintiffs do not reveal whether they were referred to Aequitas funds by their investments advisers, were sold Accused Securities by their brokers or investment advisers, or received information from their investment advisers. *Cf.* Compl. ¶¶ 19, 37 (admitting role of investment advisors). Nor do they say what offering documents or promotional materials they received and reviewed before making their investment decisions. *See, e.g.*, Compl. ¶ 33 (alleging only that "investors and potential investors" received the audited financial statements of ACF"); ¶ 34 (alleging only that "investors and potential investors" received promotional materials, quarterly updates, and other materials and information).

**C. Defendants Deloitte, EisnerAmper, Sidley, and Tonkon**

Defendants were providers of professional legal and accounting services to one or more of the Aequitas entities, at different points in time. None of them is alleged to have directly violated any Oregon securities law, or to have sold any Aequitas securities. Instead, the Complaint alleges that Defendants "participated or materially aided in [a] sale" of securities that violated Oregon law, simply by their provision of professional services.

**D. Plaintiffs' Claims**

Plaintiffs filed their original Class Action Complaint on April 4, 2016, and their Amended Class Action Complaint on May 19, 2016. Plaintiffs bring a single state law claim

against these Defendants under ORS 59.115(3). *See* Compl. ¶ 190. ORS 59.115(3) is a secondary liability statute that makes jointly and severally liable "every person who participates or materially aids in [a] sale" of securities that otherwise violates ORS 59.115. Accordingly, in order to state a claim against Defendants for secondary liability, Plaintiffs must as a threshold matter allege a primary violation of ORS 59.115 by a seller of securities. *See, e.g.*, *Anderson v. Carden*, 146 Or. App. at 683 ("[T]he liability of the nonseller participant under ORS 59.115(3) is predicated on the violation of the seller.").[4]

Plaintiffs assert two theories of primary liability—that is, two theories of how "Aequitas" sold securities in violation of ORS 59.115. First, Plaintiffs allege that "Aequitas" sold unregistered securities in violation of ORS 59.055 (made actionable by ORS 59.115(1)(a)). Compl. ¶ 190(a). Second, Plaintiffs allege that "Aequitas" made false or misleading statements in connection with its sales of securities to Plaintiffs. Compl. ¶ 190(b)-(c). This second theory of primary liability has two branches because, according to Plaintiffs, Aequitas' alleged false and misleading statements violated two different statutes. The first statute is ORS 59.135(2), which prohibits a seller from "mak[ing] an untrue statement of a material fact or [] omit[ing] to state a material fact necessary in order to make the statements made ... not misleading." Compl. ¶ 190(b). The second statute is ORS 59.115(1)(b), Compl. ¶ 190(c), which prohibits a seller from selling a security "by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made ... not misleading."

---

[4] Defendants' individual motions and briefs address their respective engagements by various Aequitas entities in more detail, as well as Plaintiffs' failure, among other things, to plead another necessary element for a claim under ORS 59.115(3), namely, that the defendant "participated or materially aided in the sale" of the securities at issue.

## III. LEGAL STANDARD

Rule 12(b)(6) requires a court to dismiss a complaint when it lacks sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs' only claim against Defendants is under ORS 59.115. Oregon courts have long recognized that "the primary basis for such an action is fraud." *Karsun v. Kelley*, 258 Or. 155, 167 (1971); *see also Aero Marine Engine, Inc. v. Transporter, Inc.*, No. 05-1469, 2007 WL 3128500, at *3 n. 2 (D. Or. Oct. 23, 2007) ("Both of the Oregon securities statutes in issue [ORS 59.115 and 59.135] create statutory 'fraud' actions."). Accordingly, the Complaint must satisfy both the requirements of Rule 8 and the heightened pleading standards of Rule 9(b).

Under Rule 8, a complaint must contain "enough [factual allegations] to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and a plaintiff must plead "more than a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678. Where a complaint alleges fraud, however, Rule 9(b) additionally requires that the circumstances constituting fraud or mistake be stated with particularity. *See* Fed. R. Civ. P. 9(b). That is, the complaint must "identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1163 (D. Or. 2015) (quotation, alteration, and citation omitted); *see also In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012) (a complaint must "set[] forth what is false or misleading about the statement and why the statements were false or misleading at the time they were made").

Although Rule 9(b) provides that a defendant's state of mind may be generally alleged, those allegations must still satisfy *Iqbal/Twombly* to avoid being impermissibly speculative. Indeed, in *Iqbal*, the United States Supreme Court made clear that the ability to allege state of

mind generally "does not give [a plaintiff] license to evade the less rigid—though still operative—strictures of" Rule 8. *Iqbal*, 556 U.S. at 686-687. Thus, even as to state of mind, a plaintiff may not merely "plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Id.*at 687.

