**William P. Ferranti**, OSB No. 160069
wpf@ferrantiappeals.com
**THE FERRANTI FIRM LLC**
1819 SW 5th Ave. #403
Portland, OR 97201
Tel: (503) 877-9220

**Linda T. Coberly** (admitted *pro hac vice*)
lcoberly@winston.com
**Catherine W. Joyce** (admitted *pro hac vice*)
cjoyce@winston.com
**Joanna Rubin Travalini** (admitted *pro hac vice*)
jtravalini@winston.com
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600

*Attorneys for Defendant EisnerAmper LLP*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| LAWRENCE P. CIUFFITELLI, for himself and as Trustee of CIUFFITELLI REVOCABLE TRUST, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>DELOITTE & TOUCHE LLP; EISNERAMPER LLP; SIDLEY AUSTIN LLP; TONKON TORP LLP; TD AMERITRADE, INC.; and INTEGRITY BANK & TRUST,<br><br>Defendants. | Case No. 3:16-cv-00580-AC<br><br>**DEFENDANT EISNERAMPER LLP'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT AND SUPPORTING MEMORANDUM**<br><br>Pursuant to Fed. R. Civ. P. 8, 9(b), and 12(b)(6)<br><br>Oral Argument Requested |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

LOCAL RULE 7-1(a) CERTIFICATION ........ 1

MOTION TO DISMISS ........ 1

MEMORANDUM OF LAW ........ 1

I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 4

III. ARGUMENT ........ 6

A. All claims against EisnerAmper should be dismissed because, as a matter of law, its alleged conduct is not "participat[ion] or material[] aid[ ] in the sale." ........ 6

B. Plaintiffs have not pleaded any connection between EisnerAmper and any particular "sale." ........ 11

C. Plaintiffs also fail to allege that EisnerAmper had any involvement with respect to five of the funds whose securities are at issue (AIOF II, ACOF, AEIF, APCF, and AMLF) or to sales by any Aequitas entity in 2014 or 2015. ........ 12

D. The claims based on ¶ 190(b) & (c) of the Amended Complaint should also be dismissed because Plaintiffs have failed to identify any untrue or misleading statement relating to any sale that EisnerAmper could possibly have aided. ........ 15

IV. CONCLUSION ........ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Am. W. Sec., Inc.*,
265 Or. 514, 510 P.2d 838 (1973) .................... 7, 9, 18

*Adamson v. Lang*,
236 Or. 511, 389 P.2d 39 (1964) .................... 7

*Ahern v. Gaussoin*,
611 F. Supp. 1465 (D. Or. 1985) .................... 7

*Ainslie v. First Interstate Bank of Oregon, N.A.*,
148 Or. App. 162, 939 P.2d 125 (1997) .................... 7

*Ainslie v. Spolyar*,
144 Or. App. 134, 926 P.2d 822 (1996) .................... 7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................... 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................... 14

*Cox v. Holcomb Family Ltd. Partnership*,
No. 1308-12201 (Or. Cir. Ct. Dec. 12, 2010) .................... 10

*Fakhrdai v. Mason*,
72 Or. App. 681, 696 P.2d 1164 (1985) .................... 8, 19

*In re Nat'l Cent. Fin. Enter.*,
846 F. Supp. 2d 828 (S.D. Ohio 2012) .................... 12

*In re Nat'l Cent. Fin. Enter., Inc. Inv. Litig.*
541 F. Supp. 2d 986 (S.D. Ohio 2007) .................... 7

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) .................... 19

*Nay ex rel. Thiele v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
No. 05 CIV. 10264 (RMB), 2006 WL 2109467 (S.D.N.Y. July 25, 2006) .................... 14

*Mann v. St. Laurent*,
229 F. Supp. 2d 1133 (D. Or. 2002) .................... 7, 9

*Monroe v. Hughes*,
860 F. Supp. 733 (D. Or. 1991),
*aff'd*, 31 F.3d 772 (9th Cir. 1994) .................... 9, 10

*Prince v. Brydon*,
307 Or. 146, 764 P.2d 1370 (1988) ........ 8, 19

*State v. Marsh & McLennan Cos.*,
241 Or. App. 107 (2011),
*rev'd on other grounds*, 353 Or. 1, 292 P.3d 525 (2012) ........ 12

*State ex rel. Oregon State Treasurer v. Marsh & McLennan Cos.*,
269 Or. App. 31, 346 P.3d 504 (2015) ........ 10

**Statutes**

ORS 59.115 ........ 12

ORS 59.115(1)(b) ........ 3, 15

ORS 59.115(3) ........ *passim*

ORS 59.135 ........ 3, 10, 15

ORS 59.137 ........ 12

**Other Authorities**

Fed. R. Civ. P. 8 ........ 1, 3

Fed. R. Civ. P. 9(b) ........ 1, 3, 14, 15, 19

Fed. R. Civ. P. 12(b)(6) ........ 1

GAO Report (August 4, 2010), http://www.gao.gov/new.items/d10948t.pdf ........ 17

U.S. Sec. & Exch. Comm'n, "Investor Publications: All About Auditors,"
https://www.sec.gov/investor/pubs/aboutauditors.htm ........ 8, 9

## LOCAL RULE 7-1(a) CERTIFICATION

As part of the meet-and-confer process further described in the Joint Motion To Dismiss filed herewith by Defendants Deloitte & Touche LLP, Eisneramper LLP, Sidley Austin LLP, and Tonkon Torp LLP ("Defendants"), counsel for EisnerAmper conferred with Plaintiffs' counsel regarding the issues raised by this motion. Plaintiffs' counsel declined to withdraw any claims or otherwise amend its pleading to address EisnerAmper's concerns, and opposes this motion.

