UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

LAWRENCE P. CIUFFITELLI, for himself
and as Trustee of CIUFFITELLI REVOCABLE
TRUST; GREG and ANGELA JULIEN;
JAMES and SUSAN MACDONALD, as Co-
Trustees of the MACDONALD FAMILY
TRUST; R.F. MACDONALD CO.; ANDREW
NOWAK, for himself and as Trustee of the
ANDREW NOWAK REVOCABLE LIVING
TRUST U/A 2/20/2002; WILLIAM
RAMSTEIN; and GREG WARRICK, for
himself and, with SUSAN WARRICK, as Co-
Trustees of the WARRICK FAMILY TRUST,
individually and on behalf of all others
similarly situated,

                Plaintiffs,

      v.

DELOITTE & TOUCHE LLP;
EISNERAMPER LLP; SIDLEY AUSTIN
LLP; TONKON TORP LLP; TD
AMERITRADE, INC.; and INTEGRITY
BANK & TRUST,

                Defendants.
_____

Case No. 3:16-cv-580-AC

FINDINGS AND
RECOMMENDATION

ACOSTA, Magistrate Judge:

Page 1 – FINDINGS AND RECOMMENDATION                 [TJP]

*Introduction*

Plaintiffs Lawrence P. Ciuffitelli and others (collectively, "Plaintiffs") bring this action against Defendants Deloitte & Touche LLP ("Deloitte"); EisnerAmper LLP ("EisnerAmper"); Sidley Austin LLP ("Sidley"); Tonkon Torp LLP ("Tonkon"); TD Ameritrade, Inc. ("Ameritrade"); and Integrity Bank & Trust ("Integrity") (collectively, "Defendants"). Plaintiffs allege multiple violations of the Oregon Securities Law, stemming from the sale of securities issued by "Aequitas," a group of related investment and private equity entities. The Aequitas group of companies, which are not a party to this action, entered receivership in early 2016. A civil enforcement action, *Securities and Exchange Commission v. Aequitas Management, LLC et al.*, case number 3:16-cv-0438-PK ("*SEC* Lawsuit"), is currently pending before Judge Papak.

Presently before the court is a joint motion to dismiss Plaintiffs' First Amended Complaint ("FAC"), filed by Deloitte, EisnerAmper, Sidley, and Tonkon. Also before the court are motions to dismiss the FAC filed individually by Deloitte, EisnerAmper, Sidley, Tonkon, Ameritrade, and Integrity. Joint Movants additionally move for judicial notice of some offering documents for the securities at issue, engagement letters between Aequitas companies and Deloitte, and some regulatory filings made by Aequitas companies.

*Summary of Decision*

The court should grant in part and deny in part Defendants' Motions to Dismiss. Plaintiffs insufficiently allege the Aequitas entities' primary violations of the Oregon Securities Law. Rule 9(b) requires Plaintiffs to allege the Aequitas entities' misrepresentations and material omissions with particularity. Plaintiffs' remaining allegations against the Aequitas entities and the Defendants are subject to Rule 8. Accordingly, the court should grant the motions to dismiss as follows: The court should dismiss the allegations in the FAC that do not

differentiate between the Aequitas entities and the securities they sold.  The court should also dismiss the allegations of misrepresentations and material omissions that do not state when and where the misleading statements occurred, or that misrepresentations were false when made. Additionally, the court should dismiss alleged material omissions where Plaintiffs do not identify an affirmative statement made false by the omission.

The court should deny Defendants' motions to dismiss based on construction of the Oregon Securities Law.  Plaintiffs need not plead receipt of misleading communications if the security purchased was part of a series or group of transactions effected by means of misleading communications.  The Oregon Securities Law creates "participation and material aid" liability for non-sellers whose interactions with a seller have a causal, material relationship with an unlawful securities transaction.  Plaintiffs adequately allege that Deloitte, EisnerAmper, Tonkon, Sidley, Integrity, and Ameritrade participated in or materially aided some securities transactions by Aequitas entities.

The court should grant Plaintiffs leave to file another amended complaint because the defects of the FAC could be cured by additional factual allegations.

*Factual Background*

The 51-page FAC lays out a complex series of allegations, centered on the securities business of the Aequitas group of companies.  Not all of the allegations are relevant to the pending motions.  Still, significant background facts are necessary to resolve the pending motions.  The following facts are alleged in the complaint and, for the purposes of the pending motions to dismiss, the allegations in the complaint are taken as true and construed in the light most favorable to Plaintiffs.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009).

Page 3 – FINDINGS AND RECOMMENDATION                                    [TJP]

I.  Parties.

The complaint contains allegations relating to three principal groups:  the Aequitas group, Plaintiffs, and Defendants.

A.  The Aequitas Group.

The Aequitas group of entities is a group of approximately 75 affiliated limited liability companies, partnerships, and corporations.  (First Am. Compl. ("FAC") (ECF No. 57), ¶ 21.) The complaint refers to the group of companies collectively as "Aequitas."  (E.g., id. ¶¶ 1–4.) This Findings and Recommendation will refer to the entire group of affiliated entities as "the Aequitas group," and to unspecified groups of affiliated entities as "the Aequitas entities."  A complex series of loans, ownership interests, management agreements, and other relationships connected the Aequitas group.  (E.g., id. ¶¶ 21–25, 29, 169–75.)

Aequitas Management, LLC ("Management") is the parent entity of the Aequitas group. (Id. ¶ 22.)  Management holds an 84% ownership stake in Aequitas Holdings, LLC ("Holdings"). (Id.)  Holdings is the sole owner and member of Aequitas Commercial Finance, LLC ("ACF") and sole shareholder of Aequitas Capital Management, Inc. ("ACM").  Id.  ACM wholly owns Aequitas Investment Management, LLC ("AIM").  (Id. ¶ 25.)  Management, Holdings, ACM, and AIM ("the Control Entities") owned and managed the subordinate Aequitas entities.  (Id. ¶¶ 21–25.)

Principally, the Aequitas group raised funds by selling securities through ACF.  (FAC ¶ 27.)  Additional Aequitas subordinate entities sold securities mentioned in the complaint: MotoLease Financial, LLC ("MotoLease"); Aequitas Income Protection Fund, LLC ("AIPF"); Aequitas Income Opportunity Fund, LLC ("AIOF"); Aequitas Income Opportunity Fund II, LLC ("AIOF II"); Aequitas Capital Opportunities Fund, LP ("ACOF"); and Aequitas Enhanced

Income Fund, LLC ("AEIF") (collectively, "the Funds"). (*Id.* ¶ 28.) ACF owned all or part of the Funds. (*Id.* ¶ 23.)

   B. *Plaintiffs*.

Plaintiffs are investors who purchased securities from ACF or the Funds. (FAC ¶¶ 8–14; 64–70.) With the exception of AEIF, ACF and the funds each sold securities to at least one named plaintiff. (*Id.* ¶¶ 64–70.) Which plaintiff purchased which securities is not relevant to the pending motions because Plaintiffs sue in a representative capacity. In some cases, the issuing entities induced Plaintiffs to extend the maturity date of a purchased security or reinvest the proceeds of a security after redemption. (*E.g. id.* ¶¶ 67(c), 68(a).) Plaintiffs seek to represent a class of all investors who purchased securities from the Aequitas group on or after June 29, 2011. (*Id.* ¶ 181.)

   C. *Defendants*.

Deloitte, an accounting firm, performed accounting and auditing services for Aequitas entities in 2013 and 2014. (FAC ¶ 15.) EisnerAmper, an accounting firm, performed accounting and auditing services for Aequitas entities in 2011 and 2012. (*Id.* ¶ 16.) Sidley is an international business law firm. (*Id.* ¶ 17.) Sidley provided legal advice to Aequitas entities regarding sales of securities and prepared legal documents necessary to sell securities through ACOF and other Aequitas entities. (*Id.* ¶¶ 17; 30(d).) Tonkon, an Oregon law firm, prepared legal documents necessary to sell securities through multiple Aequitas entities. (*Id.* ¶ 18.) Ameritrade, a corporation, served as custodian for unspecified Aequitas securities and referred investors to financial advisors to buy unspecified Aequitas securities. (*Id.*¶ 19.) Integrity, a commercial bank, served as custodian for unspecified Aequitas securities and solicited sales of

unspecified Aequitas securities.  (*Id.* ¶ 20.)  The specific interactions of each defendant with specific Aequitas entities are detailed below.

### A. Structure and Organization.

The Aequitas group used a complex system of ownership interests, financial transactions, management agreements, and other relationships to connect the myriad Aequitas entities.  (FAC ¶¶ 21–25.)  Plaintiffs, giving some examples, allege that there were minimal operational distinctions between the nominally separate entities.  (*Id.* ¶¶ 29, 103–08.)  The intra-Aequitas transactions meant the proceeds of securities sold by individual entities were used to fund the operations of the Aequitas group, regardless of the individual entity's stated purpose.  (*Id.* ¶ 29.)  Conversely, the success or failure of ACF and the Funds depended on the financial wellbeing of the Aequitas group.  (*Id.*)

### B. Business Activities.

The Aequitas group engaged in diverse business activities, including purchasing consumer debt from multiple industries.  (FAC ¶¶ 2, 104, 110, 117, 126.)  A group of Aequitas subsidiaries, owned by ACF, purchased student loans from Corinthian Colleges, Inc. ("Corinthian").  (*Id.* ¶¶ 146–60.)  Another group of Aequitas subsidiaries purchased vehicle leases, through ACF and Motolease.  (*Id.* ¶¶ 125–29.)  Other Aequitas subsidiaries purchased healthcare receivables and debt-consolidation loans.  (*Id.* ¶¶ 104, 117.)

### C. Finances.

The Aequitas group raised capital in part by selling securities.  (FAC ¶ 26.)  The group also obtained third-party financing from lenders.  (*Id.* ¶¶ 107, 119, 130.)  ACF, the Funds, and subsidiary Aequitas affiliates often paid management fees to ACM, which ran some of the day-

to-day operations of other Aequitas entities.  (E.g. *id.* ¶¶ 103, 108.)  ACF also loaned tens of millions of dollars to Holdings and other Aequitas entities.  (*Id.* ¶ 170.)

>    *D.  Securities.*

The Aequitas entities sold securities — promissory notes and interests in Aequitas entities — as a fundraising method.  (FAC ¶ 26.)  The securities at issue in this case were not registered under Oregon or Federal law.  (*Id.*)  The primary fundraising mechanism for the Aequitas entities was ACF's sale of Secured Subordinated Promissory Notes ("ACF Notes").  (*Id.* ¶ 27.)  Other Aequitas entities sold separate securities, including:  Limited Liability Company Interests, sold by AIPF ("AIPF Interests"); Senior Secured Promissory Notes, sold by AIOF ("AIOF Notes"); Senior Secured Promissory Notes, sold by AIOF-II ("AIOF-II Notes"); Senior Secured Promissory Notes, sold by MotoLease ("MotoLease Notes"); LLC Interests, sold by AEIF ("AEIF Interests"); and Capital Commitments, sold by ACOF ("ACOF Interests") (collectively with the ACF Notes, "the Disputed Securities").  (*Id.* ¶ 28.)  The Funds represented that the other Disputed Securities were distinct from the ACF Notes, concealing the complex financial interdependence between the ACF, the Funds, and other Aequitas entities.  (*Id.* ¶ 29.)  The FAC alleges the Disputed Securities were essentially the same security because of the intra-Aequitas financial dealings.  (*Id.*)

The Funds sold the Securities using Private Placement Memoranda ("PPM"), where the seller described to potential investors its business operations, assets, and risks.  (FAC ¶¶ 32, 39, 51, 45, 57, 61.)  Each of the PPMs contained a directory, listing the manager, auditor, legal counsel, and other partners of the issuing entities.  Investors purchased securities by completing subscription agreements.  (*Id.* ¶¶ 32, 39, 45, 51, 57, 61.)

/ / / / /

III.  Defendants' Involvement with the Aequitas Group.

Plaintiffs' claims against Defendants arise from Defendants' transactions with the Aequitas group.  Each defendant interacted with one or more Aequitas entity.  Plaintiffs allege Defendants provided services or engaged in transactions that enabled the Aequitas entities to sell the Disputed Securities to investors.  (FAC ¶ 30.)  The services each defendant provided were necessary to the sale of the securities or the Aequitas group's ongoing securities business.  (*Id.* ¶¶ 15–20, 30.)  In several PPMs, the Aequitas entities identified EisnerAmper, Deloitte, Tonkon, and/or Sidley as auditor or counsel to the entities, depending on the time of issue.  (*Id.* ¶¶ 15, 33, 34, 41, 42, 47, 48, 53, 58, 63.)  The "directory" section identifying EisnerAmper, Deloitte, Tonkon, and/or Sidley appeared in the first pages of each PPM, before any information about the issuing entity or the offered security.  (Decl. of Gavin M. Masuda ("Masuda Decl.") (ECF No. 79), Exs. 13 at v, 14 at vii, 15 at iv–v; Decl. of Philip Van Der Weele ("Van der Weele Decl.") (ECF No. 76), Exs. 2 at v, 3 at v.)

   A.  *EisnerAmper & Deloitte.*

The allegations against EisnerAmper and Deloitte are similar, as the firms had comparable functions during different time periods.  EisnerAmper was the auditor for ACF, AIPF, and AIOF in 2011 and 2012.  (FAC ¶¶ 30(a), 33, 41, 47.)  Deloitte was the auditor for ACF, AIPF, AIOF, AIOF II, AIEF, and ACOF in 2013 and 2014.  (*Id.* ¶¶ 30(b), 34, 42, 48, 53, 58, 63.)  During the years when each firm audited ACF, Deloitte and EisnerAmper audited the financial statements of myriad subordinate Aequitas entities as part of the consolidated statements of ACF.  (*Id.* ¶ 30(a–b).)  ACF, AIPF, and AIOF provided financial documents audited by EisnerAmper and Deloitte to prospective investors.  (*Id.* ¶¶ 30(a), 33–34, 41–42, 47–48, 53, 58, 63.)  With EisnerAmper's knowledge and consent, ACF, AIPF, and AIOF issued

some PPMs identifying EisnerAmper as their auditor. (*Id.* ¶¶ 15, 33, 41, 47.) With Deloitte's knowledge and consent, ACF, AIPF, AIOF, AIOF II, AIEF, and ACOF issued PPMs identifying Deloitte as their auditor. (*Id.* ¶¶ 15, 34, 42, 48, 53, 58, 63.) Other promotional materials sent to current and prospective investors in ACF, AIPF, and AIOF identified EisnerAmper as their auditor. (*Id.* ¶¶ 35, 43, 49.) Similarly, promotional materials sent to current and prospective investors in ACF, AIPF, AIOF, AIOF II, and ACOF identified Deloitte as their auditor. (*Id.* ¶¶ 35, 43, 49, 54, 59).

