1               IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF OREGON

3    LAWRENCE P. CIUFFITELLI, for      )
     himself and as Trustee of         )
4    CIUFFITELLI REVOCABLE TRUST; GREG )
     and ANGELA JULIEN; JAMES and SUSAN)
5    MACDONALD, as Co-Trustees of the  )
     MACDONALD FAMILY TRUST, ET AL.,   )
6                                      )  Case No. 3:16-CV-580-AC
            Plaintiffs,                )
7                                      )
     v.                                )  July 25, 2017
8                                      )
     DELOITTE & TOUCHE, LLP,           )
9    EISNERAMPER, LLP; SIDLEY AUSTIN,  )
     LLP; TONKON TORP, LLP; TD         )
10   AMERITRADE, INC.; and INTEGRITY   )
     BANK & TRUST,                     )
11                                     )
            Defendants.                )
12   _____    )  Portland, Oregon

13

14                 TRANSCRIPT OF PROCEEDINGS
                   (Telephonic Status Conference)

15

16       BEFORE THE HONORABLE JOHN V. ACOSTA, MAGISTRATE JUDGE

17

18

19

20

21   COURT REPORTER:         AMANDA M. LeGORE
                             CSR, RDR, CRR, FCRR, CE
22                           U.S. COURTHOUSE
                             1000 SW Third Avenue, Suite 301
23                           Portland, OR  97204
                             (503)326-8184

24

25

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:      TIMOTHY DeJONG
                              KEITH KETTERLING
 3                            Stoll, Stoll, Berne, et la.
                              209 SW Oak Street, Fifth Floor
 4                            Portland, OR  97204
                              (503)227-1600
 5

 6                            STEVEN BERMAN
                              Hagens Berman, et al.
 7                            1918 8th Avenue Suite 3300
                              Seattle, WA  98101
 8                            (206)623-7292

 9

10   FOR DEFENDANT DELOITTE
     & TOUCHE:                PETER WALD
11                            Latham & Watkins LLP
                              505 Montgomery Street, 20th Floor
12                            San Francisco, CA  94111
                              (415)391-0600
13

14
                              GARY GRENLEY
15                            ERYN HOERSTER
                              Garvey, Schubert & Barer
16                            11th Floor, 121 SW Morrison Street
                              Portland, OR  97204
17                            (503)228-3939

18
     FOR DEFENDANT
19   EISNERAMPER:             WILLIAM FERRANTI
                              The Ferranti Firm, LLC
20                            1819 SW Fifth Avenue, Suite 403
                              Portland, OR  97201
21                            (503)877-9220

22
                              LINDA COBERLY
23                            Wintston & Strawn, LLP
                              35 West Wacker Drive
24                            Chicago, IL  60601
                              (312)558-8768

25
```

```
 1   FOR DEFENDANT SIDLEY
     AUSTIN:                    KEVIN BRADY
 2                             BRUCE ABBOTT
                               Munger, Tolles & Olson, LLP
 3                             350 South Grand Avenue, 50th Floor
                               Los Angeles, CA  90071
 4                             (213)683-9100

 5
                               JEFFREY EDELSON
 6                             Markowitz, Herbold, et al.,
                               1211 SW Fifth Avenue
 7                             Suite 3000
                               Portland, OR  97204
 8                             (503)295-3085

 9
     FOR DEFENDANT TONKON
10   TORP:                     PHILIP VAN DER WEELE
                               K&L Gates, LLP
11                             One SW Columbia Street, Suite 1900
                               Portland, OR  97258
12                             (503)228-3200

13
     FOR DEFENDANT TD
14   AMERITRADE:               NICHOLAS CHRISTAKOS
                               Eversheds Sutherland (US) LLP
15                             700 Sixth Street, Suite 700
                               Washington, DC 20001
16                             (202)383-0100

17
                               MATTHEW KALMANSON
18                             Hart Wagner, LLP
                               1000 SW Broadway, Suite 2000
19                             Portland, OR  97205
                               (503)222-4499
20

21

22   FOR DEFENDANT
     INTEGRITY BANK:           SREEVAMSHI C. REDDY
23                             Lane, Powell, P.C.
                               601 SW Second Avenue, Suite 2100
24                             Portland, OR  97204-3158
                               (503)778-2169
25
```

4

1          (Tuesday, July 25, 2017; 9:30 a.m.)

2

3                    P R O C E E D I N G S

4

5          THE COURT:  Good morning.  This is Judge Acosta.

6          All right.

7          THE ATTORNEYS:  Good morning, your Honor.

8          THE COURT:  I'm going to take something of an

9   abbreviated roll because I'm going to ask who's representing

10  the parties, and I would prefer that the lawyer or lawyers

11  representing each party are the ones who respond.

12          We may have multiple lawyers on the call for each of

13  the parties, but I'm guessing not everyone's going to speak.

14          But let's start with the plaintiffs, and we'll see

15  what we -- what we get from that.

16          One thing to note, I have a court reporter with me.

17  So when you do speak, please do identify yourselves.

18          Who do we have for the plaintiffs?

19          MR. DeJONG:  Good morning, Judge Acosta.  Tim DeJong

20  with Stoll Berne, for the plaintiff.

21          THE COURT:  Thank you.

22          Who do we have --

23          (Indiscernible.)

24          THE COURT REPORTER:  I didn't hear him.

25          THE COURT:  Repeat that, please.

