# EXHIBIT 4

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF MULTNOMAH

KENNETH and ISABELLA POMMIER,            )
                                         )
co-trustees of Kenneth W. Pommier       )
                                         )
& Isabella B. Pommier Family            )
                                         )
Revocable Trust Dated 3/18/1986;        )
                                         )
et al.,                                  )No. 16CV36439
                                         )
        Plaintiffs,                     )
                                         )
        vs.                             )
                                         )
DELOITTE & TOUCHE LLP, et al.,          )
                                         )
        Defendants.                     )
_____ )
                                         )
WALTER WURSTER, et al.,                 )
                                         )
        Plaintiffs,                     )No. 16CV25920
                                         )
        vs.                             )
                                         )
DELOITTE & TOUCHE LLP, EISNERAMPER       )
                                         )
LLP; SIDLEY AUSTIN LLP; TONKON          )
                                         )
TORP LLP; DUFF & PHELPS, LLC; TD        )
                                         )
AMERITRADE, INC., and INTEGRITY         )
                                         )
BANK & TRUST,                           )
                                         )
        Defendants.                     )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KATHLEEN M. DAILEY
April 6, 2018

```
 1           BE IT REMEMBERED that the proceedings were
 2      taken before Aleshia K. Macom, RMR, RPR, CSR,
 3      CRR, on April 6, 2018, commencing at the hour of
 4      8:30 a.m., at the Multnomah County Courthouse,
 5      1021 SW Fourth Avenue, Courtroom 716, Portland,
 6      Oregon.
 7                          *   *   *
 8                        APPEARANCES
 9      MILLER NASH GRAHAM & DUNN LLP
10         By Ian Christy
11             Bruce L. Campbell
12             ian.christy@millernash.com
13             bruce.campbell@millernash.com
14         111 SW Fifth Avenue, Suite 3400
15         Portland, Oregon 97204
16         Counsel for Wurster Plaintiffs
17
18      LATHAM & WATKINS
19             Peter A. Wald
20             Gavin Masuda
21             peter.wald@lw.com
22             gavin.masuda@lw.com
23      505 Montgomery Street, Suite 2000
24      San Francisco, California 94111
25      Counsel for Defendant Deloitte & Touche, LLP
```

1        FRIDAY, APRIL 6, 2018; PORTLAND, OREGON;

2                        8:30 A.M.

3                        *   *   *

4        THE CLERK:  All rise.

5        THE COURT:  Good morning.  All of you for a

6    motion to compel?  Really?  All right.  Take a

7    seat.

8        All right.  Here we are this morning in

9    Wurster versus Deloitte & Touche, 16CV25920.

10   Who's ever going to speak, if you want to put

11   yourself on the record.

12       MR. WALD:  Good morning, Your Honor.  Peter

13   Wald and Gavin Masuda of Latham & Watkins for

14   the Deloitte defendant.

15       MR. MASUDA:  Good morning, Your Honor.

16       THE COURT:  Can you put yourself on the

17   record.  I know it was kind of him.

18       MR. MASUDA:  Of course, Your Honor.  Gavin

19   Masuda of Latham & Watkins for defendant

20   Deloitte & Touche, LLP.  Thank you.

21       THE COURT:  Thank you.

22       MR. CHRISTY:  Your Honor, Ian Christy from

23   Miller Nash Graham & Dunn on behalf of the

24   Wurster plaintiffs.

25       THE COURT:  Christy spelled?

1          MR. CHRISTY:  C H R I S T Y.

2          THE COURT:  Thank you.

3          MR. CAMPBELL:  And, Your Honor, Bruce

4     Campbell on behalf of the Wurster plaintiffs,

5     but I will not have a speaking role today.

6          THE COURT:  All right.  Well, thank you for

7     letting me know.

8          Okay.  It was your motion to compel.

9          MR. WALD:  Yes.

10          THE COURT:  I've read everything.

11          MR. WALD:  Thank you, Your Honor.  I'm happy

12     to respond to any questions that you have out of

13     the box or I can --

14          THE COURT:  Well, I can give you my -- I'm

15     curious -- How do I state this?  The logic of

16     why you ought to get this documentation is a

17     little lost on me, just overall, because of the

18     nature of the statute that we're operating under

19     and the idea that really the only affirmative

20     defense that I see is the one that comes into

21     play under secondary liability that you did not

22     know or could not know of the fraud.  And so I'm

23     a little lost about how plaintiffs' personal

24     financial records bear on that.