## IV. ARGUMENT

### A. Plaintiffs' Claim Based On The Sale Of Unregistered Securities Should Be Dismissed

Plaintiffs' first theory of primary liability is that the Aequitas Securities were sold without proper registration under ORS 59.055. *See* Compl. ¶ 190(a). This claim fails for two independent reasons.

#### 1. The Securities Were Federal Covered Securities And Thus Are Excluded From Any Registration Requirement Under Oregon Law

The first problem with this claim lies in the statute itself: Oregon law explicitly does *not* require registration of any security that is "a federal covered security for which notice has been filed and fees have been paid." ORS 59.055(3). Under Oregon law, a "federal covered security" is defined to include, among other things, securities that are sold under an SEC Regulation D exemption.[5] In this case, all Aequitas Securities were "federal covered securities"—and therefore not required to be registered under Oregon law—because they were sold pursuant to an SEC Regulation D exemption. Indeed, the issuance of each of the Aequitas Securities was

[5] Oregon law defines "federal covered security" by reference to 15 U.S.C. § 77r(b). *See* ORS 59.015(5). 15 U.S.C. § 77r(b) defines "covered security" as, among other things, an offering exempt from registration under SEC "rules or regulations issued under section 77d(2)." 15 U.S.C. § 77r(b)(4)(F). Section 77d(2) exempts from registration "transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(a)(2). Securities sold pursuant to 17 C.F.R. § 230.506 are "deemed to be transactions not involving any public offering." 17 C.F.R. § 230.506(a). A security is sold pursuant to Section 230.506 (Rule 506 of Regulation D) when sold only to accredited investors and up to 35 other purchasers who the issuer reasonably believes are able to evaluate the investment. 17 C.F.R. § 230.506(b); 17 C.F.R. § 230.501(e)(1)(iv).

accompanied by an SEC Form D claiming specific exemptions under Regulation D and other applicable federal law. *See* Masuda Decl. Exs. 5-10 (Form Ds).[6] The Court may properly take judicial notice of these SEC filings as establishing that Aequitas claimed the exemption. *See Vesta Corp. v. Amdocs Mgmt. Ltd.*, 129 F. Supp. 3d 1012, 1021 (D. Or. 2015) ("[c]ourts may take judicial notice of SEC filings, press releases or contents of a website, when they are matters of public record. When a court takes judicial notice of a public record, it may do so not for the truth of the facts recited therein, but for the existence of the record, which is not subject to reasonable dispute over its authenticity." (quotations and internal citations omitted)).

Plaintiffs do not suggest—nor could they—that the Aequitas Securities were not actually "federal covered securities," *i.e.*, that the exemptions were improperly claimed. The Complaint alleges only that the Aequitas Securities were "not registered under any state or federal law." *E.g.*, Compl. ¶¶ 31, 38, 44, 50, 56, 60. But lack of registration is legally irrelevant, because both federal law (SEC Regulation D) and state law (ORS 59.055(3)) allowed the sale to occur *without* registration. Moreover, ORS 59.115(1) specifically restricts liability to the sale of securities "other than a federal covered security." Accordingly, Plaintiffs' bare allegation of "non-registration" is not sufficient to state a claim for relief. *See Houston v. Seward & Kissel, LLP*, No. 07-cv-6305, 2008 WL 818745, at *9 (S.D.N.Y. Mar. 27, 2008) (holding that a plaintiff asserting a violation of ORS 59.055 must plead facts showing that securities were not "federally covered" securities).

---

[6] More precisely, the Form Ds accompanying the ACF Notes, AIOF Notes, and AIOF-II Notes claimed exemption under Rule 506, and Section 3(c)(5) of the Investment Company Act. The Form Ds accompanying the AIPF Interests, and the ACOF Interests claimed exemption under Rule 506 and Section 3(c)(1) of the Investment Company Act.

### 2. Plaintiffs' Non-Registration Claim Is Preempted By Federal Law

In addition, the fact that the Aequitas Securities were sold under an SEC Regulation D exemption preempts the operation of Oregon law. Under the National Securities Market Improvement Act of 1996 ("NSMIA"), "no law . . . of any State" that requires registration of securities "shall directly or indirectly apply to a security that is a covered security." 15 U.S.C. § 77r(a)(1)(A). NSMIA preemption applies "[r]egardless of whether the private placement actually complied with the substantive requirements of Regulation D or Rule 506." *Temple v. Gorman*, 201 F. Supp. 2d 1238, 1244 (S.D. Fla. 2002).[7] And this makes perfect sense: "When an offering purports to be exempt under federal Regulation D, any allegation of improper registration is covered exclusively by federal law." *Pinnacle Commc'ns. Int'l, Inc. v. Am. Family Mortg. Corp.*, 417 F. Supp. 2d 1073, 1087 (D. Minn. 2006); *accord Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1116 (N.D. Okla. 2003). The NSMIA also mandates dismissal.