## MOTION TO DISMISS

Pursuant to Rules 8, 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and this Court's Orders (Docs. 47, 70), Defendant EisnerAmper LLP hereby moves to dismiss the First Amended Class Action Complaint, in its entirety, with prejudice. The grounds for the motion are set forth in the Memorandum of Law below. EisnerAmper has also joined in the Joint Motion to Dismiss that raises issues common to all four Defendants.

## MEMORANDUM OF LAW

### I. INTRODUCTION

Plaintiffs' allegations against EisnerAmper LLP fall far short of the pleading standards that govern in this Court—and the requirements for liability for "participat[ing] or materially aid[ing] in the sale [of securities]" under ORS 59.115(3). Critically, Plaintiffs do not contend that EisnerAmper *took any action at all* that was directed toward any sale of securities. EisnerAmper's role was simply to audit the year-end financial statements for three of the funds and for two fiscal years (2011 and 2012), long before any of the funds began to suffer the difficulties that Plaintiffs contend led to their collapse. Moreover, even after one amendment, Plaintiffs' current complaint does nothing to connect EisnerAmper with any particular sale, any particular Plaintiff, or any sale carried out by means of a false or misleading statement.

Accordingly, the claims should be dismissed with prejudice as against EisnerAmper even if they survive against the other Defendants.

***First***, and most fundamentally, the theory underlying the claims against EisnerAmper fails as a matter of law. According to Plaintiffs, EisnerAmper "participate[d] or materially aid[ed] in" the sales of securities to Plaintiffs simply by auditing the funds' year-end financial statements. Plaintiffs do not contend that EisnerAmper took any affirmative action with respect to any of the *securities offerings*; they merely claim that EisnerAmper played a limited role with respect to the funds' business as a whole. Allowing Plaintiffs' claims to proceed on this basis would dramatically extend the reach of secondary liability under the Oregon securities laws and would be contrary to the way the Oregon courts have interpreted ORS 59.115(3).

***Second***, even if Plaintiffs' current allegations were sufficient to connect EisnerAmper with a particular securities offering, they are not sufficient to connect EisnerAmper with any particular "*sale*." The Amended Complaint identifies 13 separate purchasing decisions by 7 different sophisticated plaintiffs over a 5-year class period, involving securities issued by many different funds, supposedly based on 9 different fund-specific private placement memoranda (PPMs), which may or may not have identified EisnerAmper as the fund's outside auditor. But Plaintiffs do not say which PPM (if any) or other information they actually had in hand before making any particular purchase. Thus, no Plaintiff has succeeded in connecting EisnerAmper's work or role with any "sale" for which that Plaintiff has a claim.

***Third***, to the extent any of the claims against EisnerAmper merit consideration, only a handful of them could possibly survive. Plaintiffs fail to allege any connection at all between EisnerAmper and five of the eight Aequitas funds that issued the securities underlying the Amended Complaint. And with respect to the three other funds—the funds for which

EisnerAmper served as auditor—Plaintiffs fail to allege any connection between EisnerAmper and the sales in 2014 and 2015, which most closely preceded the funds' collapse. Even if an auditor could be said to have "participate[d] or materially aid[ed] in the sale [of securities]" where it merely audited the seller's year-end financial statements, it may *not* be held liable where the plaintiff cannot allege even that much.

***Finally***, Plaintiffs have failed to plead that any sale of securities in 2013 and earlier—during EisnerAmper's engagement—was made "by means of" any untrue or misleading statement. ORS 59.115(1)(b); *see also* ORS 59.135 (plaintiff must plead a false statement "in connection with" a sale). The overarching problems with Plaintiffs' Amended Complaint are addressed in Defendants' Joint Motion To Dismiss, which EisnerAmper joins in full. But the pleading problems for the claims against EisnerAmper run much deeper. With respect to 2011, 2012, and 2013, Plaintiffs plead virtually no facts at all about the true state of affairs at the Aequitas entities. To the extent they identify any statement in connection with sales during this period, they do not plead any facts showing how and why that statement was false or misleading when made, as Rule 9(b) requires. Indeed, Plaintiffs' allegations fail even under Rule 8: their bare assertions of pervasive fraud going back to 2011 are plainly implausible, given that the losses that Plaintiffs say caused the funds' collapse did not manifest themselves until years later. For this reason too, the claims against EisnerAmper must be dismissed, even if they proceed against the other Defendants.

These deficiencies in the claims against EisnerAmper are not merely a problem of pleading; they are a problem of timing and fact, and thus they cannot be cured. Plaintiffs have been fully aware of EisnerAmper's position on these issues for some time and yet have chosen to stand on their current allegations. Even when they amended their complaint to add new

defendants and expand on certain allegations, they did not (and could not) do anything to cure the defects discussed here. As the Amended Complaint makes clear, EisnerAmper does not belong in this lawsuit. The claims against EisnerAmper should be dismissed with prejudice.