The financial statements that EisnerAmper and Deloitte audited helped conceal the financial interdependence, the integrated nature of the Aequitas group, and the growing insolvency of the Aequitas group over time. (*Id.* ¶¶ 15–16, 161–174.)

  *B. Tonkon*.

Tonkon was legal counsel for multiple Aequitas entities, including ACF, AIOF, AIOF-II, AIPF, AEIF, ACOF, Motolease, and AIM. (FAC ¶¶ 15, 30(c).) Tonkon prepared documents necessary for ACF and the Funds to sell securities. (*Id.* ¶¶ 15, 30(c), 32, 39, 45, 51, 61.) Tonkon drafted or helped draft the PPMs and subscription agreements for all of the Disputed Securities, except for ACOF Interests. (*Id.*) As with the accounting firms, promotional materials sent to current and prospective investors in ACF, AIPF, AIOF, and AIOF II identified Tonkon as counsel to the issuers. (*Id.* ¶¶ 35, 43, 49, 54.) Tonkon also advised AIM in its capacity as investment advisor and manager of multiple Aequitas entities. (*Id.* ¶ 30(c).)

  *C. Sidley*.

Sidley was legal counsel to ACOF, AIM, and other unspecified Aequitas entities. (FAC ¶¶ 17, 30(d), 40, 46, 52, 57, 62.) Sidley prepared documents necessary for ACOF to sell securities, including drafting the PPM and subscription agreements for the ACOF Interests. (*Id.*

¶¶ 30(d), 57.)  Some promotional materials sent to current and prospective investors in ACOF identified Sidley as counsel to ACOF.  (*Id.* ¶ 59.)  As counsel to AIM, Sidley had indirect involvement with the operations of AIM-managed Aequitas subsidiaries, including AIPF, AIOF, AIOF-II, ACOF, and AEIF.  (*Id.* ¶¶ 30(d), 40, 46, 52, 62.)  Sidley enabled an unspecified Aequitas entity to pledge its healthcare receivables as collateral to secure $100 million in financing, removing those assets from investors.  (*Id.* ¶ 30(d).)

   D.  *Integrity*.

   Integrity offered and solicited sales of ACF Notes and AIOF-II Notes to prospective investors.  (FAC ¶¶ 30(f), 36, 55.)  Integrity prepared subscription agreements and other documents necessary to complete sales of ACF Notes and AIOF-II Notes.  (*Id.*)  Integrity is the custodian of some Disputed Securities.  (*Id.*)

   E.  *Ameritrade*.

   Ameritrade referred investors to third-party financial advisors to purchase unspecified securities from Aequitas subsidiaries.  (FAC ¶ 30(e).)  Ameritrade was also the custodian for some unspecified Aequitas Securities.  (*Id.*)

III.  Misrepresentations and Material Omissions.

   The allegations of the Aequitas group's misconduct spans over 100 paragraphs of the FAC.  (FAC ¶¶ 71–175.)  Accordingly, the facts restated here will not repeat every allegation against the Aequitas group.  Instead, the following allegations reflect the general actions and events giving rise to the lawsuit.  The FAC refers generally to "Aequitas" in many allegations, without specifying which Aequitas entity engaged in specific conduct.  The following facts refer to specific Aequitas entities, where possible.

/ / / / /

Page 10 – FINDINGS AND RECOMMENDATION                                [TJP]

A. *Problems with Specific Aequitas Investments*.

An ACF subsidiary, ASFG, LLC ("ASFG"), had a lucrative student-loan origination agreement with Corinthian. (FAC ¶ 146.) ASFG purchased student loans from Corinthian at a net discount, with a recourse agreement requiring Corinthian to buy back any loans in default. (*Id.*) So long as Corinthian met its obligations under the recourse agreement, ASFG collected on loans at a profit and sold any past-due loans back to Corinthian. (*Id.* ¶ 147.) Corinthian began to face increasing public relations problems and regulatory scrutiny, beginning in 2010 and increasing afterwards. (*Id.* ¶ 115.) Corinthian's demise became increasingly apparent in late 2013. (*Id.* ¶¶ 115(h), 155.) ASFG terminated its relationship with Corinthian in early 2014. (*Id.* ¶ 155.) Corinthian ceased its operations in 2014, while facing a civil-enforcement action from the Consumer Financial Protection Bureau. (*Id.* ¶ 116.) Corinthian declared bankruptcy in 2015, increasing default rates on the loans and eliminating any remedy ASFG might have had against Corinthian. (*Id.* ¶ 160.) The Aequitas group did not disclose any of the preceding information about the investment in Corinthian, including Corinthian's identity, the Aequitas group's exposure to financial harm as Corinthian declined, and the adverse events occurring to Corinthian. (*Id.* ¶¶ 109–16.)

Besides the Corinthian portfolio, other Aequitas investments faced challenges. ACF and other Aequitas entities invested in consumer-credit receivables ("the Consumer Receivables"), claiming the receivables as valuable assets. (FAC ¶¶ 117, 123–24.) ACF and other Aequitas entities pledged all or most of the Consumer Receivables as collateral for third-party loans. (*Id.* ¶ 120.) The Consumer Receivables portfolio consisted of sub-prime consumer loans, and had a high failure rate. (*Id.* ¶¶ 117, 121.) The failure rate of the Consumer Receivables portfolio exceeded the assumptions of the third-party lenders, making the portfolio a futile investment.

(*Id.* ¶ 121.)  ACF and other Aequitas entities defaulted on the third-party financing obligations underlying the Consumer Receivables in 2015.  (*Id.*)  The Aequitas group did not disclose any of the preceding information about the Consumer Receivables to investors.  (*Id.* ¶¶ 117–24.)

     *B.  Financial Engineering and Use of Invested Assets.*

     The Aequitas group used complex financial engineering to embellish its financial well-being to investors.  (FAC ¶¶ 104–106, 110–112, 161–75.)  Intra-Aequitas loans eliminated the functional distinctions between nominally separate entities.  (*Id.* ¶ 29.)  The intra-Aequitas transactions funneled money from the Funds to ACF, rendering the Funds wholly dependent on the fate of ACF and the Aequitas group.  (*Id.* ¶¶ 29, 167, 173.)  Functionally, there was no difference between investing in ACF and the Funds.  (*Id.* ¶ 29.)  ACF also loaned substantial amounts to Holdings, to fund the operational expenses of the Control Group.  (*Id.* ¶¶ 169–74.)

     In communications to investors regarding the ACF Notes, ACF represented that the collateral supporting the ACF Notes exceeded the total owed on the ACF Notes.  (FAC ¶ 161.)  But ACF's statements regarding its collateral overstated the value of its assets, particularly assets derived from intra-Aequitas transactions.  (*Id.* ¶¶ 161, 166.)  ACF reported its loan to Holdings as a valuable asset, without reflecting Holding's lack of collateral and inability to repay the loan.  (*Id.* ¶ 173.)  ACF and the Funds also claimed ownership interests in fellow Aequitas entities as valuable assets, regardless of the actual value of the ownership interests.  (*Id.* ¶¶ 166–68.)  ACF and the Funds did not disclose the intra-Aequitas transactions and misrepresented the intra-Aequitas transactions to investors.  (*Id.* ¶¶ 161–68.)  The Aequitas group also reported some illusory ownership interests in Aequitas subordinates as valuable assets in 2013 and 2014.  (*Id.* ¶ 167.)

/ / / / /

Page 12 – FINDINGS AND RECOMMENDATION                                             [TJP]

C. *Use of Invested Assets*.

The promotional materials for the Funds misrepresented the use of invested assets, describing varied investment strategies unique to each Fund and omitting the use of the Funds' assets as a source of cash for ACF. (FAC ¶¶ 136–42.) ACF and the Funds also used assets to fund bonuses, large salaries, private aircraft, and company parties for the Aequitas group and its employees, a use not disclosed to investors. (*Id.* ¶¶ 144, 171.) ACF and the Funds paid millions of dollars annually to ACM and other Aequitas entities in management fees, without disclosing the amount or recipient of the management fees to investors. (*Id.* ¶ 175.) As the Aequitas group's financial health deteriorated, ACF and the Funds began to use newly invested money to repay earlier investors. (*Id.* ¶¶ 136, 141.) The materials distributed to prospective investors either did not disclose the use of new investments to repay previous investors or described such uses as infrequent. (*Id.* ¶¶ 137–142.) Only in December 2015 did ACF disclose its use of newly invested assets to repay prior investors. (*Id.* ¶ 143.)

D. *Insolvency*.

The Aequitas group became insolvent, although the complaint does not specify when insolvency occurred. (FAC ¶ 169.) The Aequitas group used intra-Aequitas loans to conceal its insolvency, using new investments to fund through ACM the operating expenses of the Aequitas group. (*Id.* ¶¶ 169, 171.) The outstanding balance of the largest intra-Aequitas loan — from ACF to Holdings — grew from $62.7 million in 2012 to $180.3 million at the end of 2015. (*Id.* ¶ 170.) The Aequitas group received collateral analyses indicating the balance of the ACF–Holdings loan exceeded Holding's ability to collateralize the debt, as early as 2014. (*Id.* ¶ 173.) The Aequitas group did not disclose these collateral analyses to investors. (*Id.*)

Page 13 – FINDINGS AND RECOMMENDATION                                    [TJP]

Throughout the period of insolvency, the Aequitas group continued to sell securities, increasingly using the proceeds of the sales to repay previous investors. (*Id.* ¶¶ 136, 141.)

In February 2016, the Aequitas entities publically declared their insolvency to investors and turned operations over to an outside consultant. (FAC ¶¶ 176–78.) The Securities and Exchange Commission ("SEC") filed suit in March 2016 against Management, Holdings, ACF, ACM, and several top executives. (*Id.* ¶ 179.) The SEC and Aequitas entities asked the court to appoint a receiver in the course of the *SEC* Lawsuit against the Aequitas entities. (*Id.* ¶ 180.)

*Standards*

I.  Federal Rule of Civil Procedure 8.

Federal Rule of Civil Procedure ("Rule") 8 requires that complaints in federal court consist of "a short and plain statement of the claim showing that the pleader is entitled to relief." Pleadings need not contain detailed factual allegations, but "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, a claim "may proceed even if it strikes a savvy judge that actual proof of [necessary] facts is improbable," and the plaintiff is unlikely to succeed on the merits. *Id.* at 556.

On a motion to dismiss for failure to state a claim, the court may consider only the pleadings themselves, exhibits that are physically attached to the complaint, and matters of which the court may take judicial notice. *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (per curiam). The court generally must "accept all allegations in the complaint are true and draw all reasonable inferences in favor of the nonmoving party." *Dahlia v. Rodriguez*, 753 F.3d 1060, 1066 (9th Cir. 2013) (quoting *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999)). The court is not bound to accept as true allegations contradicted by "matters properly

subject to judicial notice or by exhibit[s]" attached to the complaint.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on denial of reh'g* 275 F.3d 1187.  Legal conclusions in a complaint are not entitled to a presumption of truth.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

II.  Federal Rule of Civil Procedure 9(b).

Under Rule 9(b), parties must plead fraud, claims sounding in fraud, and allegations of fraudulent conduct with specificity, alleging the "who, what, when, where, and how of the misconduct charged."  *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011).  Where a claim sounds in fraud, plaintiffs must plead the entire claim with particularity. *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1104–05 (9th Cir. 2003).  A claim sounds in fraud where a plaintiff "allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim."  *Id.*  In a claim based on fraudulent and non-fraudulent conduct, Rule 9(b) applies only to the allegations of fraudulent conduct.  *Id.* at 1104. Rule 9(b) also furthers three policy interests:

> (1) to provide defendants with adequate notice to allow them to defend the charge and deter plaintiffs from the filing of complaints "as a pretext for the discovery of unknown wrongs"; (2) to protect those whose reputation would be harmed as a result of being subject to fraud charges; and (3) to "prohibit [ ] plaintiff[s] from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis."

*Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (quoting *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996)).

III.  Motion for Judicial Notice.

Federal Rule of Evidence 201 allows the court to take judicial notice of facts (1) that are generally known within the court's jurisdiction; or "(2) can be accurately and readily determined

from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). Courts "may take judicial notice of undisputed matters of public record . . . including documents on file in federal or state courts." *Harris v. County of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012).

*Analysis*

No Aequitas entity is a party to this lawsuit. Nonetheless, the conduct of Aequitas entities is at the core of the allegations in the complaint. Plaintiffs claim the Aequitas entities sold securities in violation of the Oregon Securities Law, ORS §§ 59.005–59.451. Defendants' alleged liability depends on the Aequitas group's predicate violations of the Oregon Securities Law. *See* OR. REV. STAT. § 59.115(3) (creating derivative liability for third-parties based on participation or material aid in unlawful securities transactions). Defendants contest the legal and factual sufficiency of the allegations of primary violations of the Oregon Securities Law by the Aequitas entities, as well as the allegations of participation or material aid by Defendants.

I.  The Oregon Securities Law.

Plaintiffs' claims all arise under the Oregon Securities Law, ORS 59.005 *et seq*. Some initial discussion of the structure of the Oregon Securities Law is therefore necessary. Oregon courts interpret the Oregon Securities Law liberally "to afford the greatest possible protection to the public." *Foelker v. Kwalke*, 279 Or. 379, 385 (1977) (internal quotation marks and citation omitted). The Oregon Securities Law allows private actions for direct buyer-to-seller transactions under ORS 59.115. *State v. Marsh & McLennan Cos.*, 353 Or. 1, 8–9 (2012). Both sellers and non-sellers of securities may be liable to purchasers under section 115 for the purchase price of unlawfully sold securities. The relevant portion of the statute provides:

(1) A person who sells a security is liable . . . to a purchaser of the security if the person:

(a) Sells a security in violation of the Oregon Securities Law or of any condition, limitation or restriction imposed upon a registration or license under the Oregon Securities Law; or

(b) Sells a security in violation of ORS 59.135 (1) or (3) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

. . .

(3) . . . every person who participates or materially aids in the sale is also liable jointly and severally with and to the same extent as the seller, unless the nonseller sustains the burden of proof that the nonseller did not know, and, in the exercise of reasonable care, could not have known, of the existence of facts on which the liability is based. Any person held liable under this section shall be entitled to contribution from those jointly and severally liable with that person.

OR. REV. STAT. § 59.115.