```
1              MR. BERMAN:  Steve Berman for the plaintiff.
2              THE COURT:  Thank you.
3              Anyone else for the plaintiff?
4              All right.  Thank you.
5              MR. KETTERLING:  Your Honor, this is Keith
6   Ketterling.  I don't plan to participate (indiscernible).
7              THE COURT:  All right.  Thank you.  And,
8   Mr. Ketterling, I would point out that you sound like you're in
9   a car, on a cell phone, and you're -- at least on our end of
10  it, it is slightly broken up.  So if you don't plan to talk,
11  that's probably a good idea.  But if you do, we'll -- we'll see
12  how that works.
13             All right.
14             MR. KETTERLING:  Your Honor, I do plan to put my
15  phone on mute, so it won't affect the call.
16             THE COURT:  Thank you.
17             All right.  Who do we have for the defendant Deloitte
18  & Touche?
19             MR. WALD:  Good morning, your Honor.  It's Peter Wald
20  and Gavin Masuda from Latham & Watkins on behalf of Deloitte.
21             THE COURT:  All right.  Is there any --
22             MR. GRENLEY:  And, your Honor, it's Gary Grenley and
23  Eryn Hoerster of Garvey Schubert, also for Deloitte.  And we
24  don't plan to speak, though.
25             THE COURT:  Thank you.
```

1           Who do we have for EisnerAmper?

2           MR. FERRANTI:  Good morning, your Honor.  You have

3  William Ferranti, from the Ferranti firm, for EisnerAmper.  And

4  also on the call with us this morning is my co-counsel, Linda

5  Coberly from Winston & Strawn.

6           THE COURT:  All right.  Thank you.

7           For Sidley Austin?

8           MR. BRADY:  Good morning, your Honor.  This is Kevin

9  Brady, here with Bruce Abbott, from Munger Tolles & Olson, for

10 Sidley Austin.

11          THE COURT:  Thank you.

12          Anyone else?

13          MR. EDELSON:  Good morning, your Honor.  Jeff

14 Edelson, Markowitz Herbold, also for Sidley.

15          THE COURT:  All right.  Thank you, Mr. Edelson.

16          All right.  And for Tonkon Torp?

17          MR. VAN DER WEELE:  Good morning, your Honor.  Phil

18 Van Der Weele, from K&L Gates, for Tonkon Torp, and nobody

19 else.

20          THE COURT:  Thank you.

21          For TD Ameritrade.

22          MR. CHRISTAKOS:  Your Honor, this is Nick Christakos,

23 Eversheds Sutherland, for TD Ameritrade.

24          THE COURT:  Thank you.

25          MR. KALMANSON:  Good morning, your Honor.  It's

1   Matthew Kalmanson from Hart Wagner, also for TD Ameritrade.

2            THE COURT:  Thank you.

3            And for Integrity Bank & Trust.

4            MS. REDDY:  Good morning, your Honor.  It's Vamshi

5   Reddy from Lane Powell for Integrity Bank.

6            THE COURT:  All right.  Thank you.

7            Anyone else for Integrity?

8            MS. REDDY:  No.

9            THE COURT:  All right.  Thank you.

10           All right.  So now that we have that out of the way,

11  we're here for a scheduling conference in light of Judge

12  Mosman's adoption of my F & R on the motions to dismiss.

13           The first thing I'll ask -- and Mr. DeJong, I will

14  address my question to you first -- is whether the parties have

15  talked about scheduling of next steps.

16           MR. DeJONG:  Thank you, your Honor.  Yes, this is Tim

17  DeJong for the plaintiffs.  We have spoken, and I'm pleased to

18  report that I believe we have agreements on -- on a schedule to

19  propose to you.

20           I have heard from everybody except Integrity, I

21  believe.  Everybody has indicated that they agree with the

22  proposed schedule.

23           THE COURT:  Mr. -- Mr.DeJong has -- hang on just a

24  minute.

25           Has Integrity seen the schedule?

1          MS. REDDY:  Your Honor, this is Vamshi Reddy.  We

2     have seen the schedule, and it's acceptable to Integrity Bank.

3          THE COURT:  Thank you.  All right.  Mr.DeJong, it

4     sounds like we have an agreed-upon schedule.

5          It would probably be best for you to submit a

6     stipulated scheduling order.  But for purposes of today, it

7     would be helpful to know what the schedule sets out, in case

8     there are any things that need to be adjusted, tweaked, or

9     discussed for clarity.

10          Go ahead, please.

11          MR. DeJONG:  Sure.  The first event would be the

12     plaintiffs' filing of a second amended complaint, which we

13     agreed would happen 45 days from today; which I've calculated

14     as September 8th.

15          THE COURT:  All right.  Thank you.

16          MR. DeJONG:  The second item would be the responses

17     to the second amended complaint, which would be 45 days

18     thereafter, which I've calculated as October 23rd.

19          THE COURT:  Thank you.

20          MR. DeJONG:  And the third event anticipates that the

21     responses will be motions to dismiss.  And it's the deadline

22     for the plaintiffs' oppositions to the motions to dismiss which

23     we have agreed would happen 30 days after the motions are

24     filed, and I've calculated that as November 22nd.

25          THE COURT:  Thank you.

1          MR. DeJONG:  The final date is the replies for the

2    motion to dismiss, which would be 28 days after the opposition

3    or December 20th, 2017.

4          THE COURT:  Thank you.

5          All right.  What else is on the agreed-upon schedule?

6          MR. DeJONG:  That is as far as we took the scheduling

7    discussion, your Honor.

8          THE COURT:  All right.  Thank you.

9          So I anticipated that might be the likely next step.

10   And, of course, that's fine.  The questions I have, then -- and

11   Mr. DeJong, I will again start with you on behalf of the

12   plaintiffs -- is whether the parties have had any discussion

13   about discovery now that the protective order motions have been

14   determined and since we apparently will have a second amended

15   complaint and motions to dismiss that address the second

16   amendment complaint.

17         MR. DeJONG:  Your Honor, I suppose the answer to that

18   is we've had sporadic discussions with certain defendants, but

19   nothing, I suppose, positive to report to the Court on that

20   front.

21         THE COURT:  All right.  So before I hear from any of

22   the defendants, my other question is, from your perspective, do

23   you think whatever discovery discussions the parties have had

24   will result in an agreed-upon discovery schedule?  Or is this

25   something that you anticipate the Court will need to resolve?

1           (Pause.  No response.)

2           THE COURT:  Mr. DeJong?

3           MR. DeJONG:  Oh, I apologize.  I thought you directed

4    that to the defendants.

5           THE COURT:  No.  That was my last -- that was my

6    other question to you, and then I was going to hear from the

7    defendants.

8           MR. DeJONG:  My apologies.

9           THE COURT:  That's all right.

10          MR. DeJONG:  My expectation is that discussions

11   with -- between the parties would not be fruitful and that we

12   will require visits with the Court, set -- for the Court

13   setting a discovery schedule in resolving questions such as

14   whether or not, you know, the limited stay that was recognized

15   as to some of the defendants is still in place; or if that

16   should be lifted now that the motions to dismiss were decided.

17          THE COURT:  All right.  All right.  So I'll take the

18   defendants in the order in which they appear in the case

19   caption.

20          Mr. Wald, I'll start with you.

21          What is Deloitte's view of discovery at this point,

22   going forward?

23          MR. WALD:  Thank you, your Honor.  I think, briefly,

24   our position can be summarized as follows.  There is an

25   important second amended complaint, and that was there will be

1    motion practice with respect to that complaint that will play

2    out over the fall.  At issue -- as you know from your findings

3    and recommendations, now adopted as the rule of the case --

4    will be whether and to what extent the plaintiffs can allege

5    facts that allow them to stay in court on claims with respect

6    to specific securities offerings.

7          In our view the resolution of those issues will have

8    the dramatic impact on the scope of discovery that ultimately

9    will be allowed.

10         We think that the Court's rulings on the predicate

11    discovery motions that have been brought to the Court, up until

12    now, reflect a balance and fair balancing, if you will, of the

13    interests of all the parties until we -- the pleadings are