25          MR. WALD:  Okay.  Let me see if I can

Page 5

1       address that straightforwardly, Your Honor.

2            These were private placement transactions,

3       as The Court appreciates.  In order to be

4       permitted to purchase, the plaintiffs needed to

5       warrant and represent that they were accredited

6       investors.

7            THE COURT:  And they did.

8            MR. WALD:  They did make that warrant and

9       representation.  That is correct.  That is a

10      defined term, as Your Honor appreciates, under

11      the securities laws.  Regulation D requires them

12      to have -- to be able to demonstrate either that

13      they have a net worth of a million dollars or

14      more or that they have income of $200,000 or

15      more for each of the two years prior to their

16      purchase of the unregistered security.

17           So, at a very basic level, Your Honor,

18      Deloitte seeks these documents to test the

19      proposition of whether these plaintiffs told the

20      truth when they signed the subscription

21      agreements and were, in fact, accredited

22      investors under the law.

23           THE COURT:  But why do you have to test the

24      truth?  Just accept that that is the truth and

25      where does that get you?  I mean, why would you

1       want to undermine that they were accredited?

2            MR. WALD:  Your Honor, if they lied in order

3       to get into these investments, we believe that's

4       something a jury can take into account in

5       deciding --

6            THE COURT:  But tell me in terms of

7       pleading, what would you plead to make that

8       admissible or relevant or --

9            MR. WALD:  As The Court recognized in In Re

10      Baker, it just goes to their basic credibility

11      about the allegations that they're making, which

12      is, among other things, that Deloitte's

13      involvement in this transaction was material to

14      them, as Your Honor has found in connection with

15      the finding, with -- in upholding the

16      allegations on secondary liability.  And in

17      finding that they had adequately alleged that

18      Deloitte's credibility was important to them, we

19      believe we are able, we should be able to argue

20      to the jury either that they lied in order to

21      get into these investments, which the jury could

22      well conclude on the basis of that, the

23      inference to be drawn is they didn't care about

24      anything except getting into the investments or

25      on the other hand, Your Honor --

1        THE COURT:  But where does that get you?

2    Because your only defense is that you did not

3    know and could not know.  So I don't understand

4    how that bears on any defense or element of the

5    case.

6        MR. WALD:  It bears, Your Honor, on at least

7    the following things:  On secondary liability it

8    bears on the question of whether Deloitte's

9    association with the transaction, which we

10   dispute as a matter of fact, but for these

11   pleading purposes we accept that you found that

12   they have pled enough, we submit, Your Honor,

13   that we can show through cross-examination that

14   Deloitte's association with the transaction was

15   not material to them, was not material to them.

16       THE COURT:  Well, but that -- Okay.  So, I

17   mean, without doing a back-door reliance, which

18   is also a question mark because we know that

19   there's not a reliance factor, I mean, I can see

20   you saying the fact that Deloitte was on the PPM

21   and they were accredited and sophisticated means

22   that it had no bearing on their decision.  I

23   mean, if that's even at issue, setting aside the

24   whole reliance argument for a moment.  But, but

25   that is contrary to what you're just now saying,

```
 1        because you can't have it both ways.  You can't
 2        say they are sophisticated and so us being on
 3        the PPM didn't matter to them in their purchase
 4        and therefore it wasn't material and also they
 5        weren't accredited and therefore not, and then
 6        of course it does get into the whole thing about
 7        whether accredited and sophisticated is the same
 8        thing, which is also a question mark.  But you
 9        can't say that because they were liars and
10        weren't accredited, then what?  They shouldn't
11        have bought it.
12             MR. WALD:  Yes, Your Honor.
13             THE COURT:  But that's not a defense.
14             MR. WALD:  Well, Your Honor, we believe the
15        jury is, is entitled to consider from a but-for
16        point of view whether they would have bought
17        these securities with or without Deloitte's
18        association.  And, and, Your Honor, the facts
19        are binary.  They either were accredited or they
20        were not accredited.
21             THE COURT:  But you get to make a
22        presumption that they were accredited because
23        they bought and certified as such.
24             MR. WALD:  And what if those were lies, Your
25        Honor?
```

Page 9

1          THE COURT:  That's what I mean.  It's a

2     circular argument, because I don't understand

3     how that goes to anything that's an element of

4     the case.