### B. Plaintiffs' Claim Based On The Sale Of Securities By Means Of Alleged Misrepresentations Or Omissions Should Be Dismissed

Plaintiffs' second theory of primary liability is that Aequitas violated ORS 59.135(2) and ORS 59.115(1)(b), both of which prohibit the making of false or misleading statements in connection with the sale of securities. ORS 59.135(2); ORS 59.115(1)(b); *see* Compl. ¶ 190(b) & (c) (asserting Aequitas's violation of these statutes). While ORS 59.135(2) and ORS 59.115(1)(b) are not identical, Plaintiffs' attempts to plead sales of securities in violation of these statutes suffer from several common defects. Specifically, Plaintiffs fail to plead that: (i) any false or misleading statements were made "in connection with" a specific sale (ORS 59.135(2)), or, equivalently, that any specific sale was made "by means of" false or misleading statements (ORS 59.115(1)(b)); (ii) Aequitas' alleged "omissions" rendered misleading any affirmative

---

[7] *But see Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 913 (6th Cir. 2007).

statement made; and (iii) any affirmative statement was false or misleading when made. Plaintiffs' contention that Aequitas violated ORS 59.135(2) also fails for the separate reason that the Complaint fails adequately to allege scienter.

### 1. Plaintiffs Fail To Connect Any Of Their Securities Purchases With Any False Or Misleading Statement

ORS 59.115(1)(b) and 59.135(2) are not general fraud prevention statutes. To the contrary, they reach only false or misleading statements that are made "in connection with" a specific securities transaction. *See* ORS 59.115(1)(b); ORS 59.135(2); *Loewen v. Galligan*, No. A9005-02822, 1992 WL 12582753 (Or. Cir. Ct. Aug. 19, 1992) (granting summary judgment for defendant on ORS 59.115 claim where plaintiff purchased securities before the allegedly fraudulent prospectus was issued, negating any "causal connection between the [] misrepresentation and the decision to buy" (emphasis omitted)), *aff'd*, 130 Or. App. 222 (1994); *Sparling v. Daou (In re Daou Sys., Inc.)*, 411 F.3d 1006, 1025 (9th Cir. 2005) (holding under the analogous federal Rule 10b-5 that a "court must also consider whether the plaintiff has shown some causal connection between the fraud and the securities transaction in question." (citing *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1026 (9th Cir. 1999))).[8]

Plaintiffs have failed to plead any connection between the misstatements and omissions allegedly made by "Aequitas" and the actual transactions in which unnamed entities or investment advisors sold these securities to them. *First*, despite asserting that a wide range of

[8] In rejecting claims under ORS 59.115(3), the Ninth Circuit has noted the connection between the Oregon state blue sky law and federal law. *See Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1166 (9th Cir. 1996) ("Since . . . Oregon . . . chose to enact laws paralleling Rule 10b-5, we think it only logical that [it] intended [ORS 59.115 (b)] to be interpreted consistently with the federal rule.") (quoting *Shivers v. Amerco*, 670 F.2d 826, 831 (9th Cir. 1982)); *see also Badger v. Paulson Inv. Co.*, 311 Or. 14, 21 (1991) (discussing Oregon's "controlling person" provision in context of federal securities law); *Karsun*, 258 Or., at 161 ("In 1967 the Oregon Blue Sky Law was amended by ORS 59.115(1)(b) to adopt substantially the same terms as set forth in the Federal Security Act of 1933, 15 U.S.C.A. § 77(1)(2).").

documents—including several years' worth of PPMs, "audited financial statements," letters to investors, and other unspecified marketing materials—contained misstatements or material omissions, Plaintiffs never once identify the documents they themselves received, from whom, or when they received them. Instead, Plaintiffs consistently allege that at some unspecified time, unspecified "investors" received these materials. *See*, *e.g.*, Compl. ¶ 3 (alleging that "books and [ ] financial statements [were] provided to investors"); ¶¶ 15-16 (alleging that "audited financial statements were a material part of the information made available to investors"); ¶ 159 (alleging that a June 23, 2014 letter was "sent . . . to investors").