## II. STATEMENT OF FACTS

In their Amended Complaint, Plaintiffs claim to have purchased Aequitas-related securities sold in violation of the Oregon Securities Laws. They further claim that the defendant law firms and auditors materially aided or participated in (and thus are liable for) the unlawful sales. A more detailed discussion of the Aequitas entities at issue in this litigation and their relationship to Defendants can be found in Defendants' Joint Motion to Dismiss the First Amended Complaint.

As to Defendant EisnerAmper, Plaintiffs allege that non-party Harb, Levy & Weiland LLP ("HLW")—and, after March 2012, EisnerAmper itself—served as outside auditor for certain Aequitas entities for a short time several years before the Aequitas funds fell apart. *See* Am. Compl. ¶¶ 16, 30(a). Specifically, in 2011, HLW took over the audit work from a different firm and was retained to audit the financial statements for the year ending December 31, 2011 for certain specific Aequitas entities. *Id.* ¶¶ 16, 30(a), 33, 41, 47. After what Plaintiffs describe as HLW's "merger" with EisnerAmper, EisnerAmper audited and issued an opinion on the financial statements for those same entities for the period ending December 31, 2012.[1] *See id.*

---

[1] Plaintiffs allege that EisnerAmper is HLW's "successor by merger." Am Compl. ¶ 16(a); *see also, e.g.*, ¶¶ 33, 41, 47 (failing to differentiate between HLW and EisnerAmper in allegations that "EisnerAmper" was identified as auditor on certain PPMs "during at least 2011 to 2013"). For present purposes only, we accept this allegation; it makes no difference to the issues raised in this motion or the Joint Motion to Dismiss. For that reason, and for ease of argument, we refer herein to EisnerAmper's engagement (which actually began in March 2012) as including HLW's term in 2011. In point of fact, however, EisnerAmper is *not* HLW's "successor by merger"; it has no responsibility for any liability of HLW related to services that HLW provided to any Aequitas entity. EisnerAmper will prove as much, if necessary, at the appropriate time.

For fiscal year 2013, Aequitas changed audit firms again, this time bringing in Defendant Deloitte & Touche LLP. *Id.* ¶¶ 34, 42, 48, 53, 58, 63. Once Deloitte was retained, EisnerAmper's role ended. *See id.*

Plaintiffs vaguely assert that "[i]nvestors and potential investors" in securities issued by ACF, AIPF, and AIOF[2] received those funds' 2011 and 2012 audited statements. *Id.* ¶¶ 33, 41, 47. But the complaint does *not* say whether Plaintiffs in particular received the statements, who sent them, when, and whether the statements were sent or received before or after the purchase was made. *See id.* Plaintiffs also claim (without alleging any supporting facts) that EisnerAmper gave "consent" to being identified in the PPMs as the auditor "in connection with the offering and sale." *See id.* But in fact, the offering documents for the ACF, AIPF, and AIOF offerings in 2012 and some part of 2013 merely listed EisnerAmper (or HLW in 2011) as "Auditor" in a company "Directory" that also included the fund's manager, legal counsel, address, and registered address, as well as the dates of its fiscal year and directions for making written inquiries. *See, e.g.*, Request for Judicial Notice, Declaration of Philip Van Der Weele, Ex. 1 at 6 (ACF PPM, March 1, 2013), Ex. 3 at 6 (AIPF PPM, June 1, 2012); *id*., Declaration of Gavin Masuda, Ex. 13 at 6 (ACF PPM, Nov. 30, 2013).

Separately, Plaintiffs also make sweeping reference to "Certain" "promotional materials, quarterly updates, and other materials and information" that purportedly "highlighted the role of" the various Professional Defendants. *Id.* ¶¶ 35, 43, 49. But Plaintiffs never identify these "Certain" materials, explain how they "highlighted" EisnerAmper's "role" (or even what that

---

[2] These acronyms and others used in this brief describe certain Aequitas-related entities, as defined in the First Amended Complaint.

"role" was), allege that Plaintiffs themselves received the materials and when, or specify when any other investors may have received them during the five-year class period.

Several years after EisnerAmper's alleged involvement, the Aequitas entities collapsed. As Plaintiffs summarize it, in February 2016, ACF (the main asset-owning entity) told investors that it had not been able to meet redemption requests since November 2015 and was preparing to liquidate; ACM (the main asset-managing entity) advised that it had retained an outside financial consultant to take over; and "Aequitas" announced layoffs. *See id.* ¶¶ 176–178. Soon thereafter, in March 2016, the U.S. Securities and Exchange Commission filed suit against certain Aequitas entities and executives, charging them with securities fraud and seeking the appointment of a receiver. *Id.* ¶ 179. In so doing, the SEC acknowledged that Aequitas was still solvent as late as 2014[3]—and Plaintiffs do not allege to the contrary. *See id.* ¶ 145 (suggesting that "Aequitas" "knew that it was insolvent" in January 2014).

## III. ARGUMENT

### A. All claims against EisnerAmper should be dismissed because, as a matter of law, its alleged conduct is not "participat[ion] or material[] aid[ ] in the sale."