Plaintiffs allege the Aequitas entities violated three provisions of Oregon securities law in selling the Disputed Securities. First, Plaintiffs claim the Disputed Securities were sold without registration, in violation of ORS § 59.055. Plaintiffs also allege the Aequitas entities made material misrepresentations and omissions in selling the Disputed Securities, violating both ORS § 59.115(1)(b) and ORS § 59.135(2). Plaintiffs assert causes of action for violations of ORS § 59.055 and § 59.135(2) under ORS § 59.115(1)(a), which creates a cause of action for any sale made "in violation of the Oregon Securities Law." Plaintiffs then allege Defendants bear secondary liability for "participat[ing] or materially aid[ing] in" the Aequitas group's unlawful sales of securities. OR. REV. STAT. § 59.115(3).

A. *ORS § 59.055*.

Courts often describe ORS § 59.055 as a prohibition on the sale of unregistered securities. *See, e.g.*, *State v. Ghim*, 360 Or. 425, 441 (2016) ("[T]he legislature has prohibited

the sale of unregistered securities in Oregon, ORS 59.055"). Textually, ORS § 59.055 forbids sale or offering of any security in Oregon unless one of three conditions exists. First, a security may be sold if it is registered. OR. REV. STAT. § 59.055(1). The second condition depends on specific exempt transactions identified in ORS § 59.025 and § 59.035. OR. REV. STAT. § 59.055(2). Third, sales are allowed if the security is a "federal covered security," defined by reference to the federal Securities Act. OR. REV. STAT. § 59.055(3). Under federal law, federal covered securities include "transactions by an issuer not involving any public offering." 15 U.S.C. §§ 77d(2)(a), 77r(b). The U.S. Securities and Exchange Commission ("SEC") further defines "transactions by an issuer not involved in any public offering" by regulation. SEC Regulation D, 17 C.F.R. §§ 230.500–230.508, defines specific non-public offerings that qualify as federal covered securities.

> B.  *ORS §§ 59.115(1)(b), 59.135(2).*

Two provisions of the Oregon Securities Law forbid similar conduct in selling securities: making an "untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading." OR. REV. STAT. §§ 59.115(1)(b); 59.135(2). The statutes differ in the required connection between the misstatement or omission and the sale of securities. Under ORS § 59.115(1)(b), a violation occurs when "a person sells or successfully solicits the sale of a security . . . by means of" a material false statement or omission. *Id.* § 59.115(1)(b). ORS § 59.135(2) applies more broadly, applying to material misstatements or omissions made "directly or indirectly, in connection with the purchase or sale of any security or the conduct of a securities business." *Id.* § 59.135(2).

/ / / / /

Page 18 – FINDINGS AND RECOMMENDATION                                    [TJP]

C.  *ORS § 59.115(3)*.

Non-sellers who participate or materially aid in an unlawful securities sale are jointly and severally liable to the purchasers.  OR. REV. STAT. § 59.115(3).  A purchaser seeking recovery from a non-seller must first allege a primary violation by a seller.  *Comp. Concepts, Inc. v. Brandt*, 137 Or. App. 572, 587 (1995) ("[L]iability under ORS 59.115(3) is dependent on and derivative from the liability of a seller.").   Under ORS § 59.115(3), "'[p]articipate' and 'materially aid' are separate concepts, not synonyms."  *Prince v. Brydon*, 307 Or. 146, 149 (1988).  Generally, participation addresses direct involvement in the sale, while material aid involves indirect support for the seller in making the sale.  *Id.* at 150 (drafting partnership documents and providing legal advice regarding private securities offering was material aid); *Adams v. Am. W. Secs., Inc.*, 265 Or. 514, 527 (1973) (preparing sales documents for use in transaction was participation); *Ainslie v. Spolyar*, 144 Or. App. 134, 145 (1996) ("*Ainslie I*") (preventing a foreclosure and providing legal services prior to an offering was material aid).  Still, other decisions use the terms together ("participate or materially aid"), without distinction. *See, e.g.*, *Fakhrdai v. Mason*, 72 Or. App. 681, 684 (1985); *Ainslie v. First Interstate Bank of Or., N.A.*, 148 Or. App. 162, 184–85 (1997) ("*Ainslie II*").

II.  Applicable Pleading Standards.

The parties dispute whether Rule 9(b) requires Plaintiffs to plead with specificity allegations of primary violations of the Oregon Securities Law and participation or material aid in an unlawful sale of securities. Defendants argue all of Plaintiffs' claims sound in fraud and thus must be pleaded with particularity.  Plaintiffs concede claims under ORS 59.135(2) sound in fraud, but otherwise contend their claims are subject only to Rule 8.  (Opp. To Jt. Mot. (ECF No. 119), at 11.)

As a threshold matter, Defendants argue Rule 9(b) applies to the entire case because actions under ORS § 59.115 are statutory fraud actions. *See Karsun v. Kelley*, 258 Or. 155, 167 (1971) ("the basis for [an action under ORS 59.115] is fraud"). Plaintiffs contend Rule 9(b) applies only to allegations of fraudulent conduct because the FAC alleges both fraudulent and non-fraudulent conduct. *See Vess*, 317 F.3d at 1104. The specificity requirements of Rule 9(b) may apply to entire claims for relief, or to individual factual allegations. *Id.* at 1104–05. Here, Plaintiffs allege three claims for relief: one for sales of unregistered securities and two for sales of securities through misrepresentation or material omission. (FAC ¶¶ 191–93.) All claims assert Defendants' secondary liability based on primary violations of the Oregon Securities Law by the Aequitas group. (*Id.* ¶ 190.) Accordingly, the court must first determine whether any or all of the claims sound in fraud, such that allegations against both the Aequitas group and Defendants must be pleaded with particularity.

    *A. All Allegations and Claims*.

Defendants first argue the entirety of the complaint sounds in fraud because Plaintiffs' claims arise under ORS § 59.115. Courts have characterized actions under ORS § 59.115 and ORS § 59.135 as "statutory 'fraud' actions." *E.g.*, *Aero Marine Engine, Inc. v. Transporter, Inc.*, No. 05-1469, 2006 WL 3128500, at *3 n.2 (D. Or. Oct. 23, 2007) (quotation marks omitted). Because Plaintiffs bring claims under ORS § 59.115, Defendants conclude Rule 9(b) applies to all of Plaintiffs' allegations. Plaintiffs respond that cases referring to actions under ORS § 59.115 as "fraud" actions did not address pleading standards, and they identify multiple aspects of their claims that do not allege fraudulent conduct. Instead, Plaintiffs suggest the court should apply Rule 9(b) to this case on an allegation-by-allegation basis. *See Vess*, 317 F.3d at

1104 (where a plaintiff alleges "some fraudulent and some non-fraudulent conduct . . . only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements.").

Two Ninth Circuit cases are instructive on this issue. In *Vess*, the court analyzed a series of allegations against a pharmaceutical company, the American Psychological Association, and an advocacy group, arising out of each defendant's role in promoting sales of Ritalin, a prescription drug. *Vess*, 317 F.3d at 1100–01. In that case, the complaint alleged some allegations of a fraudulent conspiracy among all defendants, and other allegations of non-conspiratorial, non-fraudulent failures to disclose information and warn consumers. *Id.* at 1105–06. The court held that the complaint alleged a combination of fraudulent and non-fraudulent conduct, and applied Rule 9(b) only to the allegations of fraudulent conduct. *Id.* The court also held that Rule 9(b) applied to all of the allegations of a fraudulent conspiracy because they asserted "a unified course of fraudulent conduct." *Id.* at 1107–08. In contrast, *Kearns* addressed claims against a single car manufacturer, alleging misrepresentations regarding a used-car certification program. *Kearns*, 567 F.3d at 1125–26. The court concluded all of the claims were state-law fraud claims under California law, and applied Rule 9(b) to the complaint as a whole. *Id.* at 1126–27.

Thus, the entirety of a complaint is subject to Rule 9(b) if it exclusively alleges claims sounding in fraud or a uniform course of fraudulent conduct by all defendants. *Kearns*, 567 F.3d at 1126–27. Rule 9(b) does not apply categorically where a complaint asserts some claims that do not sound in fraud or alleges a mixture of fraudulent and non-fraudulent conduct by at least one defendant. *Vess*, 317 F.3d at 1105–06. For Defendants' pleading argument to prevail, then, the FAC must either allege entirely claims sounding in fraud or allege a unified course of fraudulent conduct against all defendants. It is therefore necessary to determine the

Page 21 – FINDINGS AND RECOMMENDATION                                [TJP]

requirements for pleading a cause of action against a non-seller under the Oregon Securities Law.

Pleading a claim against a non-seller requires two groups of allegations:  a primary violation by the seller, and requisite acts of participation or material aid by the non-seller. *Anderson v. Carden*, 146 Or. App. 675, 684 (1997).  A prima facie case of participant or material aider liability does not require any allegation of wrongdoing by the non-seller, let alone allegations of fraud.  *Id*. at 683 ("[T]he remedy against nonseller participants is not contingent on the nonsellers' violation of any law.").  Even where the allegedly unlawful securities sale involves fraud, participation and material aid merely entails a connection to the unlawful transaction.  *Prince*, 307 Or. at 149–50.  In this case, Plaintiffs do not allege any defendant engaged in fraudulent or independently wrongful conduct.

The claims against Defendants do not sound in fraud because they do not "rely entirely" on allegations of fraud.  *Vess*, 317 F.3d at 1104.  Plaintiffs allege the Aequitas group engaged in a complex series of violations of the Oregon Securities Law, while the allegations against Defendants describe their connection to ACF and the Funds.  The allegations of Defendants' participation and material aid in the Aequitas group's sales of securities stand separate from the wrongdoing alleged against the Aequitas group.  *See id.* at 1103; *cf. Kearns*, 567 F.3d at 1125.  Moreover, the FAC does not rely on a "uniform course of fraudulent conduct" by all Defendants — Plaintiffs allege only that Defendants participated or materially aided in the sale of securities.  Whether a non-seller knew of the facts making the transaction unlawful arises as an affirmative defense, not as an element of the cause of action.  *Adams*, 265 Or. at 528–29.  Accordingly, the specificity requirements of Rule 9(b) do not apply to the entirety of the complaint.  The

appropriate approach is to analyze the FAC's allegations categorically, by subject of the allegations.

B. *Primary Violations through Non-Registration*.

Allegations of selling securities without registration are not subject to Rule 9(b).  As non-registration claims do not require any showing of fraudulent conduct or even intentional wrongdoing, Rule 9(b) could apply only  to claims under ORS § 59.055 through the "claims sounding in fraud" doctrine.  *See Vess*, 317 F.3d at 1104.  But *Vess* delimits the pleading requirements of Rule 9(b) by claim.  *Id.*  A claim for violation of ORS § 59.055 is a strict liability claim, requiring no allegations of fraud or other intentional wrongdoing.  The claims for non-registration therefore do not allege fraud, and are subject only to Rule 8.  *Walling v. Beverly Enters.*, 476 F.2d 393, 397 (9th Cir. 1973).  Accordingly, Rule 9(b) does not apply to the allegations supporting Plaintiffs' claim for selling unregistered securities, except for the extent to which the same allegations support a separate allegation of fraud.

C. *Primary Violations through Misrepresentation and Omission*.

Plaintiffs' claims alleging Aequitas committed primary violations of the Oregon Securities Law through misrepresentation and omission sound in fraud, and must be pleaded with particularity.  Of the two misrepresentation or omission statutes, the parties contest the applicability of Rule 9(b) only to claims under ORS § 59.115(1)(b);  Plaintiffs agree that Rule 9(b) applies to claims under ORS § 59.135(2).  Thus, Plaintiffs must plead all allegations of misrepresentation and omission with particularity whether or not Rule 9(b) applies to the claims of misrepresentation or omission.  Still, Defendants seek to dismiss all claims arising under ORS § 59.115(1)(b) for failure to comply with the pleading requirements of Rule 9(b).  The court therefore must determine whether Rule 9(b) applies to claims under ORS 59.115(1)(b).

The allegations against the Aequitas entities, under both ORS § 59.115(1)(b) and § 59.135(2), allege a broad fraudulent scheme to conceal the financial infirmities of the Aequitas enterprise. (FAC ¶¶ 71–175.) Regardless of whether all claims under ORS § 59.115(1)(b) are subject to Rule 9(b), Plaintiffs' claim of a substantial pattern of misrepresentation, omission, and other deception sounds in fraud. *Vess*, 317 F.3d at 1101–05 (complaint alleging a course of willful misrepresentations and omissions regarding pharmaceuticals was a "unified course of fraudulent conduct" subject to Rule 9(b)); *see also Aero Marine Engine, Inc. v. Transporter, Inc.*, 3:05-cv-1469-HA, 2007 WL 3128500, at *3 n.2 (D. Or. Oct. 23, 2007) (concluding both statutes create statutory fraud actions). Accordingly, the court holds that Rule 9(b) requires pleading with particularity all of Plaintiffs' claims of misrepresentation and omission.

D. *Secondary Liability*.

Defendants, and Tonkon in particular, argue claims of participant and material aid liability are also securities fraud claims that must be pleaded with particularity. Defendants rely on cases describing non-seller liability under ORS § 59.115(3) as a "securities fraud" claim. *Jost v. Locke*, 65 Or. App. 704, 709 n.4 (1983); *Paulsell v. Cohen*, No. Civ. 00-1175-ST, 2002 WL 31496397, at *27 (D. Or. May 22, 2002). Neither *Jost* nor *Paulsell* applied Rule 9(b) to claims for non-seller liability. *Jost*, 65 Or. App. at 709 n.4; *Paulsell*, 2002 WL 31496397, at *27. As previously noted, participant and material aid liability does not require allegations of wrongdoing, let alone fraud, by the non-seller. *Anderson*, 146 Or. App. at 683. Claims for non-registration which do not allege fraud are not made subject to Rule 9(b) by the presence of separate claims alleging fraud. *Vess*, 317 F.3d at 1104 ("The rule does not require allegations supporting a claim to be stated with particularity when those allegations describe non-fraudulent conduct.").

The cases Defendants rely on to establish a heightened pleading standard do not apply to this case. *Riley v. Brazeu*, 612 F. Supp. 674, 678 (D. Or. 1985), required heightened pleading of claims that a non-seller assisted in the seller's fraud. The other cases individual defendants cite also address aiding and abetting the fraud itself. *See, e.g.*, *Morgan v. Prudential Group, Inc.*, 81 F.R.D.. 418, 425 (S.D.N.Y. 1978); *Varnberg v. Minnick*, 760 F. Supp 315, 330 (S.D.N.Y 1991). Aiding and abetting fraud alleges a closer connection between the non-seller and the fraud than participating or aiding in the sale. Under the Oregon Securities Law, secondary liability does not require any participation in fraudulent conduct, only a sufficient nexus with unlawful sales. *Anderson v. Carden*, 146 Or. App. 675, 683 (1997). Accordingly, Plaintiffs may plead Defendants' secondary liability under the more liberal Rule 8 standard.