14    finally set and the parties really understand which

15    transactions are going to be put at issue and, therefore, what

16    the scope of discovery should be.

17         So while we're certainly open -- I want to be very

18    clear about this.  While we're certainly open to any further

19    discussions with the plaintiffs as to whether there is

20    additional incremental discovery beyond what's already been

21    ordered that would be efficient for the parties to produce --

22    and I have in mind two-way discovery on this because class

23    certification is around the corner.  And, in our view, if we're

24    going to have additional discovery, it should include discovery

25    on class certification issues as well.

1          But our view is that the bulk of the discovery should

2     await the Court's final ruling as to which transactions are in

3     and which transactions are out, subject to, as I said,

4     continued discussions with the plaintiffs and through meet and

5     confer and -- and hopefully the presentation to the Court of --

6     of a position when that process is completed.

7          THE COURT:  All right.  Thank you.

8          All right.  For EisnerAmper.

9          MR. FERRANTI:  Thank you, your Honor.

10         Our position is basically the same as Deloitte's,

11    with -- you know, we've fully complied with the Court's

12    November discovery order, which did not contemplate the ESI

13    would proceed at all, yet.  And, in fact, it actually went

14    beyond the terms of that order to produce -- (indiscernible)

15    opinions; which is ten, not just the six mentioned in the

16    order.  So it was a substantial production.

17         And we think the Court struck a good balance that

18    should continue to govern the competing concerns, including

19    costs and proportionality and the fact of the scope of the

20    plaintiffs' claims are -- were disputed and continue to be

21    disputed.  And, of course, your court approved certain portions

22    of the allegations, but that all seems (indiscernible) the

23    amended complaint, plaintiffs' effort to -- to add a

24    particularity demanded by the Court, including to connect

25    EisnerAmper to specific quotes of Aequitas entities and sales

1   that they claim were aided.

2          So -- so, really, the long story short, what we

3   propose for next steps is we would like to see the second

4   amended complaint, see how plaintiffs respond to the Court's

5   ruling, and discuss further discovery from there and possibly

6   be able to resolve that.  And, if not, then we would be looking

7   for help from the Court.

8          THE COURT:  Mr. Ferranti, so that I understand, when

9   you discussed -- or when you described the discovery that

10  EisnerAmper has so far produced, my understanding is you said

11  ESI was not included?

12         MR. FERRANTI:  That's correct, your Honor.

13         THE COURT:  All right.

14         MR. FERRANTI:  We did produce the work papers in the

15  electronic form.

16         THE COURT:  Right.

17         MR. FERRANTI:  But our understanding of the order was

18  that it did not contemplate ESI.  And we made that clear to

19  plaintiffs, when we made our production.  And its -- as far as

20  our understanding, is plaintiffs were satisfied with what we

21  produced.  And I have been in touch with plaintiffs' counsel

22  about further discovery, and look forward to talking to them

23  further about that.  But, yes, our production did not include

24  ESI.

25         THE COURT:  All right.  Thank you.

1     For Sidley.

2          MR. BRADY:  Thank you, your Honor.

3          We generally agree with Deloitte and Eisner that

4     broader discovery should await a new complaint from the

5     plaintiff, since our motion to dismiss was focused on the lack

6     of spec -- specificity with respect to -- with respect to

7     Sidley; and the Court ultimately agreed with that.

8          As far as the protective order, we have produced all

9     materials consistent with the protective order, which amounts

10    to over 1.5 million pages of materials that the plaintiffs

11    have.  The only issue is the production of ESI and specifically

12    of e-mails.

13          And given the Court's recent ruling with respect to

14    Integrity, we think it makes sense to start discussions about

15    an ESI protocol now in the case.

16          In our view, an ESI -- an ESI protocol makes a lot of

17    sense.  There are a lot of parties to the case.  There are lots

18    of documents, lots of potential search terms and custodians.

19    And we think it makes a lot of sense to get all of the parties

20    on the same page as far as a unified process for selecting

21    custodians and selecting search terms and also creating a

22    unified process for the metadata that will be provided.

23          THE COURT:  All right.  Thank you.

24          For Tonkon Torp?

25          MR. VAN DER WEELE:  Your Honor, Phil Van Der Weele

1  for Tonkon Torp.

2          First of all, Tonkon didn't move for a protective

3  order, but we produced -- I would say, by analogy, what we

4  envisioned your order contemplating that -- that Sidley

5  produce -- with, I guess, one -- one distinction, which is that

6  we produce based on matter-based repositories of documents.

7  But -- not custodial but within the matter-based.  We didn't

8  distinguish between ESI and nonESI because it was almost all

9  electronic.

10          That being said, I agree with the position

11 articulated by Deloitte that further broader discovery should

12 be -- if any, should be framed by what's in the second amended

13 complaint.

14          THE COURT:  Thank you.

15          TD Ameritrade.

16          MR. CHRISTAKOS:  Your Honor, this is Nick Christakos

17 speaking for TD Ameritrade.  Our position is not terribly

18 dissimilar from the others, but I suppose I would emphasize one

19 or two different points.

20          First, we understood the Court's order in response to

21 the various motions for protective order to essentially strike

22 a compromise on what should happen until the pleadings are set,

23 recognizing that that could take a long time.

24          So our understanding -- subject to clarification from

25 the Court on what the Court intended -- is that the order,

1   which -- to which the parties have responded and produced quite

2   a bit of documentation was to be the extent of at least the

3   written discovery until the pleadings are in fact set.

4          That said, we do think that, like everyone else, we

5   need to see what the complaint looks like, currently.  There is

6   no complaint in the case, so we need to see what the next

7   complaint looks like.  Certainly happy to discuss with

8   plaintiffs various issues once we see that.

9          But our position is and remains that when subsequent

10  discovery does resume and proceed, we think there should be a

11  bifurcation between class discovery and merits discovery,

12  because we think that could be quite significant --

13  particularly for our client -- given, as the Court is aware, if

14  class certification is decided in the favor of TD Ameritrade,

15  then the named plaintiffs would be required to proceed to

16  arbitration.  So we think that's a pretty significant, at

17  least, possibility that would, in this case, warrant proceeding

18  with class discovery before merits.

19         Finally, as to ESI, I think a lot of our documents,

20  frankly, are stored electronically.  So to the extent that

21  we -- to the extent that we identify and produce specific

22  subject matters of documents that was electronic, we have not

23  discussed with plaintiffs an ESI protocol.  And we have not

24  done general searches on all possible responsive documents as

25  yet, consistent with -- with what we understood the Court's

1    order to be.

2              Certainly happy to begin discussion of an ESI

3    protocol so if and when we get to that point we are ready to go

4    with the plaintiffs.  But, again, I would not propose to do

5    that until we see what the second amended complaint looks like.

6              THE COURT:  Thank you.

7              And then for Integrity Bank?

8              MS. REDDY:  Thank you, your Honor.

9              Obviously Integrity is in receipt of the Court's

10   order, and we intend to fully comply.  I think, at this stage,

11   it provides much needed clarity, as we attempt to discuss -- as

12   others have raised -- an ESI protocol.  And, I think, a unified

13   process with respect to ESI generally makes sense at this