5          MR. WALD:  It goes to the question of

6     whether they are credible in saying that

7     Deloitte's association with this transaction was

8     material to them, something which Your Honor has

9     found under the Galbraith case and the Gonia

10    case, et cetera, is an important element of the

11    claim.

12         THE COURT:  But the credibility argument is

13    an opposite argument, in my eyes.  That's the

14    argument that they were sophisticated and thus,

15    or accredited, and thus had the ability to know

16    that Deloitte's name on the PPM wasn't anything

17    that influenced anything or aided in the sale,

18    because it had no real bearing on it.

19         MR. WALD:  Your Honor, they've come into

20    this court and they've said to Your Honor that

21    they've lost their life savings and they're

22    living hand to mouth.  We expect to see those

23    arguments with the jury.

24         THE COURT:  Well, you might expect it, but

25    I'm not sure I'm allowing it.  Because that

Page 10

1    argument from the beginning has troubled me, as

2    I already said to Mr. Kayser.  So we'll talk

3    about that another day.  But that's not what's

4    here.

5         MR. WALD:  Okay.  Well, Your Honor, we

6    submit that you are certainly right that if they

7    are, in fact, accredited investors, that we are

8    able, we should be entitled to argue certain

9    inferences to the jury on that basis.  If they

10   are not, however, accredited investors and they

11   lied in order to get into these investments, we

12   submit to Your Honor that that goes to the

13   question of whether they cared or they didn't

14   care about Deloitte's association with the

15   transaction.  And we believe we should be

16   entitled to argue the inference to the jury that

17   these people -- And we've seen documents, Your

18   Honor, we've already started to see documents

19   where they're saying, we are looking for a

20   high-return, low-risk investment to which people

21   might say, aren't we all?

22        THE COURT:  Well, but your argument sounds

23   like to me a reliance argument, and we don't

24   have that in this case.

25        MR. WALD:  We don't think it is reliance,

Transcript of Proceedings                     April 6, 2018

1        Your Honor.  We think it goes to materiality.

2        We think it goes to the question of whether or

3        not Deloitte's association with the transaction

4        was material, as Your Honor has found is an

5        important element of secondary liability.

6             THE COURT:  But you get to presume that they

7        are accredited.  And I really do think there is

8        a fair argument to be made around the question

9        that I've already noted, and that was in the

10       papers of whether "sophisticated" and

11       "accredited" are synonymous.  They might not be.

12       There's, you know, remember the Beverly

13       Hillbillies?  They had tons of money but weren't

14       sophisticated.

15            MR. WALD:  Well, Your Honor, I don't -- from

16       a relevance point of view, likely to, reasonably

17       calculated to lead to the discovery of

18       admissible evidence --

19            THE COURT:  Well, I do understand the

20       standard for discoverability, but I also

21       understand the balance of privacy and

22       protection.  And I'm really struggling to find

23       out how getting into their financial records

24       that have nothing to do with the damages of this

25       case, because the damages are separate and

1     apart.

2          MR. WALD:  Let's talk about the damages,

3     Your Honor.

4          THE COURT:  Okay.

5          MR. WALD:  Because they are relevant to the

6     damages.  The damages, as you know, are set by

7     statutory formula.  They depend on what they

8     purchased, when they purchased, and what monies

9     they received as a consequence of their

10    purchase, at least those elements.  And what we

11    submit is that we're entitled to see bank

12    statements, broker statements, tax returns that

13    confirm the dates of purchase, the date of

14    sales, if any, or rollovers and the amount of

15    interest that was secured by the plaintiffs in

16    connection with those investments.

17         THE COURT:  So tell me why, because I don't

18    know, the reference to the bankruptcy package.

19    I mean, what's lacking from that that gives, if

20    that's the right reference.

21         MR. WALD:  Well, that's the one thing that's

22    been told to us so far, Your Honor.  I mean,

23    this is the --

24         THE COURT:  Well, what's in it?

25         MR. WALD:  The bankruptcy trustee attempted

Page 13

1    to put together a package of information for

2    each investor and sent it back to the investor,

3    saying is this accurate or is this not accurate?

4    We don't know what they have responded to.  But,

5    but it doesn't -- The -- In his own filing the

6    receiver said, we can't verify these numbers

7    because Aequitas did not keep ledgers that allow

8    us to do that.  So we don't know what the right

9    numbers are.