*Second*, Plaintiffs fail to specify which Aequitas entity made the alleged misstatements or omissions. Instead, they allege that "Aequitas"—a term not even defined in the Complaint—made these misstatements or omissions. *See*, *e.g.*, Compl. ¶¶ 72-135 (alleging that "Aequitas" made dozens of omissions). Rule 8 requires more—and Rule 9(b) requires *much* more. Plaintiffs' failure— indeed, strategic refusal—to distinguish among the issuers or sellers is fatal to their claims. *See*, *e.g.*, *Twombly*, 550 U.S. at 564 n.10 (holding that unless a complaint specifies alleged misconduct on a defendant-by-defendant basis, "a defendant seeking to respond to plaintiffs' conclusory allegations . . . would have little idea where to begin."); *In re Galena Biopharma, Inc.*, 117 F. Supp. 3d at 1164 n.15 (dismissing under Rule 9(b) "impermissible allegations attributing something to all Defendants as a single unit").

Plaintiffs' failure to specify the documents and information they received in connection with their purchases, or where that information came from, reflects an attempt to mask serious deficiencies in their claims. For example, Plaintiffs claim that an AEIF PPM dated January 26, 2015 falsely represented Aequitas' uses of investor funds. *See* Compl. ¶ 140. But, as discussed above, none of the Plaintiffs purchased AEIF Notes, and there are no allegations that any

Plaintiffs received the January 26, 2015 AEIF PPM. This alleged "misrepresentation" could not have been made "in connection with" the sale of any security at issue in this case. In fact, because Plaintiffs did not purchase the AEIF Notes, they lack standing to pursue any claim based on them. *See State v. Marsh & McLennan Cos.*, 241 Or. App. 107, 114 (2011) (ORS 59.115 "creates a cause of action for purchasers of stock who are damaged by misrepresentations in face-to-face securities transactions"), *rev'd on other grounds*, 353 Or. 1 (2012).[9] To the extent Plaintiffs' theory of primary liability of false/misleading statements is based on statements about the AEIF Notes, the claim against Defendants under ORS 59.115(3) must be dismissed.

Other allegations suffer from similar defects. For example, Plaintiff Ciuffitelli claims to have purchased ACF Notes in May 2013. Compl. ¶ 64. Although Ciuffitelli does not specify what documents he received beforehand, or whether any of those documents contained misstatements or omissions, the Complaint's other allegations make clear that he was not defrauded in connection with this purchase: the only ACF PPM that is alleged to have contained misstatements is dated *six months after* Ciuffitelli purchased his ACF Notes. *See* Compl. ¶ 137. The sale to Ciuffitelli could not have been made "by means of" any allegedly false statements in that later-issued PPM. Indeed, the Complaint fails to identify any allegedly false or misleading statements—made by ACF or otherwise—affecting Ciuffitelli's purchase of his ACF Note. Similar pleadings defects are present in connection with all Plaintiffs' claims about "Aequitas" Notes and Interests.[10]

---

[9] For this same reason—no purchases—Plaintiffs lack standing to pursue a claim as to the APCF Notes.

[10] The Complaint's pleading failures raise the fundamental question: what information did Plaintiffs actually have about their investments, and from which sources did any such information come? Possibilities include the Registered Investment Advisors who, as Plaintiffs admit, played an integral role in investors' securities purchases. *See* Compl. ¶¶ 19-20. These Advisors could have provided Plaintiffs with information about Aequitas or the Accused

Plaintiffs' failure to link any particular alleged misstatement to any particular sale and purchase of an Accused Security is fatal to their Complaint. Even under Rule 8 pleading standards, Plaintiffs have failed to provide Defendants fair notice of their claims, because it is not possible for Defendants to ascertain which (if any) of the alleged "misstatements and omissions" were made "in connection" with any sale and purchase at issue in the Complaint (ORS 59.135) or which sales were made "by means of" a particular alleged false statement or omission (ORS 59.115(1)(b)).

### 2. Plaintiffs Fail To Plead Actionable "Omissions"

From paragraphs 72 through 135 of the Amended Complaint, Plaintiffs recite a litany of alleged "omissions" by "Aequitas." *See*, *e.g.*, Compl. ¶¶ 72-78 (omissions regarding registration of securities); ¶¶ 86-92 (omissions regarding repayment of investments); ¶¶ 114-118 (omissions regarding student loan receivables). Not once in these 60 paragraphs, however, do Plaintiffs identify any affirmative statement that was rendered misleading due to allegedly omitted facts.