First and foremost, Plaintiffs' claims against EisnerAmper fail as a matter of law because EisnerAmper did not "participate[] or materially aid[] in" any sales of securities. Plaintiffs have not alleged that EisnerAmper took any action at all with respect to any particular security or securities offering. Instead, they simply contend that EisnerAmper served as outside auditor for the sellers' year-end financial statements. As a matter of law, this is not enough to create liability under ORS 59.115(3).

---

[3] *See* SEC Compl. ¶ 3, No. 16-cv-00438-PK (D. Or. filed Mar. 10, 2016) *available at* https://www.sec.gov/litigation/complaints/2016/comp-pr2016-49.pdf ("ACF appears to have been profitable from 2011 to 2013").

Under ORS 59.115(3), "[e]very person who participates or materially aids in [a] sale" in violation of the Oregon Securities Laws is "liable jointly and severally with and to the same extent as the seller." Oregon courts "have emphasized that liability as a participant or a provider of material aid depends on the extent and importance of the defendant's involvement." *Ainslie v. First Interstate Bank of Oregon, N.A.*, 148 Or. App. 162, 184, 939 P.2d 125, 137 (1997).

Critically, the defendant must have taken some affirmative action directed toward the particular securities offering at issue. *See, e.g.*, *Mann v. St. Laurent*, 229 F. Supp. 2d 1133 (D. Or. 2002) (dismissing claim against third-party defendant where plaintiff alleged only that the defendant was a business advisor and owned stock in the company that issued the securities, and that he attended two meetings with the plaintiff). For example, courts have allowed claims to proceed against a third-party defendant based on allegations that it drafted and circulated the offering materials for the sale,[4] acted as an agent for the sale,[5] extended a loan to the seller specifically for the purpose of lifting a restriction on the sale,[6] or performed post-audit review procedures specifically in connection with the offering.[7]

Where the defendant merely provides professional services to the seller's business in general, however, Oregon courts are not willing to sustain claims under ORS 59.115(3)—unless the professional has knowledge of the fraud and engages in conduct that goes beyond "services normally performed" by a professional for its client. *Adams v. Am. W. Sec., Inc.*, 265 Or. 514, 528, 510 P.2d 838, 844 (1973) (allowing claim to proceed against seller's attorney only because

---

[4] *Ainslie v. Spolyar*, 144 Or. App. 134, 138, 926 P.2d 822 (1996); *In re Nat'l Cent. Fin. Enter., Inc. Inv. Litig*. 541 F. Supp. 2d 986, 1013–14 (S.D. Ohio 2007) (applying Oregon law).

[5] *Ainslie v. First Interstate Bank*, 148 Or. App. at 183–84.

[6] *Adamson v. Lang*, 236 Or. 511, 389 P.2d 39 (1964).

[7] *Ahern v. Gaussoin*, 611 F. Supp. 1465, 1472, 1491 (D. Or. 1985).

his conduct went beyond mere preparation of documents and other services normally performed by an attorney for his client, in part because the attorney knew about the wrongdoing and performed services specifically to facilitate the closing of the particular sale).

Even in cases where the third-party defendant did perform work with respect to the offering specifically, "something more than the mere preparation and execution of documents is required to find liability." *Fakhrdai v. Mason*, 72 Or. App. 681, 684, 696 P.2d 1164, 1166 (1985); *accord Prince v. Brydon*, 307 Or. 146, 149, 764 P.2d 1370, 1371 (1988) ("[M]ore than preparation of documents [i]s needed for liability."). "Typing, reproducing, and delivering sales documents may all be essential to a sale, but they could be performed by anyone; it is a drafter's knowledge, judgment, and assertions reflected in the contents of the documents that are 'material' to the sale." *Prince*, 307 Or. at 149.

As a matter of law and logic, serving as outside auditor for a company's year-end financial statements—without more—cannot constitute material aid or participation in any particular sale of securities. An outside auditor's role is to test and opine on the year-end financial statements that its client has prepared. *See* U.S. Sec. & Exch. Comm'n, "Investor Publications: All About Auditors" ("A company's management has the responsibility for preparing the company's financial statements and related disclosures. The company's outside, independent auditor then subjects the financial statements and disclosures to an audit.").[8] The auditor then issues a brief report addressed to the client's Board or current shareholders. *Id*. ("A company's outside, independent auditor examines the company's financial statements and provides a written report that contains an opinion as to whether the financial statements are fairly

---

[8] *Available at* https://www.sec.gov/investor/pubs/aboutauditors.htm.

stated and comply in all material respects with [generally accepted accounting principles].”). The report relates to the financial statements themselves, not to any particular transaction. *Id.*

Plaintiffs do not allege that EisnerAmper’s role was any different. The crux of Plaintiffs’ case against EisnerAmper is simply that it “acted as the auditor” of certain entities’ year-end financial statements. Am. Compl. ¶ 30(a). There is no allegation that EisnerAmper did anything other than provide ordinary auditing services. It did not draft materials or perform procedures for purposes of any specific offering, nor did it have any contact with potential buyers. And while Plaintiffs assert in conclusory fashion that certain PPMs identified EisnerAmper “[w]ith EisnerAmper’s knowledge and consent” (*e.g.*, ¶ 47), they do not allege any facts to support this assertion. For example, they do not allege that EisnerAmper issued any formal letter of consent with respect to the PPM, revisited its prior audit work for that purpose, or reissued its prior audit opinions specifically for inclusion in the PPM.