III.  Collective References to the Aequitas Entities

Throughout the FAC, Plaintiffs refer generally to "Aequitas" and the "Aequitas Securities." Defendants oppose Plaintiffs' use of collective references to the Aequitas group and to the securities sold by the Aequitas group. Under both Rules 8 and 9(b), Defendants contend Plaintiffs must distinguish between legally distinct Aequitas entities and securities. Plaintiffs disagree. Plaintiffs argue the court may, as a matter of law, disregard the separateness of the Aequitas entities and the securities they sold. As to the entities, Plaintiffs contend the piercing the corporate veil doctrine allows the court to disregard the nominal separateness of the Aequitas entities. Plaintiffs also argue that the group-pleading doctrine allows Plaintiffs to refer generally to the Aequitas group because of the close organizational and functional ties between the entities. Regarding the securities, Plaintiffs ask the court to consider all securities issued by the Aequitas group as an integrated offering — essentially, to disregard the separateness of the securities.

A.  *Piercing the Corporate Veil.*

The court first considers whether the doctrine of piercing the corporate veil supports treating the Aequitas group as one entity for the purposes of the Oregon Securities Law. Plaintiffs argue the Aequitas group's use of subsidiary and affiliate business entities helped conceal the true financial health and structure of the Aequitas group.  Therefore, Plaintiffs conclude, the court may disregard the corporate separateness of the individual Aequitas entities in this case.  Oregon law does not support Plaintiffs' conclusion.  Even if Plaintiffs could pierce the corporate veils between one or more Aequitas entities in a case against the Aequitas group, Oregon law provides no basis for using veil-piercing to extend non-seller liability under ORS 59.115(3).

Plaintiffs do not cite, nor can the court find, any decision by an Oregon appellate court considering whether the veil-piercing doctrine extends to secondary liability.  This court's task is to "reasonably determine the result that the [Oregon Supreme Court] would reach if it were deciding the case."  *Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644, 649 (9th Cir. 2016).  Where Oregon appellate decisions do not provide direct guidance, the court may still provide a remedy based on the methods of interpretation used by state courts.  *Id.*

Oregon law allows courts to disregard corporate separateness to allow an injured party to recover from a corporate parent based on an injury inflicted by a subsidiary or affiliate.  *State ex rel. Neidig v. Superior Nat'l Ins. Co.*, 343 Or. 434, 454–55 (2007) (citing *Amfac Foods v. Int'l Sys. & Controls Corp.*, 294 Or. 94, 108–09 (1982)).  Control and ownership alone is not enough to support veil-piercing; the corporate separateness must be used to achieve some injustice or perpetrate a fraud.  *Id.* at 108.  The underlying rationale is to keep wrongdoers from using corporate forms to avoid responsibility.  *Id.*

In *Amfac,* the court undertook a survey of past veil-piercing cases, to determine the underlying rationale of the doctrine. *Amfac*, 294 Or. at 103–08. The court described the limited liability inherent in corporate forms, and focused the exception on "conduct of the [parent or affiliate] sought to be charged, and the relationship between the improper conduct and the creditor's claim." *Id.* at 108. The "extraordinary remedy" of disregarding the separateness of legal entities rests on the defendant's misconduct. *Id.* at 103, 108–09. Here, Defendants' liability is purely derivative of alleged violations by the Aequitas entities. *Anderson*, 146 Or. App. at 683. Piercing the corporate veil to expand Defendants' liability would disadvantage parties who face no allegations of unlawful conduct, much less alleged use of corporate forms to evade liability. Imposing expanded liability against parties who have not engaged in culpable wrongdoing is inconsistent with the purpose of Oregon's veil-piercing doctrine because the veil-piercing doctrine turns on culpable conduct by the defendant. Accordingly, even if piercing the corporate veil would apply in a direct lawsuit by Plaintiffs against the Aequitas entities, the rationale behind the doctrine does not support expanding the liability of third-party non-sellers under the Oregon Securities Law. Therefore the court declines to apply the veil-piercing doctrine to derivative liability actions under ORS § 59.115(3).

B. *Group Pleading*.

Plaintiffs contend the group pleading doctrine allows a general reference to an affiliated group of business entities acting jointly. The group pleading doctrine allows a plaintiff to allege wrongdoing against a group of individuals or entities jointly engaging in fraudulent or conspiratorial conduct. *Wool v. Tandem Computers*, 818 F.2d 1433, 1440 (9th Cir. 1987) (allowing group pleading where a group of corporate officers jointly published fraudulent financial statements), *overruled on other grounds by Hollinger v. Titan Capital Corp.*, 914 F.2d

1564, 1575 (9th Cir.1990) (en banc).  Defendants argue group pleading is inappropriate in this case.

Here, Plaintiffs seek to use group pleading to plead the primary liability of the Aequitas entities, which are not parties to this action.  Group pleading arose as a mechanism for alleging a defendant's liability when the specifics of a defendant's participation in a common scheme or fraudulent action are unknown to a plaintiff.  *See, e.g., DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1248 (2d Cir. 1987) (allowing group pleading against a partnership where the allegations dealt with internal operations).  Group pleading remains a way to allege joint participation in a venture where a plaintiff cannot know the specifics of individual involvement.  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184–85 (N.D. Cal. 2009) (allowing group pleading against corporate families as to a price-fixing conspiracy); *see also Wool*, 818 F.2d at 1440 (noting that "where possible, Wool has extended such particularity to the individual defendants.").

Defendants object to Plaintiffs' use of group pleading in this lawsuit as impermissibly lumping together all of the Funds and Control Entities.  *See Swartz v. KPMG LLP*, 476 F.3d 756, 764–65 (9th Cir. 2007) ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together but 'require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . .'") (internal quotation marks and citation omitted).  Because each defendant had varying involvement with different entities or groups of entities, Defendants argue the FAC does not provide sufficient notice of their alleged involvement with the Aequitas group, and thus the scope of the claims against them.  Thus, Defendants conclude any use of group pleading must also provide each defendant with sufficient notice of the allegations against that defendant.

Group pleading is appropriate where Plaintiffs allege fraud in the inner workings of Aequitas. For example, Plaintiffs allege the Aequitas entities concealed the true operations and financial health of the Aequitas entities through complex financial engineering and use of "shell" entities. (FAC ¶¶ 163–67.) This allegation addresses conduct Plaintiffs could not know when filing their lawsuit, and therefore is properly pleaded using group pleading. But most of the allegations in the complaint relate to misrepresentations and omissions by individual Aequitas entities. Here, Defendants' objection to Plaintiffs' use of group pleading has merit.

Plaintiffs fail to satisfy the requirements of either Rule 9(b) or Rule 8 by referring generally to "Aequitas" making misrepresentations and omissions. Defendants' secondary liability is contingent upon transactions they participated in or materially aided through working relationships with ACF and the Funds. Defendants did not work with "Aequitas" — Defendants worked with individual Aequitas entities. (FAC ¶ 30.) Defendants cannot defend against Plaintiffs' claim without knowing who sold the securities at issue. Plaintiffs argue Defendants have sufficient information to know which "Aequitas" each allegation refers to, but this argument does not address the requirements of Rules 8 and 9(b). Particularity, not presumption, is the standard in federal courts. To provide notice to Defendants — and certainly to allege fraud with particularity — Plaintiffs must, where possible, identify the entity that allegedly made each misrepresentation or omission.

The court should grant Defendants' motions to dismiss as to all allegations of actions by or interactions with "Aequitas" instead of a specific Aequitas entity. The allegations of misrepresentations and omissions in paragraphs 72–135, 141–45, 148–50, 153, 159, 161, 166, 168, and 173 all improperly refer to "Aequitas" without identifying a specific Aequitas entity. Additionally, the allegations of Defendants' participation in or material aid for the Aequitas

group's securities business in paragraphs 30, 32, 35, 39, 43, 45, 49, 51, 54, 57, 59, and 61 all improperly refer to a defendant's interactions with "Aequitas."

C. *Integrated Offering*.

Plaintiffs also refer to the securities sold by all Aequitas entities, without distinction among the various securities. Defendants argue that by referring to the Disputed Securities and other securities sold by Aequitas entities without distinction, Plaintiffs improperly ignore differences including type of security, seller, and offering documents. In response, Plaintiffs contend the court should view any security sold by an Aequitas entity as an "integrated offering," disregarding the separateness of the securities when determining whether the securities were sold in violation of the Oregon Securities Law. The court rejects Plaintiff's integrated offering theory. First, Plaintiffs do not establish that an integrated offering theory exists under the Oregon Securities Law. Second, just as Plaintiffs cannot use a unitary reference for the Aequitas group, Rule 9(b) does not allow them to make unitary reference to the securities sold by the Aequitas group.

Under Plaintiffs' integrated offering theory, the Aequitas group was the "issuer" of all securities sold by individual entities and, thus, the court may disregard the distinction between the individual securities. The only authority Plaintiffs offer are cases interpreting the term "issuer" in the federal Securities Act, defined in 15 U.S.C. § 77b(4). *See, e.g., S.E.C. v. Murphy*, 626 F.2d 633, 643 (9th Cir. 1980) (construing § 77b(4) to determine the availability of a private offering exemption under § 77d). Plaintiffs conclude that "Aequitas" is the issuer of all securities sold by any Aequitas entity, and therefore that the Disputed Securities and any other securities sold by an Aequitas entity are part of an integrated offering. The court disagrees. Even if the Aequitas group is the issuer of all of the securities its subsidiaries and affiliates sold,

it does not follow that the securities are all part of an integrated offering for purposes of determining secondary liability for misrepresentations, omissions, and selling unregistered securities.

First, "issuer," as applied in § 77d and construed in *Murphy*, relates to the availability of a private-offering exemption from registration. *Murphy*, 626 F.2d at 641–42. The question presented there was whether, to qualify for an exemption from registration, a subsidiary had to provide information to prospective investors about its parent company. *Id.* at 637–38. *Murphy* did not address secondary liability or claims of misrepresentation. *Id.* The term "issuer" does not appear in the federal analogue to ORS § 59.115. 15 U.S.C. § 77l; *see Karsun v. Kelley*, 258 Or. 155, 161 (1971) (ORS § 59.115 was modeled on 15 U.S.C. § 77l). Nor does "issuer" appear in ORS §§ 59.115 or 59.135, even though "issuer" is defined and used elsewhere in the Oregon Securities Law. *See* OR. REV. STAT. §§ 59.015 (9) (definition); 59.035 (use). Accordingly, *Murphy* and similar cases do not support an integrated offering theory under the Oregon Securities Law because they address construe a defined term that does not appear in the statutes. Plaintiffs offer no other authority for their integrated offering theory or any other basis for disregarding the differences between the Disputed Securities as a matter of law.

Second, for the same reasons Plaintiffs cannot refer to the many Aequitas entities as "Aequitas," Rules 8 and 9(b) do not allow Plaintiffs to refer to securities sold at different times, by different entities, and using different offering documents as "Aequitas Securities." Defendants have varying relationships to different Aequitas entities and their securities offerings, and thus lack sufficient notice of the claims against them where Plaintiffs use "Aequitas Securities."

In sum, Plaintiffs' allegations fail to distinguish between the securities sold by different Aequitas entities.  Plaintiffs' integrated offering theory is unsupported by the Oregon Securities Law, and does not allow consideration of all of the "Aequitas Securities" as a single securities offering.  The unitary reference to "Aequitas Securities" is also insufficient under Rules 8 and 9(b).

### D.  Dismissal with Leave to Amend.

The court should dismiss the FAC for failure to comply with Rule 9(b) insofar as the FAC refers to "Aequitas" or the "Aequitas securities."  Oregon law does not support disregarding the legal separateness of the Aequitas entities or the Aequitas securities for the purposes of non-seller liability under the Oregon Securities Law.  Moreover, the group-pleading doctrine does not support allegations of conduct by "Aequitas," except where the allegations are of internal operations where Plaintiffs could not reasonably know which Aequitas entity or entities engaged in specific conduct.

The FAC is premised on Plaintiffs' legal theory that the Aequitas group and all securities sold by Aequitas entities are legally indistinguishable in the secondary-liability context.  Because this theory is not legally viable, all allegations regarding "Aequitas" and "Aequitas securities" are insufficiently pleaded.  The court should therefore dismiss the FAC, with leave to amend, and Plaintiffs should be required to allege actions by specific Aequitas entities and differentiate between the securities sold by Aequitas entities.

## IV.  Consideration of Documents.

Defendants, and Deloitte in particular, ask the court to take judicial notice of several documents in support of their motions to dismiss.  Plaintiffs do not object to judicial notice of some documents, specifically: (1) certain Generally Accepted Auditing Standards ("GAAS")

(Masuda Decl., Exs. 1–4); (2) SEC filings by the Funds (*Id.* Exs. 6–10); and (3) the complaint filed in the *SEC* lawsuit. (*Id.* Ex. 25). Plaintiffs condition their position on the purpose of the notice: they do not object to judicial notice of the documents, if limited to the existence of the documents and not the facts therein. (Pls.' Partial Objs. To Defs.' Req. for Judicial Notice (ECF No. 117), at 1.) Plaintiffs contest judicial notice of the facts asserted in the SEC filings and application of the incorporation by reference doctrine to the PPMs. (*Id.*)

A. *SEC Filings and Court Documents.*

Courts may take judicial notice of information "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). Court filings are public records, whose authenticity is not subject to reasonable dispute. *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir.2001). SEC filings are also public records subject to judicial notice. *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 129 F. Supp. 3d 1012, 1020–21 (D. Or. 2015). When taking judicial notice of public records, courts take notice of the existence of the records rather than the information contained in the records. *Id.*; *Lee*, 250 F.3d at 690. Courts may not take judicial notice of reasonably disputed facts, nor may courts draw inferences from documents subject to judicial notice "that contradict the reasonable inferences drawn from the facts alleged in Plaintiff[s'] complaint." *Lee*, 250 F.3d at 1022. Accordingly, the court takes judicial notice of the existence SEC Complaint and SEC Filings, but only as to the existence of the documents.

B. *GAAS Documents.*

The court should take judicial notice of the GAAS document, to establish the terms of the GAAS themselves. *See In re Medicis Pharm. Corp. Sec. Lit.*, 689 F. Supp. 2d 1192, 1202 n.6

(D. Ariz. 2009) ("In the context of securities litigation, courts frequently take judicial notice of [similar accounting standards].")  But at this stage in the litigation, courts cannot infer from the terms of the GAAS that an auditor complied or did not comply with the GAAS in their auditing activities because the court must accept Plaintiffs' allegations as true.  *S.E.C. v. Cotton*, No. SACV 06-0905 AG, 2006 WL 6382128, at *6 (C.D. Cal. Dec. 21, 2006) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997)).  Whether EisnerAmper and Deloitte actually complied with GAAS in auditing the Aequitas entities is an issue of fact inappropriate for resolution on a motion to dismiss.