14   stage.

15             We have already made a preliminary production,

16   including the files for the named plaintiff and other

17   representative agreements.

18             So, at this stage, we just need to figure out what we

19   need to do to comply with the Court's opinion and order.

20             THE COURT:  Thank you.

21             Mr. DeJong, do the plaintiffs agree or disagree that

22   whatever additional discovery should occur next should be

23   determined based on the allegations in the second amended

24   complaint that will be filed in early September?

25             MR. DeJONG:  Your Honor, we disagree.  It's our

1    position that the second amended complaint will simply supply

2    additional detail.   The allegations and the charges are known.

3    So there's no -- you know, in our view, the second amended

4    complaint isn't the dramatic event that Deloitte characterized

5    it as in terms of discovery.

6         We -- in our view, we're not limited to discovery

7    based upon claims that are allowed to proceed.   The discovery

8    (indiscernible) is matters that are reasonably calculated to

9    lead to the discovery of admissible evidence.

10        And so regardless of the outcome of a motion to

11   dismiss against the second amended complaint, I think we would

12   still have latitude for discovery well beyond what -- any, you

13   know, misrepresentations that aren't found to be specific

14   enough.

15        So that does not seem to be a valid reason to delay

16   discovery further.   We're already, you know, a long time into

17   this case.   And the expectations, I think, should be on

18   everybody's part that a very substantial case is going to be

19   proceeding.

20        THE COURT:   All right.   My next question then is

21   whether to move -- Mr. DeJong, I'll start with you -- to move

22   forward with discovery.   The parties first must have an

23   agreed-upon set of ESI protocols.

24        MR. DeJONG:   I don't understand why we would have to

25   have that in advance of discovery, your Honor.   I think we have

1    a couple of different issues to discuss here.  And one is the

2    discovery that's already been ordered by the Court.

3         THE COURT:  Yes.

4         MR. DeJONG:  And then there's the issue of discovery

5    beyond that, if your Honor is going to allow it.

6         And I don't -- so let's take -- let's take the issues

7    regarding the discovery that your Honor has already ordered.

8    And I understood your order of yesterday to be -- to clarify

9    that Integrity and Ameritrade are now required to produce their

10   ESI that was responsive on the topics that you identify in your

11   order.

12        I heard some ambiguity, at least from Integrity's

13   lawyer, who seems to suggest that we have to have an ESI

14   protocol before that can happen.  I didn't see that in your

15   order.  And -- but Sidley has raised that issue and has

16   asserted that an ESI protocol is required before they comply

17   with the balance of your -- your Honor's order.

18        We don't understand why that's needed.  We've asked

19   repeatedly for Sidley to tell us why, and we've had no response

20   to that.  I think the burden clearly falls under Rule 26 on

21   Sidley to make a case and a showing as to why an ESI protocol

22   is necessary and not just an additional matter of delay of the

23   production process here.

24        It's hard -- it's hard to argue against something

25   when we don't know what their position is because they haven't

1   (indiscernible).

2           THE COURT:  Mr. Brady, can you address that?

3           MR. BRADY:  Yes, your Honor.

4           First of all, in terms of the -- our production with

5   respect to the protective order, like I said before, we have

6   produced over a million pages of documents that -- so I'm not

7   sure where counsel's coming from with respect to not having

8   complied with the bulk of the order.

9           And we simply have said to -- to plaintiffs and also

10  to the Court that the -- in our view that the order was unclear

11  with respect to ESI, and that's why plaintiffs turned to the

12  Court and sought the clarification with respect to that.  And

13  we also had agreed that we could use an additional

14  clarification with respect to whether ESI was required under

15  the protective order.

16          But, as I said earlier, we -- and we said this to --

17  to plaintiff.  We think that an ESI protocol will help to put

18  all of the defendants on the same page.  We've already run into

19  issues where, for example, different parties have produced

20  documents with -- using different metadata fields, which makes

21  it far more difficult to search those documents, to -- to order

22  them by date, or -- or to find the author of the documents, and

23  so on.  So -- and, again, this is something we -- we've

24  explained to the plaintiffs.

25          THE COURT:  So just a follow-up question, Mr. Brady.

1          First, to confirm what I heard you say about my

2     ruling on the protective order that Sidley filed, that it left

3     some question or it was not clear that electronically stored

4     information was included.

5          I'm not sure I understand how Sidley reached that

6     conclusion or has that question?

7          MR. BRADY:  Sure, your Honor.  So as we -- as we read

8     the order -- just to provide the context in which we received

9     the order, back in -- I believe it was November or earlier,

10    when the parties filed a joint report of the Rule 26

11    conference, the parties had agreed at that time that production

12    with ESI would not be appropriate, and we agreed to discuss ESI

13    issues in conjunction, or as the case proceeded.

14         And then, later on, the Court, as well, in November

15    had explained -- or noted in the November 4th conference that

16    the parties should start thinking about ESI issues, and

17    essentially should come back to the Court to address protocol.

18         So with that background, as we read the orders, ESI

19    was never discussed as part of the meet-and-confer process

20    surrounding the protective order motion.

21         THE COURT:  All right.  Well, my comment -- and this

22    perhaps falls under the category of "no good deed goes

23    unpunished," was intended to get the parties working

24    proactively to address an issue that often comes up in

25    document-intensive cases, which is, for example -- but not the

1    exclusive example -- what search terms will be used to find

2    documents that are relevant to the allegations in the complaint

3    and the defenses that have been asserted.  I certainly --

4    because I anticipated there would be discovery, at least to

5    some extent going forward, notwithstanding the pending motions

6    to dismiss, I certainly thought it was prudent for the parties

7    to start looking ahead to the likelihood that they would have

8    to produce documents and, therefore, get in place ESI protocols

9    that everyone agreed upon so that there aren't motions filed or

10    the parties dispute the search terms they're using; whether

11    they have to search for archived or legacy data, and the format

12    in which ESI would be produced.

13         So that's what I had in mind with respect to

14    electronically stored information.  In large part, driven by my

15    experience in other cases where there have been

16    document-intensive discovery efforts and electronically stored

17    information has been the subject of disagreement.  Or, I should

18    say, have -- find that it has been the subject of disagreement.

19         Mr. Brady, have you proposed any specific ESI

20    protocols to the plaintiff?

21         MR. BRADY:  No, your Honor.

22         We twice offered to begin a -- a discussion with all

23    of the parties about ESI protocol, but that -- the plaintiffs

24    haven't yet agreed to go forward with that discussion.

25         THE COURT:  Have -- Mr. Brady, have the defendants

1    had a discussion among themselves about -- even if only

2    generally -- ESI protocols?

3            MR. BRADY:  In general terms, yes, your Honor.  We

4    haven't narrowed down any specifics, but we have been

5    discussing these issues.

6            THE COURT:  So, Mr. Brady, since I have you in the

7    crosshairs, as it were, on this issue, here's my next question.

8    In your view, what is the likelihood the defendants can agree

9    upon a set of ESI protocols to present to the plaintiffs?