10        THE COURT:  So the underlying documentation

11    hasn't been provided for the actual sales that,

12    purchases that are at issue in the case?

13        MR. WALD:  Not, as to our knowledge it's not

14    part of the bankruptcy package, Your Honor, nor

15    is it clear whether whatever was sent out by the

16    bankruptcy receiver is accurate.

17        THE COURT:  Okay.  Well, we're going to sort

18    that out because you do have a right to the

19    documentation that supports what we bought.

20    But, I mean, that was from Aequitas; right?

21        MR. WALD:  Right.

22        THE COURT:  Okay.  Well, I'll hear from you

23    about what that piece is.  But, I mean, you have

24    a right to whatever supports their damages in

25    terms of whatever that is, but somebody will

1      educate me more about what piece of paper that
2      would look like.
3              MR. WALD:  All right.  So let's hold damages
4      to one side, Your Honor.  Our submission on
5      relevance is that there are three ways in which
6      these documents are relevant.  The first is it
7      goes to the question of primary liability.  The
8      plaintiffs have said that they were misled about
9      the riskiness, the relative stability on the one
10     hand or riskiness in security of --
11             THE COURT:  You mean the "lent to
12     credibility" argument?
13             MR. WALD:  Well, that's for secondary
14     liability, Your Honor.
15             THE COURT:  Yeah.
16             MR. WALD:  But I think it's part and parcel
17     of the same thing.  I think the first question
18     is whether or not we are entitled to show that
19     if they were misled about the relative security
20     and safety of these investments, which we
21     contest, that it was because they lied in order
22     to get into the investment.  And we think that
23     we should be entitled to confirm from the
24     plaintiffs' own documents whether they actually
25     were accredited investors as they told Aequitas,

1    as a condition of being allowed to invest in

2    these investments, we should be allowed to see

3    whether that was true.  And if it wasn't true,

4    we should be allowed to argue to the jury that

5    if they were misled, it was because they,

6    themselves, lied in order to get into this

7    investment.  And that is a primary liability

8    argument, Your Honor, which goes to the question

9    of whether there were false and mis- --

10        THE COURT:  But if there was fraudulent

11   statements or fraud in the inducement or however

12   you want to look at it, fraud in buying the

13   purchase, whether they had money or not, that's

14   a separate and apart issue.

15        MR. WALD:  They would not have been on the

16   scene, Your Honor, if they had told the truth.

17   They would not have been on the scene.  They

18   would not have been permitted to invest in these

19   securities if they had told the truth.  And the

20   jury is entitled to take that into account in

21   assessing --

22        THE COURT:  So you want to, you're likening

23   it to a causation piece of the case then?

24        MR. WALD:  Correct.  The connection to the

25   sale.  That's right.  That's exactly right under

1       both primary liability and secondary liability.

2           And then, Your Honor, I know there's a,

3       there's a live debate about the affirmative

4       defenses.  But to the extent that, that they,

5       you know, that we are entitled to show and we

6       believe that we are entitled to show things like

7       in pari delicto, things like ratification and

8       estoppel, all of those would be, would be, would

9       make relevant the question of how they talked

10      themselves into, if I can put it that way, Your

11      Honor, being able and allowed to invest in these

12      securities.

13          THE COURT:  Well, and I'll have to say that

14      right now that doesn't hold water for me, those

15      defenses.  But I'm willing to be educated on it

16      on another day.

17          But the equitable defenses I just don't see

18      under our, Oregon law how you would get that.

19      But I'll save that for another day.  I would not

20      give you the documentation on that basis.

21          MR. WALD:  All right.  Well, let's -- then I

22      won't continue with that argument, Your Honor.

23          Our fundamental point is that yes, you're

24      right.  If they really were sophisticated

25      investors, it could lead to one set of

1    inferences to argue to the jury.  If they lied

2    and they weren't sophisticated investors, that

3    leads to a different set of arguments and

4    inferences that we would ask the jury to draw,

5    including the fact that but for their own

6    misrepresentations, they never would have been

7    in the investments and they can't say that they

8    were misled by the conduct of Deloitte when what

9    they were misled by was the fact that they lied

10   to get into the investments and they never

11   should have been admitted as investors.