This failure requires dismissal of Plaintiffs' "omissions" allegations. Neither ORS 59.115(1)(b) nor 59.135(2) creates an affirmative duty to disclose information—even material information—to investors. This is because, in no uncertain terms, ORS 59.115(1)(b) and 59.135(2) prohibit only omissions of facts that are necessary "to make *the statement made*, in light of the circumstances under which they are made, not misleading." ORS 59.115(1)(b), 59.135(2) (emphasis added); *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015) (holding that analogous language in Section 11 of Securities Act of 1933 does not create "a general disclosure requirement;" rather, "it affords a cause of action only when an issuer's failure to include a material fact has rendered a published

---

Securities that was not from Aequitas. Without knowing whether Plaintiffs purchased through Advisors, and what they were told about their purchases, Defendants simply cannot defend Plaintiffs' claims.

statement misleading"). Plaintiffs' failure specifically to identify any statement rendered misleading by the "omissions" they identify, much less plead facts showing why that statement was misleading, is fatal to their "omissions" claims. *See* ORS 59.115(1)(b), 59.135(2); *Omnicare*, 135 S. Ct. at 1332.

### 3. Plaintiffs Fail To Plead That Any Affirmative Statement Was False When Made

From paragraphs 136 through 175 of the Complaint, Plaintiffs purport to identify a series of "misrepresentations and omissions" related to: (a) "use of investor funds" (Compl. ¶¶ 136-145); (b) student loan receivables (Compl. ¶¶ 146-160); (c) asset valuation (Compl. ¶¶ 161-168); and (d) solvency (Compl. ¶¶ 169-175). As discussed below, Plaintiffs fail to "set[] forth what is false or misleading about the statement[s] and why the statements were false or misleading at the time they were made." *In re Rigel Pharm.*, 697 F.3d at 876.

#### a. Use Of Investor Funds

Plaintiffs allege that "written investment materials" were false or misleading because they concealed that new investor funds were used to repay prior investors and operating costs. *See* Compl. ¶ 136. The "written investment materials" Plaintiffs identify are six PPMs from different Aequitas entities, issued over a five-year period from March 23, 2010 (AIOF PPM, *see* Compl. ¶ 138) through January 26, 2015 (AEIF PPM, *see* Compl. ¶ 140).

Plaintiffs fail to allege facts showing that statements in each of these PPMs were false when made. As an initial matter, all the PPMs at issue warned investors—with increasingly strong language over time—that their funds could be used to repay prior investors or pay Aequitas' operating expenses. The March 23, 2010 AIOF PPM disclosed that "[p]roceeds from the [AIOF] Notes *may* also be used to pay redemptions of previously issued Notes and to provide for the Fund's working capital needs." Compl. ¶ 138 (emphasis added). Then, a November 30,

2013 ACF PPM disclosed that ACF would "[f]rom time to time" use new investor funds to pay prior investors. *See* Compl. ¶ 137. By 2014, Aequitas warned that it "expected" to use investor funds to "pay obligations with respect to" senior investments and operating costs. Masuda Decl. Ex. 15, at 62 (AIOF-II PPM dated Oct. 1, 2014).

Plaintiffs allege no facts showing that these disclosures were false when made. To the contrary, these disclosures are entirely consistent with the alleged truth—that "an increasing majority of funds raised from investors was used to pay redemptions and interest payments to other investors." Compl. ¶ 136. Indeed, even assuming the truth of Plaintiffs' allegation that by 2014, "virtually all new investor money was used by Aequitas to satisfy obligations to prior investors," Compl. ¶ 141, Aequitas disclosed in 2014 that it "expected" it would use investor funds for exactly that purpose. *See* Masuda Decl. Ex. 15, at 61 (Oct. 1, 2014 AIOF-II PPM).[11]

#### b. Student Loan Receivables

Plaintiffs' claim regarding student loan receivables is largely an omissions claim. That is, Plaintiffs allege that Aequitas failed to disclose a range of details regarding its relationship with Corinthian, including Corinthian's identity as the student loan receivables counterparty (Compl. ¶ 149), the "actual cost to Aequitas" of the student loan receivables (Compl. ¶ 150), and the existence of specific agreements between Aequitas and Corinthian (Compl. ¶ 153).