All of this is fatal to the claims against EisnerAmper, which merely provided ordinary professional services and is not alleged to have taken any affirmative action directed toward the particular securities offering itself. *See Mann*, 229 F. Supp. 2d at 1139 (dismissing claim against defendant who was merely a business advisor and stockholder in the seller’s business generally and had not participated in the particular sale); *see also, e.g.*, *Adams*, 265 Or. at 528 (sustaining claim against attorney only because he “did considerably ‘more’” than provide ordinary legal services, as he filed the registration statement and prospectus with knowledge of the particular sale and was a “participant in [the] formulation of [the] plan”).

At least two courts have found similar or even *stronger* allegations insufficient to state a claim against an auditor under ORS 59.115(3). First, in *Monroe v. Hughes*, 860 F. Supp. 733 (D. Or. 1991), this Court dismissed securities fraud claims against an auditor defendant, including a

claim under ORS 59.115(3), even though plaintiffs specifically alleged that the "prospectus for th[e] sale included [the auditor's] 1988 audit report as well as unaudited financial statements for [a] six-month period" that the auditor "had reviewed" and with respect to which it "provided comfort letters to the underwriters" involved in the specific offering. *See* 31 F.3d 772, 774 (9th Cir. 1994) (affirming dismissal). This was clearly a more substantial and direct role in the particular securities offering than alleged against EisnerAmper here. And second, in *Cox v. Holcomb Family Ltd. Partnership*, No. 1308-12201 (Or. Cir. Ct. Dec. 12, 2010) (attached hereto as Ex. A), the court granted a motion to dismiss filed by Jones & Roth PC, an auditing firm. *Id.* at 9. The plaintiff had alleged only that the firm "provided [and] reviewed financial statements for [the seller]" that the issuer's banks had "required" to keep the issuer in business and issuing securities. *Id*. The court held that this was not sufficient, as there were no allegations to show "the extent and importance of [defendant accounting firm's] involvement or its connection to the underlying sales." *Id*. The allegations here are even more "scant" than in *Cox* (*id.*), as Plaintiffs here do not say whether or why audited financial statements were "required" for any aspect of the offerings.

Any other rule would dramatically change the way the securities laws work in Oregon. Although an auditor's report can be the basis for a claim of fraud, such claims generally require allegations that the auditor made a false statement with scienter—that is, with an intent to defraud. *See, e.g.*, *State ex rel. Oregon State Treasurer v. Marsh & McLennan Cos.,* 269 Or. App. 31, 50, 346 P.3d 504, 514 (2015) ("[T]he legislature understood the phrase 'violation of ORS 59.135(1), (2), or (3)' to refer to acts that are committed with *scienter*.") (emphasis in original). Auditor liability under ORS 59.115(3), by contrast, does not require allegations that the auditor acted with scienter; it leaves the auditor's lack of knowledge for proof as an

affirmative defense. But there is a trade-off: to get the benefit of this scienter-less cause of action, the plaintiff *does* need to allege that the auditor affirmatively "participate[d] in or materially aid[ed] *in the sale*." ORS 59.115(3) (emphasis added). Conducting financial statement audits and issuing audit opinions cannot be enough, or else the scienter requirement could be avoided for every securities sale by an audited entity. Nothing about the structure of these provisions would permit such an extreme result.

**B. Plaintiffs have not pleaded any connection between EisnerAmper and any particular "sale."**

Even if EisnerAmper's role as outside auditor were sufficient to constitute participation or material aid in a securities offering (and it is not), Plaintiffs still have not pleaded any connection between EisnerAmper and their particular purchases. Again, ORS 59.115(3) imposes secondary liability only where the third party "participate[d] or materially aid[ed] *in the sale*" of a particular security. ORS 59.115(3). There are 7 different plaintiffs in this case, and they purchased 6 different securities[9] in transactions scattered throughout the 5-year class period. Further, the complaint identifies 9 different PPMs, only a few of which specifically identified EisnerAmper (or its predecessor HLW) as the fund's outside auditor. But Plaintiffs do not say which PPM (if any) or other information they actually had in hand before making any particular purchase, nor do they say whether that particular information had anything to do with EisnerAmper. Thus, no Plaintiff has succeeded in connecting EisnerAmper's work or role to any "sale" for which that Plaintiff has a claim.

Indeed, Plaintiffs do not even allege that they saw audited financial statements before their purchases—and there can be no presumption that they did, because these were not sales on

---

[9] Although the complaint also discusses securities issued by AEIF and APCF, none of the Plaintiffs named in the complaint claim to have purchased those securities.

a public exchange.[10] At most, the Amended Complaint states that "[i]nvestors and potential investors received the audited financial statements" (*e.g.*, ¶ 33)—a transparent bit of artful pleading, obviously designed to obscure the fact that investors may well have received audited financial statements (if at all) only *after* they completed their purchases and became stakeholders or shareholders in the seller. *See In re Nat'l Cent. Fin. Enter.*, 846 F. Supp. 2d 828, 909 (S.D. Ohio 2012) (granting summary judgment for a defendant where purchaser had not had any contact with defendant and had not reviewed any statement drafted by defendant before making its purchase). Plaintiffs' utter failure to connect EisnerAmper, its work, or its role with any of their purchases provides an alternative basis for dismissal.