### C. Documents Incorporated by Reference.

The most contentious issue regarding extraneous documents is consideration of engagement letters between Deloitte and some Aequitas entities (Masuda Decl. Exs. 12–13), certain PPMs (*Id.* Exs. 14–16; Van der Weele Decl. Exs. 1–3), and Deloitte-audited financial documents for some Aequitas entities (Masuda Decl. Exs. 16–24).  While the motion for judicial notice is submitted by all Defendants, Deloitte is the proponent of the documents at issue.  (Def. Deloitte & Touche LLP's Reply in Supp. of Req. for Judicial Notice (ECF No. 133).)  Deloitte seeks judicial notice of these documents under the incorporation-by-reference doctrine.  *See Knievel v. ESPN*, 393 F.3d 1069, 1076 (9th Cir. 2005) (applying the doctrine).  Incorporation by reference allows the court to consider documents outside of the complaint when ruling on a motion to dismiss, but only under a narrow set of circumstances.  *Id.*  A document is incorporated by reference when its "contents are alleged in a complaint," the document's authenticity is undisputed, and the document is not attached to the complaint.  *Id.* (quoting *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 986 (9th Cir. 1999)).  The doctrine also applies when "the plaintiff's claim depends on the contents of a document, the defendant attaches the

document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint." *Id.* (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1988)).

Deloitte argues the engagement letters, PPMs, and audited financial documents are incorporated by reference in the FAC because the allegations against Deloitte explicitly mention or implicitly rely on the documents. Plaintiffs do not dispute the authenticity of any of the proffered documents, but, plaintiffs disagree that the FAC incorporates the documents by reference. Alternatively, Plaintiffs argue the court should not use the documents to draw inferences adverse to Plaintiffs at this stage in the litigation. *See Vesta*, 129 F. Supp. 3d at 1022 (refusing to draw inferences adverse to the nonmoving party from documents subject to judicial notice in ruling on a motion to dismiss).

The court does not consider the engagement letters under the incorporation by reference doctrine. The distinction between the engagement letter and the scope of work done by Deloitte is important. Deloitte argues the engagement letters are subject to judicial notice, based on the following premise: "Deloitte's engagement as independent auditors depends on the contents of the engagement letters which define the engagement." (Req. for Judicial Notice at 11.) Deloitte's argument for considering the engagement letters conflates the terms of the engagement letter with the scope of work Deloitte actually performed for the Aequitas group, as alleged in the FAC. Plaintiffs do not allege the contents of or otherwise rely on the engagement letter between Deloitte and the Aequitas entities. Thus, while Deloitte's work for the Aequitas group is central to the FAC, the terms of its engagement letter are not.

The court does consider the PPMs, but not the other documents, under the incorporation by reference doctrine. The FAC references the PPMs repeatedly (FAC ¶¶ 32, 39, 45, 51, 57, 61),

Page 35 – FINDINGS AND RECOMMENDATION                                    [TJP]

and relies on the alleged misrepresentations and omissions in the PPMs as a basis for the Aequitas entities' primary violations of the Oregon Securities Law (*see, e.g.*, *id.* ¶¶ 137–40). Because Plaintiffs allege the contents of the PPMs, but did not attach the PPMs to the complaint, the PPMs are subject to judicial notice.

The parties also contest the extent to which the court may disregard Plaintiffs' allegations based on the PPMs. Deloitte argues the court may disregard allegations in the FAC when contradicted by the PPMs. *See Sprewell*, 266 F.3d at 988 ("The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit."). Plaintiffs reply that the court cannot use inferences drawn from extrinsic documents to contradict the allegations in the FAC. *Vesta*, 129 F. Supp. 3d. at 1021–22 (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Deloitte argues *Vesta* is inapplicable to this case because it dealt with judicially noticed documents, not documents incorporated by reference. *See id.* at 1020.

The court considers the PPMs as though they were attached to the complaint, and construe the contents of the PPMs in the light most favorable to Plaintiffs. The court may "treat [documents incorporated by reference] as part of the complaint." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). The court must also construe the complaint in the light most favorable to Plaintiffs when ruling on a motion to dismiss. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009). Accordingly, whether under the analysis articulated in *Vesta* and *Lee* or by treating the documents as part of the complaint, the court must construe the contents of the documents in the light most favorable to the plaintiff when ruling on a motion to dismiss. *Id.*

/ / / / /

<u>V.  Misrepresentations and Omissions</u>.

Defendants also assert six grounds for challenging Plaintiffs' allegations of misrepresentations and omissions regarding the Securities, arising under the elements of primary violations of the Oregon Securities Law and the particularity requirement of Rule 9(b).  First, Defendants argue Plaintiffs fail to connect the majority of Aequitas' alleged misrepresentations and omissions with specific representations to purchasers.  Second, Defendants seek to dismiss all of Plaintiffs' misrepresentation claims for failing to allege a causal connection between the misrepresentations and Plaintiffs' purchases.  Third, Defendants contend Plaintiffs' misrepresentation claims are improper because Plaintiffs do not allege that specific affirmative representations were false when made.  Fourth, Defendants argue Plaintiffs' omissions claims fail because Plaintiffs do not connect the alleged omissions with any affirmative statement.  Fifth, Defendants seek dismissal of some misrepresentation and omission claims because the misleading communications appeared to occur after the sale.  Sixth, and finally, Defendants claim Plaintiffs did not sufficiently allege the Aequitas entities acted with scienter.

    *A.  Structure and Purpose of ORS § 59.115(1)(b)*.

Initially determining the proper construction of ORS § 59.115(1)(b) is necessary here, as multiple arguments depend on the terms of the statute.  Plaintiffs' claims against Defendants are derivative of the Aequitas entities' primary violations of Oregon securities laws.  Specifically, ORS § 59.115(3) provides for secondary liability for material aid or participation in sales violating ORS § 59.115(1).  One does not violate ORS § 59.115(3); secondary liability attaches because of the seller's violation and the non-seller's involvement in the sale.  *Ainslie v. First Interstate Bank of Or., N.A.*, 148 Or. App. 162, 184 (1997).  Plaintiffs allege the Aequitas entities violated ORS § 59.115(1)(b) by misrepresentations and omissions regarding the

operations and financial health of the Aequitas entities.   Accordingly, to resolve Defendants'
arguments that Plaintiffs insufficiently pleaded the Aequitas entities' primary violations of
Oregon securities law, the court first must determine the requirements of a claim under ORS
§ 59.115(1).

The Oregon Legislature adopted ORS § 59.115(1)(b) in 1967.   The subsection remains
substantially unchanged.   The Legislature intended ORS § 59.115(1)(b) to mirror a provision of
the Federal Security Act of 1933, 15 U.S.C. § 77l(2).   *Karsun*, 258 Or. at 161.   Thus, decisions
construing the parallel federal statute are instructive in interpreting ORS § 59.115(1)(b).   *Id.*   The
provisions of ORS § 59.115 and the remainder of the Oregon Securities Law are "to be liberally
construed to afford the greatest possible protection to the public.   *Adamson v. Lang*, 236 Or. 511,
516 (1964).

Plaintiffs allege Aequitas' primary violation occurred under the following provision: "A
person is liable . . . if the person sells or successfully solicits the sale of a security . . . by means
of an untrue statement of a material fact or omission."   OR. REV. STAT. § 59.115(1)(b).   A
substantial disagreement exists regarding the scope of two components of the provision: what is
the scope of "selling a security," and what nexus does "by means of" require.   First, Defendants
argue the "sale" of a security is limited to individual purchases, *i.e.*, each purchase is an
independent sale for purposes of Section 115.   Plaintiffs construe "sale" to reach the entire
offering of related securities.   Second, Defendants contend Section 115 requires Plaintiffs to
plead a causal connection between the misrepresentation and the sale.   Plaintiffs contend Section
115 allows an action based on sales of a security merely if the seller made a material
misrepresentation or omission regarding that security, without need of causation.

/ / / / /

Page 38 – FINDINGS AND RECOMMENDATION                                                    [TJP]

B. *Connection Between Misleading Information and Sale.*

Defendants argue the FAC fails to allege sufficient connections between the alleged misrepresentations and omissions and individual purchases. Defendants first contend Plaintiffs must plead that individual purchasers purchased Disputed Securities based on misleading information. This contention is incorrect. A primary violation of ORS § 59.115(1)(b) does not require reliance on a misrepresentation or omission. *Everts v. Holman*, 64 Or. App. 145, 152 (1983) ("ORS 59.115(1)(b) imposes liability without regard to whether a buyer relies on the omission or misrepresentation."). Moreover, a case interpreting the federal analogue to ORS § 59.115(1)(b) rejected any requirement that a buyer receive the misleading communication, if the seller sold a group of securities by means of a material misstatement or omission. *See Sanders v. John Nuveen & Co.*, 619 F.2d 1222, 1226–27 (7th Cir. 1980), *cited in Everts*, 64 Or. App. at 152.

Defendants also argue Plaintiffs must plead individual receipt of offering documents containing misrepresentations or omissions. In support, Defendants cite cases describing ORS 59.115 as covering "face-to-face transactions." *See, e.g.*, *State v. Marsh & McLennan Cos., Inc.*, 353 Or. 1, 12 (2012). Defendants interpret "face-to-face" as limiting the scope of an ORS § 59.115(1)(b) violation to an individual transaction between one buyer and one seller. Defendants also rely on an Oregon Circuit Court case, *Loewen v. Galligan*, No. A9005-02822, 1992 WL 12582753 (Or. Cir. Ct. Aug. 19, 1992), *aff'd* 130 Or. App. 222 (1994).[1] *Loewen* held that a securities transaction is not unlawful because of a subsequent misleading statement, as the prior sale was not "by means of" a misleading statement. *Id.* at *8. Defendants rely on other

---

[1] The appellate decision in *Loewen* did not discuss the aspects of the trial court's decision upon which Defendants rely. *See Loewen*, 130 Or. App. at 239 (deciding the ORS 59.115 claim based on timeliness).

statements in *Loewen*, suggesting the misleading statement must cause the transaction. *Id.* In that respect, *Loewen* conflicts with *Marsh* and *Everts* by requiring transaction causation for a claim under ORS 59.115(1)(b). *Compare id.* at *8–9 *with Marsh*, 323 Or. at 17 (reliance and transaction causation are the same thing in securities fraud context) (quoting *Dura Pharm., Inc. v. Broudo*, 511 U.S. 164, 180 (2005)) *and Everts*, 64 Or. App. at 152 (no reliance requirement under ORS 59.115(1)(b)). Plaintiffs contend ORS 59.115(1)(b) requires only a nexus between communicated misrepresentation or omission and a group of securities.

Defendants argue ORS 59.115(1)(b) requires a plaintiff to plead receipt of a misleading communication. While Defendants correctly note that Oregon cases interpreting ORS § 59.115(1)(b) all involve receipt of a misleading communication, nothing in those decisions suggests receipt was a requirement. Instead, *Everts* expressly rejected a reliance requirement for claims under ORS 59 § 59.115(1)(b). *Everts*, 64 Or. App. at 152 (citing *Sanders*, 619 F.2d at 1225). The holding in *Everts* does not require receipt of a misleading communication simply because the plaintiff in that case received a misleading prospectus. *Id.*

Plaintiffs may plead sale of a security by means of a misleading statement where the seller made a misleading statement in the offering documents or other promotional materials for a security. *Sanders* contains an instructive fact pattern. There, a class of securities purchasers sued under the federal analogue to Section 115(1)(b) (15 U.S.C. § 77l(2)), alleging that the offering documents for a series of unsecured promissory notes contained misleading financial information. *Sanders*, 619 F.2d at 1224. The defendants claimed not all class members received the misleading offering documents, and thus could not state a claim because there was no causal relationship between the misleading documents and purchases. *Id.* at 1225. The court rejected the defendants' argument, concluding requiring receipt of an offering document improperly

imposes a reliance requirement and ignores the effect of misleading communications on the market price and reputation of a security. *Id.* at 1225–27. The court held that issuing securities using misleading documents makes all sales of that security "by means of" the misleading document, regardless of whether every purchaser received or relied on the documents. *Id.* at 1227 ("[I]t is enough that the seller sold by means of a misleading prospectus securities of which those purchased by the plaintiff were a part.").

*Sanders* controls because it furthers the remedial purpose of Oregon's Blue Sky law. Although *Sanders* is a non-binding aid to interpreting ORS 59.115, it interpreted the federal statute (15 U.S.C. § 77l(2)) upon which ORS § 59.115 was modeled. *Badger v. Paulson Inv. Co., Inc.*, 311 Or. 14, 21 (1991). *Sanders* makes clear that § 77l(2) was intended to reach all securities sold in an offering where the seller employed misleading communications to promote sales. *Sanders*, 619 F.2d at 1227. Further, the same statutory language at issue in *Sanders* — "by means of" — is at issue here. *Compare* OR. REV. STAT. § 59.115(1)(b) *with* 15 U.S.C. § 77l(2).

*Sanders* also is consistent with *Everts* because requiring receipt of misleading communications serves no purpose other than implicitly requiring reliance. *Sanders*, 619 F.2d at 1225, *Everts*, 64 Or. App. at 152. Misleading communications have a broad effect on the reputation of a seller in the market, even when the securities are sold in private offerings. *Id.* at 1227 ("[P]ublication of [defendant's] true financial condition would have caused a total collapse of the market for its notes."). When the Funds sold securities using allegedly misleading offering documents and financial statements, all buyers of a security experienced the market effect of the Funds' misrepresentations and material omissions. The Funds would not have been able to find buyers for the Disputed Securities had they represented the true condition and nature

of the Aequitas entities as a whole.  *See id.*  Accordingly, the court addresses as "sales" each group of sales the Funds effected through the allegedly misleading PPMs and other communications.

The court also adopts the same approach for Plaintiffs' claim under ORS § 59.115(1)(a) for violating ORS § 59.135(2).  The provisions of ORS § 59.135 do not create an independent cause of action, but are actionable only through ORS §§ 59.115 and 59.137.  *Marsh*, 353 Or. at 8.  Plaintiffs bring their ORS § 59.135(2) claim under ORS § 59.115(1)(a).  Both ORS § 59.115(1)(a) and (1)(b) apply when a person "[s]ells or successfully solicits the sale of a security."  The connecting language between the misleading communication and sale is similar: "by means of" in ORS § 59.115(1)(b); "in connection with" in ORS § 59.135(2).  Just as misleading offering documents and promotional materials render a group of sales "by means of" that misleading statement, the broad remedial purpose of the Oregon Securities Law also supports finding those statements "in connection with" a group of sales, whether or not the purchaser received the statements.