10           MR. BRADY:  I think there's a very high likelihood

11   that we could reach some sort of agreement.

12           THE COURT:  All right.  So, Mr. Brady, here's the way

13   I'm going to -- and, everyone else, I'm going to resolve this

14   particular issue.

15           I realize the second amended complaint will be

16   forthcoming in about a month and a half.  However, I think

17   Mr. DeJong has a very good point.  Even though additional

18   detail will be added, I don't think there is much dispute about

19   what the plaintiffs are looking for, or at least what documents

20   are or potentially are implicated in the case based on the

21   allegations in the case that already exist.

22           So it seems to me, Mr. Brady, that you and the

23   defendants can move forward to finalizing a set of ESI

24   protocols that the defendants agree should be used to look for

25   documents that are relevant to the claims asserted in the

1   current complaint.

2          And those can be modified, it seems to me, as

3   necessary based on additional allegations that appear in the

4   second amended complaint when that is filed in September.

5          In your experience, working with the other

6   defendants' counsel in this case, how much time from today do

7   you think would be necessary for the defendants to present to

8   the plaintiffs their proposal for search protocols of

9   electronically stored information?

10          MR. BRADY:  I would say two weeks, please, your

11   Honor.

12          THE COURT:  All right.  And I want to be clear about

13   one thing, Mr. Brady.

14          If you say two weeks, my anticipate -- my expectation

15   is that is the time you think is reasonable and gives you

16   sufficient cushion to get it done.  Don't give yourself a close

17   deadline or the other defendants a close deadline simply

18   because you're trying to make me happy.

19          I want to make sure that if you commit to a date,

20   barring any unforeseen developments, you'll be able to produce

21   on that date.

22          Is two weeks enough time?

23          MR. BRADY:  Understood, your Honor.  Perhaps, in

24   light of your counsel, I would propose three weeks.

25          THE COURT:  That's pretty much what I figured, too.

1          So three weeks from today -- today is July 25.   Three
2    weeks from today would be Tuesday -- hang on.   I have to make
3    sure I'm looking at the right year.   That's the 21st -- is that
4    the 21st of August?
5          Yeah, that's the 21st.   August 21 --
6          Doesn't sound right to me.
7          MR. DeJONG:   Excuse me, your Honor, I think it would
8    be August 15, three weeks from today.
9          THE COURT:   Thank you.   You're right.   Sorry.   I'm
10   not sure -- I couldn't read that.   August 15.
11         Mr. Brady, since you volunteered for this -- I'm sure
12   I heard you say that -- I'm going to put you in charge of
13   taking the lead, making sure this moves forward in that
14   three-week time period, and you will be the one transmitting
15   the suggested protocols to plaintiffs' counsel on August 15.
16         MR. BRADY:   Sounds good, your Honor.   We'll get it
17   done.
18         THE COURT:   Thank you.
19         Mr. DeJong, you're going to see protocols you may or
20   may not agree with.   How much time do you think you're going to
21   need in order to take a look at what the defendants will
22   present, based on what you know about the case, and give a
23   meaningful response?
24         MR. DeJONG:   Your Honor, I would ask for two weeks,
25   although we will certainly try to do it more quickly than that.

1          THE COURT:  All right.

2          THE CLERK:  29th.

3          THE COURT:  So by August 29, the plaintiffs will

4    respond.

5          If there is a disagreement that cannot be resolved

6    over the search terms and other protocols to be put in place,

7    then if, Mr. DeJong, you are to respond by the 29th and talk

8    with plaintiffs' counsel -- I'm sorry, defendants' counsel,

9    what I will ask is that no later than September 12, the parties

10   submit a joint report with their respective positions on ESI to

11   the Court, and I will resolve it.

12         And if I think I need to have a hearing because I

13   have questions, I will enter that in the docket.  Otherwise, I

14   will let you know my determination on that.

15         And I was thinking about this particular point over

16   the weekend, as I was getting ready for the hearing today.

17         It seems to me, from my experience, that the parties

18   are better off -- almost always -- if they can agree on

19   protocols, search terms, and -- and other matters related to

20   the production of electronic information.  And that the

21   alternative of having the Court decide it for the parties is

22   often less desirable.

23         I'm happy to do that, if I have to.  But I'll tell

24   you the way I'll look at it if there is a dispute.

25         I am likely to adopt one side's proposal.  I may or

1    may not modify it.  But, right now, what I think is the parties

2    know this case better than I with respect to the documents that

3    are there and to be gained and searched for, and so I would

4    suggest that if there are disagreements that cannot be

5    resolved, each side should put forth their most reasonable

6    proposal to obtain electronically stored information in light

7    of the case's procedural posture.  Which is, specifically,

8    there will be a second amended complaint, and we know there

9    will be a second round of motions to dismiss.

10          All right.  And, Mr. Brady, to be clear, just in

11   case, if there is a disagreement and the defendants' proposal

12   is presented in the report, you should take the lead in making

13   sure that the defendants' views are accurately and fully

14   represented.

15          MR. BRADY:  Understood, your Honor.

16          THE COURT:  Thank you.

17          All right.

18          MR. WALD:  Your Honor?

19          THE COURT:  Yes.

20          MR. WALD:  This is Peter Wald.  Can I just have two

21   minutes on this subject?

22          THE COURT:  Go ahead.

23          MR. WALD:  Thank you.

24          I think I understand the Court's order and,

25   obviously, will comply.  And I think it's an important first

1  step.

2          I just want to address something that Mr. DeJong

3  stated about the discovery standard.  I believe Mr. DeJong --

4  if I heard him correctly -- said that the discovery standard

5  has to do with discovery that is likely to lead to relevant

6  evidence.  And, of course, that was the rule under the old Rule

7  26.

8          THE COURT:  Right.  Right.

9          MR. WALD:  Not the rule under the new Rule 26, which

10  talks about relevance and the parties' claim or defense and

11  proportional to the needs of the case.

12          Why -- why I do raise this?  I raise it because under

13  the schedule that the Court has heard this morning and is going

14  to adopt, there will be a second amended complaint that will be

15  filed.  There will be motions to dismiss.  And, ultimately, the

16  Court will resolve, fully and finally, which claims are in the

17  case against which defendants.

18          As the Court knows, different defendants intersected

19  specific Aequitas entities or did not intersect specific

20  Aequitas entities at different times.  So timing is important

21  and the nature of the intersection and whether it actually

22  happened with specific entities will be important.

23          And until we see whether plaintiffs are able to

24  survive on specific entity-by-entity claims and

25  offering-by-offering claims, we aren't really going to know

1    what the second amended complaint is going to look like with

2    respect to each defendant.  I know that that is self-evident,

3    and the Court knows that.

4          The reason I go into it is because I would like at

5    least to put a marker down that whatever we decide sort of on

6    the first round of this negotiation with respect to ESI, that

7    it be open to the parties to come back to the Court and suggest

8    tweaks or modifications, so that the ESI protocol, as -- as is

9    appropriate for whatever specific claims remain against

10   specific defendants, covering specific entities and specific

11   time periods.

12         THE COURT:  Well, thank you, Mr. Wald.

13         First, I did hear Mr. DeJong's characterization of

14   the discovery standard, and I made the same observation about

15   it that you did; that the standard is different now, following

16   the 2015 amendments.