12        THE COURT:  So you've got a bunch of joint

13   plaintiffs and you're in front of a jury.  And

14   so on half of them you're going to argue they're

15   sophisticated and therefore it didn't matter and

16   on the other half you're going to say they

17   weren't and therefore it was but-for causation.

18        MR. WALD:  Your Honor, we have a mass

19   action.  That's what it is.  We're confronted

20   with that problem.  I mean, we'll have to talk

21   to Your Honor about how you want to structure

22   the trial.  We recognize that's going to be an

23   issue.  Right now we're just in discovery.

24   We're trying to discover the facts.  We have

25   charts, Your Honor, for each plaintiff.  You

Page 18

```
 1    know, that's the only way we can defend the
 2    case.  That's how it's presented to us.  And so
 3    we need to go through each plaintiff and we need
 4    to show, we need to understand whether or not
 5    they were, in fact, accredited and whether or
 6    not they told the truth in connection with their
 7    subscription agreements.
 8         Once we have the basic facts and we have the
 9    facts on damages, Your Honor, then we can take a
10    step back and we can assess what we actually
11    have in the case.  But without the underlying
12    documents, we can't do that.
13         THE COURT:  Okay.  Let me hear from the
14    plaintiffs.
15         MR. CHRISTY:  Thank you, Your Honor.  Our
16    position is that there is absolutely no nexus
17    between the documents that Deloitte seeks and
18    the claims and defenses at issue in this case.
19    And I think Your Honor got to the heart of it
20    with your discussion about the relevance of
21    sophistication here.  Our position is that there
22    is absolutely no relevance to accredited
23    investor status or sophistication in any way
24    that would reflect on our claims as investors
25    under the Oregon securities law.
```

Page 19

1          THE COURT:  Well, then get to his but-for

2     causation argument.

3          MR. CHRISTY:  The but-for causation argue is

4     entirely a collateral issue.  The fact that

5     investors may have lied, we have no evidence

6     that investors did lie about their accredited

7     investor status, but the fact that they --

8     assuming, for the sake of argument, that is the

9     case, that does not defeat a claim under the

10    Oregon securities law.  There is no affirmative

11    defense that would allow them to make that

12    statement and, and have the jury conclude that

13    they are somehow responsible.  It's essentially

14    a covert way of imposing an in pari delicto

15    requirement or affirmative defense, which the

16    Oregon legislature has not allowed based on the

17    language of the statute, which provides very

18    single affirmative defense that the defendants

19    knew or in the exercise of reasonable care

20    should have known about the fraud.

21          The defense that Mr. Wald is talking about

22    is not something that would defeat a claim, even

23    if it's true.  So --

24          THE COURT:  What about the damages?

25          MR. CHRISTY:  The damages issue, I think

1    Mr. Wald is misrepresenting the nature of what

2    we are going to be providing as proof in this

3    matter.  The investor packets that our clients

4    received are, are the crux of what --

5         THE COURT:  Okay.  So they receive.  So tell

6    me what it is.

7         MR. CHRISTY:  So it's a packet of

8    information that the receiver put together that

9    shows the principal that our investors invested.

10   It shows the amount of interest that our

11   investors received back.  It shows what they, it

12   shows the amount that was reinvested.  It's

13   essentially a balance sheet showing the

14   different types of --

15        THE COURT:  But where did it come from?  How

16   did he create that?

17        MR. CHRISTY:  Our understanding is that the

18   receiver looked through the Aequitas records and

19   was able to make a determination based on those

20   records as to what the damages --

21        THE COURT:  So where are the original

22   documents so the defendants can have them?

23        MR. CHRISTY:  They were in the Aequitas

24   receiver's database, and the defendants have

25   access to that database.  They have the same

Transcript of Proceedings                          April 6, 2018

Page 21

1       information that we have.  And we don't intend
2       to rely on any information that the defendants
3       are currently seeking to prove our claims.
4              THE COURT:  So your clients don't have their
5       own documentation.
6              MR. CHRISTY:  Our clients -- Excuse me, Your
7       Honor.  Our clients have some of their own
8       documentation.  To the extent it pertains to
9       Aequitas, we have produced all those materials.
10      We have produced the materials relating to the
11      notes that our clients signed.  We have produced
12      notes relating to the transactions themselves,
13      the subscription agreements, the private
14      placement memorandum, of that information, to
15      the extent it's in our clients' possession, has
16      been produced to the defendants.
17             THE COURT:  So I need at that addressed.
18      Why then are you thinking there's something
19      else?
20             MR. WALD:  Your Honor, it's easy for the
21      plaintiffs to call their brokers and to supply
22      us with the broker statements which are
23      inarguable and will show once and for all what
24      they bought, when they bought it and what they
25      received on it.  The receiver in his report said

Transcript of Proceedings                        April 6, 2018

Page 22

1          he doesn't know.