These allegations fail for the same reason as Plaintiffs' other "omissions" claims: Plaintiffs fail to identify any affirmative statement that was rendered materially misleading as a

---

[11] Even if Plaintiffs had alleged any inconsistency between Aequitas' statements, and its use of investor funds over time, the statements would be too vague to be actionable. *See San Diego Cty. Emps. Ret. Ass'n v. Maounis*, 749 F. Supp. 2d 104, 122 (S.D.N.Y. 2010) (statements that fund allegedly operating as a single-strategy natural gas fund was "diversifi[ed]" were not misleading where, among other disclosures, the PPM qualified that "[t]he Manager is not subject to any formal diversification requirements, and the Fund's portfolio may *from time to time* be concentrated in a limited number of positions or strategies") (emphasis added).

result of the alleged omission. Plaintiffs allege that "Aequitas misled investors by omitting to disclose Corinthian as the effective guarantor of the Aequitas student debt portfolio." Compl. ¶ 148. But there is no identified affirmative statement that was rendered misleading by this alleged omission. *See Omnicare*, 135 S. Ct. at 1332; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) ("§ 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information."); *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("Rule 10b-5 and Section 14(e) in terms prohibit *only* misleading and untrue statements, not statements that are incomplete…. Often a statement will not mislead even if it is incomplete, or does not include all relevant facts.") (emphasis in original). Nor do Plaintiffs allege any facts showing why any specific affirmative statement would have been misleading. *See Omnicare*, 135 S. Ct. at 1330 (holding that "whether an omissions makes an expression of opinion misleading always depends on context").

The *only* statement Plaintiffs actually identify related to student loan receivables was a June 23, 2014 letter from "Aequitas" to unspecified "investors" that allegedly "included numerous false and misleading statements." Compl. ¶ 159. But, again, Plaintiffs fail to allege any particularized facts establishing that the challenged statement was false when written in 2014. Instead, after reciting a statement that allegedly "equated the face value of the Corinthian loans to their 'collateral' value", Plaintiffs baldly assert: "That statement also was fundamentally untrue, and Aequitas knew it." Compl. ¶ 159. This conclusory allegation falls well short of the particularity demanded by Rule 9(b).[12]

[12] Events occurring after this letter was sent (Compl. ¶ 160) cannot render its statements false or misleading at the time made. *In re Rigel Pharm., Inc.*, 697 F.3d at 876 (a complaint must "set[] forth what is false or misleading about the statement and why the statements were false or misleading at the time they were made.").

**c. Asset Valuation**

Plaintiffs also assert that Aequitas misled investors as to the value of: (i) collateral supporting the ACF Notes (Compl. ¶¶ 161-162); and (ii) certain "investment" assets reported in ACF's "audited financial statements." Compl. ¶¶ 163-168.

With respect to the "collateral" allegation, Plaintiffs identify statements in two unnamed "document[s] provided to investors and potential investors" that were allegedly dated November 24, 2014 and April 3, 2015. Compl. ¶¶ 161. These statements cannot support claims for sales occurring before November 24, 2014. And even for sales occurring thereafter, Plaintiffs' conclusory assertion that "[t]hese statements were false or misleading," *see* Compl. ¶ 161, falls far short of satisfying Rule 9(b).

With respect to the "investment assets" allegation, Plaintiffs claim that the value of ACF's investments, as reflected in ACF's audited financial statements, "increase[ed] dramatically over time." Compl. ¶ 164. Although Plaintiffs assert that these reported values were overstated, they offer no supporting facts that might render such allegation plausible (much less particularized). Instead, they claim that "[o]n information and belief, Aequitas created most, if not all, of these investment assets essentially out of thin air through financial engineering conducted outside the consolidated ACF group." Compl. ¶ 166. Plaintiffs' "information and belief" are not facts, and cannot support a claim that Aequitas' investment values were false or misleading at the time they were reported. *See United States ex rel. Brooks v. Trillium Cmty. Health Plan, Inc.*, No. 6:14-cv-01424, 2016 U.S. Dist. LEXIS 57635, at *4 (D. Or. Apr. 29, 2016) ("Claims made on information and belief are not usually sufficiently particular, unless

they accompany a statement of facts on which the belief is founded.") (citing *Shroyer v. New Cingular Wireless Servs., Inc*., 622 F.3d 1035, 1042 (9th Cir. 2010)).[13]

**d. Aequitas' Solvency**

Plaintiffs allege that Aequitas "concealed that it was insolvent" through intercompany loans from ACF to Holdings (the "ACF-Holdings Note"), which Plaintiffs claim were "identified on ACF's books as highly valuable assets." Compl. ¶ 169. They allege that the characterization of the ACF-Holdings Note was false because, "[i]n truth, the ACF-Holdings Note and other Aequitas affiliate loans became less and less valuable." Compl. ¶ 169.