### C. Plaintiffs also fail to allege that EisnerAmper had any involvement with respect to five of the funds whose securities are at issue (AIOF II, ACOF, AEIF, APCF, and AMLF) or to sales by any Aequitas entity in 2014 or 2015.

The Amended Complaint purports to assert broad and sweeping claims against all the Defendants based on a host of Aequitas-related securities offerings. *See* Am. Compl. ¶¶ 26–28 (listing all eight securities). But closer examination reveals that Plaintiffs have not alleged—even in broad strokes—that EisnerAmper had any specific connection at all with at least five of the eight funds that issued the relevant securities, or with sales by *any* fund in 2014 or 2015. Any claims against EisnerAmper based on sales of those securities and/or in those years should be dismissed.

Plaintiffs contend that EisnerAmper served as auditor with respect to the year-end financial statements of only *three* of the eight relevant Aequitas funds: ACF, AIPF, and AIOF.

---

[10] *See State v. Marsh & McLennan Cos.*, 241 Or. App. 107, 114 (2011) (ORS 59.115 "creates a cause of action for purchasers of stock who are damaged by misrepresentations in face-to-face securities transactions"), *rev'd on other grounds*, 353 Or. 1, 292 P.3d 525 (2012) (reliance may be presumed for claims under ORS 59.137, involving efficient public market sales, but not for direct, face-to-face transactions challenged through ORS 59.115).

In the center section of their complaint, Plaintiffs attempt to articulate the role each Defendant played with respect to most of the relevant funds or securities. *Id.* ¶¶ 31–63. For "The ACF Notes," for example, Plaintiffs allege that EisnerAmper audited the annual financial statements of ACF for the years ended December 31, 2011 and 2012. *Id.* ¶ 33. They also allege that EisnerAmper was identified as ACF's auditor in its PPMs "during at least 2011 to 2013." *Id.* ¶ 33. Plaintiffs make similar assertions about EisnerAmper with respect to AIPF and AIOF. *Id.* ¶¶ 41, 47. These allegations are also summarized in an earlier paragraph. *Id.* ¶ 30(a) ("EisnerAmper acted as the auditor" of the year-end financial statements of "numerous Aequitas investment vehicles, including ACF; AIPF; [and] AIOF"); *see also supra* at 4 n.1.[11]

With respect to securities offered by other Aequitas entities, Plaintiffs do not mention EisnerAmper at all; they only mention Deloitte. This is the case for the securities sold by AIOF II (¶¶ 50–55), ACOF (¶¶ 56–59), and AEIF (¶¶ 60–63). With respect to the securities of AMLF, Plaintiffs do not mention either EisnerAmper *or* Deloitte, saying only that "Aequitas made no meaningful disclosures at all in connection with its sale of the AMLF Notes." *Id.* ¶ 140. And Plaintiffs do not discuss APCF and its notes beyond identifying them early in the complaint. *Id.* ¶¶ 25, 28, 30(c).

Further, even for the three relevant entities for which EisnerAmper *did* serve as auditor—ACF, AIPF, and AIOF—Plaintiffs concede that EisnerAmper's role ceased some time in 2013, when the funds retained Deloitte. *See id.* ¶ 34 (Deloitte audited ACF's year-end financial statements for the years ended December 31, 2013 and December 31, 2014). In fact, Plaintiffs

---

[11] Plaintiffs also allege that EisnerAmper "acted as the auditor" for certain other Aequitas entities (¶ 30(a)), but they do not assert claims based upon any sale of securities by those entities. And while they contend that EisnerAmper also audited ACF's *consolidated* financial statements (*id.*), they do not contend that any investor received those, and they do not otherwise link EisnerAmper's work on the consolidated financial statements with any particular offering.

allege that "from 2013 forward," the PPMs issued by these entities "identified Deloitte as the auditor." *Id.*; *see also id.* ¶ 42 (AIPF), ¶ 48 (AIOF). Accordingly, Plaintiffs do not allege that EisnerAmper was in any position to "participate[] or materially aid[]" any sales of securities by these entities—or any other, for that matter—in 2014 or 2015.

To withstand a motion to dismiss for failure to state a claim, a complaint must contain enough factual matter to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Here, that requires some allegation that EisnerAmper "participate[d] or materially aid[ed] in" the relevant sale of securities. ORS 59.115(3). Plaintiffs' inability to link EisnerAmper with the securities offered by AIOF II, ACOF, AEIF, APCF, or AMLF—or with sales in 2014 and 2015 by *any* entity—is a complete failure of pleading under *Iqbal* and *Twombly*, as well as under the heightened particularity requirements required by Rule 9(b). *See, e.g.*, *Nay ex rel. Thiele v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 05 CIV. 10264 (RMB), 2006 WL 2109467, at *3, n.1 (S.D.N.Y. July 25, 2006) ("Having found [no] connection to the purchase or sale of securities … on the part of Merrill Lynch, the Court need not determine whether the remaining elements of [Plaintiff's] ... claim have been alleged sufficiently or whether [Plaintiff's] fraud allegations otherwise meet the specificity requirements of Rule 9.") (citations and internal quotation marks omitted).

Indeed, by connecting EisnerAmper with only three sellers of securities and for only a limited time, Plaintiffs effectively concede that EisnerAmper was not involved in any other securities offerings. To the extent the complaint asserts claims against EisnerAmper on any other basis, such claims should be dismissed with prejudice.