In sum, ORS § 59.115(1)(b) requires Plaintiffs to plead actionable misrepresentations and omissions connected to a sale or group of sales of a security.  Plaintiffs need not plead individual receipt of or reliance upon the misleading communications.

### C. Where and When Misrepresentations and Omissions Occurred.

Defendants next argue Plaintiffs must allege that misstatements and omissions appeared in specific documents.  Particularly, Defendants challenge the lack of specific connections between the alleged misrepresentations and omissions and the Disputed Securities.  Put differently, Defendants argue it is unclear when the Funds made the alleged misleading statements, and in connection with which Disputed Securities.  Defendants advance two specific

arguments regarding to Plaintiffs' lack of specificity in when and where misleading statements appeared.  First, Defendants argue Plaintiffs must allege they received misleading information prior to the sale.  Second, Defendants argue Rule 9(b) requires Plaintiffs to plead when and where the misleading statements occurred with particularity, including that the statements were false when made.  Plaintiffs contend that, under *Everts*, they need not plead any connection between the misleading statements and a purchase of securities.

First, Plaintiffs must plead facts sufficient to show that allegedly misleading communications preceded Plaintiffs' purchases of the Disputed Securities. As discussed above, the Oregon Securities Law does not require a plaintiff to allege or prove receipt of a misleading communication if the seller uses misleading communications to sell a group of securities of which the plaintiff's purchase was a part.  *Everts*, 64 Or. App. at 152.  But the misleading communication must precede the sale.  *Loewen*, 1992 WL 12582753, at *8–9.

Second, Plaintiffs must allege when and where misrepresentations and omissions appeared.  Rule 9(b) applies to the primary-liability allegations against the Aequitas entities, for the reasons previously discussed.  Under Rule 9(b), a plaintiff alleging misrepresentations or omissions must allege when and where the misleading statement was made, "what is misleading about [the] statement, and why it is false."  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994), *superseded by statute on other grounds by* 15 U.S.C. § 78u–4(b)(2).  Defendants also note that some of Plaintiffs' allegations hinge on changing circumstances.  For example, the Aequitas group's investment in Corinthian and the ACF–Holdings loan both became much more problematic over time.  (FAC ¶¶ 115, 155, 170–71.)  Where, as here, whether a statement was misleading when made depends on changing circumstances, the plaintiff must allege that the statement was false when made.  *GlenFed*, 42 F.3d at 1549.

Accordingly, the court should grant the motions to dismiss as to Plaintiffs' allegations of misrepresentations and omissions by the Aequitas group, with leave to amend. The allegations in paragraphs 72–135, 149–50, 160–61, 163, 168, and 173 do not identify where and when the allegedly misleading statement appeared. The allegations in paragraphs 137–40 state when and where misleading statements about uses of funds appeared, but lack allegations showing why the statements were false when made. Similarly, the allegations in paragraphs 86–102, 115–16, 121, 132–33, 136, 144, 158, 160, 169, and 173 all concern misrepresentation or omissions about circumstances that changed over time, without alleging facts showing affirmative statements were false when made. Any amended complaint must comply with Rule 9(b) by alleging which Aequitas entity made a misrepresentation or material omission, when and where the statement was made, and what was misleading about the statement when made.

### D. Material Omissions.

Defendants argue most of Plaintiffs' omission claims fail to identify an affirmative statement made false by an omission. Under ORS § 59.115(1)(b), a violation occurs when a seller makes an "omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading." Plaintiffs contend the broad remedial purpose of the Oregon Securities Law mandates full disclosure of material facts in promotional or offering materials.

No Oregon cases substantially discuss the contested provision, but two cases are instructive. In *Foelker v. Kwake*, 279 Or 379, 386 (1977), the court found allegations of material omissions sufficient when statements of account values were not accompanied by disclosure regarding problems with the accounts. Plaintiffs cite *Foelker* as support for their method of pleading, but *Foelker* identifies affirmative statements made false by omissions. *Id.* (seller told

buyer that it "had 'at least' $10,000 in accounts receivable, and named some of such accounts, but did not disclose that there were any problems in collecting such accounts"). Plaintiffs here have not made that connection.

Plaintiffs' reliance on *Everts*, where the court stated "ORS 59.115(1)(b) mandates a full and truthful disclosure of material information," is similarly inapposite. *Everts*, 64 Or. App. at 152. The relevant portion of *Everts* dealt with the impact of disclaimers, concluding boilerplate disclaimers did not cure omission of material information regarding the seller's financial condition. *Id.* The court in *Everts* identified specific and general affirmative statements made false by the seller's material omissions. *Id.* at 149–50 (seller provided financial statements and prospectus with information about the issue). Thus, *Everts* does not stand for the proposition that the material omission provision of ORS § 59.115(1)(b) does not require an affirmative statement made false by the omission. Accordingly, the court should grant the motions to dismiss as to the material omissions alleged that do not identify an affirmative statement made false by the particular material omission – specifically, paragraphs 71–135, 149–50, 153, 158, 160, 163, and 173.

   *E. Scienter.*

Scienter — "a guilty state of mind" in making misleading statements — is a required element of a violation of ORS § 59.135(2). *State v. Marsh & McClellan Co.*, 269 Or. App. 31, 47 (2015); *Cox*, slip op. at 13. Plaintiffs argue that they may allege scienter generally, and that their allegations sufficiently allege scienter. *Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007) ("While the factual circumstances of the fraud itself must be alleged with particularity, the state of mind — or scienter — of the defendants may be alleged generally."). Defendants argue the plausibility requirement of *Twombly* and *Iqbal* applies to allegations of

scienter.  *See United States ex rel. Lee v. Corinthian Coll.*, 655 F.3d 984, 1000 (9th Cir. 2011) (applying plausibility standard to scienter).  Defendants then contend Plaintiffs do not allege facts supporting a plausible allegation of scienter.

Plaintiffs must allege facts supporting a plausible inference of scienter, and scienter must be adequately specified.  The particularity requirement of Rule 9(b) did not apply to allegations of scienter — consequently, Rule 8 applies to allegations of scienter just as it applies to all other allegations.  *Lee*, 655 F.3d at 1000; *Odom*, 486 F.3d at 554.  *Twombly* and *Iqbal*'s plausibility requirement derives from Rule 8.  *Iqbal*, 556 U.S. at 677–79; *Twombly*, 550 U.S. at 553–56.  Accordingly, Plaintiffs must plead facts supporting a plausible inference of scienter.  They have done so here.

The FAC generally alleges facts supporting a plausible inference of scienter as to the Aequitas entities.  Plaintiffs claim Aequitas deceived investors, maintained a façade of financial stability, and repaid prior investors with newly invested funds to conceal insolvency.  Plaintiffs do not specifically allege that every misleading statement was intended to mislead investors, but the overall course of conduct alleged against the Aequitas group is sufficient to create the necessary inference.  Accordingly, the FAC sufficiently alleges scienter.

VI.  Participant Liability.

Defendants challenge the allegations of their participation and material aid in the allegedly unlawful sales.  Plaintiffs' failure to allege when and where misrepresentations occurred, the falsity of statements when made, and which Aequitas entity made what statements regarding which securities eliminates Defendants' secondary liability, for purposes of the FAC.  Defendants also contend that even if the Aequitas entities' primary liability was sufficiently pleaded, the allegations of participation in and material aid for the securities transactions are also

insufficient.  Accordingly, the court considers these arguments to determine whether the court should deny Plaintiffs leave to amend because their theory of liability fails as a matter of law.

The parties' disagreement about the participation and material aid allegations centers around two issues.   First, relevant to all Defendants, the parties advocate divergent interpretations of the required connection between participation or material aid, and unlawful sales.  Second, each defendant contests the sufficiency of the specific allegations Plaintiffs levy against the individual defendant.   Accordingly, the court first constructs the standard for participation or material aid liability under ORS 59.115(3).   The court next addresses the sufficiency of the allegations against each individual defendant.

   A.  *Standard for Non-Seller Liability*.

Under ORS 59.115(3), "'[p]articipate' and 'materially aid' are separate concepts, not synonyms." *Prince*, 307 Or. at 149.  Whether aid in a sale is material "depends on the importance of one's personal contribution to the transaction." *Id.*  Generally, participation addresses direct involvement in the sale, while material aid involves indirect support for the seller in making the sale.  *Id.* at 150 (drafting partnership documents and providing legal advice regarding private securities offering was material aid); *Adams*, 265 Or. at 527 (1973) (preparing sales documents for use in transaction was participation); *Ainslie v. Spolyar*, 144 Or. App. 134, 145 (1996) ("*Ainslie I*") (preventing a foreclosure and providing legal services prior to an offering was material aid).   Other Oregon decisions use the terms together, "participate or materially aid," without distinction.  *See, e.g., Fakhrdai v. Mason*, 72 Or. App. 681, 684 (1985); *Ainslie v. First Interstate Bank of Or., N.A.*, 148 Or. App. 162, 184–85 (1997) ("*Ainslie II*"). Plaintiffs, citing the liberal construction of Oregon's securities laws mandated by *Adamson v. Lang*, 236 Or. at 516, advocate for a broad scope of secondary liability.

Page 47 – FINDINGS AND RECOMMENDATION                                    [TJP]

The parties primarily disagree regarding the required nexus between acts supporting a securities business and the sale of securities. This dispute arises because Plaintiffs assert participation and material aid liability against EisnerAmper, Deloitte, Tonkon, and Sidley based on their alleged material aid in large groups of securities transactions. Defendants argue ORS § 59.115(3) and *Prince* limit non-seller liability to acts where the purchaser of securities received documents reflecting the non-seller's "knowledge, judgment, or assertions." Defendants therefore conclude the allegations of participation or material aid are insufficient because they do not allege involvement in each named plaintiff's purchases. Plaintiffs contend ORS § 59.115(3) encompasses any acts in support of the securities business of a seller, whether or not the acts directly supported specific sales of securities.

A non-seller's liability depends on the importance of their conduct — whether participation or aid — to the sale. For the reasons discussed below, the court concludes non-seller liability depends on a causal relationship between unlawful securities transactions and the nature of the non-seller's support for the transactions. First, the non-seller's interactions with the seller must have a causal relationship with the transaction. *Adams*, 265 Or. at 529 (finding liability where a "sale would and could not have been completed or consummated without" the non-seller's actions). Second, the non-seller's conduct must reflect some "knowledge, judgment" or other specialized skills particular to the non-seller. *Prince*, 307 Or. at 149. If persons materially aid an unlawful sale of securities, their professional roles are not a defense to liability. *Id.* at 151.

1. Causal Relationship with Securities Sales.

Secondary liability under ORS 59.115(3) first requires interactions with a seller that have a causal relationship to an unlawful sale of securities. *Adams*, 265 Or. at 529. For example, in

*Adams* a lawyer participated in a transaction when he prepared, oversaw the execution of, and filed registration documents for a security. *Id.* at 528–30. The court held that the lawyer "contributed to the completion and consummation" of the transaction, which "would not and could not have been completed or consummated without" various documents prepared by the lawyer. *Id.* at 529–30. The *Prince* court also found liability based on conduct with a causal relationship with a sale. There, an attorney provided legal advice to a seller, drafted necessary legal documents and substantial parts of the offering documents, and provided a tax opinion which investors received. *Prince*, 307 Or. at 148; *see also Prince v. Brydon*, 89 Or. App. 203, 206 (1988) (summarizing facts). The court held that sale of the securities could not have occurred without the lawyer's services. *Prince*, 307 Or. at 149 (quoting *Prince*, 89 Or. App. at 206). Further, the court held that the lawyer's conduct was not immune from liability because the services were "routine parts of a securities practice." *Id.*

Building on *Adams* and *Prince*, the court in *Ainslie I* found non-seller liability based on conduct more attenuated from the transaction in that case. *Ainslie I*, 144 Or. App. at 145. In *Ainslie I*, the seller issued an offering memorandum for a Christmas-tree business, proposing to purchase cutting rights on a tree farm. *Id.* at 138–39. The cutting-rights purchase was contingent on receiving sufficient subscriptions from prospective investors. *Id.* Prior to receiving sufficient subscriptions, the tree farm was about to undergo foreclosure. *Id.* The seller's attorney and a bank manipulated transactions to release funds from an escrow account set up for the purchase, despite the lack of sufficient investors. *Id.* The court concluded that the attorney had materially aided in the transaction, in part by "prevent[ing a] foreclosure that would at the least have seriously impeded the offering." *Id.* at 145. *Ainslie I* demonstrates that

interactions enabling a seller to continue its securities business constitutes material aid for any subsequent enabled transactions.

Plaintiffs also rely on *Black & Co v. Nova-Tech, Inc.*, 333 F. Supp. 468 (D. Or. 1971), a decision of this court interpreting ORS 59.115(3).  *Black* applied ORS 59.115(3) expansively, holding that designation of a law firm as corporate counsel in published reports made "the firm's partners 'participants' in any unlawful securities transactions in which the annual reports were used for promotional purposes."  *Id.* at 472.  Defendants contend *Black* should not guide this court's analysis, in part because *Adams* criticized *Black* as overbroad.  *See Adams*, 265 Or. at 527–28 ("The decision[] in *Black & Company v. Nova-Tech, Inc.* . . . [is] not binding on us and some of the statements in th[at] opinion[] may be overly broad, if literally applied.")  *Prince* clarified the criticism of *Black* in *Adams* as "stat[ing] a possible question, not a conclusion." *Prince*, 307 Or. at 149–50.  Accordingly, the court considers *Black* as persuasive authority, but does not adopt any statement from *Black* unless supported by other authority.

2.  Materiality of Support for Transaction.

The *Prince* court also defined materiality under ORS 59.115(3), distinguishing essential but ministerial tasks, which do not create secondary liability ("typing, reproducing, and delivering sales documents"), from materially aiding acts such as drafting documents requiring "knowledge [and] judgment."  307 Or. at 149.  A non-seller's acts of participation or aid are only material when the interactions require some judgment, skill, expertise, or ability particular to the non-seller.  *Id.*  Put differently, an interaction is material if "could [not] have been performed by anyone."  *Id.*

Defendants contend the materiality criteria announced in *Prince* protects non-sellers from liability where a non-seller's involvement with the sale was confined to their professional role as

auditor or attorney, or where no offering documents reflected the knowledge or judgment of the non-seller.  Neither contention is correct.  First, *Prince* expressly rejected limitations on liability based on professional roles.  *Id.* at 151.  ("The defense against strict liability, in short, was to be a showing of ignorance, not the professional role of the person who renders material aid in the unlawful sale.")  Defendants' reliance on *Prince* is further undercut because the reversed opinion of the court of appeals held an attorney bore no liability because the attorney "only rendered routine legal services to the partnership."  *Prince v. Brydon*, 89 Or. App. 203, 207 (1988), *rev'd*, 307 Or. at 149, 151.  Thus, whether any defendant's conduct was more or less than the ordinary professional role of that defendant is immaterial to the question of participation or material aid.