17         And I think, because I have issued a handful of

18   rulings on various protective order motions, the parties are

19   well aware of my overall view about discovery in this case in

20   its current procedural posture.

21         I anticipate that I will continue in that view, even

22   with the second amended complaint because there is quite a bit

23   of distance to go yet in this case.

24         I don't have any concern about revisiting the scope

25   of discovery as appropriate, especially if, for example, one or

1    more motions to dismiss are filed and ultimately granted in a

2    way that limits or, perhaps, even eliminates categories of

3    discovery that any party or perhaps former party must produce,

4    but I also want to make this observation.

5            It's not just one plaintiff and one defendant in this

6    case, such that if the defendants' motion to dismiss were

7    successful the case would be over.  There are multiple

8    defendants.  And if any of them are dismissed from the case, it

9    does not necessarily mean the information in their possession

10   suddenly does not become discoverable.

11           The plaintiffs made this point early on in the case.

12   I agree generally that even a dismissed party in this case, if

13   there is to be any, will have evidence that will bear on the

14   claims and defenses that have been asserted or argued.

15           So I think you probably appreciate that.  But I do

16   understand your point about adjusting or modifying the scope of

17   discovery in light of what happens with any motion to dismiss.

18           So you've marked it.  It's on the radar in the case.

19   I'm aware of it.  And we will address it if we need to.  All

20   right.

21           MR. WALD:  Thanks very much, your Honor.

22           THE COURT:  Thank you, Mr. Wald.

23           All right.  We have a schedule for briefing following

24   the filing of the second complaint for which we also have a

25   date.

1    We have deadlines for the parties to start working on

2    electronically stored information.

3    Mr. DeJong, one question I have.  Putting aside the

4    electronically stored information or -- that one or more of the

5    defendants have not yet produced because of the protocol issue,

6    are there any other documents that were to be produced,

7    following my protective order rulings, that have not yet been

8    produced and are not in the process -- as far as you know -- of

9    being produced?

10    MR. DeJONG:  Your Honor, my -- my recollection is

11    that TD Ameritrade took the position that they would produce

12    only documents that relate directly to the named plaintiffs.

13    And so that was -- you know, in addition to the

14    position that they didn't have to produce any e-mails that fell

15    within the categories of documents, which you identified in

16    your order; so we have -- we have that problem.  But the other

17    problem is that none of the defendants who filed protective

18    order motions produced e-mails.

19    THE COURT:  Produced e-mails?

20    All right.

21    MR. DeJONG:  Correct.  That would fall within the

22    categories of the limited discovery that you ordered and in the

23    response to the protective order motions.

24    THE COURT:  Mr. Brady, in your view, are the ESI

25    protocols necessary before the e-mails can be produced?

1        MR. BRADY:  Yes, your Honor.  The protocols are a

2   part of the -- the importance of the protocols is to create a

3   process for selecting the custodians whose e-mails will be

4   searched and the search terms that will be used to search

5   through their e-mails.

6        THE COURT:  Mr. Brady, I'll ask you another question,

7   and then I'll hear from any of the other defendants' counsel

8   who wish to also weigh in.

9        Mr. Brady, are there any e-mails that, in your view,

10  can be produced now, even though ESI protocols are not in

11  place?

12       MR. BRADY:  To clarify, when we made our prior

13  production, we turned over -- and these were documents that

14  were responsive to the protective order.  We produced 1.5

15  million cases of materials.  And within those materials -- I --

16  I don't have the exact number, but it was well over 200,000

17  separate e-mails within those documents that we have turned

18  over to the plaintiffs and that the plaintiffs are -- are, I

19  presume, reviewing now.

20       THE COURT:  All right.  Thank you.

21       Mr. Wald, has Deloitte & Touche produced e-mails

22  or -- even if it's not all the e-mails that might be within the

23  scope of the discovery requests?

24       MR. WALD:  Your Honor, I believe that Mr. DeJong will

25  agree that we have produced ESI electronically stored data for

1    the categories that your Honor ordered produced.

2              I do not believe that, by and large, that that

3    production included e-mails, broadly defined.

4              We -- we certainly believe that we need to have

5    agreed-upon ESI protocols, including search terms, custodians,

6    date ranges, sources of ESI, those kinds of things, before we

7    could make a further search or a -- you know, a full search,

8    you know, for e-mails.

9              And we're certainly, you know, happy to talk to the

10   plaintiffs about that in a -- in a subsequent meet and confer.

11   It does, of course, (indiscernible) the issue we were just

12   discussing, which is what are the transactions that are

13   involved here.  But subject to that caveat and the Court's

14   observations about that caveat, we have not yet.  And we

15   anticipate that that will be the subject of the next round of

16   discovery.

17             THE COURT:  Thank you.  Mr. Ferranti, has EisnerAmper

18   produced any e-mails yet?

19             MR. FERRANTI:  No, your Honor, I don't believe we

20   have, unless there were some that were included in the formal

21   work papers, which is possible.

22             But we did not understand the Court's order to

23   require a search of e-mail or other ESI.  In part because

24   plaintiffs specifically conceded in their briefing on their

25   protective order that they were proposing production of only

34

1    the audit work papers with discovery of ESI to go forward

2    later.

3              And I think in the Court's order, the Court also

4    recognized that e-mail and database searches -- they refer to

5    both of those together -- require that the parties first

6    propose and work out search terms, and whatnot, that we've

7    discussed now, sort of doing going forward.  But at the time

8    the Court issued the order, that was ahead.  And, again,

9    plaintiffs have said what they were demanding at the time was

10   work papers.  And we made clear that that's what we were

11   producing to them was nonESI.

12             And, again, had not heard any objection to that

13   production, which was back in January.

14             THE COURT:  Thank you.

15             Mr. Van Der Weele, e-mails produced?

16             MR. VAN DER WEELE:  Yes, your Honor.  Consistent with

17   what I said before, we produced e-mails that were in electronic

18   folders that were organized by matter.  We did not produce

19   e-mails that would be in electronic folders, organized by a

20   custodian.

21             THE COURT:  Thank you.

22             Mr. Christakos, TD Ameritrade.

23             MR. CHRISTAKOS:  Your Honor, let me respond, first,

24   generally.

25             We did comply fully with the Court's order on

1   discovery, and we did so in a timely manner on the day

2   indicated, but for the two specific areas that were the subject

3   of our motion for reconsideration, which the Court has now

4   resolved.

5           So we did produce a variety of documents not

6   specifically related to the customers, and who -- who are

7   plaintiffs in the case because those were required by the Court

8   to be produced.  But in agreements and various other categories

9   of documents.

10          With respect to e-mails, yes, we did produce e-mails.

11  But somewhat similar to the prior answer, where -- where

12  e-mails were readily identifiable, contained in files

13  associated with customers who were -- who were named

14  plaintiffs, we gathered them and produced them.

15          I do not believe that we ran, sort of, company-wide

16  e-mail searches to find any stragglers that were not deposited

17  where they should have been in the company's, you know, subject

18  matter folders for these customers.  So that is something, of

19  course, we can -- would do.  But we did produce e-mails, to the