2                    THE COURT:  Okay.  But what about the

3          Aequitas documentation themselves that they say

4          you have the database for?

5                    MR. WALD:  Well, the database is 16 million

6          documents, Your Honor.  It was made available

7          about a month ago basically to people.  What we

8          know is that the receiver who has been

9          collecting documents and information for the

10         past two years did the best job that the

11         receiver could, sent to the plaintiffs, to each

12         of the plaintiffs apparently a set of

13         information and asked them to verify whether it

14         was accurate.  We don't know.

15                   THE COURT:  But the core documents that are

16         in database you can't get to?

17                   MR. WALD:  We can get to them Your Honor.

18         We don't know that they will show what we're

19         looking for, which is --

20                   THE COURT:  Oh.  Well, why don't you look

21         first and see if they do or don't?

22                   MR. WALD:  Your Honor, there are 16 million

23         documents there.  We, we are --

24                   THE COURT:  Are they not organized by name

25         that you could just do a status search?

Transcript of Proceedings                    April 6, 2018

1          MR. WALD:  No.

2          THE COURT:  Really?  Are you kidding me?

3          MR. MASUDA:  Your Honor, if I may, the more

4     fundamental problem is even if we were able to

5     run a search and identify, for example,

6     Mr. Wurster's documents, the receiver himself

7     has noted problems in the data where Aequitas

8     did not sufficiently maintain their own records

9     in the database for even the receiver, with all

10     of his resources, to be able to say, I know what

11     this plaintiff purchased and exactly when.  And

12     that's in the latest receiver's report, which is

13     published in the SEC case.

14          THE COURT:  Okay.  Is it impossible to go to

15     the broker and get the piece of papers?

16          MR. CHRISTY:  I would not say it's

17     impossible, but it's an extreme burden to go to

18     66 different clients and 66 different brokers

19     and collect all of that information especially,

20     especially, Your Honor, because that information

21     is already in the Aequitas database.

22          THE COURT:  The exact same documents?

23          MR. CHRISTY:  We don't know exactly what our

24     clients --

25          THE COURT:  So do you, have you already

Transcript of Proceedings                              April 6, 2018

Page 24

1         accessed the database and got this thing, all
2         this on behalf of your clients?
3              MR. CHRISTY:  We do have access to the
4         database, Your Honor.  Yes.
5              THE COURT:  Well, why don't you provide it
6         to them?
7              MR. CHRISTY:  Through the Aequitas database?
8              THE COURT:  Well, from whatever means, a
9         broker, a database, your clients' safe at home.
10        I mean, why can't you give them papers saying
11        what the damages are?
12             MR. CHRISTY:  Well, Your Honor, our position
13        is we've already provided all that information.
14             THE COURT:  How?
15             MR. CHRISTY:  Through the Aequitas investor
16        packets and through the other material that our
17        clients have in their possession.
18             THE COURT:  Okay.  The packets of original
19        documentation is what I just heard, and I just
20        heard that the receiver's having issues with
21        some of it himself.  And so they want to verify
22        the truth of the under -- of the claim.
23             MR. CHRISTY:  I think that's slightly a
24        misstatement of what the receiver has said.  The
25        receiver has actually talked about the fact that

Transcript of Proceedings                              April 6, 2018

Page 25

1       Aequitas did a very good job at bookkeeping.

2       It's one of the only things that Aequitas did

3       that was, that was actually on the level and

4       successful.  So I don't think that that's

5       correct that the receiver's database is somehow

6       inaccurate.

7            To the extent that we are trying to prove

8       our claims based on any documentation, it's

9       based on documents that we've either already

10      provided to them or documents that are in the

11      Aequitas receiver's database.

12           THE COURT:  Yeah, but they want to verify

13      the truth of the matter, that it's a real

14      amount.  And so you have to figure out a way to

15      assuage them of their fears that you're asking

16      for something that isn't actually true.  So I

17      don't, you know, because a summary is not the

18      actual document.  And so they want to see a

19      piece of paper that really says what your client

20      paid for the investment and what the interest

21      was.