These allegations, like the others, fail to satisfy Rule 9(b). The sole affirmative statement Plaintiffs purport to identify is that the ACF-Holdings Note was identified on ACF's books "as [a] highly valuable asset." Compl. ¶ 169. But the Amended Complaint fails to specify what "books" these were—much less where the ACF-Holdings Note was discussed, and what specifically was said about it. This pleading failure is no surprise: the November 2013 ACF PPM (which Plaintiffs have incorporated by reference in the Complaint) does not even identify the ACF-Holdings Note, much less describe it as a "highly valuable asset." *See* Masuda Decl. Ex. 14, at 23 (Nov. 30 2013 ACF PPM) ("Financial Information Summary" including purported "balance sheet" line items, but not identifying the ACF-Holdings Note).

Moreover, even if Aequitas did actually represent to investors that the ACF-Holdings Note was a "highly valuable asset," the truth or falsity of that statement necessarily turns on

---

[13] Moreover, even factual allegations that Aequitas' valuations of its investments were objectively wrong would not be enough. Aequitas' valuation estimates were management's *opinions*. Thus, to demonstrate falsity, Plaintiffs must plead facts showing that Aequitas knew those valuations were false. *See Omnicare*, 135 S. Ct. at 1326 (holding that an expression of opinion "explicitly affirms one fact: that the speaker actually holds the stated belief."); *In re Velti PLC Securities Litigation*, No. 13-cv-03889, 2015 WL 5736589, at *18 (N.D. Cal. Oct. 1, 2015) (under *Omnicare*, to show the falsity of an opinion statement, plaintiff must allege facts amounting to "fraud or intentional or reckless misconduct").

*when* it was made. Plaintiffs admit that "the ACF-Holdings Note and other Aequitas affiliate loans *became* less and less valuable" over some unspecified period of time. Compl. ¶ 169 (emphasis added). Without specificity as to which statements Plaintiffs allege to have been false or misleading—and when/on what basis—this Court cannot begin to ascertain whether those statements were false when made.

#### 4. Plaintiffs Fail to Plead That Aequitas Acted With Scienter, As Required Under ORS 59.135(2)

Furthermore, Plaintiffs' theory that "Aequitas" sold securities in violation of ORS 59.135(2) (Compl. ¶ 190(b)—one of two statutory branches for the false statements/material omissions theory of primary liability) fails for the additional reason that they have failed adequately to allege scienter. *State v. Marsh & McLenann Cos.*, 269 Or. App. 31, 49 (2015) (holding that claims under ORS 59.135(2) require the pleading of scienter).

As explained above, although Rule 9(b) permits Plaintiffs to allege state of mind "generally," it does not permit Plaintiffs to "plead the bare elements of [their] cause of action." *Iqbal*, 556 U.S. at 687. Instead, the complaint must contain "enough [factual allegations] to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Amended Complaint's allegations of Aequitas' "knowledge" are limited to the following:

- By July 1, 2014, Aequitas "knew and had knowledge" that Corinthian would not honor its recourse obligations and its ability to collect on Corinthian loans would be impacted. Compl. ¶¶ 158.
- The statement in a June 23, 2014 letter to investors that "Aequitas has funded approximately 46% of the current loan portfolios and is sitting on $119 MM of cash equity in these portfolios" was "fundamentally untrue, and Aequitas knew it." Compl. ¶ 159.
- Aequitas manipulated the value of the ACF-Holdings Note, and knew that its ability to pay investors depended on the holding company's ability to pay ACF, and that the holding company was unable to pay ACF. Compl. ¶¶ 172-173.

There are no facts alleged that would give rise to even a plausible inference that any of the Aequitas entities "knew" these facts at a particular time—and certainly not prior to July 1, 2014. *See Iqbal*, 556 U.S. at 687 (holding that a plaintiff may not "plead the bare elements of his cause of action . . . [and] expect his complaint to survive a motion to dismiss."). Plaintiffs have not provided factual allegations concerning: who is supposed to have known about the statement's falsity, how that person came to know of such falsity, when that person came to know of such falsity, and what underlying facts supposedly informed that person of such falsity. These pleading deficiencies are fatal.

### C. To The Extent The Claim Is Based On Sales Made Before April 4, 2013, The Claim Is Barred By ORS 59.115(6)'s Three-Year Statute Of Limitations

The default statute of limitations applicable to any theory of primary liability arising under ORS 59.115 is three years. ORS 59.115(6). Plaintiffs appear to concede that ORS 59.115(6) limits their theories of primary liability based on ORS 59.055 (sales of unregistered securities) and, ORS 59.135(2) ("false or misleading statements" in connection with sale of securities) to sales occurring before April 4, 2013. *See* Compl. ¶ 190(a)-(b) (alleging only that "[w]ithin three years before this action was commenced, Aequitas sold [securities in violation of ORS 59.055 and of 59.135(2), both of which violations are made actionable by 59.115(1)(a)]").