**D. The claims based on ¶ 190(b) & (c) of the Amended Complaint should also be dismissed because Plaintiffs have failed to identify any untrue or misleading statement relating to any sale that EisnerAmper could possibly have aided.**

As the Joint Motion explains, Rule 9(b) imposes a heightened pleading standard for this case, and the Amended Complaint fails to meet it. Among other shortcomings, Plaintiffs' allegations do not support a plausible inference that Aequitas made any statement that was false or misleading when made. And further, as shown below, their allegations are plainly insufficient with respect to sales made during EisnerAmper's engagement—more than two years before the Aequitas funds unraveled.

Again, EisnerAmper served as outside auditor at Aequitas for a very short time—only for the fiscal years ending December 31, 2011 and December 31, 2012. Am. Compl. ¶¶ 33, 41, 47; *see also supra* at 4 n.1. During fiscal year 2013, the engagement shifted to Deloitte. *Id.* ¶¶ 34, 42, 48, 53, 58, 63. The question, then, is whether any of the sales during EisnerAmper's engagement were made "by means of" an untrue or misleading statement. ORS 59.115(1)(b); *see also* ORS 59.135 (false statement "in connection with" a specific sale).

With respect to the short period of EisnerAmper's engagement, however, Plaintiffs allege virtually no facts at all. Nowhere do they describe the true condition of the Aequitas entities in those early years. They do not allege, for example, that Corinthian defaulted on a single recourse payment during that period. And most of the alleged "failures to disclose" plainly relate to information that arose well after EisnerAmper's engagement had ended. *Id.* ¶¶ 121, 140, 158–160, 173. Indeed, many of Plaintiffs' alleged omissions are explicitly tied to later periods. *E.g.*, *id.* ¶ 116 (alleging that "Aequitas" did not disclose the impact that the "2014 civil charges brought against Corinthian and Corinthian's 2015 bankruptcy" could have on the funds).

In fact, the gist of Plaintiffs' allegations is that problems arose for "Aequitas" *over time*, and ultimately (in 2015, or perhaps 2014) the sellers' statements *became* misleading. For

EisnerAmper, this is plainly insufficient; under this theory, there were no sales made "by means of" a misleading statement until EisnerAmper was no longer on the scene. And to the extent that Plaintiffs try to tie any of these allegations back to the earlier years—as they do for the three categories of allegations discussed below—their pleading is grossly insufficient.

***First***, Plaintiffs challenge the funds' statements about what they "intended" to do with respect to using investor money. Am. Compl. ¶¶ 136–139 (citing statements in 2010, 2012, 2013, and 2014). According to Plaintiffs, "Aequitas" indicated to investors (again, not necessarily to Plaintiffs themselves) that investor funds would not be used to repay prior investors, and yet they were.[12] Plaintiffs contend—in conclusory fashion—that the funds "intended to and did use those funds for purposes other than those stated." *Id.* ¶¶ 138–139.

But the Amended Complaint utterly fails to plead any facts suggesting that the funds "intended to and did use those funds" for such purposes *in 2011, 2012, or 2013*. Nowhere do they contend that this supposed "use" was taking place all the way back to those earlier periods when EisnerAmper was still serving as the funds' auditor. To the contrary, Plaintiffs *admit* that the misuse of funds really became a problem only later, "[b]y 2014." *Id.* ¶ 141. This defeats any claim against EisnerAmper.

***Second***, Plaintiffs suggest that the sellers materially misled investors because, though they revealed a heavy reliance on for-profit education investments, they failed to identify Corinthian in particular. The purpose of this omission, according to Plaintiffs, was to "prevent investors from discovering the administrative, regulatory, legal, and public perception troubles that were hammering Corinthian's business model during the 2010–2014 period, and

---

[12] In point of fact, the offering documents specifically disclosed that this was a possible use of funds. *See* Defs.' Joint Br. at 19-20.

undermining Corinthian's ability to continue to honor its contractual recourse obligations." *Id.* ¶ 149; *see also id.* ¶¶ 150–153 (alleging other omissions relating to Corinthian). But Aequitas *did* disclose its financial relationship with Corinthian. For example, in the 2012 AIPF PPM, Aequitas disclosed that ACF had agreed to provide funding for loans originated for Corinthian. *See* Request for Judicial Notice, Declaration of Philip Van Der Weele, Ex. 1 at ¶ 5.

Further, and in any event, Plaintiffs do not (and cannot) plead facts showing that Corinthian's own particular identity would have been "material" for investors during EisnerAmper's tenure, when the same troubles were affecting the entire for-profit education industry. This Court may take notice of the fact that the GAO Report issued in August 2010 attacked the entire industry and did not single out Corinthian by name. *See id.* ¶ 115(b) (referencing GAO Report); GAO Report dated August 4, 2010, *available at* http://www.gao.gov/new.items/d10948t.pdf. The same is necessarily true of the "new federal regulations." *Id.* ¶ 115(e). And Plaintiffs concede that the Senate investigation was "sharply critical of the for-profit education industry" as a whole. *Id.* ¶ 115(f). As for Corinthian itself, Plaintiffs have not alleged that it defaulted—or was even at any serious risk of defaulting—on a single recourse obligation in 2011 or 2012. It was only in "late 2013" that Plaintiffs contend the "writing was on the wall" for Corinthian in particular. *E.g.*, *id.* ¶ 155. In short, Plaintiffs have not plausibly pleaded any material misstatements or omissions with respect to Corinthian in the earlier years—the only period in which EisnerAmper could possibly have participated or aided in the resulting sales.