Defendants also argue *Prince* limited non-seller liability to involvement where the buyer receives some document reflecting the knowledge, judgment, or other expertise of the non-seller. In *Prince*, the court stated:  "Typing, reproducing, and delivering sales documents may all be essential to a sale, but they could be performed by anyone; it is a drafter's knowledge, judgment, and assertions reflected in the contents of the documents that are 'material' to the sale."  *Prince*, 307 Or. at 149.  Defendants read this sentence as limiting material aid to instances where a buyer receives documents reflecting a non-seller's "knowledge, judgment, or assertions."  But the quoted sentence from *Prince* does not reflect the outer bounds of non-seller liability.  Instead, the court was defining the concept of materiality by contrasting varying roles in preparation and execution of sales documents.  Other interactions with a seller may create secondary liability for material aid, subject to the causation and materiality requirements.  *Id.* at 149–50.  While this construction of ORS 59.115(3) imposes a broad scope of potential secondary liability, the *Prince* court noted that the legislative history of ORS 59.115(3) shows the legislature intended to place

such a "substantial burden" on non-sellers who participate in or materially aid an unlawful sale of securities. *Id.* at 150.

Plaintiffs and Defendants both rely on *Cox v. Holcomb Family Limited Partnership*, an Oregon Circuit Court decision regarding the issue of attenuation. In *Cox*, investors in an allegedly fraudulent securities business brought a lawsuit under ORS 59.115(3) against two banks and an accounting firm, alleging participation and material aid in the unlawful sale of securities. *Cox v. Holcomb Family Ltd. P'ship*, No. 1308-12201, slip op. at 6-9 (Or. Cir. Ct., Dec. 14, 2010). The court found the allegations against the banks were sufficient, but the allegations against the accounting firm did not state a claim for non-seller liability. *Id.* The banks provided loans to the seller, giving the seller credibility and creating an illusion of financial strength. *Id.* at 7. The court dismissed the claims against the accounting-firm defendant, because the one-line allegation of "review[ing] financial statements for" the issuer necessary for the loans was insufficient to establish "the extent or importance of [the accounting firm]'s involvement or its connection to the underlying sales." *Id.* at 9. The *Cox* analysis is instructive here and, as appropriate, will be applied to individual defendants below.

Finally, Deloitte provided the court with supplemental authority on the scope of non-seller liability, in the form of a case decided after oral argument on the motions to dismiss. In a decision construing the non-seller liability provision of Ohio securities law, a federal district court in Ohio concluded a bank had not participated or aided in unlawful securities sales because the bank only engaged in "normal commercial activities." *Cruz v. PNC Bank, Nat'l Ass'n*, Case No 3:16-cv-0292, 2017 WL 86327, at *2–3 (S.D. Ohio Jan. 10, 2017), *appeal filed* Jan. 31, 2017. *Cruz* does not inform the court's analysis. The Ohio statute at issue in *Cruz* includes language similar to that used in ORS § 59.115(3), *see* OHIO REV. CODE § 1707.43(A) ("every

person that has participated in or aided the seller in any way in making such sale or contract for sale"), but Ohio courts recognize an exception for banks engaged in "normal commercial banking activities." *See Wells Fargo v. Smith*, 2013-Ohio-855, ¶¶ 28–29 (Ct. App.) (collecting cases). Oregon courts do not recognize such a distinction. The holding in *Cruz* turned on Ohio-specific principles, and thus has minimal persuasive weight on this case. *See Cruz*, 2017 WL 86327, at *3.

In sum, ORS § 59.115(3) imposes secondary liability on non-sellers when a non-seller's interactions with a seller have a causal relationship with an unlawful securities transaction. *Adams*, 265 Or. at 529–30. The causal relationship may exist even if the interaction is a routine part of a professional's work with sellers of securities. *Prince*, 307 Or. at 149, 151. The interaction must enable an unlawful securities transaction, that it may be attenuated from the transaction is not determinative. *Adams*, 265 Or. at 529–30; *Ainslie I*, 144 Or. App. at 145. The interaction also must be material, in that it reflects the professional skill, judgment, or abilities of the non-seller. *Prince*, 307 Or. at 149.

The participation-and-material-aid allegations against Defendants fall into three broad categories. First, the law-firm defendants allegedly prepared documents necessary for the consummation of transactions, materially aiding the sale itself. (FAC ¶ 30(c–d).) Second, Integrity and Ameritrade allegedly facilitated some transactions with specific investors. (FAC ¶ 30(e–f).) Finally, the law-firm and accounting-firm defendants allegedly provided professional services necessary for the success of the Aequitas group's securities business as a whole. (FAC ¶ 30(a–d).)[2]

---

[2] Plaintiffs also allege some additional acts of participation or material aid in their responses to the motions to dismiss, but the court does not consider allegations not included in the complaint, *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998), except to allow leave to

*B. Deloitte.*

Plaintiffs allege Deloitte participated and materially aided in the sale of multiple Disputed Securities in its role as auditor for ACF, AIOF, AIOF-II, AEIF, ACOF, AIPF, and other Aequitas subsidiaries. Deloitte argues the allegations against it do not state a plausible claim for non-seller liability.

First, Deloitte argues the allegations against it have an insufficient connection to any of Plaintiffs' securities purchases. Relying on *Prince*, Deloitte contends an auditor can incur participation or material aid liability only if a purchaser receives the auditor's work product — audited financial statements and the auditor's report — with the auditor's consent. (Deloitte Mot. at 14.) Plaintiffs disagree — and based on the previous analysis, so does the court. Deloitte's position depends on its professional role as an auditor, but nothing in ORS 59.115(3), or the cases interpreting it limit non-seller liability to actions with a non-seller's professional role. To the contrary, a non-seller's professional role is irrelevant. *See Prince*, 307 Or. at 151 (a non-seller's professional role was not intended to be a defense). Nor does Deloitte's citation to the GAAS definitions of an auditor's role limit its potential liability under ORS 59.115(3). Deloitte implicitly asks the court to assume Deloitte's interactions with the Aequitas entities were strictly limited by the GAAS, an assumption the court cannot make in ruling on a motion to dismiss. *Cotton*, 2006 WL 6382128, at *6. Accordingly, the court rejects Deloitte's proposed auditor-specific scope of non-seller liability, and examines whether Deloitte's interactions with

---

amend. *Orion Tire Corp. v. Goodyear Tire & Rubber Corp.*, 268 F.3d 1133, 1137 (9th Cir. 2001). Accordingly, the discussion that follows analyzes the sufficiency only of the allegations in the FAC. Plaintiffs may include any additional bases for participation or material aid in any amended complaint. *Id.*

ACF and the Funds had a material, causal relationship with ACF and the Funds' sales of securities.

Plaintiffs allege Deloitte's connection with and work for the Aequitas group was a necessary component of the Aequitas group's fundraising model. The Aequitas group allegedly built the trust of prospective investors in part by prominently describing Deloitte as auditor of multiple Aequitas entities engaged in securities sales, and by providing Deloitte-audited financial statements to current and prospective investors. First, ACF and the Funds identified Deloitte as the auditor in its promotional materials. (FAC ¶¶ 15, 34, 42, 48, 53, 58, 63.) Plaintiffs claim Deloitte's association with the Aequitas entities provided credibility for their securities sales, because of Deloitte's reputation with investors. (*Id.* ¶ 15.) The "clout" Deloitte provided to the Aequitas entities attracted and supported the retention of investors. (*Id.*) Additionally, prospective investors received Deloitte-audited financial statements as promotional materials. (*Id.* ¶¶ 30(a), 33–34, 41–42, 47–48, 53, 58, 63.)

The court should deny Deloitte's motion to dismiss as to its participation or material aid. Plaintiffs plausibly allege Deloitte's participation or material aid in at least some securities transactions by ACF, AIOF, AIOF-II, ACOF, AEIF, and Motolease. Because the complaint insufficiently differentiates between the Aequitas entities, the securities they sold, and the groups of securities sold by means of misleading securities, the court should defer a determination of the sufficiency of Deloitte's alleged acts of participation or material aided to an amended complaint.

Second, Deloitte objects to finding participation and material aid based on an auditing relationship because such liability would extend to most, if not all auditors. Accepting the truth of this premise *arguendo*, Oregon courts have considered and rejected similar arguments. In *Prince*, the court considered the possible scope of liability for attorneys who prepare

prospectuses, a common task for attorneys with a securities practice. *Prince*, 307 Or. at 150–51. The *Prince* court found that the legislative history for ORS 59.115(3) shows intent to reach the routine activities of professionals who work with sellers of securities, placing the burden on those professionals to "exonerate themselves from liability." *Id.* The broad scope of non-seller liability reflects a deliberate choice by the legislature. *Id.* Accordingly, even if auditors of sellers of securities face broad potential liability, limiting such liability is beyond the purview of this court. Routine auditing services may incur liability when the auditing has a material, causal relationship with securities transactions.

Third, Deloitte argues extensively that the PPMs did not contain Deloitte-audited financial documents, and that most of the PPMs for Disputed Securities were issued before Deloitte completed audits of financial statements. (Deloitte Mot. at 17–18.) Even if Deloitte is correct, Plaintiffs do not allege the PPMs were the only promotional materials ACF and the Funds used. (*See, e.g.*, FAC ¶ 35 (alleging the existence of other promotional materials for the ACF Notes highlighting Deloitte's involvement), ¶ 43 (alleging the existence of other promotional materials for the AIPF notes highlighting Deloitte's involvement), ¶ 49 (alleging the existence of other promotional materials for the AIOF notes highlighting Deloitte's involvement).) Plaintiffs also allege Deloitte consented to the Aequitas entities' advertising their association with Deloitte, at least in the PPMs. (FAC ¶¶ 15, 34, 42, 48, 53, 58, 63.) Accepting the allegations in the complaint as true, and construing the complaint and all other materials in favor of Plaintiff, the record supports a plausible claim for relief. *See Zucco Partners*, 552 F.3d at 989.

The FAC plausibly alleges that the Aequitas entities used their affiliation with Deloitte to attract potential investors. Deloitte is a well-known and respected professional services firm,

Page 56 – FINDINGS AND RECOMMENDATION                                    [TJP]

and its association with the Aequitas entities plausibly could cause investors to make a speculative investment in a company with limited transparency as to assets, valuation, and operations. *See Cox*, slip op. at 8 (finding liability based on loans giving "the illusion of credibility"). By associating itself with the Aequitas entities as auditor, Deloitte plausibly materially aided in any transactions conducted by means of PPMs and promotional materials advertising Deloitte as the auditor. Deloitte's contribution to the transaction is not interchangeable with any other professional services firm, as not every accounting firm has the same reputation as Deloitte. *See Prince*, 307 Or. at 149 (aid to the transaction is not material if services "could be performed by anyone"). Accordingly, Plaintiffs state a plausible claim for non-seller liability against Deloitte based on the prominent mention of Deloitte as auditor in several PPMs and on the importance of Deloitte's reputation to the Aequitas entities' securities business.

Similarly, Plaintiffs' allegation that various Aequitas entities used Deloitte-audited financial statements in selling securities plausibly alleges material aid in any transaction involving such financial statements. Plaintiffs plausibly allege prospective investors received financial information audited by Deloitte. (FAC ¶¶ 15, 34, 42, 48, 53, 58, 63.) Any transaction or group of transactions effected using the Deloitte-audited financial statements was "by means of" such financial statements. *Sanders*, 619 F.2d at 1226–27. The credibility Deloitte's involvement lends to such financial statements plausibly could have a causal effect on any sales made by means of Deloitte-audited financial statements. *Cox*, slip op. at 7–8; *see also Black*, 333 F. Supp. at 472 (finding non-seller liability based on designation as corporate counsel in annual reports).

Plaintiffs' final theory of non-seller liability is that Deloitte's auditing services enabled the Aequitas group to conduct its securities business as a whole.  The facts alleged in the complaint do not plausibly support this claim — Plaintiffs rely on facts not alleged in the complaint to support the importance of Deloitte's services to the particular business structure the Aequitas group employed.  (Resp. to Deloitte's Mot. (ECF No. 122), at 5–7.)  Plaintiffs cannot add new facts to the complaint in their response to a motion to dismiss.  *Schneider*, 151 F.3d at 1197 n.1.  The court should grant Deloitte's motion as to Plaintiffs' claim against Deloitte based on alleged material aid for the Aequitas entities based on auditing activities alone, with leave to amend.  *Orion Tire Corp.*, 268 F.3d at 1137.

In sum, the court should deny in part and grant in part Deloitte's motion to dismiss.  Plaintiffs plausibly allege Deloitte's participation and material aid in securities transactions conducted by means of PPMs and promotional materials identifying Deloitte as auditor, and use of Deloitte-audited financial statements as promotional materials.  Plaintiffs do not allege sufficient facts to support their claim that Deloitte's auditing services materially aided all of the Aequitas group's securities sales.

### C. *EisnerAmper*.

First, EisnerAmper claims its connections with the Aequitas group were insufficient to participate or materially aid in any sales of securities, even if the claims of the Aequitas group's primary liability were sufficiently pleaded.  Plaintiffs' allegations of material aid by EisnerAmper follow a similar theory as the allegations against Deloitte.  For the reasons discussed above regarding the claims against Deloitte, the court rejects EisnerAmper's interpretation of *Prince* and ORS § 59.115(3).  EisnerAmper's advertised association with the Aequitas entities, together with the use of EisnerAmper-audited financial statements as

promotional materials in at least some Aequitas securities transactions, support a plausible claim

for participation or material aid under ORS § 59.115(3).  *Cox*, slip op. at 7–8; *Black*, 333 F.

Supp. at 472.  Plaintiffs also state a plausible claim for relief based on any sales made by means

of EisnerAmper-audited financial statements.  *Sanders*, 619 F.2d at 1226–27.

Second, EisnerAmper seeks dismissal of the claims against it based on the timing of its

involvement with the Aequitas group.  EisnerAmper's auditing relationship with the Aequitas

group allegedly ended in 2012.  (FAC ¶¶ 16, 30(a).)  EisnerAmper contends the alleged

misrepresentations, and thus unlawful sales, occurred after EisnerAmper ended its relationship

with the Aequitas entities.  Most of this disagreement revolves around the issue of when and

where the Aequitas entities made misleading statements, an issue analyzed in depth above.  The

precise scope of Plaintiffs' claims against EisnerAmper is unclear because Plaintiffs pleaded

their allegations under a "unified offering" theory.