20  extent we're able to find them, using reasonable efforts as

21  to -- as to the customers in question and as to -- as to the

22  other categories that were the subject of the Court's order.

23          For example, if they were agreements that were

24  produced, and their communications could readily identify an

25  e-mail or other form associated with transmittal of those

1   agreements or regarding those agreements, we endeavored to find

2   and produce those as well.

3           THE COURT:  Is there any e-mail remaining to be

4   produced that you haven't yet produced because -- for any

5   reason?  Protocols or otherwise?

6           MR. CHRISTAKOS:  Well, with respect to the documents

7   that we produced -- and setting aside for the moment our need

8   to produce documents in response to the Court's resolution of

9   our motion to reconsider, I suspect that there are.  Again, we

10  didn't run -- we didn't run a -- multiple custodian searches or

11  searches throughout the entire company database to find all

12  possible e-mails.

13          We tried to be a little bit more narrow or a little

14  more targeted about it to -- to find things with respect to

15  the -- to the customers who are named plaintiffs.  I think we

16  caught most if not all of those, but we need to go back and

17  double-check that.

18          THE COURT:  All right.  Thank you.

19          MR. CHRISTAKOS:  Of course, we need -- obviously, we

20  need to produce documents now in response to the Court's order

21  yesterday, and I would anticipate there would be e-mails there

22  as well.

23          THE COURT:  All right.  And, finally, for Integrity,

24  Ms. Reddy.

25          MS. REDDY:  Yes, your Honor.  I think Integrity is

1    similarly situated to defendant TD Ameritrade.

2          I think based on your Honor's order of yesterday, we

3    do anticipate producing e-mails.  To the extent that any have

4    been produced to date, they would have been e-mails that were

5    included in the files of the named plaintiff that we have

6    already produced.  That it was our understanding the e-mails

7    were encompassed within the parameters of ESI.  There was no

8    fulsome production of e-mails has been made to date.

9          To that -- to that end, we, for the reasons already

10   discussed, believe that a protocol with respect to search

11   terms, custodians, date ranges, would certainly be helpful in

12   facilitating that production.  But we are happy to confer with

13   plaintiff offline to discuss any sort of preliminary production

14   of e-mails that can be made pursuant to your Honor's order.

15         THE COURT:  All right.  Thank you.

16         Mr. DeJong, anything further on this topic before we

17   move to the next topic?

18         MR. DeJONG:  Yes, thank you, your Honor.

19         So with respect to the orders on the protective order

20   motions as to Sidley, Ameritrade, and Integrity, we've had no

21   meaningful e-mail production from any of those parties.

22         Mr. Brady referred to the 1.5 million documents and

23   200,000 e-mails that he says were produced.

24         What Deloitte did was they produced to us Equitas's

25   e-mails that had been produced on Aequitas's behalf to the SEC,

1    so when -- we didn't get any of Sidley's loan e-mails, your

2    Honor.  And with Ameritrade, I think, as Mr. Christakos said,

3    what they produced to us were any e-mails that happened to be

4    within Mr. Checkatele's (phonetic) file at Ameritrade.  So, you

5    know, that's -- that's not merits discovery.

6          And I'm looking at your Honor's order on the

7    protective order motion.  I've just used Sidley as an example.

8          We have -- we have one item here that is -- that

9    orders Sidley to produce all documents Sidley sent to and

10   received from the investment advisor to the ACOF fund.  I can't

11   comprehend why Sidley would need to have an ESI protocol to

12   respond to that order that is in effect, that has been

13   outstanding; I think was due in April.

14         All of -- all of the information known -- necessary

15   to respond to that order is known to Sidley.  So -- and it's

16   very difficult for us to be in this position of having to

17   negotiate things when -- when the positions on the other side

18   are that -- you know, no discovery should proceed.  So --

19         THE COURT:  Mr. Brady, what about that?

20         MR. BRADY:  Well, the first point is that that -- the

21   same e-mails are among the -- are among the 200,000 e-mails

22   that we produced.

23         Mr. DeJong's correct, those were e-mails that we

24   produced -- simply produced on behalf of various Aequitas

25   entities to the SEC.  But there certainly is overlap between

1   those e-mails and the e-mails in the Sidley files.

2          THE COURT:  All right.  Let me be clear about the

3   protocol process.  Once the protocols are resolved, whether the

4   parties reach agreement or whether they submit any

5   disagreements to me for final resolution, I will expect that

6   electronically stored information -- whatever that ends up

7   being, according to the protocols -- be produced promptly.

8          Now, this is July 25.  The protocol process will take

9   about four to five weeks.  If I have to resolve anything, it

10  could be longer.  And, of course, in early September, the

11  second amended complaint will be filed.

12         I mention all of this because I want to be clear that

13  I don't expect the defendants to be waiting until

14  mid-September, for example, or sometime in September, to start

15  looking for electronically stored information or the custodians

16  who might have it.

17         I expect all the defendants to be identifying

18  possible custodians now, so that the process will be as

19  expedited as appropriate once the protocols are resolved and in

20  place.

21         I share Mr. DeJong's concern that this case has been

22  around now for a while.  A year and a half, at least.  We are

23  still getting the pleadings settled, and we still are looking

24  at what can reasonably be characterized as initial discovery.

25  So I want to take whatever steps are appropriate to move

40

1   discovery forward efficiently and promptly.  So everyone should

2   start looking at that now, in the anticipation of having to do

3   searches to at least some extent.  So custodians, where they're

4   located, how they're stored, and how to retrieve them.

5          If any of you are encountering systems that have been

6   archived or no longer in use, you should start now, working

7   with your respective clients to figure out how to retrieve data

8   you might have to get from Legacy Systems, or systems that have

9   been taken offline or have been upgraded.

10          I don't want to have any unnecessary delays, because

11  those are things, it seems to me, you can work on now, even if

12  you don't know exactly what it is the protocols will require.

13          All right.  I have a question for those of you who

14  are monitoring or involved in the Securities Exchange

15  Commission case that is assigned to Judge Papak.

16          Are there any issues in our case that are affected by

17  the stay that -- by the stay that had been in place?

18          Mr. DeJong, to your knowledge, are there any?

19          MR. DeJONG:  Yes, there are.

20          THE COURT:  There are?

21          MR. DeJONG:  Yes.  For example, we're -- yes, your

22  Honor.  We're prohibited from taking discovery from Aequitas

23  itself, presently.

24          THE COURT:  Okay.  And that -- Mr. DeJong, that stay

25  is still in place?

1        MR. DeJONG:  It is, as far as I understand.  That's

2    correct, your Honor.

3        So it impacts our ability to take discovery on some

4    of these issues of primary liability.

5        THE COURT:  All right.  Do you have any information,

6    Mr. DeJong, about whether -- when, if ever, that stay will be

7    lifted in whole or in part?

8        MR. DeJONG:  What I've been told by the receiver's

9    lawyer is that they are hopeful of making available to all of

10   the parties a very substantial database of documents.  So in

11   the near future, which --

12       THE COURT:  In the near future?

13       MR. DeJONG:  They've been telling us for some time.

14   So I don't have any better information than that.  I would hope

15   it would happen in the next several months.  But it's dragged

16   on for a while, your Honor.

17       But there hasn't been any discussion, that I'm aware

18   of, of lifting the stay or any specificity given for any

19   proposal on timing of -- of lifting the stay.  So unless

20   somebody else has better information than I do, I can't answer

21   that question.

22       THE COURT:  Thank you.

23       Any -- for the defendants, anyone have any additional

24   information about the stay in the SEC case?

25       All right.  Seems --

1          MR. WALD:  Your Honor, it's Peter Wald.  I don't know

2    that I've got better information than Mr. DeJong has on what is

3    going to happen or on what time frame.

4          But I do want to underscore what Mr. DeJong said or

5    at least implied by his tone of voice, which is that it's -- I

6    think I speak for everybody on the phone call in saying that

7    it's extremely frustrating and -- and burdensome not to have

8    access to the very substantial database of documents that has

9    been collected in connection with that proceeding by the

10   receiver.

11         And I -- given the -- the unquestioned powerful

12   impact of that document database and ultimately the testimony

13   from Aequitas insiders on the claims and defenses advanced in

14   this case, it's just -- it's -- at the end of the day, there

15   will be a limit to how far we can proceed in our proceeding,

16   unless and until the parties to this case -- both the

17   plaintiffs and the defendants, get full access to that

18   evidence, both documents and depositions.

19         So I know that that's something your Honor

20   appreciates.  But it's something that when we talk to each

21   other, it's something that we talk about a lot.

22         THE COURT:  All right.  Thank you.  That's helpful.

23         Well, Judge Papak has that case.  I reviewed the

24   docket but not in great detail this morning before getting on

25   the call.

1          As far as can I tell, there is no pending motion or

2     any other pending consideration about lifting the stay.  It's

3     in place, and I suppose will continue to be until someone in

4     that case moves forward with trying to get it lifted.

5          All right.  All right.  So -- but where we are right

6     now, procedurally in the case, I think that covers the issues

7     that need to be covered.  But I don't want to cut off any issue

8     discussion that anyone believes we should have at this time.

9          Mr. DeJong, is there anything else we should take up

10    at this time?

11         MR. DeJONG:  Your Honor, I just want to make sure I

12    understand.  Are you excusing Sidley, Ameritrade, and Integrity

13    from producing the e-mails that are responsive to your orders

14    on the protective order motions, pending resolution of an ESI

15    protocol?

16         THE COURT:  Well, let me -- not necessarily.

17         Let me state what I understood to be the answers to

18    the question I asked about that.

19         Some e-mail has been produced.  Not all e-mail has

20    been produced.  The defendants seem to be of the collective

21    view that additional production of electronically stored

22    information needs to happen after protocols are agreed upon.

23         You mentioned a specific example, which are the

24    e-mails -- correct me if I'm wrong -- internal to Sidley.

25    Correct?

1          MR. DeJONG:  Documents that Sidley sent to and

2    received from the investment advisor to the ACLF fund was the

3    example that I used.

4          THE COURT:  Right.

5          MR. DeJONG:  There are others that would apply

6    equally on the list of documents.  I just pulled that one.

7          THE COURT:  All right.  Mr. Brady, what about that?

8          I think I -- frankly, I'm not sure if I was precise

9    enough when I asked you my question.  But why can't those

10   e-mails be produced now?

11         MR. BRADY:  Your Honor, our -- our position is that

12   there are hopeful potential custodians that are in play here,

13   and that we need to have in discussion -- we need to have a

14   preliminary decision which custodians -- who the e-mails we

15   need to be searching in the first place and what search terms

16   we should be using.

17         And that conversation with plaintiffs will be far

18   more productive after -- after there is an ESI protocol in

19   place.

20         But, also, you are correct that some of these e-mails

21   that Mr. DeJong is referencing are indeed among the 200,000, or

22   so, e-mails that Sidley has already produced.

23         THE COURT:  Some, but not all?

24         MR. BRADY:  Correct.

25         THE COURT:  Well, I will reiterate what I said a

1  while back during this call about having mentioned late last

2  fall the prudence of moving forward with talking about ESI

3  protocols.  For whatever reason or reasons, that either got

4  lost in the briefing shuffle of the various motions to dismiss

5  and protective order motions.  But I want the parties to move

6  forward on that now, as we've outlined.

7          Mr. DeJong, we're going to have to wait until those

8  protocols get in place.  But all defendants -- as I said, once

9  the protocols are resolved, I will expect electronically stored

10  information, including e-mails, to be produced promptly.

11          And that means -- as I said earlier -- among other

12  things, identifying custodians or potential custodians now is

13  the thing to start working on.  You could always cut back on

14  the number of custodians, but it seems to me you have enough

15  information about what the plaintiffs seek and what the claim

16  is in the case to start identifying those who might be in

17  possession of responsive documents.

18          All right.  Mr. DeJong, is there anything else for

19  the plaintiffs?

20          MR. DeJONG:  No, your Honor.

21          THE COURT:  All right.  I'll take the defendants in

22  turn.

23          Mr. Wald, anything else for Mr. Deloitte?

24          MR. WALD:  Not for us, your Honor.  Thank you.

25          THE COURT:  Thank you.

46

1          Mr. Ferranti, for EisnerAmper?

2          MR. FERRANTI:  No.  Thank you, your Honor.

3          THE COURT:  All right.  Mr. Brady, for Sidley?

4          MR. BRADY:  No, your Honor.  Thank you.

5          THE COURT:  Mr. Van Der Weele, for Tonkon Torp?

6          MR. VAN DER WEELE:  No, your Honor.  Thank you.

7          THE COURT:  Mr. Christakos, for TD Ameritrade?

8          MR. CHRISTAKOS:  Your Honor, I'll just note -- and

9   this is something I'll just kind of put on the radar of

10  everyone, particularly the plaintiffs, that we're all going to

11  work with them the best we can to comply with the Court's order

12  yesterday.  But what we -- what we in effect must not do is try

13  to find documents responsive to the initial production order

14  based on the protective order motions for all putative members

15  of the class who may have been TD Ameritrade customers.

16          The way the TD Ameritrade world works, there could be

17  any number of custodians who had some level of contact with all

18  of those customers.  We're going to do the best we can.  And

19  we'll try to engage in those discussions with plaintiffs'

20  counsel early, so that we can keep them posted and -- and try

21  to do this in a sort of rolling production.  But it is not a --

22  I don't want to underestimate the task we've been handed.  We

23  will rise to it.  But I do want to note that it's -- we're

24  going to have to work on this sort of week by week, as best we

25  can, and try to work that out with plaintiffs.

1            THE COURT:  All right.  Thank you.

2            And Ms. Reddy, for Integrity?

3            MS. REDDY:  Nothing further, your Honor.  Thank you.

4            THE COURT:  Thank you.  Thank you, everyone, for

5    being available this morning or, as the case may be, this

6    afternoon.  I appreciate it very much, and I hope all of you

7    have a good day.  Bye-bye.

8            MR. DeJONG:  Thanks, your Honor.  Goodbye.

9            (Conclusion of proceedings.)

10                        --oOo--

11

12    I certify, by signing below, that the foregoing is a correct

13    stenographic transcript of the oral proceedings had in the

14    above-entitled matter this 7th day of August, 2017.  A

15    transcript without an original signature or conformed signature

16    is not certified.  I further certify that the transcript fees

17    and format comply with those prescribed by the Court and the

18    Judicial Conference of the United States.

19            /S/ Amanda M. LeGore

20            _____

21            AMANDA M. LeGORE, CSR, RDR, CRR, FCRR, CE
                  CSR No. 15-0433  EXP:  3-31-2018
22

23

24

25