22           So I don't really mind how you go about

23      doing it, but it sounds like that it may not

24      exist in perfection, Mr. Wald, but that it

25      exists to the point where it's admissible in

1      court to support a claim for damages.

2           And so the two of you have to get on the

3      same page and sort this out with each other

4      because the documents to a degree that would

5      create admissibility for a claim are there and

6      that's what they're going to rely on.  And if

7      you think that's inadequate, then you can tell

8      the jury it's inadequate.  But in terms of them

9      giving it to you or you getting, who, you know,

10     nobody wants to go to the database and I

11     probably think, there's costs affiliated with

12     that I'm quite sure.  But it is your claim.  So

13     somehow you have to get them to say, okay, we

14     can live with this.

15          MR. CHRISTY:  And to be clear, Your Honor,

16     we don't have a problem with providing

17     information relating to our Aequitas

18     investments, but what Mr. Wald, what Deloitte is

19     asking for is far broader than that.  They're

20     asking for tax returns --

21          THE COURT:  No.  No.  No.  No.  I'm just

22     talking about the purchase.  I'm just talking

23     about the investment for, I'm talking about the

24     damage claim, what you're going to be asking the

25     jury for, whatever supports what you're asking

1      the jury for needs to have some foundational

2      documentation to it and you need to give that to

3      them.  That's all I'm talking about.

4           MR. WALD:  Your Honor, if I may, let me just

5      say I don't think there's any doubt that they

6      could call their brokers and get these records.

7      And there would be no question as to the

8      accuracy and the authenticity.

9           THE COURT:  Okay.

10          MR. WALD:  They've made no.

11          THE COURT:  I don't think making 66 phone

12     calls in a major action like this is a big deal,

13     personally.  A paralegal could cover that in a

14     week at most.

15          MR. WALD:  And there's been no showing, Your

16     Honor, of burden.  They didn't put anything --

17          THE COURT:  Okay.  I'm with you on that.

18          MR. WALD:  All right.  And with respect to

19     the receiver, Your Honor, what he said in the

20     most recent report is, quote, that Aequitas

21     lacked a consolidated accounting and investor

22     reporting platform and he acknowledged that,

23     quote, the receiverships records do not align

24     with investor and creditor records.

25          THE COURT:  Okay.  We're going to get to

1        besides a packet.  So we're not going to just

2        rely on a summary from somebody.  We need some

3        original documentation.  And whether that's from

4        the database or from a broker or from your

5        client, mox nix to me.  Just figure it out and

6        give it to each other.

7             MR. CHRISTY:  To be clear, I just want to

8        make sure I understand what Your Honor's saying

9        here.  We're talking about documents relating to

10       the Aequitas investments.

11            THE COURT:  I am.  That's what I'm talking

12       about.  I'm not talking about your clients'

13       personal records or tax records beyond that.

14       I'm talking about the claim for damages.

15            MR. CHRISTY:  I think we can work that out

16       then, Your Honor.

17            MR. WALD:  Your Honor, can I then go back to

18       the causation issue just to wrap up?

19            THE COURT:  Yeah.

20            MR. WALD:  Because I don't believe that

21       there's been a credible response by the other

22       side on that issue.  If the plaintiffs lied to

23       get into the investments and that is what caused

24       their damages, the jury is entitled to conclude

25       that Deloitte is not responsible for that.  The

Transcript of Proceedings                    April 6, 2018

Page 29

1          jury is entitled to conclude that there is not a
2          causal connection between the alleged conduct of
3          Deloitte and the sale, which Your Honor on
4          page 16 I believe of your opinion recognizes the
5          law in the state of Oregon, that they need to
6          show not only that it was material to them, and
7          we've talked about that, but also that it caused
8          the sale.  And if that's not what caused the
9          sale, we're entitled to argue that inference
10         very hard to this jury, Your Honor.
11             And so there, it isn't just a matter of
12         credibility.  It's a matter of whether or not
13         that causal chain has been broken.  And we
14         submit, Your Honor, that what we're asking for
15         is not -- They haven't made the argument on
16         burdensomeness.  We do understand and appreciate
17         that these are personal financial records.  They
18         are the plaintiffs'.  They're suing Deloitte for
19         hundreds of millions of dollars.  We have a
20         protective order.  And under Reg D we are
21         entitled to original documents that prove or
22         disprove the warrant and representation that
23         they made, that they had income of $200,000 or
24         more for each of the two years prior to their
25         purchase of Aequitas securities or net worth of

1      a million dollars.  And if we can demonstrate

2      that some or many of them did not, Your Honor,

3      we intend to argue very hard that there is no

4      causation here.

5          THE COURT:  Okay.  I, as I sit right now,

6      I'm denying in part and granting in part.  I'm

7      granting on what we just talked about with

8      damages.  I'm denying otherwise with leave to

9      renew later in the case once we get more into

10     developing the structure of the case legally.  I

11     don't think you have the affirmative defense

12     that you're trying to claim that you have, but I

13     can be educated to that if later on I'm

14     convinced otherwise.

15         But at this stage in the proceedings you're

16     not going to get that documentation.  We'll see

17     as we develop because I'm first to admit I keep

18     getting educated.  I keep learning more.  And so

19     if I don't get something right at this moment in

20     time, maybe it will make a difference later in

21     time and I'll see the error of my ways.  But as

22     we sit here right now today, you're not getting

23     it besides the damage documentation.  And then

24     we'll see how this unfolds.  And as we learn

25     more as we move through the case and, I mean,

Page 31

1    financial records can be provided easily.  And

2    I'd liken it to in a punitive damage case where

3    we don't offer up the net worth in documentation

4    until later in the case as a way to protect it

5    until we see if it's really going happen or not.

6        So I guess with that said, I'm going to see

7    if this is really going to happen or not in

8    terms of the defense that you're trying to say

9    here today that you're going to be asserting,

10   because I don't know that you actually can.  But

11   we'll see.  Okay?  That's the ruling today.

12           MR. WALD:  Thank you, Your Honor.

13           MR. CHRISTY:  Thank you, Your Honor.

14           THE COURT:  Do you want a time frame for

15   providing these or can you work that out between

16   you?

17           MR. CHRISTY:  I think we can work that out.

18   Should we prepare an order, Your Honor?

19           THE COURT:  Yes, you should.

20           MR. CHRISTY:  All right.  We're happy to do

21   that.

22           THE COURT:  Do you want a time frame or are

23   you good with working it out?  Can you do it

24   within, what, 30 days?  Is that what you want?

25           MR. WALD:  That would be great, Your Honor.

Transcript of Proceedings                                        April 6, 2018

1          THE COURT:  Is that adequate amount of time?

2          MR. CHRISTY:  You know, I'm not certain.  I

3     don't know the number of people that we're going

4     to need to talk to or their level of

5     responsiveness.

6          THE COURT:  Well, given the length of this

7     case, 45 days?

8          MR. CHRISTY:  I think 45 days would be

9     reasonable, Your Honor.

10          THE COURT:  Okay.  45 days.

11          MR. WALD:  Your Honor, if I may, and mindful

12     of what you just said about coming back to you

13     later in the case not only on the affirmative

14     defenses but on the causation issue, which is

15     their burden on the affirmative defense, just

16     want to make sure that the documents that we are

17     seeking are preserved.

18          THE COURT:  Yes.  So don't destroy anything.

19     That would be very bad.  Okay.

20          MR. CHRISTY:  Understood, Your Honor.

21          THE COURT:  Then I'd give a jury instruction

22     you wouldn't like.  All right.  Bye for now.

23          (Recess at 9:02 a.m.)

24                         *    *    *

25

Transcript of Proceedings                                    April 6, 2018

Page 33

1                    C E R T I F I C A T E

2

3          I, Aleshia K. Macom, CSR No. 94-0296, do

4     hereby certify that at the time and place

5     mentioned in the caption herein; that said

6     proceedings were taken down by me in stenotype

7     and thereafter reduced to typewriting; and that

8     the foregoing transcript, pages 1 to 32, both

9     inclusive, constitutes a full, true and accurate

10    record of said proceedings had during the taking

11    of said hearing, and of the whole thereof, to

12    the best of my ability.

13          Witness my hand at Portland, Oregon, this

14    16th day of April, 2018.

15

16    _____

      Aleshia K. Macom

17    CSR No. 94-0296

      Expires 9-30-2020

18

19

20

21

22

23

24

25