Plaintiffs attempt to assert the ORS 59.115(1)(b) branch of the "false or misleading statements" theory of primary liability, however, based on sales dating back to June 29, 2011. *See* Compl. ¶ 190(c). But sales from June 29, 2011 through April 3, 2013 are outside ORS 59.115's three-year statute of limitations. Apparently, Plaintiffs seek to avail themselves of ORS 59.115(6)'s "discovery rule," which allows an action for violation of 59.115(1)(b) to be commenced within "two years after the person bringing the action discovered or should have discovered the facts on which the action is based." ORS 59.115(6). To trigger this discovery

rule, however, Plaintiffs are required to plead facts justifying their delayed discovery. *TRM Corp. v. Paulsell*, No. CV-02-215, 2002 WL 31549112, at *2 (D. Or. June 4, 2002) (finding that where "[t]he face of the Complaint does not reveal why [plaintiff] delayed filing its claims beyond the [] statute of limitations ... [plaintiff] must allege facts justifying that delay" to avoid dismissal); *see also Mitchell v. Greenough*, 100 F.2d 184, 186 (9th Cir. 1938) (holding that invocation of the discovery rule must be "fortified by a statement of facts which justifies the claim of ignorance, and this requires a statement of the circumstances under which the discovery was made as well as the reasons for prior ignorance.").

Plaintiffs assert that they "did not know of the untruths or omissions and, in the exercise of reasonable care, could not have known"—but the Complaint pleads no facts supporting this allegation. *See* Compl. ¶ 190(c). Indeed, the Complaint admits that many of the facts Plaintiffs claim to have been "omitted," were in fact disclosed. For example, Plaintiffs cite Aequitas' supposed failure to disclose the 2010 GAO Report as an actionable misstatement—but this was a public document, released as part of a public congressional investigation more than five years before the complaint was filed. Compl. ¶ 115(a)-(b). Any claims based on securities purchases before April 4, 2013 should be dismissed.

## V. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint with prejudice.

June 10, 2016.

MARKOWITZ HERBOLD PC

By: s/ *David B. Markowitz*
**David B. Markowitz**, OSB No. 742046
**Chad M. Colton**, OSB No. 065774

3000 Pacwest Center

GARVEY SCHUBERT BARER

By: s/ *Gary I. Grenley*
**Robert C. Weaver, Jr.**, OSB No. 801350
**Gary I. Grenley**, OSB No. 75138
**Paul H. Trinchero**, OSB No. 014397

1211 SW Fifth Avenue
Portland, OR 97204
Telephone: (503) 295-3085
Email:
davidmarkowitz@markowitzherbold.com
chadcolton@markowitzherbold.com

-And-

**Brad D. Brian**
**Bruce A. Abbott**
**Zachary M. Briers**
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
Email: brad.brian@mto.com
bruce.abbott@mto.com
zachary.briers@mto.com

**Attorneys for Defendant Sidley Austin LLP**

K&L GATES LLP

By: s/ *Philip s. Van Der Weele*
**Philip S. Van Der Weele,** OSB No. 863650
**B. John Casey**, OSB No. 120025
**Adam W. Holbrook**, OSB No. 145494

One SW Columbia Street, Suite 1900
Portland, OR 97258
Telephone: (503) 228-3200
Email: phil.vanderweele@klgates.com
john.casey@klgates.com
adam.holbrook@klgates.com

**Attorneys for Defendant Tonkon Torp LLP**

121 SW Morrison Street, 11th Floor
Portland, OR 97204
Telephone: (503) 228-3939
Email: rweaver@gsblaw.com
ggrenley@gsblaw.com
ptrinchero@gsblaw.com

-And –

**Peter A. Wald**
**Gavin M. Masuda**
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Email: peter.wald@lw.com
gavin.masuda@lw.com

**Attorneys for Defendant Deloitte & Touche LLP**

THE FERRANTI FIRM LLC

By: s/ *William P. Ferranti*
**William P. Ferranti,** OSB No. 160069

1819 SW 5th Avenue, Suite 403
Portland, OR 97201
Telephone: (503) 877-9220
Email: wpf@ferrantiappeals.com

-And –

**Linda T. Coberly**
**Catherine W. Joyce**
**Joanna Rubin Travalini**
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Telephone:(312) 558-5600
Email: lcoberly@winston.com
cjoyce@winston.com
jtravalini@winston.com

**Attorneys for Defendant EisnerAmper LLP**