In fact, not only have Plaintiffs failed to state a claim, but they have actually pleaded themselves out of Court as far as Corinthian and the early years of the class period. As Plaintiffs concede, the arrangement between Corinthian and ASFG (the Aequitas entity at issue, a

subsidiary of ACF) involved substantial "discount fee[s]" paid by Corinthian to ASFG, together with a promise that Corinthian would repurchase loans that turned out to be uncollectible. *Id.* ¶ 146. "[I]f ASFG could collect on the purchased loans, it would make the entire amount of the 'discount fee' as profit, and any loans on which ASFG could not collect would be repurchased by Corinthian," making this—in Plaintiffs' own words—"*a 'no-lose' situation*" for Aequitas. *Id.*¶ 147 (emphasis added). Plaintiffs say this would be so "only as long as Corinthian . . . [met] its contractual recourse obligations" (*id.*)—but they concede that this remained true at least well into 2013. *See id.*¶ 156 (alleging that, "[b]y the end of January 2014", though Corinthian had allegedly failed to purchase $70 million in non-performing loans, "[it] had paid ASFG about $71.5 million to purchase non-performing loans having a face value of about $120 million"). Plaintiffs further admit that "the collapse of Corinthian's business" did not take place until "mid-2014" (¶ 158), and that it was the "2014 civil charges" and "Corinthian's 2015 bankruptcy" that "raised the possibility that the entire Corinthian student loan portfolio might be rescinded," "greatly increased the rates of default," and "eliminated any possibility of recourse against Corinthian" (¶ 116). This is no doubt why the SEC's complaint alleges that Aequitas was solvent through early 2014. *See id.* ¶ 179 (referencing the SEC's complaint); SEC Compl., No. 16-cv-00438-PK, filed Mar. 10, 2016, cited *supra* at 6 & n.2. Plaintiffs here do not disagree with that assertion. Am. Compl. ¶ 145 (suggesting Aequitas only "knew that it was insolvent" after "January 2014"). This defeats their effort to tie any fraud relating to Corinthian back to the early years, when EisnerAmper was supposedly participating in sales of securities.

***Third***, Plaintiffs' allegations about "investment assets" and "non-marketable common stock" (Am. Compl. ¶¶ 161–168) also fail with respect to sales between 2011 and 2013.

According to the Amended Complaint, the 2011 and 2012 year-end financial statements included amounts in both of these categories. *Id.* ¶ 166.

But Plaintiffs do not explain how or why these figures were materially misleading in the context of the financial statements as a whole, much less in the context of all the information available to investors. More is required to state a claim. *See Prince*, 307 Or. at 149; *Adams*, 265 Or. at 528; *Fakhrdai*, 72 Or. App. at 684. And Plaintiffs concede that the amounts in these categories nearly tripled in the year after EisnerAmper's last audit and then, in the following year, increased by another 56%. *Id.* ¶ 164; *see also id.* ¶¶ 169–175 (focusing on years 2014 and onward with respect to ACF Holdings Note). Thus, as with the allegations regarding the use of investor funds and Aequitas' relationship with Corinthian, the most that could be said regarding these valuation allegations for the 2011 to 2013 period is that Plaintiffs are trying to establish a baseline—after which problems arose and allegedly were hidden—to support a claim for fraudulent sales in 2014 and 2015. Assuming that they have, in this way, managed to state a claim against some other Defendant based on sales in 2014 and 2015, they have not done so for purposes of a claim against EisnerAmper based upon sales in 2011, 2012, or 2013.

In sum, Plaintiffs' Amended Complaint does not provide plausible—much less particularized—allegations of false or misleading statements by the Aequitas funds with respect to sales of securities from 2011 to 2013. And again, those are the only sales that EisnerAmper allegedly participated in or materially aided. Rule 9(b) requires Plaintiffs to identify each specific statement alleged to be false or misleading, and facts sufficient to establish that such statement was false when made. *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Even if the Amended Complaint were sufficient as to the later years, it would still be utterly lacking for the years relevant to the claims against EisnerAmper.

## IV. CONCLUSION

For the foregoing reasons—as well as for the reasons set out separately in the Joint Motion—Defendant EisnerAmper LLP respectfully requests that the Court dismiss Plaintiffs' First Amended Class Action Complaint as against EisnerAmper LLP, with prejudice.

Dated: June 10, 2016

Respectfully submitted,

s/William P. Ferranti
William P. Ferranti, OSB No. 160069
**THE FERRANTI FIRM LLC**
1819 SW 5th Ave. #403
Portland, Oregon 97201
Tel: (503) 877-9220
wpf@ferrantiappeals.com

**Linda T. Coberly**, Admitted Pro Hac Vice
lcoberly@winston.com
**Catherine W. Joyce**, Admitted Pro Hac Vice
cjoyce@winston.com
**Joanna Rubin Travilini**, Admitted Pro Hac Vice
jtravalini@winston.com
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Tel: (312) 558-5600

*Attorneys for Defendant EisnerAmper LLP*