But Plaintiffs also contend EisnerAmper's initial involvement with the Aequitas entities

constitutes material aid for all subsequent sales of securities by helping "Aequitas in building its

façade, behind which it operated for many years."  (Resp. to EisnerAmper's Mot. to Dismiss

(ECF No. 121), at 15–16.)  Put differently, Plaintiffs argue the Aequitas group could continue

selling securities only because its structure concealed its true financial condition from investors.

EisnerAmper's services as auditor allegedly helped Aequitas maintain an illusion of success and

stability.  Accordingly, EisnerAmper materially aided in every security transaction an Aequitas

entity made during and after EisnerAmper was auditor to some Aequitas entities.  This theory

may be viable, at least in some form.  *Ainslie I*, 144 Or. App. at 145 (finding material aid where

lawyer and banks enabled a group of securities transactions through an escrow transaction).  But

the FAC does not contain even conclusory allegations that EisnerAmper's auditing services were

Page 59 – FINDINGS AND RECOMMENDATION                              [TJP]

necessary for the ongoing securities business of the Aequitas entities, let alone the facts showing a plausible basis for such a theory. *Twombly*, 550 U.S. at 555.

Accordingly, the court should grant EisnerAmper's motion to dismiss as to the claim for non-seller liability for sales of securities beyond those made by means of promotional materials highlighting EisnerAmper or financial documents audited by EisnerAmper. Leave to amend is appropriate, as the record does not indicate Plaintiffs cannot allege additionally facts showing the plausibility of Plaintiffs' theory. *Cf. Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051–52 (9th Cir. 2008) ("Dismissal without leave to amend is proper if it is clear the complaint could not be saved by amendment.").

    *D. Tonkon*.

Tonkon seeks its dismissal because the allegations against it fail to adequately plead Tonkon's participation or material aid in the Aequitas group's securities transactions. Apart from arguments analyzed previously in this Findings and Recommendation, Tonkon makes three principal arguments. First, Tonkon challenges the allegations of participation and material aid for failing to connect Tonkon's drafting of PPMs, subscription agreements, and other promotional documents with the misleading portions of such documents. Second, Tonkon argues its "preparation and execution of documents" cannot constitute participation or material aid, as a matter of law. Finally, Tonkon contends the claims based on its provision of "legal services" to AIM and other Aequitas entities does not state a plausible claim for non-seller liability because the allegations do not specify the legal services provided or what relationship the legal services had to any unlawful securities transactions. For the reasons that follow, the court should dismiss the allegations based on unspecified legal services, but otherwise deny Tonkon's motion to dismiss.

Tonkon argues the document-drafting-based allegations of participation and material aid are insufficiently pleaded because they do not connect Tonkon's services with the misleading portions of the Aequitas entities' promotional materials. Here, Tonkon conflates material aid in a sale with material aid in the unlawful portion of the sale. ORS § 59.115(3) imposes non-seller liability based on participation or material aid in the sale itself, regardless of whether the participation or material aid has any connection with the unlawfulness of the sale. *Comp. Concepts*, 137 Or. App. at 581; *see also Anderson*, 146 Or. App. at 683. Plaintiffs need allege only the unlawfulness of the sale and Tonkon's involvement in the sale. *Anderson*, 146 Or. App. at 683.

Next, Tonkon contends Oregon decisions establish that a defendant has no liability for "mere preparation and execution of documents." *See Fakhrdai*, 72 Or. App. at 684. Oregon decisions consistently reflect liability for attorneys and others who prepare documents with a material, causal relationship to the sale. *See id.* at 686 (liability for "preparation and execution of a contract"); *Prince*, 307 Or. at 149 (liability for drafting an offering circular and other documents necessary for the transaction); *Adams*, 265 Or. at 529 (liability for preparation of documents necessary to consummate securities transaction); *Anderson*, 146 Or. App. at 648 ("There is no question that a person who prepares documentation in connection with a sale of securities is a person who 'participates or materially aids' in the sale under ORS 59.115(3)."). Thus, whether a non-seller was involved in document preparation or other conduct is irrelevant; the proper inquiry is whether the non-seller's involvement had a causal, material relationship with the transaction. *Prince*, 307 Or. at 149–51. Plaintiffs allege that Tonkon drafted all or part of several Aequitas entities' offering documents and subscription agreements. The PPMs and subscription agreements were necessary to consummate the sales of securities. Plaintiffs'

allegations regarding Tonkon's participation and material aid by drafting offering documents and subscription agreements therefore state a plausible claim for relief under ORS § 59.115(3).

Tonkon also challenges the sufficiency of allegations that it participated or materially aided by providing unspecified legal services directly to Aequitas entities selling securities, and indirectly by serving as counsel to AIM. The provision of legal services to a seller may constitute material aid if the legal services have a causal, material relationship with a transaction. *Ainslie I*, 144 Or. App. at 145. But Plaintiffs' allegations are little more than a legal conclusion, and thus do not render their legal-services-based theory plausible. *Iqbal*, 556 U.S. at 678–79. Plaintiffs do not specify what these legal services were and how the legal services had a causal, material relationship with any securities transactions. (FAC ¶ 30(c).) Accordingly, the court should dismiss any claims against Tonkon for non-seller liability based on legal services other than preparation of documents necessary for sales of securities, with leave to amend.

    *E. Sidley*.

Sidley's motion to dismiss advances two arguments. First, Sidley correctly observes its only alleged direct involvement in a sales transaction is in drafting a PPM for ACOF. Sidley then argues there is no plausible allegation that any sale of ACOF violated the Oregon Securities Law. Second, Sidley contends that Plaintiffs' allegations of material aid in securities other than ACOF do not state a plausible claim for relief. Plaintiffs dispute both contentions.

Sidley does not contest the possibility of participation or material aid in a sale through preparing offering documents for ACOF. Instead, Sidley argues the allegations of a primary violation by ACOF are insufficient. Without a primary violation by ACOF, Sidley would have no derivative liability. *Anderson*, 146 Or. App. at 683. The sole allegation of a misleading statement by ACOF is an alleged omission in a 2014 PPM (Masuda Decl. Ex. 14) regarding the

use of investor funds.  Sidley argues the allegation is insufficient because it does not identify an affirmative statement made false by the omission, and it fails to allege scienter.  For the reasons discussed earlier in this Findings and Recommendation, the court should dismiss the allegation against ACOF, with leave to amend, because it does not identify an affirmative statement made false by the omission.  OR. REV. STAT. §§ 59.115(1)(b); 59.135(2).

 *F. Integrity.*

 Plaintiffs allege Integrity participated and materially aided in sales of ACF Notes and AIOF-II Notes by soliciting sales and preparing subscription agreements necessary to consummate the transactions.  Integrity argues these allegations are insufficiently pleaded because Integrity's involvement is within the exemption from liability in § ORS 59.115(4), and because the complaint does not specifically allege which sales Integrity participated in.  ORS 59.115(4) provides a qualified exemption from liability under ORS § 59.115(3) for "a person whose sole function in connection with the sale of a security is to provide ministerial functions of escrow, custody or deposit services."  Integrity served as custodian for some Disputed Securities.  (FAC ¶ 30(f).)

 The court finds Integrity is not shielded from liability because of its status as a custodian.  The plain text of ORS § 59.115(4) only exempts a custodian from liability when serving as a custodian is the person's "sole function in connection with the sale of a security."  Plaintiffs do not rely solely on Integrity's role as a custodian to support their claims; they also allege Integrity solicited sales of some Disputed Securities, and drafted subscription agreements to complete some transactions.  (FAC ¶¶ 30(f), 36, 55.)  The allegations against Integrity go beyond serving as custodian and fall outside of ORS § 59.115(4).  Accordingly, the court should deny Ameritrade and Integrity's motions to dismiss based on ORS § 59.115(4).

Integrity's remaining argument for dismissal is a lack of specificity in the allegations of its involvement the Aequitas group's securities transactions. In part, this argument depends on applying Rule 9(b) to allegations of participation or material aid. Because Rule 9(b) does not apply to allegations of non-seller liability, the FAC instead is subject to the Rule 8(a) plausibility standard. Plaintiffs allege Integrity's solicitation of some sales and preparation of documents in support of other transactions. In both cases, Integrity's alleged conduct plausibly has a causal, material relationship with consummation of the transactions. Plaintiffs do not need to identify every transaction Integrity allegedly participated in or materially aided at this stage of the lawsuit. The court should therefore conclude that the allegations of Integrity's participation and material aid are sufficient under Rule 8(a).

*G. Ameritrade.*

Similarly to Integrity, Ameritrade seeks to dismiss the claims against it because of its status as a custodian and the sufficiency of the allegations against it. Plaintiffs allege Ameritrade steered customers to third-party financial advisors to purchase Disputed Securities. As with Integrity, ORS § 59.115(4) does not shield Ameritrade from liability because Plaintiffs allege acts of participation and material aid other than custodial services. (FAC ¶ 30(e).)

The court also concludes that the allegations of participation or material aid against Ameritrade are sufficient under Rule 8(a). Plaintiffs allege Ameritrade referred customers to third-part financial advisors to buy ACF Notes. (FAC ¶ 37.) Construed in the light most favorable to Plaintiffs, these factual allegations support a plausible inference that the referrals had a material, causal relationship with any resulting purchases of ACF Notes.

/ / / / /

/ / / / /

VII.  Statute of Limitations.

Defendants seek dismissal of all of Plaintiffs' claims based on conduct before April 4, 2013, based on the three-year statute of limitations for actions under ORS § 59.115.  The FAC asserts liability for sales beginning in 2011.  The default statute of limitations for actions under Section 115 is three years from the date of sale.  OR. REV. STAT. § 59.115(6).  A two-year discovery rule applies, starting from the point at which when the plaintiff "discovered or should have discovered the facts on which the action is based."  *Id.*  The court may consider a statute of limitations defense on a motion to dismiss where the "defense is obvious on the face of a complaint."  *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013).  Plaintiffs concede their non-registration claim is subject to the three-year statute of limitations, but they argue their claims based on material misrepresentations and omissions are timely under the discovery rule.  Defendants concede the discovery rule is available, but contend Plaintiffs do not plead facts showing the discovery rule applies.

In the complaint, Plaintiffs allege they "did not know of the untruths or omissions and, in the exercise of reasonable care, could not have known of the untruths or omissions."  (FAC ¶ 190(c).)  Plaintiffs rely on the preceding statement to invoke the discovery rule.  Defendants argue Plaintiffs must allege facts supporting application of the discovery rule to this case.  Indeed, even before the heightened pleading standards announced in *Twombly* and *Iqbal*, a plaintiff had to allege facts supporting invocation of the discovery rule.  *Mitchell v. Greenough*, 100 F.2d 184, 186 (9th Cir. 1938); *TRM Corp v. Paulsell*, No. CV-02-215-ST, 2002 WL 51349112, at *2 (D. Or. June 4, 2002) (citing *Mitchell*).  Oregon law also requires a plaintiff to plead facts showing the date of discovery.  *Frohs v. Greene*, 253 Or. 1, 7 (1969).  Here, Plaintiffs

do not plead the date or dates when they discovered the alleged violations.  The court should dismiss all of Plaintiffs' claims based on sales prior to April 4, 2013, with leave to amend.

Plaintiffs also contend language limiting their claim for relief in paragraph 190(b) to the three years prior to filing was a typographical error, and that they intended the claim in paragraph 190(b) to also invoke the discovery rule.  Defendants argue Plaintiffs cannot add language to the complaint by claiming a typographical error.  On a motion to dismiss, the court considers the language in the complaint, and cannot rely on clarifications and elaborations in responsive pleadings.  *Schneider,* 151 F.3d at 1197 & n.1 (9th Cir. 1998).  The existing language in paragraph 190(b) controls, and limits Plaintiffs' claims to three years prior to filing.  Plaintiffs may, on filing another amended complaint, allege a specific discovery date and supporting facts, and an alleged discovery date to the claims in paragraph 190(b).

VIII.  Standing.

Lastly, Defendants seek to excise many claims from the complaint based on standing. Defendants argue Plaintiffs do not have standing to assert claims regarding securities they did not purchase. Plaintiffs respond they have standing to pursue claims regarding all Disputed Securities because Plaintiffs and all members of the putative class share a common injury, traceable to shared statutory violations.  Plaintiffs cite multiple cases finding investor standing as class representatives for securities-law violations for types of securities the investors had not purchased, where the same alleged misconduct caused common injuries.  *E.g. Facciola v. Greenberg Traurig LLP*, 281 F.R.D. 363, 367 (D. Ariz. 2012); *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 594 (N.D. Cal. 2009).  Here, Plaintiffs allege the Funds sold the Disputed Securities pursuant to a unitary course of misconduct, concealing and manipulating the financial wellbeing of the Funds.  (FAC ¶ 28–30.)

The court should defer any ruling on standing until its ruling on class certification. The standing arguments Defendants raise would not remove any party from this action. Each named plaintiff asserts a cognizable claim against at least one defendant, and each defendant allegedly participated or materially aided in at least one allegedly unlawful sale of securities. Accordingly, each plaintiff asserts, and each defendant faces, at least one claim creating Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (plaintiffs must allege a concrete and particularized, actual or imminent injury in fact).

Defendants' concerns are better addressed in the context of class certification. Plaintiffs' claims are for the purchase price of the securities they purchased, with interest. OR. REV. STAT. § 59.115(2). The FAC clearly identifies which securities Plaintiffs purchased. (FAC § 64–70.) The FAC make allegations about securities Plaintiffs did not purchase only in seeking to represent purchasers of those unpurchased securities in a class action. (*Id.* ¶ 181.) The question of whether Plaintiffs may assert claims based on securities they did not purchase is therefore inextricable from the issue of whether this case may proceed as a class action. Accordingly, the court should address the standing issues when and if this case reaches the class certification stage. *See Facciola*, 281 F.R.D. at 367 (addressing standing during a motion for class certification); *In re Juniper*, 264 F.R.D. at 594 (same); *In re Sepracor Inc.*, 233 F.R.D. 52, 56 (D. Mass. 2005) (same).

## Conclusion

The court should GRANT in part and DENY in part the Joint Motion to Dismiss (ECF No. 74), Deloitte's Motion to Dismiss (ECF No. 85); EisnerAmper's Motion to Dismiss (ECF No. 78); Sidley's Motion to Dismiss (ECF No. 81); Tonkon's Motion to Dismiss (ECF No. 80); Integrity's Motion to Dismiss (ECF No. 95); and Ameritrade's Motion to Dismiss (ECF No.

113).  The court GRANTS in part and DENIES in part Deloitte's Motion for Judicial Notice (ECF No. 77).

*Scheduling Order*

The Findings and Recommendation will be referred to a district judge for review. Objections, if any, are due April 6, 2017.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 23rd day of March, 2017.


_____/s John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge