**William P. Ferranti**, OSB No. 160069
wpf@ferrantiappeals.com
**THE FERRANTI FIRM LLC**
1819 SW 5th Ave. #403
Portland, OR 97201
Tel: (503) 877-9220

**Linda T. Coberly** (admitted *pro hac vice*)
lcoberly@winston.com
**Joanna Rubin Travalini** (admitted *pro hac vice*)
jtravalini@winston.com
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600

*Attorneys for Defendant EisnerAmper LLP*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| LAWRENCE P. CIUFFITELLI, for himself and as Trustee of CIUFFITELLI REVOCABLE TRUST, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>DELOITTE & TOUCHE LLP, *et al.*,<br><br>Defendants. | Case No. 3:16-cv-00580-AC<br><br>**EISNERAMPER'S ANSWER AND AFFIRMATIVE DEFENSES**<br><br>JURY TRIAL DEMANDED |

EisnerAmper LLP, by and through its undersigned attorneys, answers the Second Amended Complaint of Plaintiffs as follows. In substantial part, Plaintiff's allegations are so broad and vague as to entity, actor, and time period as to be incapable of admission or denial as stated—or, at a minimum, EisnerAmper lacks knowledge or information to form a belief as to the truth of such allegations. For that reason (among others), pursuant to Fed. R. Civ. 8(b)(3),

EisnerAmper denies all allegations in Plaintiffs' Second Amended Complaint except those admitted specifically below.

## INTRODUCTION

1. This lawsuit seeks to recover losses for more than 1,500 investors who, at the end of 2015, were owed more than $600 million on the securities they purchased from the Aequitas companies. Defendants' participation and assistance made these sales possible. According to the most recent estimate by the court-appointed Receiver for the Aequitas companies, those investors will lose at least $450 million of the principal on their investments, after Aequitas collapsed in spectacular fashion and was shut down by the Securities and Exchange Commission ("SEC").

**ANSWER:** Paragraph 1 contains characterizations and conclusions of law to which no answer is required. To the extent the allegations in Paragraph 1 are deemed to be factual, and to the extent the allegations apply to it, EisnerAmper denies each and every such allegation. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

2. The Aequitas securities were sold in violation of the Oregon Securities Law. The securities were not registered in compliance with Oregon law, and Aequitas sold the securities by means of untrue statements of material fact and omissions of material facts. A temporary litigation stay prevents plaintiffs from naming at this time as defendants in this lawsuit the Aequitas companies and others primarily liable for these violations, including Aequitas executives Robert Jesenik, Brian Oliver and Scott Gillis. However, the Oregon Securities Law provides for joint-and-several secondary liability in such situations. Defendants participated and aided in the unlawful sales of Aequitas securities, and Integrity Bank & Trust also successfully solicited some of the unlawful sales of Aequitas securities. Thus, Defendants are jointly and severally liable to return to all Aequitas investors the money the investors paid for the securities, plus interest at the rate stated in the security or 9 percent, whichever is greater.

**ANSWER:** Paragraph 2 contains characterizations and conclusions of law to which no answer is required. To the extent the allegations in Paragraph 2 are deemed to be factual, and to the extent the allegations apply to it, EisnerAmper denies each and every such allegation. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

3. The untrue statements and omissions by Aequitas are extensive and pervasive and are alleged in detail herein. In general terms, the investments were represented to be secure, stable, and liquid. Aequitas emphasized "strong asset coverage," and investors were told that the value of the Aequitas collateral backing their securities substantially exceeded the collective amount owed to security holders. Aequitas represented that it had taken additional steps to reduce risk, including securing guarantees and recourse agreements and monitoring the assets on a monthly basis. Investors were told that the money they invested would be used to purchase "stable" and valuable assets, primarily consisting of hospital and education receivables, from "financially strong institutions." Aequitas touted that its investors "have enjoyed consistent quarterly interest payments with no loss of principal since 2003." And they were told that their securities were liquid, meaning that investors could cash out of their investments if they chose to do so. Each of those representations was untrue or misleading.

**ANSWER:** Paragraph 3 contains argument, characterizations, and conclusions of law to which no answer is required. To the extent the allegations in Paragraph 3 are deemed to be factual, and to the extent the allegations apply to it, EisnerAmper denies each and every such allegation. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

4. In truth, there was nothing stable or secure about the investments. Aequitas was dependent upon investor money—not to fund purchases of assets, as Aequitas represented—but to satisfy redemptions and interest payments to other investors. Aequitas was also dependent upon investors renewing their investments on maturity, to avoid huge redemption obligations. Aequitas' assets did not generate sufficient income to satisfy Aequitas' massive debt obligations, including to the investors. Investors were not told this. Instead, Aequitas manufactured an appearance of financial strength by manipulating the value of assets carried on its books. Aequitas accomplished this for six years by constructing a morass of interrelated companies and frequent inter-company transactions. The collateral values reflected on its books and in financial statements provided to investors were highly inflated. Aequitas failed to write down the collateral values even when the assets were severely distressed or worthless. For instance, the "financially strong" education institution that originated the student loans in which Aequitas invested was the very unstable, notorious for-profit Corinthian Colleges. Aequitas failed to disclose that a significant portion of investors' money was used to fund various Aequitas-related or -sponsored companies without receiving fair value.

**ANSWER:** Paragraph 4 contains argument, characterizations, and conclusions of law to which no answer is required. To the extent the allegations in Paragraph 4 are deemed to be factual, and to the extent the allegations apply to it, EisnerAmper denies each and every such

allegation. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

5. Aequitas internal documents reveal that Aequitas was dependent on receipt of new investor money at least as early as 2010. Aequitas internal communications detail a continuous cash crunch and dependence on raising huge amounts of new investor money and upon dissuading existing investors from redeeming their securities for survival. Rather than acknowledge its extensive problems, Aequitas implemented a facade. To the outside world, Aequitas was flying high, throwing lavish parties, opening expensive new offices, hiring new employees, traveling by private plane—all of which compounded Aequitas' financial problems—and reporting impressive financial results. Inside the company, executives discussed in dire terms the company's continual failure to sell sufficient new securities to purchase assets and meet obligations. An October 2015 memo from one executive documents extensive, ongoing misuse of investor funds, misrepresentations in the sale of securities, failure to provide adequate disclosure information to investors, and routine violations of SEC rules and regulations. In February 2016, Aequitas was forced to disclose to investors for the first time that it had not been able to satisfy investors' redemption requests for months, leading to the implosion of Aequitas, the termination of nearly all of its employees, a lawsuit by the SEC, and a request to have a receiver appointed to manage the disaster.

**ANSWER:** Paragraph 5 contains argument, characterizations, and conclusions of law to which no answer is required. To the extent the allegations in Paragraph 5 are deemed to be factual, and to the extent the allegations apply to it, EisnerAmper denies each and every such allegation. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this class action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interests and costs; is a class action involving 100 or more class members; and at least one member of the Class is a citizen of a different state than a Defendant.

**ANSWER:** EisnerAmper admits that this Court has jurisdiction over this matter.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants reside in Oregon and in this District and a substantial part of the events and omissions giving rise to the claims occurred in this District.

**ANSWER:** EisnerAmper admits that venue is proper in this Court. To the extent the allegations in Paragraph 7 are deemed to be factual, and to the extent the allegations apply to it, EisnerAmper denies each and every such allegation.

8. This Court has personal jurisdiction over Defendants pursuant to Rule 4(k)(l)(a) of the Federal Rules of Civil Procedure because Defendants are subject to the jurisdiction of the courts of general jurisdiction in Oregon. Defendant Tonkon Torp LLP is a citizen of Oregon. The activities of Defendants Deloitte & Touche LLP; EisnerAmper LLP; Sidley Austin LLP; and Duff & Phelps, LLC in Oregon and the services they each provided to persons in Oregon form the basis of the claims asserted against them in this complaint. The services that TD Ameritrade, Inc., and Integrity Bank & Trust provided to persons in Oregon form the basis of the claims asserted against them in this complaint. Each of the Defendants engaged in conduct made actionable under the Oregon Securities Law.

**ANSWER:** EisnerAmper admits that this Court has specific personal jurisdiction over EisnerAmper. To the extent the allegations in Paragraph 8 are deemed to be factual, and to the extent the allegations apply to it, EisnerAmper denies each and every such allegation.

## PARTIES

9. Plaintiff Lawrence P. Ciuffitelli, a resident of California, acting for himself and in his capacity as trustee of the Ciuffitelli Revocable Trust U/A 5/1/1996 ("Ciuffitelli"), purchased securities from Aequitas in the total principal amount of $2.5 million.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 9 and, on that basis, denies such allegations.

10. Plaintiffs Greg and Angela Julien, residents of California, acting in their capacities as trustees of the Gregory and Angela Julien Revocable Trust U/A 7/2/2012 (the "Juliens"), purchased securities from Aequitas in the total principal amount of $375,000.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 10 and, on that basis, denies such allegations.

11. Plaintiff R. F. MacDonald Co. ("RFMC"), a California corporation with its principal place of business in Hayward, California, purchased securities from Aequitas in the total principal amount of more than $4.7 million.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 11 and, on that basis, denies such allegations.

12. Plaintiffs James and Susan MacDonald, residents of California, acting as co-trustees of the MacDonald Family Trust U/A 12/05/2000 (the "MacDonalds"), purchased securities from Aequitas in the total principal amount of $2 million.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 12 and, on that basis, denies such allegations.

13. Plaintiff Andrew Nowak, a resident of Oregon, acting for himself and in his capacity as trustee of the Andrew Nowak Revocable Living Trust U/A 2/20/2002 ("Nowak"), purchased securities from Aequitas in the total principal amount of $2.1 million.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 13 and, on that basis, denies such allegations.

14. Plaintiff William Ramstein ("Ramstein"), a resident of California, purchased securities from Aequitas in the total principal amount of $1,945 million.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 14 and, on that basis, denies such allegations.

15. Plaintiffs Greg and Susan Warrick, residents of California, acting as co-trustees of the Warrick Family Trust, and plaintiff Greg Warrick, acting for himself, purchased securities from Aequitas in the total principal amount of $151,200.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 15 and, on that basis, denies such allegations.

16. Defendant Deloitte & Touche LLP ("Deloitte") is a Delaware limited liability partnership registered to do business in Oregon. As detailed herein, Deloitte performed auditing and accounting services for Aequitas and enabled Aequitas to sell securities that are at issue in this action. Deloitte officially replaced Defendant EisnerAmper LLP as Aequitas' auditor on or about September 12, 2013. Deloitte prepared audited financial statements for Aequitas for the years 2013 and 2014. These audited financial statements were excerpted and referenced in offering documents and provided to prospective investors and existing investors deciding whether to invest or re-invest. The audited financial statements were a material part of the information made available to investors and the existence of an auditor gave Aequitas clout. Indeed, the offering documents for Aequitas securities prominently identified Deloitte as Aequitas' auditor. On and after March 24, 2014, Deloitte was identified, in the publicly-available Form ADV filed by Aequitas Investment Management, LLC ("AIM"), as the auditor for all the Aequitas funds (that is, all Aequitas fundraising vehicles other than ACF).

**ANSWER:** Paragraph 16 contains argument, characterizations, and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 16 and, on that basis, denies such allegations, except that EisnerAmper admits that Deloitte replaced EisnerAmper as Aequitas' auditor no later than September 12, 2013; that Deloitte's name was included, as auditor, in certain Aequitas entities' offering documents; and that Deloitte was identified on the SEC Form ADV filed on March 24, 2014 by Aequitas Investment Management, LLC ("AIM") as the auditor of certain Aequitas funds.

17. Defendant EisnerAmper LLP is a New York limited liability partnership registered to do business in Oregon, and the successor by merger to Harb Levy & Weiland LLP ("EisnerAmper"). As detailed herein, EisnerAmper performed auditing and accounting services for Aequitas and enabled Aequitas to sell securities that are at issue in this action. EisnerAmper prepared audited financial statements for Aequitas for the years 2011 and 2012. These audited financial statements were excerpted and referenced in offering documents and provided to prospective investors and existing investors deciding whether to invest or re-invest. The audited financial statements were a material part of the information made available to investors and the existence of an auditor gave Aequitas clout. Indeed, the offering documents for Aequitas securities prominently identified EisnerAmper as Aequitas' auditor. Even after Deloitte replaced EisnerAmper as auditor, Aequitas private placement memorandums ("PPMs") continued to reference and excerpt from the EisnerAmper audited financial statements. Until March 24, 2014, EisnerAmper was identified, in the publicly-available Form ADV filed by AIM, as the auditor for all the Aequitas funds (that is, all Aequitas fundraising vehicles other than ACF).

**ANSWER:** Paragraph 17 contains argument, characterizations, and conclusions of law to which no answer is required. EisnerAmper admits it is a New York limited liability partnership registered to do business in Oregon; that it provided certain auditing services and issued certain audit opinions with respect to certain Aequitas entities for fiscal years 2011 and 2012; and that a Form ADV filed with the SEC before March 24, 2014 by Aequitas Investment Management, LLC ("AIM") listed EisnerAmper as the auditor of certain Aequitas funds. EisnerAmper denies every other factual allegation in Paragraph 17.

18. Defendant Sidley Austin LLP ("Sidley") is an Illinois limited liability partnership. Sidley is an international business law firm that provided legal services to Aequitas in connection

with the sale of securities that are at issue in this action. Sidley advised Aequitas with respect to the sale of its securities, including providing a critical legal opinion regarding Aequitas' compliance with the Investment Advisers Act of 1940 that enabled Aequitas to obtain clean audit opinions from EisnerAmper and Deloitte and to sell securities, and prepared legal papers necessary for Aequitas to complete the sale of its securities, including offering documents, risk disclosures, and subscription agreements. Sidley prepared these documents with knowledge that Aequitas would sell the subject securities. Sidley was identified as legal counsel to Aequitas in offering documents. The Aequitas securities could not have been sold without the legal services that Sidley provided.

**ANSWER:** Paragraph 18 contains characterizations and conclusions of law to which no answer is required, EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 18 and, on that basis, denies such allegations, except that EisnerAmper admits that Sidley was identified as legal counsel in certain offering documents issued by certain Aequitas entities.

19. Defendant Tonkon Torp LLP ("Tonkon") is an Oregon limited liability partnership. Tonkon is a law firm with offices in Portland. At all material times, Tonkon provided legal services to Aequitas in connection with the sale of securities that are at issue in this action. Tonkon advised Aequitas with respect to the sale of its securities and prepared legal papers necessary for Aequitas to complete the sale of its securities, including offering documents, risk disclosures, subscription agreements and promissory notes. Tonkon prepared these documents with knowledge that Aequitas would sell the subject securities. Tonkon was identified as legal counsel to Aequitas in numerous offering documents. The Aequitas securities could not have been sold without the legal services that Tonkon provided.

**ANSWER:** Paragraph 19 contains characterizations and conclusions of law to which no answer is required, EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 19 and, on that basis, denies such allegations, except that EisnerAmper admits that Tonkon was identified as legal counsel in certain offering documents issued by certain Aequitas entities.

20. Defendant TD Ameritrade, Inc. ("Ameritrade") is a New York corporation registered to do business in Oregon. Ameritrade, as part of its "Advisor Direct" financial advisor referral program, recommended and referred investors to financial advisors for the purpose of purchasing Aequitas securities. Ameritrade began its practice of recommending and referring investors to financial advisors for the purpose of purchasing Aequitas securities no later than 2010. Ameritrade also served as custodian for certain Aequitas securities. Ameritrade customers

purchased more than $140 million in Aequitas securities, with Ameritrade's assistance. By contract, Ameritrade profited handsomely from its customers' purchases of Aequitas securities.

**ANSWER:** Paragraph 20 contains characterizations and conclusions of law to which no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 20 and, on that basis, denies such allegations.

21. Defendant Integrity Bank & Trust ("Integrity") is a Colorado commercial bank. Integrity actively offered and solicited the sale of more than $100 million of Aequitas securities on Aequitas' behalf. Integrity participated in Aequitas' sales of securities and solicited sales of securities on Aequitas' behalf pursuant to several contracts. Integrity was actively involved in marketing the Aequitas securities. Integrity also served as the custodian for certain Aequitas fundraising entities.

**ANSWER:** Paragraph 21 contains characterizations and conclusions of law to which no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 21 and, on that basis, denies such allegations.

22. Defendant Duff & Phelps, LLC ("Duff & Phelps") is a Delaware limited liability company registered to do business in Oregon. Duff & Phelps performed valuation services and prepared appraisal reports for Aequitas that were used in connection with the sale of securities by Aequitas.

**ANSWER:** Paragraph 22 contains characterizations and conclusions of law to which no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 22 and, on that basis, denies such allegations.

## FACTUAL ALLEGATIONS

### I. THE AEQUITAS ENTITIES

23. Aequitas conducted its securities and other business activities through various affiliated entities. The complex organizational structure, consisting of approximately 75 active entities, aided Aequitas in hiding the true nature of Aequitas' business. The integrated nature of the Aequitas businesses was a material part of the information communicated by Aequitas to

investors. Investors were told that "Aequitas conducts its business activities and transactions through various affiliate companies and trade names." Investors were told that the returns on their investments in a particular Aequitas fund or company would be tied to the performance of other Aequitas entities, and that assets of affiliate companies secured their investments. Investors were told that money was shared between Aequitas companies for their benefit, regardless of the specific company or fund they invested in, and that interest and principal on their investments would be repaid, in part, via repayment of loans from affiliated Aequitas companies.

**ANSWER:** Paragraph 23 contains characterizations and conclusions of law, and purports to quote from unidentified sources or documents from unspecified times, which documents speak for themselves, such that no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 23 and, on that basis, denies such allegations.

24. Aequitas Management, LLC ("Aequitas Management") is the parent entity of the affiliated Aequitas entities. Aequitas Management presently owns 84 percent of Aequitas Holdings, LLC ("Holdings"), which presently is the sole owner and member of Aequitas Commercial Finance, LLC, and the sole shareholder of Aequitas Capital Management, Inc.

**ANSWER:** Paragraph 24 contains statements that are vague as to identity ("the affiliated Aequitas entities") and time period and thus require no answer. EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 24 and, on that basis, denies such allegations.

25. Aequitas Commercial Finance, LLC ("ACF"), a wholly owned subsidiary of Holdings, owns all or part of numerous Aequitas entities, including Aequitas Income Protection Fund, LLC ("AIPF"), Aequitas Income Opportunity Fund, LLC ("AIOF"), Aequitas Income Opportunity Fund II, LLC ("AIOF-IF'), Aequitas Capital Opportunities Fund, LP ("ACOF"), Aequitas ETC Founders Fund, LLC ("AETC"), Aequitas Enhanced Income Fund, LLC ("AEIF"), and MotoLease Financial, LLC ("AMLF").

**ANSWER:** Paragraph 25 contains statements that are vague as to identity ("numerous Aequitas entities") and time period and thus require no answer. To the extent that this paragraph refers to the present day, EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 25 and, on that basis, denies such allegations.

26. Aequitas Capital Management, Inc. ("ACM"), another wholly owned subsidiary of Holdings, is the manager of numerous Aequitas entities, including ACF and AMLF. As such, ACM oversees the operations and investment decisions of ACF and AMLF in exchange for certain management fees and other interests.

**ANSWER:** Paragraph 26 contains statements that are vague as to identity ("numerous Aequitas entities") and time period and thus require no answer. EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 26 and, on that basis, denies such allegations.

27. ACM oversaw the operations and investment decisions of AIPF, AIOF, AIOF-II, AETC, AEIF, APCF, and ACOF (collectively, the "Aequitas Funds") in exchange for certain management fees and other interests. AIM, a wholly owned subsidiary of ACM and an SEC-registered investment advisor, is the manager of AIPF, AIOF, AIOF-II, AETC, AEIF, Aequitas Private Client Fund, LLC ("APCF"), and Aequitas Capital Opportunities GP, LLC, the general partner of ACOF ("ACOFGP"). The sole purpose of AIM was to act as the investment advisor to various Aequitas fundraising vehicles, including the Aequitas Funds.

**ANSWER:** Paragraph 27 contains statements that are vague as to identity ("various Aequitas fundraising vehicles") and time period and thus require no answer. EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 27 and, on that basis, denies such allegations.

## II. THE AEQUITAS SECURITIES

28. The Aequitas companies raised hundreds of millions of dollars from thousands of investors by selling securities issued by ACF, the Aequitas Funds, and AMLF.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 28 and, on that basis, denies such allegations.

29. As detailed herein, none of the securities were registered under any state or federal securities law. The securities were not exempt from registration. The securities were not federal covered securities.

**ANSWER:** Paragraph 29 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

30. The Aequitas companies raised investor funds by causing ACF to sell securities (the "ACF Notes") directly to investors through the so-called Aequitas "Private Note" program. The ACF Notes generally were referred to as "Secured Subordinated Promissory Notes" or "Secured Notes." The Private Note program was a continuous, unlimited offering. The offering had no ending date and no limit on the total investments. As of December 31, 2015, approximately $312 million in ACF Notes were outstanding to more than 1,500 investors.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30 and, on that basis, denies such allegations.

31. Aequitas raised additional investor funds by causing the sale of securities through other Aequitas entities, including the Aequitas Funds and AMLF. Aequitas generally referred to the securities sold through AIPF (the "AIPF Interests") as "Limited Liability Company Interests". Aequitas generally referred to the securities sold through AIOF (the "AIOF Notes") as "Senior Secured Promissory Notes". Aequitas generally referred to the securities sold through AIOF-II (the "AIOF-II Notes") as "Senior Secured Promissory Notes". Aequitas generally referred to the securities sold through AMLF (the "AMLF Notes") as "Senior Secured Promissory Notes". Aequitas generally referred to the securities sold through AEIF (the "AEIF Interests") as "Limited Liability Company Interests". Aequitas generally referred to the securities sold through APCF (the "APCF Notes") as "Secured Promissory Notes". Aequitas generally referred to the securities sold through ACOF (the "ACOF Interests") as "Capital Commitments". Aequitas caused the sale of more than $300 million in securities through the Aequitas Funds and AMLF.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31 and, on that basis, denies such allegations.

32. The offerings of the Aequitas securities were a single integrated offering for purposes of the securities registration requirements under state and federal law. ACF owned all of the equity interests in AIOF, AIOF-II, AEIF, and AMLF, and all of the voting interests in AIPF, and ACF expressly guaranteed all of the notes sold by AMLF. Aequitas created ACOF for the purpose of swapping investor funds for ownership interests in certain Aequitas entities—Aequitas caused ACF and Holdings to contribute those ownership interests to ACOF at inflated values, and Aequitas then caused investor funds to be distributed out of ACOF to ACF and Holdings based on those inflated contributions. Many of the ACOF portfolio companies were entirely dependent on ongoing ACF financing, and many of the ACOF portfolio companies were dependent on ACF (through its subsidiaries) as their sole source of revenue. Aequitas created both AEIF and AIOF-II for the sole purpose of funneling investor funds to ACF and its affiliates, and that ultimately was the function of AIOF and AIPF as well—as of December 31, 2014, their only assets were approximately $33 million and $37 million, respectively, in loans to ACF and certain of its affiliates. The integrated nature of these offerings was reflected in the audited financial statements of ACF, which were done on a consolidated basis and encompassed ACF, AIPF, AIOF, AIOF-II, AEIF, ACOF, and AMLF, as well as numerous other Aequitas entities.

**ANSWER:** Paragraph 32 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

## III. THE AEQUITAS SECURITIES WERE NOT REGISTERED, IN VIOLATION OF THE OREGON SECURITIES LAW

33. Sales of the ACF Notes began at least as early as January 4, 2006, and the offering of the ACF Notes continued through at least December 2015.

a. Sales of the ACF Notes and sales of the other Aequitas securities all were made for substantially the same general purpose of funding the redemption of investments in the various Aequitas securities and financing the operations of ACF, AIM, Holdings, and the other affiliated Aequitas companies.

b. Sales of the ACF Notes and sales of the other Aequitas securities all were part of a single plan of financing. The affiliated Aequitas companies relied on this investor funding, along with senior secured institutional credit facilities, to finance their operations and to fund investor redemptions. The affiliated Aequitas companies shifted these funds amongst themselves through various means, including inter-company loans and asset transfers.

c. Sales of the ACF Notes occurred at or about the same time as the sales of the other Aequitas securities.

d. The ACF Notes and the other Aequitas securities were substantially the same class of securities. Although these investments came in different forms—promissory notes, limited liability company membership interests, and limited partnership interests—the ACF Notes and the other Aequitas securities all were effectively of the same class. As explained above, they all ultimately looked to, or were reliant upon, ACF for repayment, and they all were subordinate to the interests of Aequitas' senior secured institutional lenders.

e. Purchasers of the ACF Notes and purchasers of the other Aequitas securities received substantially the same type of consideration in connection with their purchases because, as explained above, the AIOF Notes and the other Aequitas securities all ultimately looked to, or were reliant upon, ACF for repayment.

**ANSWER:** Paragraph 33 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

34. The ACF Notes were not registered under any state or federal securities law.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 and, on that basis, denies such allegations.

35. The Oregon Securities Law required the registration of the ACF Notes.

**ANSWER:** Paragraph 35 is a conclusion of law, to which no answer is required.

36. The issuer of the ACF Notes and persons acting on its behalf, including Integrity, engaged in general solicitation and/or general advertising in connection with the offer and sale of the ACF Notes.

a. The issuer of the ACF Notes and persons acting on its behalf, including Integrity, routinely offered and sold the ACF Notes to persons with whom the issuer did not have a substantial preexisting relationship.

b. The issuer of the ACF Notes and persons acting on its behalf, including Integrity, engaged in roadshows promoting the ACF Notes to prospective investors and/or their investment advisors, including prospective investors and investment advisors with whom the issuer of the ACF Notes did not have a substantial preexisting relationship.

c. The issuer of the ACF Notes and persons acting on its behalf, including Integrity, widely disseminated promotional, marketing, offering, and sales materials relating to the ACF Notes to prospective investors and/or their investment advisors, including prospective investors and investment advisors with whom the issuer of the ACF Notes did not have a substantial preexisting relationship.

**ANSWER:** Paragraph 36 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

37. The ACF Notes were not federal covered securities under the Oregon Securities Law. Nor were the ACF Notes covered securities under Section 18 of the Securities Act.

a. The ACF Notes were not listed, authorized for listing, or sold on any national securities exchange, and the ACF Notes were not sold in the over-the-counter market.

b. The issuer of the ACF Notes did not file with the SEC any report, registration statement, or form (other than Form D).

c. The ACF Notes were not exempt under Section 3(a) of the Securities Act, and offers and sales of the ACF Notes were not exempt under Section 4(a)(7) of the Securities Act or Rule 506 of Regulation D.

**ANSWER:** Paragraph 37 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

38. Sales of the AIOF Notes began at least as early as May 5, 2009, and the offering of the AIOF Notes continued through at least April 10, 2015.

a. Sales of the AIOF Notes and sales of the other Aequitas securities all were made for substantially the same general purpose of funding the redemption of investments in the Aequitas securities and financing the operations of ACF, AIM, Holdings, and the other affiliated Aequitas companies.

b. Sales of the AIOF Notes and sales of the other Aequitas securities all were part of a single plan of financing. The affiliated Aequitas companies relied on this investor funding, along with senior secured institutional credit facilities, to finance their operations and to fund investor redemptions. The affiliated Aequitas companies shifted these funds amongst themselves through various means, including inter-company loans and asset transfers.

c. Sales of the AIOF Notes occurred at or about the same time as the sales of the other Aequitas securities.

d. The AIOF Notes and the other Aequitas securities were substantially the same class of securities. Although these investments came in different forms—promissory notes, limited liability company membership interests, and limited partnership interests—the AIOF Notes and the other Aequitas securities all were effectively of the same class. As explained above, they all ultimately looked to, or were reliant upon, ACF for repayment, and they all were subordinate to the interests of Aequitas' senior secured institutional lenders.

e. Purchasers of the AIOF Notes and purchasers of the other Aequitas securities received substantially the same type of considerations in connection with their purchases because, as explained above, the AIOF Notes and the other Aequitas securities all ultimately looked to, or were reliant upon, ACF for repayment.

**ANSWER:** Paragraph 38 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

39. The AIOF Notes were not registered under any state or federal securities law.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 and, on that basis, denies such allegations.

40. The Oregon Securities Law required the registration of the AIOF Notes.

**ANSWER:** Paragraph 40 is a conclusion of law, to which no answer is required.

41. The issuer of the AIOF Notes and persons acting on its behalf engaged in general solicitation and/or general advertising in connection with the offer and sale of the AIOF Notes.

a. The issuer of the AIOF Notes and persons acting on its behalf routinely offered and sold the AIOF Notes to persons with whom the issuer did not have a substantial preexisting relationship.

b. The issuer of the AIOF Notes and persons acting on its behalf engaged in roadshows promoting the AIOF Notes to prospective investors and/or their investment advisors, including prospective investors and investment advisors with whom the issuer of the AIOF Notes did not have a substantial preexisting relationship.

c. The issuer of the AIOF Notes and persons acting on its behalf widely disseminated promotional, marketing, offering, and sales materials relating to the AIOF Notes to prospective investors and/or their investment advisors, including prospective investors and investment advisors with whom the issuer of the AIOF Notes did not have a substantial preexisting relationship.

**ANSWER:** Paragraph 41 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

42. The AIOF Notes were not federal covered securities under the Oregon Securities Law. Nor were the AIOF Notes covered securities under Section 18 of the Securities Act.

a. The AIOF Notes were not listed, authorized for listing, or sold on any national securities exchange, and the AIOF Notes were not sold in the over-the-counter market.

b. The issuer of the AIOF Notes did not file with the SEC any report, registration statement, or form (other than Form D).

c. The AIOF Notes were not exempt under Section 3(a) of the Securities Act, and offers and sales of the AIOF Notes were not exempt under Section 4(a)(7) of the Securities Act or Rule 506 of Regulation D.

**ANSWER:** Paragraph 42 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

43. Sales of the AIPF Interests began at least as early as September 30, 2011, and the offering of the AIPF Interests continued through at least May 27, 2014.

a. Sales of the AIPF Interests and sales of the other Aequitas securities all were made for substantially the same general purpose of funding the redemption of investments in the Aequitas securities and financing the operations of ACF, AIM, Holdings, and the other affiliated Aequitas companies.

b. Sales of the AIPF Interests and sales of the other Aequitas securities all were part of a single plan of financing. The affiliated Aequitas companies relied on this investor funding, along with senior secured institutional credit facilities, to finance their operations and to fund investor redemptions. The affiliated Aequitas companies shifted these funds amongst themselves through various means, including inter-company loans and asset transfers.

c. Sales of the AIPF Interests occurred at or about the same time as the sales of the ACF Notes, AIOF Notes, AIPF Interests, and ACOF Interests.

d. The AIPF Interests and the other Aequitas securities were substantially the same class of securities. Although these investments came in different forms—promissory notes, limited liability company membership interests, and limited partnership interests—the AIPF Interests and the other Aequitas securities all were effectively of the same class. As explained above, they all ultimately looked to, or were reliant upon, ACF for repayment, and they all were subordinate to the interests of Aequitas' senior secured institutional lenders.

e. Purchasers of the AIPF Interests and purchasers of the other Aequitas securities received substantially the same type of consideration in connection with their purchases because, as explained above, the AIPF Interests and the other Aequitas securities all ultimately looked to, or were reliant upon, ACF for repayment.

**ANSWER:** Paragraph 43 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

44. The AIPF Interests were not registered under any state or federal securities law.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44 and, on that basis, denies such allegations.

45. The Oregon Securities Law required the registration of the AIPF Interests.

**ANSWER:** Paragraph 45 is a conclusion of law, to which no answer is required.

46. The issuer of the AIPF Interests and persons acting on its behalf engaged in general solicitation and/or general advertising in connection with the offer and sale of the AIPF Interests.

a. The issuer of the AIPF Interests and persons acting on its behalf, including Integrity, routinely offered and sold the AIPF Interests to persons with whom the issuer did not have a substantial preexisting relationship.

b. The issuer of the AIPF Interests and persons acting on its behalf, including Integrity, engaged in roadshows promoting the AIPF Interests to prospective investors and/or their investment advisors, including prospective investors and investment advisors with whom the issuer of the AIPF Interests did not have a substantial preexisting relationship.

c. The issuer of the AIPF Interests and persons acting on its behalf, including Integrity, widely disseminated promotional, marketing, offering, and sales materials relating to the AIPF Interests to prospective investors and/or their investment advisors, including prospective investors and investment advisors with whom the issuer of the AIPF Interests did not have a substantial preexisting relationship.

**ANSWER:** Paragraph 46 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

47. The AIPF Interests were not federal covered securities under the Oregon Securities Law. Nor were the AIPF Interests covered securities under Section 18 of the Securities Act.

a. The AIPF Interests were not listed, authorized for listing, or sold on any national securities exchange, and the AIPF Interests were not sold in the over-the-counter market.

b. The issuer of the AIPF Interests did not file with the SEC any report, registration statement, or form (other than Form D).

c. The AIPF Interests were not exempt under Section 3(a) of the Securities Act, and offers and sales of the AIPF Interests were not exempt under Section 4(a)(7) of the Securities Act or Rule 506 of Regulation D.

**ANSWER:** Paragraph 47 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

48. The promotion of the ACOF Interests began at least as early as April 2013, and the offering of the ACOF Interests continued through at least March 2015.

a. Sales of the ACOF Interests and sales of the other Aequitas securities all were made for substantially the same general purpose of funding the redemption of investments

in the Aequitas securities and financing the operations of ACF, AIM, Holdings, and the other affiliated Aequitas companies.

b. Sales of the ACOF Interests and sales of the other Aequitas securities all were part of a single plan of financing. The affiliated Aequitas companies relied on this investor funding, along with senior secured institutional credit facilities, to finance their operations and to fund investor redemptions. The affiliated Aequitas companies shifted these funds amongst themselves through various means, including inter-company loans and asset transfers.

c. Sales of the ACOF Interests occurred at or about the same time as the sales of the other Aequitas securities.

d. The ACOF Interests and the other Aequitas securities were substantially the same class of securities. Although these investments came in different forms—promissory notes, limited liability company membership interests, and limited partnership interests—the ACOF Interests and the other Aequitas securities all were effectively of the same class. As explained above, they all ultimately looked to, or were reliant upon, ACF for repayment, and they all were subordinate to the interests of Aequitas' senior secured institutional lenders.

e. Purchasers of the ACOF Interests and purchasers of the other Aequitas securities received substantially the same type of consideration in connection with their purchases because, as explained above, the ACOF Interests and the other Aequitas securities all ultimately looked to, or were reliant upon, ACF for repayment.

**ANSWER:** Paragraph 48 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

49. The ACOF Interests were not registered under any state or federal securities law.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49 and, on that basis, denies such allegations.

50. The Oregon Securities Law required the registration of the ACOF Interests.

**ANSWER:** Paragraph 50 is a conclusion of law, to which no answer is required.

51. The issuer of the ACOF Interests and persons acting on its behalf engaged in general solicitation and/or general advertising in connection with the offer and sale of the ACOF Interests.

a. The issuer of the ACOF Interests and persons acting on its behalf routinely offered and sold the ACOF Interests to persons with whom the issuer did not have a substantial preexisting relationship.

b. The issuer of the ACOF Interests and persons acting on its behalf engaged in roadshows promoting the ACOF Interests to prospective investors and/or their investment advisors, including prospective investors and investment advisors with whom the issuer of the ACOF Interests did not have a substantial preexisting relationship.

c. The issuer of the ACOF Interests and persons acting on its behalf widely disseminated promotional, marketing, offering, and sales materials relating to the ACOF Interests to prospective investors and/or their investment advisors, including prospective investors and investment advisors with whom the issuer of the ACOF Interests did not have a substantial preexisting relationship.

**ANSWER:** Paragraph 51 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

52. The ACOF Interests were not federal covered securities under the Oregon Securities Law. Nor were the ACOF Interests covered securities under Section 18 of the Securities Act.

a. The ACOF Interests were not listed, authorized for listing, or sold on any national securities exchange, and the ACOF Interests were not sold in the over-the-counter market.

b. The issuer of the ACOF Interests did not file with the SEC any report, registration statement, or form (other than Form D).

c. The ACOF Interests were not exempt under Section 3(a) of the Securities Act, and offers and sales of the ACOF Interests were not exempt under Section 4(a)(7) of the Securities Act or Rule 506 of Regulation D.

**ANSWER:** Paragraph 52 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

53. Sales of the AIOF-II Notes began at least as early as November 1, 2014, and the offering of the AIOF-II Notes continued through at least December 2015.

a. Sales of the AIOF-II Notes and sales of the other Aequitas securities all were made for substantially the same general purpose of funding the redemption of investments in the Aequitas securities and financing the operations of ACF, AIM, Holdings, and the other affiliated Aequitas companies.

b. Sales of the AIOF-II Notes and sales of the other Aequitas securities all were part of a single plan of financing. The affiliated Aequitas companies relied on this investor

funding, along with senior secured institutional credit facilities, to finance their operations and to fund investor redemptions. The affiliated Aequitas companies shifted these funds amongst themselves through various means, including inter-company loans and asset transfers.

c. Sales of the AIOF-II Notes occurred at or about the same time as the sales of the ACF Notes, the AIOF Notes, the ACOF Interests, the AEIF Interests, and the AMLF Notes.

d. The AIOF-II Notes and the other Aequitas securities were substantially the same class of securities. Although these investments came in different forms—promissory notes, limited liability company membership interests, and limited partnership interests—the AIOF-II Notes and the other Aequitas securities all were effectively of the same class. As explained above, they all ultimately looked to, or were reliant upon, ACF for repayment, and they all were subordinate to the interests of Aequitas' senior secured institutional lenders.

e. Purchasers of the AIOF-II Notes and purchasers of the other Aequitas securities received substantially the same type of consideration in connection with their purchases because, as explained above, the AIOF-II Notes and the other Aequitas securities all ultimately looked to, or were reliant upon, ACF for repayment.

**ANSWER:** Paragraph 53 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

54. The AIOF-II Notes were not registered under any state or federal securities law.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54 and, on that basis, denies such allegations.

55. The Oregon Securities Law required the registration of the AIOF-II Notes.

**ANSWER:** Paragraph 55 is a conclusion of law, to which no answer is required.

56. The issuer of the AIOF-II Notes and persons acting on its behalf, including Integrity, engaged in general solicitation and/or general advertising in connection with the offer and sale of the AIOF-II Notes.

a. The issuer of the AIOF-II Notes and persons acting on its behalf, including Integrity, routinely offered and sold the AIOF-II Notes to persons with whom the issuer did not have a substantial preexisting relationship.

b. The issuer of the AIOF-II Notes and persons acting on its behalf, including Integrity, engaged in roadshows promoting the AIOF-II Notes to prospective investors and/or their investment advisors, including prospective investors and investment advisors with whom the issuer of the AIOF-II Notes did not have a substantial preexisting relationship.

c. The issuer of the AIOF-II Notes and persons acting on its behalf, including Integrity, widely disseminated promotional, marketing, offering, and sales materials relating to the AIOF-II Notes to prospective investors and/or their investment advisors, including prospective investors and investment advisors with whom the issuer of the AIOF-II Notes did not have a substantial preexisting relationship.

**ANSWER:** Paragraph 56 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

57. The AIOF-II Notes were not federal covered securities under the Oregon Securities Law. Nor were the AIOF-II Notes covered securities under Section 18 of the Securities Act.

a. The AIOF-II Notes were not listed, authorized for listing, or sold on any national securities exchange, and the AIOF-II Notes were not sold in the over-the-counter market.

b. The issuer of the AIOF-II Notes did not file with the SEC any report, registration statement, or form (other than Form D).

c. The AIOF-II Notes were not exempt under Section 3(a) of the Securities Act, and offers and sales of the AIOF-II Notes were not exempt under Section 4(a)(7) of the Securities Act or Rule 506 of Regulation D.

**ANSWER:** Paragraph 57 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

58. Sales of the AEIF Interests began at least as early as February 2, 2015, and the offering of the AEIF Interests continued through at least December 2015.

a. Sales of the AEIF Interests and sales of the other Aequitas securities all were made for substantially the same general purpose of funding the redemption of investments in the Aequitas securities and financing the operations of ACF, AIM, Holdings, and the other affiliated Aequitas companies.

b. Sales of the AEIF Interests and sales of the other Aequitas securities all were part of a single plan of financing. The affiliated Aequitas companies relied on this investor funding, along with senior secured institutional credit facilities, to finance their operations and to fund investor redemptions. The affiliated Aequitas companies shifted these funds amongst themselves through various means, including inter-company loans and asset transfers.

c. Sales of the AEIF Interests occurred at or about the same time as the sales of the ACF Notes, the AIOF Notes, the ACOF Interests, the AIOF-II Notes, and the AMLF Notes.

d. The AEIF Interests and the other Aequitas securities were substantially the same class of securities. Although these investments came in different forms—promissory notes, limited liability company membership interests, and limited partnership interests—the AEIF Interests and the other Aequitas securities all were effectively of the same class. As explained above, they all ultimately looked to, or were reliant upon, ACF for repayment, and they all were subordinate to the interests of Aequitas' senior secured institutional lenders.

e. Purchasers of the AEIF Interests and purchasers of the other Aequitas securities received substantially the same type of consideration in connection with their purchases because, as explained above, the AEIF Notes and the other Aequitas securities all ultimately looked to, or were reliant upon, ACF for repayment.

**ANSWER:** Paragraph 58 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

59. The AEIF Interests were not registered under any state or federal securities law.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59 and, on that basis, denies such allegations.

60. The Oregon Securities Law required the registration of the AEIF Interests.

**ANSWER:** Paragraph 60 is a conclusion of law, to which no answer is required.

61. The issuer of the AEIF Interests and persons acting on its behalf engaged in general solicitation and/or general advertising in connection with the offer and sale of the AEIF Interests.

a. The issuer of the AEIF Interests and persons acting on its behalf routinely offered and sold the AEIF Interests to persons with whom the issuer did not have a substantial preexisting relationship.

b. The issuer of the AEIF Interests and persons acting on its behalf engaged in roadshows promoting the AEIF Interests to prospective investors and/or their investment advisors, including prospective investors and investment advisors with whom the issuer of the AEIF Interests did not have a substantial preexisting relationship.

c. The issuer of the AEIF Interests and persons acting on its behalf widely disseminated promotional, marketing, offering, and sales materials relating to the AEIF Interests to prospective investors and/or their investment advisors, including prospective investors and

investment advisors with whom the issuer of the AEIF Interests did not have a substantial preexisting relationship.

**ANSWER:** Paragraph 61 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

62. The AEIF Interests were not federal covered securities under the Oregon Securities Law. Nor were the AEIF Interests covered securities under Section 18 of the Securities Act.

a. The AEIF Interests were not listed, authorized for listing, or sold on any national securities exchange, and the AEIF Interests were not sold in the over-the-counter market.

b. The issuer of the AEIF Interests did not file with the SEC any report, registration statement, or form (other than Form D).

c. The AEIF Interests were not exempt under Section 3(a) of the Securities Act, and offers and sales of the AEIF Interests were not exempt under Section 4(a)(7) of the Securities Act or Rule 506 of Regulation D.

**ANSWER:** Paragraph 62 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

63. The offering of the AMLF Notes, which was part of the Aequitas "Note Manufacturing" program, began at least as early as April 2015, and the offering of the AMLF Notes continued through at least December 2015.

a. Sales of the AMLF Notes and sales of the other Aequitas securities all were made for substantially the same general purpose of funding the redemption of investments in the Aequitas securities and financing the operations of ACF, AIM, Holdings, and the other affiliated Aequitas companies.

b. Sales of the AMLF Notes and sales of the other Aequitas securities all were part of a single plan of financing. The affiliated Aequitas companies relied on this investor funding, along with senior secured institutional credit facilities, to finance their operations and to fund investor redemptions. The affiliated Aequitas companies shifted these funds amongst themselves through various means, including inter-company loans and asset transfers.

c. Sales of the AMLF Notes occurred at or about the same time as the sales of the ACF Notes, the AIOF Notes, the AEIF Interests, and the AIOF-II Notes.

d. The AMLF Notes and the other Aequitas securities were substantially the same class of securities. Although these investments came in different forms—promissory notes, limited liability company membership interests, and limited partnership interests—the AMLF Notes and the other Aequitas securities all were effectively of the same class. As explained above, they all ultimately looked to, or were reliant upon, ACF for repayment, and they all were subordinate to the interests of Aequitas' senior secured institutional lenders.

e. Purchasers of the AMLF Notes and purchasers of the other Aequitas securities received substantially the same type of consideration in connection with their purchases because, as explained above, the AMLF Notes and the other Aequitas securities all ultimately looked to, or were reliant upon, ACF for repayment.

**ANSWER:** Paragraph 63 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

64. The AMLF Notes were not registered under any state or federal securities law.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 64 and, on that basis, denies such allegations.

65. The Oregon Securities Law required the registration of the AMLF Notes.

**ANSWER:** Paragraph 65 is a conclusions of law to which no answer is required.

66. The issuer of the AMLF Notes and persons acting on its behalf engaged in general solicitation and/or general advertising in connection with the offer and sale of the AMLF Notes.

a. The issuer of the AMLF Notes and persons acting on its behalf offered and sold the AMLF Notes to persons with whom the issuer did not have a substantial preexisting relationship.

b. The issuer of the AMLF Notes and persons acting on its behalf engaged in roadshows promoting the AMLF Notes to prospective investors and/or their investment advisors, including prospective investors and investment advisors with whom the issuer of the AMLF Notes did not have a substantial preexisting relationship.

c. The issuer of the AMLF Notes and persons acting on its behalf disseminated promotional, marketing, offering, and sales materials relating to the AMLF Notes to prospective investors and/or their investment advisors, including prospective investors and investment advisors with whom the issuer of the AMLF Notes did not have a substantial preexisting relationship.

**ANSWER:** Paragraph 66 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

67. The AMLF Notes were not federal covered securities under the Oregon Securities Law. Nor were the AMLF Notes covered securities under Section 18 of the Securities Act.

a. The AMLF Notes were not listed, authorized for listing, or sold on any national securities exchange, and the AMLF Notes were not sold in the over-the-counter market.

b. The issuer of the AMLF Notes did not file with the SEC any report, registration statement, or form.

c. The AMLF Notes were not exempt under Section 3(a) of the Securities Act, and offers and sales of the AMLF Notes were not exempt under Section 4(a)(7) of the Securities Act or Rule 506 of Regulation D.

**ANSWER:** Paragraph 67 contains characterizations and conclusions of law to which no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

## IV. THE AEQUITAS SECURITIES WERE SOLD BY MEANS OF UNTRUE STATEMENTS AND OMISSIONS

### A. Facts Supporting Allegations of Specific Untrue and Misleading Statements

#### 1. Undisclosed Prior Business Failures

68. Prior to selling the securities at issue, the principals of Aequitas experienced numerous and substantial business failures. For example, Jesenik and Oliver faced securities fraud claims in 2004 relating to their management of the predecessor companies to ACM and ACF, wherein their former business partner alleged that he was told that the business was a "cash cow" when, in fact, it was losing six figures every month. Beginning in 2007, Aequitas made substantial investments in a restaurant group that quickly failed. Also in 2007, Aequitas made substantial investments in Catcher Holdings, Inc., which failed almost immediately. In 2009, Aequitas was unable to satisfy an obligation to provide a $25 million credit facility to CashReady, LLC.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 68 and, on that basis, denies such allegations.

69. Aequitas used another substantial business failure to create and artificially inflate the value of Carepayment Technologies, Inc. ("CPTI"). CPTI began life as microHelix, Inc., an

SEC-registered company that made custom cable assemblies and mechanical assemblies for the medical and commercial OEM markets. In 2006, Aequitas began lending to and buying shares of microHelix. Aequitas had acquired more than 63% of the company's shares by 2007, when the company failed and ceased operations, officially becoming a registered "shell company" in September 2007. Aequitas ultimately sank about $20 million into its failed microHelix investment. At the end of 2009, Aequitas began the process of manipulating this $20 million failure into an illusory $35+ million asset.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 69 and, on that basis, denies such allegations.

### 2. Use of Investor Funds and Inability to Purchase Receivables Assets

70. At all relevant times, and by no later than June 9, 2010, Aequitas relied on continuing new investor funds both to repay investors and to fund operations. The Aequitas companies relied on new investments because there was a critical cash-flow mismatch between the types of assets Aequitas purchased (which, if they provided any returns at all, were structured to provide longer-term, incremental returns) and Aequitas' funding source (relatively short-term note securities). Aequitas did not disclose, until late December 2015, via a quarterly update, that "ACF uses proceeds from Private Notes primarily to repay prior investors," when, in fact, Aequitas had used proceeds from the sale of securities primarily to repay prior investors since at least 2010.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 70 and, on that basis, denies such allegations.

71. Whereas investors were told that the proceeds would be used primarily to pursue specific investment strategies for a particular fund, investor funds were used instead to cover operating losses and obligations to investors across the Aequitas business.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 71 and, on that basis, denies such allegations.

72. At all material times, Aequitas was unable to fund commitments to purchase receivables assets and unable to purchase assets because of insufficient capital.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 72 and, on that basis, denies such allegations.

73. Aequitas compounded these problems by offering short-term notes.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 73 and, on that basis, denies such allegations.

74. In January 2010, Aequitas executives discussed internally their concerns about timely repayment of securities and the need to avoid "spook[ing]" investors with late payments. Furthermore, one investment advisor, Human Investing, notified Aequitas early in 2010 of its intention to redeem all of its customers' private notes, which were set to mature in 2010.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 74 and, on that basis, denies such allegations.

75. In 2011, according to Aequitas internal communications, Aequitas needed to sell $20 million of securities per month, with $1 million from sources other than its primary fundraiser, Strategic Capital Group, to break even on cash flow.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 75 and, on that basis, denies such allegations.

76. An internal Aequitas memorandum dated October 19, 2015, sent by an Aequitas executive to other Aequitas executives and in-house counsel, documents that only a small portion of investor proceeds were actually used to purchase assets, and that this practice extended widely to the entities within the Aequitas organization.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 76 and, on that basis, denies such allegations.

77. The auditors identified Aequitas' dependence on sales of securities in their audit workpapers. In assessing Aequitas' ability to continue as a going concern as of December 31, 2012, EisnerAmper documented that Aequitas' heavy reliance upon selling securities raised doubts concerning Aequitas' ability to continue as a going concern. EisnerAmper noted that ACF had raised over $182.1 million in investor funds and that investors had renewed, rather than redeem, their investments at a historical rate of 60-70%, which led EisnerAmper to characterize the private note program as a permanent form of capital. EisnerAmper accepted, uncritically, Aequitas' representations that it would take steps to lower the cost of this private capital. When Deloitte took over as auditor, it noted that ACF had raised over $182.1 million in investor funds and that investors had renewed, rather than redeem, their investments at a historical rate of 60-70%, "making much of the capital a quasi-permanent form of capital." Remarkably, Deloitte cited "new investor money" as a basis for "the combined Aequitas companies" to operate as a going concern for the foreseeable future.

**ANSWER:** Paragraph 77 includes characterizations of a document that speaks for itself and to which no further answer is required. EisnerAmper denies all remaining allegations as to itself.

EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations as to Deloitte and, on that basis, denies such allegations.

**3. <u>Undisclosed Dependence on Renewals of Investments on Maturity</u>**

78. Aequitas continually sold millions of dollars' worth of short-term securities. As a result, Aequitas continually faced the prospect of massive redemptions as the securities matured. Aequitas lacked capital or liquid assets sufficient to satisfy these obligations. Accordingly, Aequitas' survival was, at all relevant times, dependent upon convincing investors to renew their investments on maturity, rather than redeem, or cash out, the investments. Aequitas was very successful at this, with renewal rates as high as 70%. However, investors were not informed of the substantial risk that Aequitas would collapse if renewal rates faltered.

**<u>ANSWER:</u>** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 78 and, on that basis, denies such allegations.

79. The risk of non-renewal was exacerbated by the fact that Aequitas relied on a relative few investment advisors to steer their clients, and huge amounts of money, to Aequitas. Thus, Aequitas was at risk that one or more investment advisors would recommend that all of their clients redeem their investments and that Aequitas would be unable to repay those investors.

**<u>ANSWER:</u>** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 79 and, on that basis, denies such allegations.

**4. <u>Undisclosed Facts Concerning Asset Valuations</u>**

80. At all relevant times, ACF overstated the reported values of its assets. Because the asset values were materially overstated, every representation by Aequitas that is based on or derived from those asset values was also materially overstated. For example, the purported "security" or "collateral" backing the Aequitas securities were overstated.

**<u>ANSWER:</u>** For the periods for which EisnerAmper audited ACF's financial statements, it denies the allegations in this paragraph. For all other periods, EisnerAmper lacks information or knowledge to form a belief as to the truth of the allegations contained in Paragraph 80 and, on that basis, denies such allegations.

**a. Notes Receivable (Loans to Affiliates)**

81. One of ACF's primary assets as reported in its audited financial statements was "Notes Receivable, Affiliates," which it also referred to as "Loans to Affiliates" in the Financial Information Summary sections of its various private placement memoranda.

**ANSWER:** This paragraph refers to the contents of the audited financial statements and the PPMs, which documents speak for themselves, and thus it requires no answer.

82. Aequitas Management, AIM and ACM were spending far more money than they were taking in, including large expenses related to the renovation of Aequitas' headquarters in Lake Oswego, opening a new office in New York City, outsized salaries for executives, expenses related to a private jet, and lavish expenses from marketing Aequitas securities to potential investors and brokers. Aequitas Management, AIM and ACM caused Holdings to "borrow" the shortfall from ACF. Money loaned by ACF to Holdings beginning no later than 2009 was, in turn, loaned by Holdings to AIM. The management fees that AIM generated from the various Aequitas funds were not sufficient to cover working capital needs. As a result, there was no reasonable prospect of repayment.

**ANSWER:** For the periods for which EisnerAmper conducted audits for certain Aequitas entities, it denies the allegations in this paragraph. For all other periods, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 82 and, on that basis, denies such allegations.

83. Because ACF's financial statements did not include its parent, Holdings, or affiliate, AIM, these loans were improperly presented to ACF investors as assets.

**ANSWER:** For the periods for which EisnerAmper conducted audits for certain Aequitas entities, it denies the allegations in this paragraph. For all other periods, EisnerAmper lacks information or knowledge to form a belief as to the truth of the allegations contained in Paragraph 83 and, on that basis, denies such allegations.

84. Aequitas reported the loan from ACF to Holdings, which loan ultimately totaled $180 million, as an asset of ACF valued at the face-amount of the loan, despite the fact that Holdings had little or no chance of repaying the loan. At all relevant times, the amount due on the loan exceeded Holdings' assets.

**ANSWER:** For the periods for which EisnerAmper conducted audits for certain Aequitas entities, it denies the allegations in this paragraph. For all other periods, EisnerAmper lacks

knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 84 and, on that basis, denies such allegations.

85. Generally Accepted Accounting Principles ("GAAP") required ACF to write down the carrying value of this note to reflect its impaired value. ASC 310 is the provision of GAAP that governs the recognition and valuation of loans. Pursuant to ASC 310-10-35, the impaired value of this loan should have been written down to the amount that ACF was likely to recover, based upon the likely future payments by Holdings, or, because Aequitas was unlikely to become profitable, the value of its assets that could be used to repay the note.

**ANSWER:** Paragraph 85 references generally accepted accounting standards, which speak for themselves, such that no answer is required. Paragraph 85 further contains characterizations and conclusions of law, such that no answer is required. To the extent this paragraph alleges facts, EisnerAmper denies them with respect to the periods for which EisnerAmper conducted audits for certain Aequitas entities. For all other periods, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 85 and, on that basis, denies such allegations.

86. At the end of 2010, Holdings owed ACF approximately $49 million and the assets of Holdings were only $46 million.

**ANSWER:** EisnerAmper admits that Holdings owed ACF approximately $49 million at the end of 2010. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 86 and, on that basis, denies such allegations.

87. By the end of 2011, Holdings owed ACF approximately $62.7 million.

**ANSWER:** Admitted.

88. By the end of 2012, Holdings owed ACF approximately $80.6 million.

**ANSWER:** Admitted.

89. By the end of 2013, Holdings owed ACF more than $78.8 million.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89 and, on that basis, denies such allegations.

90. ACF reported a value of $184.8 million in 2014. Of this total, $120.9 million was attributed to a note receivable from Holdings. Holdings lost $22.2 million in 2014. The limited assets of Holdings fell far short of the amounts borrowed from ACF and the company had no going concern value beyond its limited assets. By March 2014, Holdings' assets were $20 million *less* than the amount it owed to ACF. The gap between the amounts that Holdings had borrowed and the amount it could repay based upon its assets continued to grow. By February 2015, Holdings had borrowed $127.6 million from ACF, but had only $67.0 million in assets. By June 2015, its assets had slipped to $65.3 million, while the balance it owed ACF climbed to $169 million.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 90 and, on that basis, denies such allegations.

91. By the end of 2014, the prospects for collection of the entire balance owed ACF by Holdings was, at best, in serious doubt, impairing the value of this note. As described above, there was at least a $20 million shortfall between the note balance and Holdings' assets by March of 2014, and that number had swelled to $60 million by February 2015. Accordingly, even accepting Aequitas' asset values, the value of the note receivable was overstated on ACF's audited 2014 financial statements by between $20 million and $60 million.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 91 and, on that basis, denies such allegations.

92. This overstatement was highly material in light of ACF's reported equity of just $1.8 million. The accurate statement of the value of this note from Holdings would have alerted investors that ACF was insolvent and had a negative net asset value.

**ANSWER:** Paragraph 92 contains characterizations and conclusions of law, such that no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 92 and, on that basis, denies such allegations.

### b. Corinthian Colleges Student Loan Receivables

93. On June 29, 2011, Aequitas caused ACF to enter into the Tuition Loan Program Agreement (the "TLPA") with Corinthian Colleges ("Corinthian") whereby ACF agreed to purchase private loans underwritten by an "originating bank" that bore no risk of loss, with Corinthian agreeing to immediately pay a 40-50% "discount fee" to ACF, resulting in a net purchase price of 50-60% of the face value to ACF. Further, ACF retained the right to require Corinthian to repurchase any loans that were more than 90 days past-due (the "Recourse Loan Repurchases"). Accordingly, ACF would make the entire amount of this "discount fee" as profit if it collected on the loan (a 40% return), and Corinthian would buy back the loans on which

ACF couldn't collect - a "no-lose" situation, as long as Corinthian honored its contractual agreement related to the Recourse Loan Repurchases.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 93 and, on that basis, denies such allegations.

94. Between 2011 and February 2014, Campus Funding, LLC (a wholly-owned subsidiary of ACF) bought $561 million in face value of student loan debt from Corinthian Colleges.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 94 and, on that basis, denies such allegations.

95. However, widespread criticism of Corinthian's business practices continued following ACF's entry into the TLPA with Corinthian. By June of 2013, Corinthian had admitted that it was being investigated by the SEC related to its business practices, including its student loan default rates. Other governmental regulators were investigating Corinthian as well. By late 2013, the writing was on the wall that federal regulators were going to stop Corinthian's ability to obtain federal student loan financing for its students, which would be the death-knell of the company. Corinthian had honored its recourse obligations through May of 2014, but on June 18, 2014, ACF sent a Notice of Default to Corinthian Colleges, complaining that Corinthian had failed to honor its recourse obligations, and Corinthian would never again make any recourse payments to ACF.

**ANSWER:** EisnerAmper admits that Corinthian was subject to regulatory scrutiny in or around mid-June 2013, and that such scrutiny was widely known. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 95 and, on that basis, denies such allegations.

96. In its 2012 financial statements, ACF reported net assets (member's equity) of just $1.3 million, including $120 million of student loan receivables carried at ACF's determination of the "fair value" of such assets. EisnerAmper provided an unqualified audit opinion based on these numbers.

**ANSWER:** EisnerAmper admits it issued an audit opinion with respect to ACF's year-end financial statements for the 2012 financial year. EisnerAmper further admits that it provided an unqualified opinion with respect to those financial statements taken as a whole. As for what

those financial statements reported, the documents speak for themselves, so no further answer is required. EisnerAmper denies the remaining allegations contained in Paragraph 96.

97. However, ACF's audited 2012 financial statements overstated the reported fair value of its student loan receivables, as would later be admitted in its 2013-2014 financial statements:

> Subsequent to the issuance of the Company's consolidated financial statements for the year ended December 31, 2012, the Company determined that it had incorrectly calculated the fair value of its student loan receivables for the year then ended and incorrectly deferred and amortized commissions paid on its student loan receivables. Consequently, the Company has retroactively corrected its student loan receivables and deferred charges as of January 1, 2013. As a result, its members' equity has been restated as of January 1, 2013. The cumulative effect of these corrections on the Company's members' equity was a decrease of $3,071,099.

**ANSWER:** Paragraph 97 purports to quote from documents that speak for themselves. EisnerAmper denies any other allegations in this paragraph.

98. This overstatement was plainly material in that the accurate reporting of these amounts in its 2012 financial statements would have lowered ACF's Members' equity to a negative number, rendering it insolvent. Had investors been aware of ACF's insolvency, they would likely not have been willing to purchase its notes.

**ANSWER:** Paragraph 98 contains characterizations and conclusions of law such that no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 98 and, on that basis, denies such allegations.

99. ACF again overstated the value of its student loan receivables in its 2014 audited financial statements. A significant portion of the $552.7 million of total reported assets of ACF on December 31, 2014 was the total of $105.6 million in receivables ($31.8 million carried at cost and $74.8 million carried at purported "fair value"). The value of both the receivables carried "at cost" and those carried at "fair value" were materially misstated in ACF's 2014 financial statements.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 99 and, on that basis, denies such allegations.

100. ACF carried Corinthian loans that had defaulted (for which payment was more than 90 days late) at their $31.8 million cost of acquisition by ACF. Because ACF paid a net cost of 50-60% of face value, these loans were, at the most, approximately $64 million in face value. On August 20, 2014, Corinthian sold virtually all of the similar defaulted student loans it owned, totaling approximately 170,000 loans with a face value of $505 million to a third party for $19 million, or approximately 3.7% of face value. Accordingly, the impaired value of these defaulted assets was no more than $2.4 million, but ACF recognized it on its financial statements at the acquisition cost of $31.8 million - an overstatement of $29.4 million.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 100 and, on that basis, denies such allegations.

101. Likewise, ACF valued the non-defaulted Corinthian Loan receivables at their purported "fair value" of $74.8 million based on a discounted cash flow technique described in the footnotes to its 2014 financial statements that was based on numerous factors including: (i) a weighted average interest rate of 5.9% to 14.9%; (ii) a weighted average term of 48-164 months; iii) SSR rate of 0.0% to 18.6%; and (iv) a recourse rate of 39.0% to 69.0%. This "recourse rate" was a key variable in performing the calculation because all recourse payments paid the loan amount in full on a loan that would otherwise have had zero value.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 101 and, on that basis, denies such allegations.

102. But the "recourse rate" of between 39% and 69% used in ACF's model was improper, and had no basis and caused these calculations to be overstated.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 102 and, on that basis, denies such allegations.

103. On July 1, 2014, the General Counsel of Aequitas sent a letter to one of its former business partners, admitting that Aequitas was aware that Corinthian would no longer honor its commitment to repurchase defaulted loans from ACM:

> **[W]e believe that Corinthian does not intend to make any payments to Campus Student Funding under the TLPA and related agreements** . . .

* * *

> To the extent Corinthian is unable to continue as a going concern and/or is unwilling to honor its obligations under the TLPA and related agreements, **the Corinthian loan portfolios funded by Campus Student Funding will effectively become non-recourse.**

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 103 and, on that basis, denies such allegations.

104. This letter further admitted that the adverse publicity and regulatory actions against Corinthian was likely to further degrade the portfolio's value beyond previous years' performance statistics:

> In addition, it is also possible that the operating agreement between Corinthian and the Department of Education **may cause additional harm to our existing student loan portfolios.** Further, the risk of borrowers changing their payment behavior once the news about the Corinthian school wind-down has gained greater public attention represents **another significant challenge to the future performance of the student loan program.**

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 104 and, on that basis, denies such allegations.

105. The letter concluded by admitting that the combination of these factors was likely to have a serious adverse impact on the Corinthian portfolio:

> As a result of Corinthian's defaults and possible deterioration of the student borrower's payment performance, **we anticipate lower collections and significant additional expenses for servicing the existing portfolios that will not be reimbursed** as well as foregone revenues from default aversion fees, marketing participation fees, and ancillary fees that will not be paid. (emphasis added).

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 105 and, on that basis, denies such allegations.

106. Thus, by at least July 1, 2014, ACM and ACF were admittedly aware that: (i) Corinthian would no longer make any Recourse Loan Purchases, changing the character of the portfolio into a non-recourse portfolio; ii) the Corinthian Loan portfolio had been further harmed by Corinthian's agreement with the Department of Education to disband its schools; and (iii) Aequitas expected "Lower collections and significant additional expenses" related to this portfolio. Accordingly, the use of a "recourse rate" of 39% to 69% had no basis and served to dramatically overstate the calculation of fair value.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 106 and, on that basis, denies such allegations.

107. As admitted by Aequitas' General Counsel, these loan portfolios had "effectively become non-recourse portfolios." Accordingly, their proper valuation should have been

consistent with the August 20, 2014 sale of non-recourse loans for 3.7% of face value. This improper valuation methodology violated GAAP, and specifically ASC 825 by failing to recognize the Corinthian Loan assets at their dramatically decreased fair value.[1]

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 107 and, on that basis, denies such allegations.

108. ACFs 2014 audited financial statements failed to disclose the significant contingency that the CFPB had filed a lawsuit seeking a judicial rescission of all of the Corinthian Loans carried as assets on ACF's balance sheet. At a minimum, footnote disclosure of this contingency was required by GAAP. Specifically, ASC 450 requires disclosure of material loss contingencies that are "reasonably possible" (as was the CFPB's requested relief) to occur.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108 and, on that basis, denies such allegations.

**c. CarePayment Healthcare Receivables**

109. Aequitas purchase healthcare receivables through ACF's Carepayment, LLC, subsidiary ("CPLLC") and its affiliates. Aequitas pledged all of its health care receivables as collateral to secure loans to Aequitas from third party lenders.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 109 and, on that basis, denies such allegations.

110. Aequitas created an illusory asset in CPTI by causing it to service the Aequitas healthcare receivables owned by. But CPTI, which had no employees or facilities of its own, had no genuine independent value—it simply turned around and paid Aequitas to perform all of its servicing operations and functions.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 110 and, on that basis, denies such allegations.

111. The claimed value of CPTI was dependent on the health care receivables owned by Aequitas and on continuing financing from Aequitas.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 111 and, on that basis, denies such allegations.

**d. Freedom Financial Consumer Credit Receivables**

---

[1] *Financial Instruments*, Accounting Standards Codification No. 825, Financial Accounting Standards Board (2009).

112. The consumer credit receivables purchased by Aequitas (through ACF and other Aequitas affiliates) were largely subprime "C+" and "F+" consumer credit receivables (the "Freedom Financial Receivables").

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 112 and, on that basis, denies such allegations.

113. The C+ Freedom Financial Receivables comprised debt consolidation loans to persons who were insolvent or otherwise unable to meet their existing financial obligations.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 113 and, on that basis, denies such allegations.

114. Aequitas was exposed to the entire credit risk associated with the Freedom Financial Receivables, and it had no recourse to any third party with respect to any default or nonperformance under the Freedom Financial Receivables.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 114 and, on that basis, denies such allegations.

115. Aequitas was leveraging investor funds to secure substantial additional third-party financing for its purchase of the Freedom Financial Receivables.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 115 and, on that basis, denies such allegations.

116. Aequitas did not disclose the nature, extent, or material terms of the third-party financing underlying its purchase of the Freedom Financial Receivables.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 116 and, on that basis, denies such allegations.

117. Aequitas had pledged the Freedom Financial Receivables as collateral to secure all or substantially all of the third-party financing underlying Aequitas' acquisition of the Freedom Financial Receivables.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 117 and, on that basis, denies such allegations.

118. ACF had guaranteed the repayment of the third-party financing underlying Aequitas' acquisition of the Freedom Financial Receivables under certain circumstances.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 118 and, on that basis, denies such allegations.

119. The failure rate for the Freedom Financial Receivables was materially worse than the failure rate assumptions on which the third-party financing was based.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 119 and, on that basis, denies such allegations.

120. The failure rate for the Freedom Financial Receivables was materially worse than the failure rate necessary for the viability of the Freedom Financial Receivables line of business.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 120 and, on that basis, denies such allegations.

121. At least as early as mid-2015, the failure rate of the Freedom Financial Receivables caused Aequitas to be in default on the third-party financing underlying its purchase of the Freedom Financial Receivables.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 121 and, on that basis, denies such allegations.

122. The claimed value of Aequitas' wholly-owned subsidiary ACC Holdings 1, LLC ("ACCH-1") and its affiliate ACC Holdings 2, LLC ("ACCH-2"), depended entirely on the performance of the Freedom Financial Receivables.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 122 and, on that basis, denies such allegations.

123. The value of ACF's ownership interest in ACCH-1 depended entirely on the performance of the Freedom Financial Receivables owned by ACF through ACCH-1's wholly-owned subsidiary ACC Funding Trust 2014-1 ("ACCTrust-1").

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 123 and, on that basis, denies such allegations.

124. The value of ACF's loans to ACCH-2 depended entirely on the performance of the Freedom Financial Receivables owned by Aequitas through ACCH-2's wholly-owned subsidiary ACC Funding Trust 2014-2 ("ACCTrust-2").

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 124 and, on that basis, denies such allegations.

125. Aequitas claimed as valuable assets (i) ACF's ownership interest in ACCH-1, and (ii) the Freedom Financial Receivables owned by ACF (through ACCTrust-1), in addition to (iii) the amounts outstanding on ACF's direct loans to ACCH-2.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 125 and, on that basis, denies such allegations.

126. The claimed collateral supporting the Aequitas securities included (i) ACF's ownership interest in ACCH-1, and (ii) the Freedom Financial Receivables owned by ACF (through ACCTrust-1), in addition to (iii) the amounts outstanding on ACF's direct loans to ACCH-2.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 126 and, on that basis, denies such allegations.

**e. MotoLease Motorcycle Leases**

127. The claimed value of Aequitas' MotoLease, LLC, affiliate ("MotoLease") was based largely on its ability to continue to sell vehicle leases to ACF (through its wholly-owned subsidiary AMLF).

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 127 and, on that basis, denies such allegations.

128. The claimed value of AMLF was based entirely on the value of the vehicle leases purchased from MotoLease.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 128 and, on that basis, denies such allegations.

129. Aequitas was exposed to the entire credit risk associated with the MotoLease vehicle leases, and no recourse to any third party with respect to any default or nonperformance under any of those leases.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 129 and, on that basis, denies such allegations.

130. ACF claimed as valuable assets both (i) ACF's direct and indirect (through ACOF) ownership interest in MotoLease, and (ii) the vehicle leases owned by ACF (through AMLF and its affiliates).

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 130 and, on that basis, denies such allegations.

131. Aequitas claimed as collateral supporting the Aequitas securities included both (i) ACF's direct and indirect (through ACOF) ownership interest in MotoLease, and (ii) the vehicle leases owned by ACF (through AMLF and its affiliates).

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 131 and, on that basis, denies such allegations.

132. Aequitas had pledged MotoLease vehicle leases as collateral to secure loans to Aequitas from third party lenders.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 132 and, on that basis, denies such allegations.

**f. ETC Broker-Dealer**

133. The claimed value of Aequitas' ETC Global Group, LLC affiliate ("ETCGlobal") was based entirely on the continuing operations and performance of its indirect subsidiary Electronic Transaction Clearing, Inc. ("ETC"), a registered broker-dealer, in compliance with applicable laws and regulations. Aequitas did not disclose the administrative, regulatory, and legal difficulties that were undermining and diminishing the viability of ETC's continuing operations and performance, including, for example:

a. Aequitas did not disclose (i) that during the period from 2009 to 2015, ETC was operating in violation of exchange rules, NASD Rule 3010, FINRA Rule 2010, and Section 15(c)(3) of the Securities Exchange Act of 1934 and Rule 15c3-5 thereunder by failing to establish and maintain an adequate system of risk management controls and supervisory procedures, and by failing to prevent its market access customers and their traders from executing thousands of potentially manipulative trades on the exchanges of which ETC was a member despite numerous red flags and repeated notice from regulators, (ii) the regulatory investigation concerning those violations, or (iii) the FINRA complaint filed against ETC with respect to those violations.

b. Aequitas did not disclose (i) that at least as early as 2012, ETC was operating in violation of the Bank Secrecy Act, 31 U.S.C. 5311 *el seq.* and the regulations promulgated thereunder by failing to establish and implement adequate anti-money-laundering ("AML") policies, procedures, and controls, or (ii) the regulatory investigation concerning those violations.

c. Aequitas did not disclose (i) that over a two-year period, ETC had misreported transactions to FINRA and the SEC in a manner that excluded critical information regarding suspicious transactions, or (ii) the regulatory investigation concerning those violations.

d. Aequitas did not disclose (i) that in October 2012 and again in April 2013, ETC was censured and fined for violations of FINRA Rule 7450(a), or (ii) that ETC had been operating in violation of that rule.

e. Aequitas did not disclose (i) that in December 2013, ETC was censured and fined for violations of EDGA Exchange rules, or (ii) that ETC had been operating in violation of those rules.

f. Aequitas did not disclose (i) that in January 2014, ETC was censured and fined for violations of SEC Rule 200(g) of Regulation SHO and NASDAQ Rules 2110, 3010, and 4755, or (ii) that ETC had been operating in violation of those rules.

g. Aequitas did not disclose (i) that in February 2014, ETC was censured and fined for violations of SEC Rule 17a-3, FINRA Rules 2010 and 7450, and NASD Rules 3010 and 3110, or (ii) that ETC had been operating in violation of those rules.

h. Aequitas did not disclose (i) that in April 2014, ETC was censured and fined for violations of EDGX Exchange rules, or (ii) that ETC had been operating in violation of those rules.

**ANSWER:** Paragraph 133 contains characterizations and conclusions of law, such that no answer is required. Paragraph 133 further purports to characterize federal statutes and regulations that speak for themselves, such that no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 133 and, on that basis, denies such allegations.

**g. Strategic Capital**

134. Aequitas did not disclose regulatory and legal issues related to ACF's indirect subsidiary, Strategic Capital Alternatives, LLC, and its affiliates, including Strategic Capital Group, LLC. Aequitas did not disclose that the claimed value of its SC A Holdings, LLC, affiliate ("SCAH"), depended in part on the successful funneling of investor funds to Aequitas by the direct and indirect subsidiaries of SCAH, including the registered investment advisors Strategic Capital Alternatives, LLC; SAS Capital Management LLC; and Argentus Advisors, LLC. Aequitas did not disclose that the value of ACF's loans to SCAH depended in part on the successful funneling of investor funds to Aequitas by the direct and indirect subsidiaries of SCAH. Aequitas did not disclose that ACF claimed as valuable assets both (i) ACF's ownership interest (through ACOF) in SCAH, and (ii) the amounts outstanding on ACF's direct loans to SCAH.

**ANSWER:** Paragraph 134 contains characterizations and conclusions of law, such that no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 134 and, on that basis, denies such allegations.

**h. Separation of Servicing Businesses from Receivables**

135. The most significant vehicles used by Aequitas to create and inflate asset value were CPTI and EDPlus Holdings, LLC ("EDPlus"), both of which were ACOF portfolio companies. Aequitas overstated the values of CPTI and EDPlus by separating the underlying assets (receivables) from the business of servicing those receivables. CPTI and EDPlus were servicing companies; they did not own the receivables, only the right to service the receivables (which right could be terminated). By contrast, Aequitas used the receivables as collateral for institutional lines of credit (for example, from Bank of America and Wells Fargo) that Aequitas used to fund all Aequitas operations. By doing so, Aequitas leveraged investor funds, putting itself in a deeper hole.

**ANSWER:** Paragraph 135 contains characterizations and conclusions of law, such that no answer is required. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 135 and, on that basis, denies such allegations.

**B. <u>False and Misleading Statements Regarding ACF</u>**

136. The June 9, 2010, Confidential Private Placement Memorandum ("PPM") issued by ACF in connection with the sale of ACF Notes includes a Directory that identifies Tonkon as Legal Counsel. The June 9, 2010 PPM contains numerous untrue statements of material fact (and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading), including the following:

a. The "Payment Terms" identified on page 1 is materially false and misleading because it omits and fails to disclose that ACF was having difficulties in making timely interest and redemption payments and was dependent upon investors to (a) make new investments and (b) renew their investments on maturity;

b. The descriptions of the "Use of Proceeds" on page 2 is materially false and misleading because it omits to disclose that a substantial portion of the proceeds will be used to repay previous investors with maturing notes;

c. The disclosures on pages 16-22 regarding ACM's role as Manager of ACF were materially false and misleading. Specifically, page 16 identified ACM's CEO and various

other professionals employed by ACM, claiming that these employees had "complementary skills and extensive experience relevant to making and managing the investments and financial operations of' ACF. But this disclosure was materially false and misleading because it omitted to disclose that ACM and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A); *supra*;

d. The disclosure on pages 26-27 that ACF "is not obligated to register the Secured Notes and does not intend to do so" is misleading because it omitted to disclose the corresponding risk to investors if the ACF Notes did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the ACF note; (ii) refunding all such rescission requests would cause ACF to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) ACF would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law; and

e. Various of the "risk factors" disclosed in the PPM, including, *inter alia*, those identified under the headings "Economic and market risk" (Appendix A, page 1), "Leverage," (Appendix A, page 2), were materially misleading in that they were identified as "*risks*," when, in fact, they *had already materialized* as significant problems to ACF.

**ANSWER:** Paragraph 136 purports to characterize and make arguments about an ACF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 136 and, on that basis, denies such allegations.

137. The December 1, 2011, Confidential Private Placement Memorandum ("PPM") issued by ACF in connection with the sale of ACF Notes includes a Directory that identifies Harb, Levy & Weiland LLP (the predecessor of EisnerAmper) as Auditor and Tonkon as Legal Counsel. The December 1, 2011 PPM contains numerous untrue statements of material fact (and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading), including the following:

a. The disclosures on pages 4-5 outlining "The Opportunity" disclosed that ACF would invest primarily in debt-related assets in order to generate sufficient cash flow to **meet** its monthly required debt service payments, and that ACF also obtained additional security for these investments beyond the assets themselves, closely monitoring the underlying debtors to ensure their continued financial health. These disclosures included the assertions on page 5 that "[t]he Company will make investments on an opportunistic basis. This means the Company will invest in non-market correlated, niche income-yielding strategies that emerge from inefficient market conditions and which are underserved by traditional lenders" and "By remaining fast-moving and flexible, the Company expects to be able to capitalize on a variety of conditions

contributing to favorable to deal structure and pricing." These disclosures were materially false and misleading because: (1) ACFs investments did not generate sufficient cash flow to meet its debt service and other fixed obligations; (2) ACF did not invest in assets with the necessary time horizon and payment schedule that would allow ACF to meet its future cash obligations; (3) ACF was insolvent and unable to make investments; (4) investors would not be protected by adequate security interests in portfolio assets; and (5) the stated "Risk Management" plan was not employed by the Company;

b. The disclosure of ACF's "collateral" as "a security interest in all assets of" ACF (pages 1 and 12) was materially false and misleading because it omitted and failed to disclose that the value of the alleged collateral was materially overstated, leaving investors unsecured or undersecured in their investments;

c. The disclosures in the "Financial Information Summary" (page 23) were false and misleading because they materially overstated the value of ACF's collateral available to investors. This Financial Information Summary contained selected "audited" financial results for the years 2006 through 2010, identifying ACF's "Investment Assets" as being worth more than $79 million as of the end of 2010, and its "loans to affiliates" (or intercompany loans) as being worth more $53 million as of the end of 2010. These disclosures were false and misleading because the values of both the reported Investment Assets and the Loans to Affiliates were materially overstated for the reasons detailed in Section IV(A); *supra*;

d. The disclosure that advances and loans to affiliates "are secured by all assets of Aequitas Holdings LLC and the borrowing affiliates" (page 10) is materially misleading because it implies that the loans are actually secure, but omits the material information that these intercompany loans were made to Aequitas entities that were insolvent or losing copious amounts of money, and the ultimate repayment of these loans could not be considered reasonably assured. Thus, the "security" obtained from the related entities was worthless or inadequate, and the loans were unsecured or undersecured loans to failing companies with little or no reasonable chance of repayment. *See* Section IV(A); *supra*;

e. The disclosures on pages 15-18 regarding ACM's role as Manager of ACF were materially false and misleading. Specifically, page 15 identified ACM's CEO and various other professionals employed by ACM, claiming that these employees had "complementary skills and extensive experience relevant to making and managing the investments and financial operations of" ACF. But this disclosure was materially false and misleading because it omitted to disclose that ACM and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A); *supra*;

f. The disclosure that the potential "Sources of Repayment" for the notes included cash flows generated by its investment portfolio or sales of assets from its investment portfolio (page 2) was materially false and misleading because it portrayed cash flows from portfolio investments as being the primary source of repayment of its debt obligations, when, in fact, ACF relied upon the issuance of new notes as its means to pay off the previously issued notes that were coming due. This disclosure is also misleading because it omits the material fact that ACF was dependent upon investors renewing their investments on maturity;

g. The disclosures that ACF would use the proceeds from the sale of these promissory notes for "purchasing debt obligations such as accounts receivable and notes, for funding loans and leases and similar finance transactions, for acquiring equity interests in certain limited situations, for providing lines of credit to affiliated entities and for general corporate purposes" (pages 3-4 and 5) was materially false and misleading in that it portrayed ACF as planning to use the funds it obtained from investors to pursue new investment opportunities to benefit the new investors and omitted the material fact that ACF relied on money obtained from new investors to pay the principal and interest owed to old investors;

h. The disclosure on page 25 that ACF "is not obligated to register the Secured Notes and does not intend to do so" is misleading because it omitted to disclose the corresponding risk to investors if the ACF Notes did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the ACF note; (ii) refunding all such rescission requests would cause ACF to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) ACF would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law;

i. The disclosure that ACF "may be at risk for some level of losses in the event of default by third parties in its various finance transactions," and identifying various steps that ACF purportedly takes to reduce such risk (page 10) is misleading because it downplays the risk of future losses and omits to disclose the material fact that substantial losses had already been experienced;

j. Various of the "risk factors" disclosed in the PPM, including, *inter alia*, those identified under the headings "Economic and market risk" (Appendix A, page 1), "Leverage," (Appendix A, page 2), "Educational loan reform efforts may impact the Company" (Appendix A, page 3), and "Counterparty Risks" (Appendix A, page 4) were materially misleading in that they were identified as *"risks,"* when, in fact, they *had already materialized* as significant problems to ACF; and

k. The disclosures on pages 16-17 under the heading "Related Party Transactions; Conflicts of Interest" were materially false and misleading, including the specific disclosures that "The Aequitas Conflicts Review Committee (described below) has been established to review and render an opinion on matters submitted to it that involve transactions with parties related to the Company or perceived conflicts of interest with respect to transactions involving the Company" and that "The fact that members of the Investment Committee, their affiliates or any related persons are directly or indirectly interested in or connected with any entity or individual with which or with whom the Company may have dealings will not by itself preclude such dealings, and the Company will not have any rights in or to such dealings or any profits derived therefrom." These disclosures tended to portray ACF as having a process that would prevent ACM from entering into transactions that would be detrimental to ACF, but were materially false and misleading because they omitted to disclose the material information that ACM had diverted $55 million in fees that related to ACF's investment in Corinthian receivables, in a transaction evidencing a clear conflict of interest between ACM and ACF.

**ANSWER:** Paragraph 137 purports to characterize and make arguments about the contents of an ACF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph alleges facts, EisnerAmper denies them.

138. The November 30, 2012, Confidential Private Placement Memorandum ("PPM") issued by ACF in connection with the sale of ACF Notes includes a Directory that identifies EisnerAmper as Auditor and Tonkon as Legal Counsel, and includes references to and excerpts from the 2011 EisnerAmper-audited financial statements. The November 30, 2012 PPM contains numerous untrue statements of material fact (and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading), including the following:

a. The disclosures on pages 5-7 outlining "The Opportunity" disclosed that ACF would invest primarily in debt-related assets in order to generate sufficient cash flow to meet its monthly required debt service payments, and that ACF also obtained additional security for these investments beyond the assets themselves, closely monitoring the underlying debtors to ensure their continued financial health. These disclosures included the assertions on page 5 that "[t]he Company will make investments on an opportunistic basis. This means the Company will invest in non-market correlated, niche income-yielding strategies that emerge from inefficient market conditions and which are underserved by traditional lenders" and "By remaining fast-moving and flexible, the Company expects to be able to capitalize on a variety of conditions contributing to favorable to deal structure and pricing." These disclosures were materially false and misleading because: (1) ACF's investments did not generate sufficient cash flow to meet its debt service and other fixed obligations; (2) ACF did not invest in assets with the necessary time horizon and payment schedule that would allow ACF to meet its future cash obligations; (3) ACF was insolvent and unable to make investments; (4) investors would not be protected by adequate security interests in portfolio assets; and (5) the stated "Risk Management" plan was not employed by the Company;

b. The disclosure of ACF's "collateral" as "a security interest in all personal property of' ACF (pages 1 and 9) was materially false and misleading because it omitted and failed to disclose that the value of the alleged collateral was materially overstated, leaving investors unsecured or undersecured in their investments;

c. The disclosures in the "Financial Information Summary" (page 22) were false and misleading because they materially overstated the value of ACF's collateral available to investors. This Financial Information Summary contained selected "audited" financial results for the years 2009 through 2011, identifying ACF's "Investment Assets" as being worth more than $136 million as of the end of 2011, and its "loans to affiliates" (or intercompany loans) as being worth more $77 million as of the end of 2011. (The Financial Information Summary also identified "Investment Assets" of more than $79 million in 2010 and $72 million in 2009 and Loans to affiliates of more than $53 million in 2010 and $38 million in 2009). These disclosures were false and misleading because the values of both the reported Investment Assets and the Loans to Affiliates were materially overstated for the reasons detailed in Section IV(A), *supra*;

d. The disclosure that advances and loans to affiliates "are typically secured by the equity or all assets of Holdings or the specific affiliates to which funds are advanced" (page 6) is materially misleading because it implies that the loans are actually secure, but omits the material information that these intercompany loans were made to Aequitas entities that were insolvent or losing copious amounts of money, and the ultimate repayment of these loans could not be considered reasonably assured. Thus, the "security" obtained from the related entities was worthless or inadequate, and the loans were unsecured or undersecured loans to failing companies with little or no reasonable chance of repayment. *See* Section IV(A); *supra*;

e. The disclosures on pages 11-13 regarding ACM's role as Manager of ACF were materially false and misleading. Specifically, page 11 identified ACM's CEO and various other professionals employed by ACM, claiming that these employees had "complementary skills and extensive experience relevant to making and managing the investments and financial operations of' ACF. But this disclosure was materially false and misleading because it omitted to disclose that ACM and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A); *supra*;

f. The disclosure that the potential "Sources of Repayment" for the notes included cash flows generated by its investment portfolio or sales of assets from its investment portfolio (page 2) was materially false and misleading because it portrayed cash flows from portfolio investments as being the primary source of repayment of its debt obligations, when, in fact, ACF relied upon the issuance of new notes as its means to pay off the previously issued notes that were coming due. The disclosure is also misleading because it omits the material fact that ACF was dependent upon investors renewing their investments on maturity;

g. The disclosures that ACF would use the proceeds from the sale of these promissory notes to "engage in various specialty financing transactions, to provide senior and junior debt and equity funding for the benefit of its affiliates and its related investment programs" (pages 2 and 5) was materially false and misleading in that it portrayed ACF as planning to use the funds it obtained from investors to pursue new investment opportunities to benefit the new investors and omitted the material fact that ACF relied on money obtained from new investors to pay the principal and interest owed to old investors;

h. The disclosure on page 23 that ACF "is not obligated to register the Secured Notes and does not intend to do so" is misleading because it omitted to disclose the corresponding risk to investors if the ACF Notes did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the ACF note; (ii) refunding all such rescission requests would cause ACF to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) ACF would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law;

i. The disclosure that ACF "may be at risk for some level of losses in the event of default by third parties in its various finance transactions," and identifying various steps that ACF purportedly takes to reduce such risk (page 6) is misleading because it downplays the

risk of future losses and omits to disclose the material fact that substantial losses had already been experienced;

j. Various of the "risk factors" disclosed in the PPM, including, *inter alia*, those identified under the headings "Economic and market risk" (Appendix A, page 1), "Leverage," (Appendix A, page 2), "Educational loan reform efforts may impact the Company" (Appendix A, page 4), and "Counterparty Risks" (Appendix A, page 5) were materially misleading in that they were identified as *"risks,"* when, in fact, they *had already materialized* as significant problems to ACF;

k. The statement at Appendix A, page 6, that "The ability of the Company to pay interest on and repay principal of Secured Notes depends, to a great extent, on the Manager's performance and ability to select successful investments" is misleading because it omits to disclose that the company's ability to pay interest and repay principal was dependent, at least to a great extent, on selling additional securities; and

l. The disclosures on pages 12-13 under the heading "Related Party Transactions; Conflicts of Interest" were materially false and misleading, including the specific disclosures that "The Aequitas Conflicts Review Committee (described below) has been established to review and render an opinion on matters submitted to it that involve transactions with parties related to the Company or perceived conflicts of interest with respect to transactions involving the Company" and that "The fact that members of the Investment Committee, their affiliates or any related persons are directly or indirectly interested in or connected with any entity or individual with which or with whom the Company may have dealings will not by itself preclude such dealings, and the Company will not have any rights in or to such dealings or any profits derived therefrom." These disclosures tended to portray ACF as having a process that would prevent ACM from entering into transactions that would be detrimental to ACF, but were materially false and misleading because they omitted to disclose the material information that ACM had diverted $55 million in fees that related to ACF's investment in Corinthian receivables, in a transaction evidencing a clear conflict of interest between ACM and ACF.

**ANSWER:** Paragraph 138 purports to characterize and make arguments about the contents of an ACF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph alleges facts, EisnerAmper denies them.

139. The March 1, 2013, Supplement No. 1 to the November 30, 2012 PPM issued by ACF in connection with the sale of ACF Notes includes a copy of the November 30, 2012 ACF PPM and thereby makes the same untrue and misleading statements identified previously herein.

**ANSWER:** Paragraph 139 purports to characterize and make arguments about a supplement to an ACF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph alleges facts, EisnerAmper denies them.

140. The November 30, 2013, Confidential Private Placement Memorandum ("PPM") issued by ACF in connection with the sale of ACF Notes includes a Directory that identifies Deloitte as Auditor and Tonkon as Legal Counsel, and includes references to and excerpts from the 2011 and 2012 EisnerAmper audited financial statements. The November 30, 2013 PPM contains numerous untrue statements of material fact (and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading), including the following:

a. The disclosures on pages 6-8 outlining "The Opportunity" disclosed that ACF would invest primarily in debt-related assets in order to generate sufficient cash flow to meet its monthly required debt service payments, and that ACF also obtained additional security for these investments beyond the assets themselves, closely monitoring the underlying debtors to ensure their continued financial health. These disclosures included the assertions that "[t]he Company will make opportunistic investments in non-market correlated, niche income-yielding strategies;" "By remaining fast-moving and flexible, the Company expects to be able to capitalize on a variety of conditions favorable to deal structure and pricing;" and "the Company focuses on moving quickly to seize opportunities while they are still available." These disclosures were materially false and misleading because: (1) ACF's investments did not generate sufficient cash flow to meet its debt service and other fixed obligations; (2) ACF did not invest in assets with the necessary time horizon and payment schedule that would allow ACF to meet its future cash obligations; (3) ACF was insolvent and unable to make investments; (4) investors would not be protected by adequate security interests in portfolio assets; and (5) the stated "Risk Management" plan was not employed by the Company;

b. The disclosure of ACF's "collateral" as "a security interest in all personal property of' ACF (pages 2 and 10) was materially false and misleading because it omitted and failed to disclose that the value of the alleged collateral was materially overstated, leaving unsecured or undersecured in their investments;

c. The disclosures in the "Financial Information Summary" (page 22) were false and misleading because they materially overstated the value of ACF's collateral available to investors. This Financial Information Summary contained selected "audited" financial results for the years 2010 through 2013, identifying ACF's "Investment Assets" as being worth more than $306 million as of the end of 2014, and its "loans to affiliates" (or intercompany loans) as being worth more $120 million as of the end of 2014. (The Financial Information Summary also identified "Investment Assets" of more than $208 million in 2012, $124 million in 2011 and $79 million in 2010 and Loans to affiliates of more than $108 million in 2012, $77 million in 2011 and $53 million in 2010). These disclosures were false and misleading because the values of both the reported Investment Assets and the Loans to Affiliates were materially overstated for the reasons detailed in Section IV(A), *supra*;

d. The disclosure that advances and loans to affiliates "are typically secured by the equity or all assets of Holdings or the specific affiliates to which funds are advanced" (page 7) is materially misleading because it implies that the loans are actually secure, but omits the material information that these intercompany loans were made to Aequitas entities that were insolvent or losing copious amounts of money, and the ultimate repayment of these loans could not be considered reasonably assured. Thus, the "security" obtained from the related entities was

worthless or inadequate, and the loans were unsecured or undersecured loans to failing companies with little or no reasonable chance of repayment. *See,* Section IV(A), *supra*;

e. The disclosures regarding ACM's purported integrated operating platform (page 5) were materially false and misleading. Specifically, the disclosure that ACM's operating platform had "a proven set of capabilities that identifies and qualifies attractive investment opportunities, designs innovative financing structures, and then adds deep expertise in management and technology" was materially false and misleading in that this platform had caused ACF to invest in decidedly *unattractive* opportunities, including the Corinthian loan receivables. Likewise, the disclosure that and this platform "has demonstrated success optimizing business and investment outcomes" was materially false and misleading because ACFs portfolio was not "optimized," and because it omitted to disclose that ACM and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A), *supra*;

f. The disclosure that the potential "Sources of Repayment" for the notes "generally" included cash flows generated by its investment portfolio or sales of assets from its investment portfolio (pages 3 and 7) was materially false and misleading because it portrayed cash flows from portfolio investments as being the primary source of repayment of its debt obligations, when, in fact, ACF relied upon the issuance of new notes as its means to pay off the previously issued notes that were coming due. This disclosure is also misleading because it omits the material fact that ACF was dependent upon investors renewing their investments on maturity;

g. The disclosures that ACF would use the proceeds from the sale of these promissory notes to "engage in various specialty financing transactions, to provide senior and junior debt and equity funding for the benefit of its affiliates and its related investment programs and to repay previously issued Secured Notes" (pages 3 and 6-7) was materially false and misleading in that it portrayed ACF as planning to use the funds it obtained from investors to pursue new investment opportunities to benefit the new investors and omitted the material fact that ACF relied on money obtained from new investors to pay the principal and interest owed to old investors;

h. The disclosure on page 24 that ACF "is not obligated to register the Secured Notes and does not intend to do so" is misleading because it omitted to disclose the corresponding risk to investors if the ACF Notes did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the ACF note; (ii) refunding all such rescission requests would cause ACF to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) ACF would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law;

i. The disclosure at page 7 that "[t]he Company generally pays the principal and interest of Secured Notes from the proceeds of loans, leases, subordinated debt investments and similar assets of the Company and sales of Company assets, or from dividends and distributions paid to the Company from its subsidiaries or equity holdings," is false and misleading because the payments were generally, or always, made from the proceeds of sales of

securities and misleading because it omits to disclose the company's dependence on sales and renewals of securities;

j. The disclosure that "the Company may use proceeds of the sale of Secured Notes to repay the principal and interest of previously issued Secured Notes" for various stated reasons, including ACF's "efforts to reduce its weighted cost of capital" (page 7) is misleading because it fails to disclose that ACF was often using the proceeds of current offerings to replace maturing notes with lower interest payments. This disclosure is further misleading because it omits the material information that: (1) a substantial portion of the proceeds from the sale of the Notes would be used to satisfy obligations to investors; (2) ACF was dependent on sales of securities to satisfy its ongoing current capital needs and obligations; and (3) ACF's perilous financial condition;

k. The disclosure that ACF "may be at risk for some level of losses in the event of default by third parties in its various finance transactions," and identifying various steps that ACF purportedly takes to reduce such risk (page 7) is misleading because it downplays the risk of future losses and omits to disclose the material fact that substantial losses had already been experienced;

l. Various of the "risk factors" disclosed in the PPM, including, *inter alia*, those identified under the headings "educational loan reform efforts may harm the company" (Appendix A, page 2), "the performance of the Company's counterparties may affect the Company" (Appendix A, pages 2-3), "Economic and market risks exist" (Appendix A, page 3), "The Company may make investments in affiliates" (Appendix A, page 5) and "the collateral may be insufficient or unavailable" (Appendix A, pages 7-8) were materially misleading in that they were identified as "*risks*," when, in fact, they *had already materialized* as significant problems to ACF;

m. The statement at Appendix A, page 6, that "The ability of the Company to pay interest on and repay principal of Secured Notes depends, to a great extent, on the Manager's performance and ability to select successful investments" is misleading because it omits to disclose that the company's ability to pay interest and repay principal was dependent, at least to a great extent, on selling additional securities and upon investors renewing their investments on maturity;

n. The disclosure that ACF "may be unable to generate sufficient cash flow to meet debt service and payment at maturity" (Appendix A, page 7) was false and misleading when made because it omitted to disclose the material fact that ACF had *already* experienced significant difficulties in making timely interest payments and principal repayments, was experiencing severe liquidity problems, and was dependent upon sales and renewals of the Notes to keep from defaulting on its existing debt obligations; and

o. The disclosures on pages 13-14 under the heading "Related Party Transactions; Conflicts of Interest" were materially false and misleading, including the specific disclosures that "The Aequitas Conflicts Review Committee (described below) has been established to review and render an opinion on matters submitted to it that involve transactions with parties related to the Company or perceived conflicts of interest with respect to transactions

involving the Company" and that "The fact that members of the Investment Committee, their affiliates or any related persons are directly or indirectly interested in or connected with any entity or individual with which or with whom the Company may have dealings will not by itself preclude such dealings, and the Company will not have any rights in or to such dealings or any profits derived therefrom." These disclosures tended to portray ACF as having a process that would prevent ACM from entering into transactions that would be detrimental to ACF, but were materially false and misleading because they omitted to disclose the material information that ACM had diverted $55 million in fees that related to ACF's investment in Corinthian receivables, in a transaction evidencing a clear conflict of interest between ACM and ACF.

**ANSWER:** Paragraph 140 purports to characterize and make arguments about an ACF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 140 and, on that basis, denies such allegations.

141. The October 16, 2014 Supplement No. 1 to the November 30, 2013 PPM issued by ACF in connection with the sale of ACF Notes includes a copy of the November 30, 2013 ACF PPM and thereby makes the same untrue and misleading statements identified previously herein.

**ANSWER:** Paragraph 141 purports to characterize and make arguments about a supplement to an ACF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 141 and, on that basis, denies such allegations.

142. Shortly after May 9, 2015, ACF disseminated its Consolidated Financial Statements for the years 2014 and 2013 to investors. These financial statements were audited by Deloitte and include Deloitte's Independent Auditors' Report. The value of ACF's investment portfolio was materially overstated in 2014 because ACF failed to recognize losses related to the diminished value of the Corinthian loan portfolio as of December 31, 2014, as described in more detail in Section IV(A), *supra;*

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 142 and, on that basis, denies such allegations.

143. On May 11, 2015, ACF and ACF disseminated a document entitled "Aequitas Capital's Investor Update" to investors, falsely asserting that ACF's portfolio of loans was "performing acceptably."

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 143 and, on that basis, denies such allegations.

144. The September 9, 2015, Confidential Private Placement Memorandum ("PPM") issued by ACF in connection with the sale of ACF Notes includes a Directory that identifies Deloitte as Auditor and Tonkon as Legal Counsel, and includes references to and excerpts from the 2011 and 2012 EisnerAmper and 2013 and 2014 Deloitte audited financial statements. The September 9, 2015 PPM contains numerous untrue statements of material fact (and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading), including the following:

a. The disclosures on pages 5 through 7 outlining "the opportunity" disclosed that ACF would invest primarily in debt-related assets in order to generate sufficient cash flow to meet its monthly required debt service payments, and that ACF also obtained additional security for these investments beyond the assets themselves, closely monitoring the underlying debtors to ensure their continued financial health. These disclosures were materially false and misleading because: (1) ACF's investments did not generate sufficient cash flow to meet its debt service and other fixed obligations; (2) ACF did not invest in assets with the necessary time horizon and payment schedule that would allow ACF to meet its future cash obligations; (3) investors would not be protected by adequate security interests in portfolio assets; and (4) the stated "Risk Management" plan was not employed by the Company;

b. The disclosure of ACF's "collateral" as a "security interest in personal property of' ACF (pages 2 and 9) was materially false and misleading because it omitted and failed to disclose that the value of the alleged collateral was materially overstated, leaving investors unsecured or undersecured in their investments;

c. The disclosures in the "Financial Information Summary" (page 22) were false and misleading because they materially overstated the value of ACF's collateral available to investors. This Financial Information Summary contained selected "audited" financial results for the years 2011 through 2014, identifying ACF's "Investment Assets" as being worth more than $343 million as of the end of 2014, and its "loans to affiliates" (or intercompany loans) as being worth more $184 million as of the end of 2014. (The Financial Information Summary also identified "Investment Assets" of more than $306 million in 2013, $208 million in 2012 and $124 million in 2011 and Loans to affiliates of more than $120 million in 2013, $108 million in 2012 and $77 million in 2011). These disclosures were false and misleading because the values of both the reported Investment Assets and the Loans to Affiliates were materially overstated for the reasons detailed in Section IV(A), *supra*;

d. The disclosure that advances and loans to affiliates "are typically secured by the equity or all assets of Holdings or the specific affiliates to which funds are advanced" is materially misleading because it implies that the loans are actually secure, but omits the material

information that these intercompany loans were made to Aequitas entities that were insolvent or losing copious amounts of money, and the ultimate repayment of these loans could not be considered reasonably assured. Thus, the "security" obtained from the related entities was worthless or inadequate, and the loans were unsecured or undersecured loans to failing companies with little or no reasonable chance of repayment. See Section IV(A)(4), *supra*;

e. The disclosures regarding the background of both ACM and ACF (pages 5 and 12) were materially false and misleading because they omitted to disclose that ACM and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A)(1), *supra*;

f. The disclosure that the potential "Sources of Repayment" for the notes "generally" included cash flows generated by its investment portfolio or sales of assets from its investment portfolio (pages 3 and 6-7) was materially false and misleading because it portrayed cash flows from portfolio investments as being the primary source of repayment of its debt obligations, when, in fact, by no later than January of 2010, ACF relied upon the issuance of new notes as its means to pay off the previously issued notes that were coming due. The disclosure is also misleading because it omits the material fact that ACF was dependent upon investors renewing their investments on maturity;

g. The disclosures that ACF would use the proceeds from the sale of these promissory notes to "engage in various specialty financing transactions, to provide senior and junior debt and equity funding for the benefit of its affiliates and its related investment programs and to repay previously issued Secured Notes" (pages 2 and 6) was materially false and misleading in that it portrayed ACF as planning to use the funds it obtained from investors to pursue new investment opportunities to benefit the new investors and omitted the material fact that, by 2010, ACF had relied on money obtained from new investors to pay the principal and interest owed to old investors;

h. The disclosure on page 24 that ACF "is not obligated to register the Secured Notes and does not intend to do so" is misleading because it omitted to disclose the corresponding risk to investors if the ACF Notes did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the ACF note; (ii) refunding all such rescission requests would cause ACF to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) ACF would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law;

i. The disclosures on page 6 that "[t]he Company will make opportunistic investments in non-market correlated, niche income-yielding strategies;" "By remaining fast-moving and flexible, the Company expects to be able to capitalize on a variety of conditions favorable to deal structure and pricing;" and "the Company focuses on moving quickly to seize opportunities while they are still available" are untrue because the company was insolvent and unable to make investments and misleading because the company's true financial condition was not disclosed;

j. The disclosure at page 6 that "[t]he Company generally pays the principal and interest of Secured Notes from the proceeds of loans, leases, subordinated debt investments and similar assets of the Company and sales of Company assets, or from dividends and distributions paid to the Company from its subsidiaries or equity holdings," is false and misleading because the payments were generally, or always, made from the proceeds of sales of securities and misleading because it omits to disclose the company's dependence on sales and renewals of securities;

k. The disclosure that "The Company may use proceeds of the sale of Secured Notes to repay the principal and interest of previously issued Secured Notes" for various stated reasons, including ACF's "efforts to reduce its weighted cost of capital" (pages 6-7) is misleading because it fails to disclose that ACF was often using the proceeds of current offerings to replace maturing notes with lower interest payments. This disclosure is further misleading because it omits the material information that: (1) a substantial portion of the proceeds from the sale of the Notes would be used to satisfy obligations to investors; (2) ACF was dependent on sales of securities to satisfy its ongoing current capital needs and obligations; and (3) ACF's perilous financial condition;

l. The disclosure that ACF "may be at risk of loss in the event of default by third parties or affiliates in its various finance transactions or if an equity investment does not preform as anticipated" (page 7) is misleading because it omits actual, substantial losses already experienced and downplays the risk of future losses.";

m. Various of the "risk factors" disclosed in the PPM, including, *inter alia*, those identified under the headings "educational loan reform efforts may harm the company" (Appendix A, page 2), "the performance of the Company's receivable platform counterparties may affect the Company" (Appendix A, page 4), "Economic and market risks exist" (Appendix A, page 5), "The Company may make investments in affiliates" (Appendix A, pages 7-8) and "the collateral may be insufficient or unavailable" (Appendix A, pages 12-13) were materially misleading in that they were identified as "risks," when, in fact, they had already materialized as significant problems to ACF;

n. The disclosures that ACF *"may* suffer a loss in relation to the CFPB lawsuit due to the *potential* inability of Corinthian to complete its obligations for recourse" (Appendix A, pages 4-5) was materially misleading because ACM and ACF were already aware that these obligations had already effectively become non-recourse obligations by July 1, 2014 at the latest;

o. The statement at Appendix A, page 10, that "The ability of the Company to pay interest on and repay principal of Secured Notes depends, to a great extent, on the Manager's performance and ability to select successful investments" is misleading because it omits to disclose that the company's ability to pay interest and repay principal was dependent, at least to a great extent, on selling additional securities and renewing existing securities on maturity;

p. The disclosure that ACF "may be unable to generate sufficient cash flow to meet debt service and payment at maturity" (Appendix A, page 12) was false and misleading

when made because it omitted to disclose the material fact that ACF had *already* experienced significant difficulties in making timely interest payments and principal repayments, was experiencing severe liquidity problems, and was dependent upon sales and renewals of the Notes to keep from defaulting on its existing debt obligations;

q. The disclosures under the heading "Related Party Transactions; Conflicts of Interest" were materially false and misleading, including the specific disclosures that "The Aequitas Conflicts Review Committee (described below) has been established to review and render an opinion on matters submitted to it that involve transactions with parties related to the Company or perceived conflicts of interest with respect to transactions involving the Company" and that "The fact that members of the Investment Committee, their affiliates or any related persons are directly or indirectly interested in or connected with any entity or individual with which or with whom the Company may have dealings will not by itself preclude such dealings, and the Company will not have any rights in or to such dealings or any profits derived therefrom." These disclosures tended to portray ACF as having a process that would prevent ACM from entering into transactions that would be detrimental to ACF, but were materially false and misleading because they omitted to disclose the material information that ACM had diverted $55 million in fees that related to ACF's investment in Corinthian receivables, in a transaction evidencing a clear conflict of interest between ACM and ACF.

**ANSWER:** Paragraph 144 purports to characterize and make arguments about an ACF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 144 and, on that basis, denies such allegations.

145. In October 2015, ACF disseminated a "Performance Summary" for the quarter ended September 30, 2015. This Performance Summary represented a marked change in the information disclosed by Aequitas, including for the first time a calculation of "Assets Securing Subordinated Debt." This first-time disclosure showed a **net asset coverage ratio of just 106%** ($342,172,000/$321,332,000):

**ACF SUMMARY**

| | | |
|---|---|---|
| **Book Value of Total Assets** | | **$633,819,000** |
| **Less:** | Non-controlling Members' Equity | ($123,635,000) |
| **Less:** | Credit Facilities and Senior Debt | ($168,012,000) |
| **Assets Securing Subordinated Debt** | | $342,172,000 |
| **Subordinated Debt** | | $321,332,00 |

**ANSWER:** Paragraph 145 purports to characterize and quote from the referenced "Performance Summary," which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 145 and, on that basis, denies such allegations.

146. The October 27, 2015 Confidential Private Placement Memorandum ("PPM") issued by ACF in connection with the sale of ACF Notes includes a Directory that identifies Deloitte as ACF's auditor, and includes references to, and excerpts from, the 2011 and 2012 EisnerAmper and 2013 and 2014 Deloitte audited financial statements. This PPM contained numerous untrue statements of material fact (and omissions of material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading), including the following:

a. The disclosures on pages 5 through 7 outlining "the opportunity" disclosed that ACF would invest primarily in debt-related assets in order to generate sufficient cash flow to meet its monthly required debt service payments, and that ACF also obtained additional security for these investments beyond the assets themselves, closely monitoring the underlying debtors to ensure their continued financial health. These disclosures were materially false and misleading because: (1) ACF's investments did not generate sufficient cash flow to meet its debt service and other fixed obligations; (2) ACF did not invest in assets with the necessary time horizon and payment schedule that would allow ACF to meet its future cash obligations; (3) investors would not be protected by adequate security interests in portfolio assets; and (4) the stated "Risk Management" plan was not employed by the Company;

b. The disclosure of ACF's "collateral" as a "security interest in personal property of' ACF (pages 2 and 9) was materially false and misleading because it omitted and failed to disclose that the value of the alleged collateral was materially overstated, leaving investors unsecured or undersecured in their investments;

c. The disclosures in the "Financial Information Summary" (page 22) were false and misleading because they materially overstated the value of ACF's collateral available to investors. This Financial Information Summary contained selected "audited" financial results for the years 2011 through 2014, identifying ACF's "Investment Assets" as being worth more than $343 million as of the end of 2014, and its "loans to affiliates" (or intercompany loans) as being worth more $184 million as of the end of 2014. (The Financial Information Summary also identified "Investment Assets" of more than $306 million in 2013, $208 million in 2012 and $124 million in 2011 and Loans to affiliates of more than $120 million in 2013, $108 million in 2012 and $77 million in 2011). These disclosures were false and misleading because the values of both the reported Investment Assets and the Loans to Affiliates were materially overstated for the reasons detailed in Section IV(A), *supra;*

d. The disclosure that advances and loans to affiliates "are typically secured by the equity or all assets of Holdings or the specific affiliates to which funds are advanced" is materially misleading because it implies that the loans are actually secure, but omits the material information that these intercompany loans were made to Aequitas entities that were insolvent or losing copious amounts of money, and the ultimate repayment of these loans could not be considered reasonably assured. Thus, the "security" obtained from the related entities was worthless or inadequate, and the loans were unsecured or undersecured loans to failing companies with little or no reasonable chance of repayment. *See* Section IV(A)(4), *supra*;

e. The disclosures regarding the background of both ACM and ACF (pages 5 and 12) were materially false and misleading because they omitted to disclose that ACM and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A)(1), *supra*;

f. The disclosure that the potential "Sources of Repayment" for the notes "generally" included cash flows generated by its investment portfolio or sales of assets from its investment portfolio (pages 2 and 6-7) was materially false and misleading because it portrayed cash flows from portfolio investments as being the primary source of repayment of its debt obligations, when, in fact, by no later than January of 2010, ACF relied upon the issuance of new notes as its means to pay off the previously issued notes that were coming due. The disclosure is also misleading because it omits the material fact that ACF was dependent upon investors renewing their investments on maturity;

g. The disclosures that ACF would use the proceeds from the sale of these promissory notes to "engage in various specialty financing transactions, to provide senior and junior debt and equity funding for the benefit of its affiliates and its related investment programs and to repay previously issued Secured Notes" (pages 2 and 6) was materially false and misleading in that it portrayed ACF as planning to use the funds it obtained from investors to pursue new investment opportunities to benefit the new investors and omitted the material fact that, by 2010, ACF had relied on money obtained from new investors to pay the principal and interest owed to old investors;

h. The disclosure on pages 22-23 that ACF "is not obligated to register the Secured Notes and does not intend to do so" is misleading because it omitted to disclose the corresponding risk to investors if the ACF Notes did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the ACF note; (ii) refunding all such rescission requests would cause ACF to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) ACF would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law;

i. The disclosures on page 6 that "[t]he Company will make opportunistic investments in non-market correlated, niche income-yielding strategies;" "By remaining fast-moving and flexible, the Company expects to be able to capitalize on a variety of conditions favorable to deal structure and pricing;" and "the Company focuses on moving quickly to seize opportunities while they are still available" are untrue because the company was insolvent and

unable to make investments and misleading because the company's true financial condition was not disclosed;

j. The disclosure at page 6 that "[t]he Company generally pays the principal and interest of Secured Notes from the proceeds of loans, leases, subordinated debt investments and similar assets of the Company and sales of Company assets, or from dividends and distributions paid to the Company from its subsidiaries or equity holdings," is false and misleading because the payments were generally, or always, made from the proceeds of sales of securities and misleading because it omits to disclose the company's dependence on sales and renewals of securities;

k. The disclosure that "The Company may use proceeds of the sale of Secured Notes to repay the principal and interest of previously issued Secured Notes" for various stated reasons, including ACF's "efforts to reduce its weighted cost of capital" (pages 6-7) is misleading because ACF was often using the proceeds of current offerings to replace maturing notes with lower interest payments. This disclosure is further misleading because it omits the material information that: (1) a substantial portion of the proceeds from the sale of the Notes would be used to satisfy obligations to investors; (2) ACF was dependent on sales of securities to satisfy its ongoing current capital needs and obligations; and (3) ACF's perilous financial condition;

l. The disclosure that ACF "may be at risk of loss in the event of default by third parties or affiliates in its various finance transactions or if an equity investment does not preform as anticipated" (page 7) is misleading because it omits actual, substantial losses already experienced and downplays the risk of future losses.";

m. Various of the "risk factors" disclosed in the PPM, including, *inter alia*, those identified under the headings "There can be no assurance that the principal of or interest on the Subordinated Notes will be repaid" (Appendix A, page 1); "educational loan reform efforts may harm the company" (Appendix A, page 2), "the performance of the Company's receivable platform counterparties may affect the Company" (Appendix A, page 4), "Economic and market risks exist" (Appendix A, page 5), "The Company may make investments in affiliates" (Appendix A, page 8) and "the collateral may be insufficient or unavailable" (Appendix A, page 13) were materially misleading in that they were identified as "risks," when, in fact, they had already materialized as significant problems to ACF;

n. The disclosures that ACF *"may* suffer a loss in relation to the CFPB lawsuit due to the *potential* inability of Corinthian to complete its obligations for recourse" (Appendix A, page 5) was materially misleading because ACM and ACF were already aware that these obligations had already effectively become non-recourse obligations by July 1, 2014 at the latest;

o. The statement at Appendix A, page 10, that "The ability of the Company to pay interest on and repay principal of Secured Notes depends, to a great extent, on the Manager's performance and ability to select successful investments" is misleading because it omits to disclose that the company's ability to pay interest and repay principal was dependent, at least to a great extent, on selling additional securities;

p. The disclosure that ACF "may be unable to generate sufficient cash flow to meet debt service and payment at maturity" (Appendix A, page 12) was false and misleading when made because it omitted to disclose the material fact that ACF had *already* experienced significant difficulties in making timely interest payments and principal repayments, was experiencing severe liquidity problems, and was dependent upon sales of the Notes to keep from defaulting on its existing debt obligations; and

q. The disclosures under the heading "Related Party Transactions; Conflicts of Interest" were materially false and misleading, including the specific disclosures that "The Aequitas Conflicts Review Committee (described below) has been established to review and render an opinion on matters submitted to it that involve transactions with parties related to the Company or perceived conflicts of interest with respect to transactions involving the Company" and that "The fact that members of the Investment Committee, their affiliates or any related persons are directly or indirectly interested in or connected with any entity or individual with which or with whom the Company may have dealings will not by itself preclude such dealings, and the Company will not have any rights in or to such dealings or any profits derived therefrom." These disclosures tended to portray ACF as having a process that would prevent ACM from entering into transactions that would be detrimental to ACF, but were materially false and misleading because they omitted to disclose the material information that ACM had diverted $55 million in fees that related to ACF's investment in Corinthian receivables, in a transaction evidencing a clear conflict of interest between ACM and ACF.

**ANSWER:** Paragraph 146 purports to characterize and make arguments about an ACF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 146 and, on that basis, denies such allegations.

## C. False and Misleading Statements Regarding AIOF

147. The July 1, 2011 Confidential Private Placement Memorandum ("PPM") issued by AIOF in connection with the sale of AIOF Senior Secured Promissory Notes includes a Directory that identifies Tonkon as AIOF's legal counsel. This PPM contained numerous untrue statements of material fact and omissions of material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading, including the following:

a. The disclosures that [AIOF] "intends to follow a value investing style," meaning that AIOF "intends to acquire or invest in assets it believes are undervalued by the market and thus have a lower price than their true worth" (page 3); and that AIM's CEO and various other professionals employed by AIM, had "complementary skills and extensive experience relevant to making and managing the investments and financial operations of' AIOF (page 22) were materially false and misleading because Aequitas had no real expertise in this

area and had failed miserably. Further, these disclosures were materially false and misleading because they omitted the material facts that AIM and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A), *supra*;

b. The disclosure that the "Sources of Repayment" for the notes included cash flows generated by its investment portfolio or sales of assets from its investment portfolio (page 3) was materially false and misleading because it portrayed cash flows from portfolio investments as being a primary source of repayment of its debt obligations, when, in fact, AIOF primarily was dependent upon investors renewing their investments on maturity;

c. The disclosure of AIOF's "collateral" as a "security interest in all assets of the Fun (pages 2 and 20) was materially false and misleading because it omitted and failed to disclose that the value of the alleged collateral was materially overstated, leaving investors unsecured or undersecured in their investments;

d. The disclosure on page 32 that AIOF "is not obligated to register the Secured Notes and does not intend to do so" is misleading because it omitted to disclose the corresponding risk to investors if the AIOF Notes did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the AIOF note; (ii) refunding all such rescission requests would cause AIOF to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) AIOF would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law; and

e. The PPM disclosed certain "risks" that might arise at some unknown future date including that AIOF "will be subject to economic, investment and market risk" (Appendix A, page 1) and that AIOF's assets "may be inadequate to fund the Fund's obligations to Members and others" (Appendix A, page 4). These disclosures of possible future "risks" were materially false and misleading because the PPM omitted and failed to disclose that these issues were not merely future contingencies, but had already occurred.

**ANSWER:** Paragraph 147 purports to characterize and make arguments about an AIOF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 147 and, on that basis, denies such allegations.

148. The March 1, 2012 Confidential Private Placement Memorandum ("PPM") issued by AIOF in connection with the sale of AIOF Senior Secured Promissory Notes includes a Directory that identifies Tonkon as AIOF's legal counsel and EisnerAmper as AIOF's auditor. This PPM contained numerous untrue statements of material fact (and omissions of material fact

necessary to make the statements made, in light of the circumstances under which they are made, not misleading), including the following:

a. The disclosures that [AIOF] "intends to follow a value investing style," meaning that AIOF "intends to acquire or invest in assets it believes are undervalued by the market and thus have a lower price than their true worth" (page 3); and that AIM's CEO and various other professionals employed by AIM, had "complementary skills and extensive experience relevant to making and managing the investments and financial operations of' AIOF (page 21) were materially false and misleading because Aequitas had no real expertise in this area and had failed miserably. Further, these disclosures were materially false and misleading because they omitted the material facts that AIM and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A), *supra*;

b. The disclosure that the "Use of Proceeds" from the notes would "substantially" be used to purchase or participate in financing the purchase of portfolios of recourse and non-recourse healthcare and education receivables but *"may* also be used to pay redemptions of previously issued Notes" (page 2, emphases added) was materially false and misleading because it portrayed to investors that Note proceeds generally would not be used to pay redemptions to previous investors, when, in fact, AIOF primarily was dependent upon investors renewing their investments at maturity in order to fulfill its redemption obligations to previous investors.

c. The disclosure that the "Sources of Repayment" for the notes included cash flows generated by its investment portfolio or sales of assets from its investment portfolio (page 3) was materially false and misleading because it portrayed cash flows from portfolio investments as being a primary source of repayment of its debt obligations, when, in fact, AIOF primarily was dependent upon investors renewing their investments on maturity;

d. Various of the "risk factors" disclosed in the PPM, including, *inter alia*, those identified under the headings "The Fund will be subject to economic, investment, and market risk" (Appendix A, page 1), "There may be a lack of diversification in Portfolio Assets" (Appendix A, page 2), "Conflicts of Interest," (Appendix A, page 3), "Educational loan reform efforts may impact the Company" (Appendix A, page 4), and "The Collateral securing the Notes may be insufficient" (Appendix A, page 4) were materially misleading in that they were identified as *"risks"* when, in fact, they *had already materialized* as existing or likely significant problems to AIOF;

e. The disclosure of AIOF's "collateral" as a "security interest in all assets of the Fun (page 2) was materially false and misleading because it omitted and failed to disclose that the value of the alleged collateral was materially overstated, leaving investors unsecured or undersecured in their investments;

f. The disclosure on pages 11-12 regarding the "Educational Receivables Market" was materially false and misleading because, under the heading "Representative Opportunity—Private Student Loans," the PPM describes its student loan receivables portfolio but omits and fails to disclose that the "publicly-held educational institution" was the for-profit Corinthian Colleges, which was already experiencing financial distress at that time.

g. The disclosure that "[t]he forward flow loans will be purchased on a full recourse basis such that, in the event of a payment default by a loan obligor, the for-profit college is required to repurchase the loan for the unrecovered portion of the original purchase price" (page 12) was materially false and misleading because the entirety of its education credit receivables were from Corinthian Colleges, which was in financial distress such that any contractual "recourse" protection was likely illusory; and

h. The disclosure on page 29 that AIOF "is not obligated to register the Secured Notes and does not intend to do so" is misleading because it omitted to disclose the corresponding risk to investors if the AIOF Notes did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the AIOF note; (ii) refunding all such rescission requests would cause AIOF to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) AIOF would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law.

**ANSWER:** Paragraph 148 purports to characterize and make arguments about an AIOF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper denies them.

149. The December 31, 2012 Confidential Private Placement Memorandum ("PPM") issued by AIOF in connection with the sale of AIOF Senior Secured Promissory Notes includes a Directory that identifies Tonkon as AIOF's legal counsel and Harb, Levy & Weiland LLP (predecessor to EisnerAmper) as AIOF's auditor. This PPM contained numerous untrue statements of material fact (and omissions of material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading), including the following:

a. The disclosures that [AIOF] "intends to follow a value investing approach by acquiring or investing in receivables or loans with an intrinsic worth that is undervalued by the market." (page 3); and that AIM's CEO and various other professionals employed by AIM, had "complementary skills and extensive experience relevant to making and managing the investments and financial operations of' AIOF (page 31) were materially false and misleading because Aequitas had no real expertise in this area and had failed miserably. Further, these disclosures were materially false and misleading because they omitted the material facts that AIM and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A), *supra*;

b. The disclosure of AIOF's "collateral" as a "security interest in all assets of the Fun (pages 1,15) was materially false and misleading because it omitted and failed to disclose that the value of the alleged collateral was materially overstated, leaving investors unsecured or undersecured in their investments;

c. The disclosure on page 27 that AIOF "is not obligated to register the Secured Notes and does not intend to do so" is misleading because it omitted to disclose the corresponding risk to investors if the AIOF Notes did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the AIOF note; (ii) refunding all such rescission requests would cause AIOF to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) AIOF would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law;

d. The disclosures on page 11 that sales of the Senior Notes would be made by the Manager and by broker-dealers who are members of FINRA, and that the Manager "may pay selling commissions to registered broker-dealers" (page 11) were materially false and misleading because they omitted and failed to disclose that the Senior Notes were being sold through "finders" who were paid fees in spite of not being licensed as broker dealers or agents, in violation of securities laws, which subjected AIOF to significant potential penalties, including allowing investors who purchased Senior Notes in transactions in which finders' fees were paid having the right to rescind their purchases and subjecting AIOF to additional liability under state and federal laws; and

e. The PPM disclosed certain "risks" that might arise at some unknown future date including that AIOF "will be subject to economic, investment and market risk" (Appendix A, page 1); that Educational loan reform efforts may impact the Fund" (Appendix A, page 4); and that AIOF's assets "may be inadequate to fund the Fund's obligations to Members and others" (Appendix A, page 6). These disclosures of possible future "risks" were materially false and misleading because the PPM omitted and failed to disclose that these issues were not merely future contingencies, but had already occurred.

**ANSWER:** Paragraph 149 purports to characterize and make arguments about an AIOF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper denies them.

## D. False and Misleading Statements Regarding AIOF II

150. The February 12, 2012 Confidential Private Placement Memorandum ("PPM") issued by AIOF II in connection with the sale of AIOF II Series A Limited Liability Company Interests includes a Directory that identifies Tonkon as AIOF II's legal counsel and Harb, Levy & Weiland LLP (the predecessor of EisnerAmper) as AIOF II's auditor. This PPM contained numerous untrue statements of material fact (and omissions of material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading), including the following:

a. Under the heading of "About Aequitas and the Fund," the PPM disclosed that AIOF II "expects to use the proceeds from the sale of Series Interests, including the Series A Interests, to acquire Portfolio Assets, to pay obligations with respect to Series Interests and for

Organizational Expenses and Operating Costs" (page 7). This disclosure was materially false and misleading because it failed to disclose that the promissory notes issued by ACF would be partly or wholly unsecured because ACF was insolvent, and its reported assets were materially overstated;

b. The disclosures that "with a team of industry experts and years of experience in these markets, the Manager believes that [AIOF II] is well-positioned to take advantage of the currently favorable market conditions" (page 12); that Aequitas had "extensive experience and capabilities of Aequitas in private credit markets" (page 12); and that AIM's CEO and various other professionals employed by AIM, had "complementary skills and extensive experience relevant to making and managing the investments and financial operations of" AIOF II (page 30) were materially false and misleading because Aequitas had no real expertise in this area and had failed miserably. Further, these disclosures were materially false and misleading because they omitted the material facts that AIM and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A), *supra;*

c. The disclosure that "[AIOF II] intends to acquire or invest in assets it believes are undervalued by the market and thus have a lower price than their true worth" (page 5) was materially false and misleading because the assets purchased by ACF were dramatically *overvalued* (rather than undervalued) in ACF's reported and audited financial statements;

d. The disclosure on page 39 that AIOF II "is not obligated to register the Secured Notes and does not intend to do so" is misleading because it omitted to disclose the corresponding risk to investors if the AIOF II Notes did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the AIOF II note; (ii) refunding all such rescission requests would cause AIOF II to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) AIOF II would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law; and

e. The disclosures on page 38-39 that sales of the Senior Notes would be made by the Manager and by broker-dealers who are members of FINRA, and that the Manager "may pay selling commissions to registered broker-dealers" (page 38) were materially false and misleading because they omitted and failed to disclose that the Senior Notes were being sold through "finders" who were paid fees in spite of not being licensed as broker dealers or agents, in violation of securities laws, which subjected SIOF II to significant potential penalties, including allowing investors who purchased Senior Notes in transactions in which finders' fees were paid having the right to rescind their purchases and subjecting AIOF II to additional liability under state and federal laws.

**<u>ANSWER:</u>** Paragraph 150 purports to characterize and make arguments about an AIOF II PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper denies them.

151. The October 31, 2014 Confidential Private Placement Memorandum ("PPM") issued by AIOF II in connection with the sale of AIOF II Senior Secured Promissory Notes includes a Directory that identifies Tonkon as AIOF II's legal counsel and Deloitte as AIOF II's auditor. This PPM contained numerous untrue statements of material fact (and omissions of material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading), including the following:

a. Under the heading of "About the Fund," the PPM disclosed that AIOF II "will invest in promissory notes issued to the [AIOF II] by Aequitas Commercial Finance, LLC (the "Member") or applicable SPE, on senior or subordinated terms, as determined by the Manager in its sole discretion" (page 9). This disclosure was materially false and misleading because it failed to disclose that the promissory notes issued by ACF would be partly or wholly unsecured because ACF was insolvent, and its reported assets were materially overstated;

b. The disclosures that "with a team of industry experts and years of experience in these markets, the Manager believes that [AIOF II] is well-positioned to take advantage of the credit strategies' currently favorable market conditions" (page 10); that "Aequitas has established itself within large and inefficient credit markets such as education, healthcare, and private credit, where it provides unique financing solutions to companies and their consumers through its proprietary platforms" (page 10); and that AIM's CEO and various other professionals employed by AIM, had "complementary skills and extensive experience relevant to making and managing the investments and financial operations of' AIOF II (page 20) were materially false and misleading because Aequitas had no real expertise in this area and had failed miserably. Further, these disclosures were materially false and misleading because they omitted the material facts that AIM and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A), *supra;*

c. The PPM made various disclosures regarding its security interest in the assets purchased by ACF, including that: (1) "the Senior Notes are secured by a first priority security interest in all assets of AIOF II" and any security in ACF's underlying assets granted pursuant to AIOF II's purchase of ACF's promissory notes (page 17); and (2) that AIOF II accomplishes a security interest by " investing in Promissory notes issued [AIOF II] by ACF and the SPEs that are originating or participating (taking a *pari passu* or subordinate position) in the financing of receivables, consumer and commercial loans and leases, often at discounted prices, through the Aequitas platform" (page 10); and (3) "By structuring the purchase of the loans at a significant discount which provides substantial over-collateralization, Aequitas is able to mitigate the risk of a school not meeting its obligation to repurchase severely delinquent loans." (page 11). These disclosures were materially false and misleading because they omitted and failed to disclose that a material proportion of ACF's underlying collateral was education loans to students of the now-defunct Corinthian Colleges, rendering ACF insolvent, and the security interest in its assets to be worthless." Referring to the notes issued by AIOF II as "secured" is misleading for the same reasons;

d. The disclosure that "[AIOF II] follows a value investing approach by financing the purchase of receivables or debt assets that [AIOF II] believes have an intrinsic worth that is undervalued by the market" (page 10);

e. The disclosure on page 32 that AIOF II "is not obligated to register the Secured Notes and does not intend to do so" is misleading because it omitted to disclose the corresponding risk to investors if the AIOF II Notes did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the AIOF II note; (ii) refunding all such rescission requests would cause AIOF II to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) AIOF II would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law;

f. The disclosures on page 32 that sales of the Senior Notes would be made by the Manager and by broker-dealers who are members of FINRA, and that the Manager "may pay selling commissions to registered broker-dealers" (page 32) were materially false and misleading because they omitted and failed to disclose that the Senior Notes were being sold through "finders" who were paid fees in spite of not being licensed as broker dealers or agents, in violation of securities laws, which subjected SIOF II to significant potential penalties, including allowing investors who purchased Senior Notes in transactions in which finders' fees were paid having the right to rescind their purchases and subjecting AIOF II to additional liability under state and federal laws; and

g. The PPM disclosed certain "risks" that might arise at some unknown future date including the "risk of loss to bankruptcy or failure of counterparties" (Appendix A, **page** 4); that "obligors may default" (Appendix A, page 8); "there is no guarantee that [ACF's] proprietary loan selection and valuation models will be successful" (Appendix A, pages 8-9); and "counterparty risks" (Appendix A, page 12). These disclosures of possible future "risks" were materially false and misleading because the PPM omitted and failed to disclose that these issues were not merely future contingencies, but had already occurred.

**ANSWER:** Paragraph 151 purports to characterize and make arguments about an AIOF II PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 151 and, on that basis, denies such allegations.

152. The October 31, 2014 Confidential Private Placement Memorandum ("PPM") issued by AIOF II in connection with the sale of AIOF II Senior Secured Promissory Notes includes a Directory that identifies Tonkon as AIOF II's legal counsel, Deloitte as AIOF II's auditor and Integrity as its custodian. This PPM contained numerous untrue statements of material fact (and omissions of material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading), including the following:

a. Under the heading of "About the Fund," the PPM disclosed that AIOF II "will invest in promissory notes issued to the [AIOF II] by Aequitas Commercial Finance, LLC

(the "Member") or applicable SPE, on senior or subordinated terms, as determined by the Manager in its sole discretion" (page 9). This disclosure was materially false and misleading because it failed to disclose that the promissory notes issued by ACF would be partly or wholly unsecured because ACF was insolvent, and its reported assets were materially overstated;

b. The disclosures that "with a team of industry experts and years of experience in these markets, the Manager believes that [AIOF II] is well-positioned to take advantage of the credit strategies' currently favorable market conditions" (page 10); that "Aequitas has established itself within large and inefficient credit markets such as education, healthcare, and private credit, where it provides unique financing solutions to companies and their consumers through its proprietary platforms" (page 10); and that AIM's CEO and various other professionals employed by AIM, had "complementary skills and extensive experience relevant to making and managing the investments and financial operations of' AIOF II (page 21) were materially false and misleading because Aequitas had no real expertise in this area and had failed miserably. Further, these disclosures were materially false and misleading because they omitted the material facts that AIM and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A), *supra;*

c. The PPM made various disclosures regarding its security interest in the assets purchased by ACF, including that: (1) "the Senior Notes are secured by a first priority security interest in all assets of AIOF IF' and any security in ACF's underlying assets granted pursuant to AIOF IFs purchase of ACF's promissory notes (page 17); and (2) that AIOF II accomplishes a security interest by " investing in Promissory notes issued [AIOF II] by ACF and the SPEs that are originating or participating (taking a *pari passu* or subordinate position) in the financing of receivables, consumer and commercial loans and leases, often at discounted prices, through the Aequitas platform" (page 10); and (3) "By structuring the purchase of the loans at a significant discount which provides substantial over-collateralization, Aequitas is able to mitigate the risk of a school not meeting its obligation to repurchase severely delinquent loans." (page 11). These disclosures were materially false and misleading because they omitted and failed to disclose that a material proportion of ACF's underlying collateral was education loans to students of the now-defunct Corinthian Colleges, rendering ACF insolvent, and the security interest in its assets to be worthless." Referring to the notes issued by AIOF II as "secured" is misleading for the same reasons.

d. The disclosure that "[AIOF II] follows a value investing approach by financing the purchase of receivables or debt assets that [AIOF II] believes have an intrinsic worth that is undervalued by the market" (page 10) was materially false and misleading because the assets purchased by ACF were dramatically *overvalued* (rather than undervalued) in ACFs reported and audited financial statements.

e. The disclosure on page 34 that AIOF II "is not obligated to register the Secured Notes and does not intend to do so" is misleading because it omitted to disclose the corresponding risk to investors if the AIOF II Notes did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the AIOF II note; (ii) refunding all such rescission requests would cause AIOF II to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) AIOF II would be subject

to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law;

f. The disclosures on page 32 that sales of the Senior Notes would be made by the Manager and by broker-dealers who are members of FINRA, and that the Manager "may pay selling commissions to registered broker-dealers" (page 32) were materially false and misleading because they omitted and failed to disclose that the Senior Notes were being sold through "finders" who were paid fees in spite of not being licensed as broker dealers or agents, in violation of securities laws, which subjected AIOF II to significant potential penalties, including allowing investors who purchased Senior Notes in transactions in which finders' fees were paid having the right to rescind their purchases and subjecting AIOF II to additional liability under state and federal laws; and

g. The PPM disclosed certain "risks" that might arise at some unknown future date including the "risk of loss to bankruptcy or failure of counterparties" (Appendix A, **page** 4); that "obligors may default" (Appendix A, page 8); and "there is no guarantee that [ACF's] proprietary loan selection and valuation models will be successful" (Appendix A, page 9). These disclosures of possible future "risks" were materially false and misleading because the PPM omitted and failed to disclose that these issues were not merely future contingencies, but had already occurred.

**ANSWER:** Paragraph 152 purports to characterize and make arguments about an AIOF II PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 152 and, on that basis, denies such allegations.

**E. False and Misleading Statements Regarding ACOF**

153. The February 2014 Confidential Private Placement Memorandum ("PPM") issued by ACOF in connection with the sale of ACOF Limited Partnership Interests includes a Directory that identifies Deloitte as ACOF's auditor and Sidley as Legal Advisers to the General Partner (Aequitas Capital Opportunities GP, LLC) and the Investment Advisor (AIM). The PPM further identifies Duff & Phelps, describes its work as an independent valuation agent, and discloses Duff & Phelps' valuations of the fund's primary assets. This PPM contained numerous untrue statements of material fact (and omissions of material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading), including the following:

a. The disclosures at page 2 that proceeds would be used "to finance growth investments in the Existing Portfolio Investments and new investments in growth oriented companies generally in the financial services arena" and at page 4 that "the Investment Advisor expects that capital committed to the Partnership will be allocated to both existing and new

investments, with a significant portion of invested capital funding growth investments in the portfolio companies described below under '—Existing Portfolio Investments' and the remainder funding investments in new opportunities" are misleading because it omits to disclose that (a) a substantial portion of the proceeds would be used to satisfy obligations to other Aequitas investors and (b) Aequitas' dependence on new investments and renewal of existing investments.

b. The disclosures regarding the "Existing Portfolio Companies" were materially false and misleading because the PPM omitted to disclose information alleged in Section IV(A) regarding those portfolio companies and regarding the student loan receivables, healthcare receivables and motorcycle leases held by Aequitas;

c. The disclosure at page 12 that the EducationPlus Loan Program "recently ceased funding Corinthian loans with the intention of implementing enhancements to align with current market conditions" was materially false and misleading because it omitted to disclose the reasons that Aequitas had ceased funding of Corinthian loans and suggests that the reason was to "implement enhancements to align with current market conditions" rather than the actual reasons that Aequitas had ceased funding Corinthian loans;

d. The disclosed "Aequitas valuations" of CPTI, EDPlus, ETC, MotoLease and Strategic Capital are materially untrue or misleading because the actual fair values were materially less than represented. For example, the CPTI and EDPlus valuations effectively assumed (i) that CPTI and EDPlus owned the receivables portfolios that they each serviced, when, in fact, those receivables were owned by various Aequitas companies and pledged as collateral for senior secured credit facilities, and (ii) that CPTI and EDPlus were independent from Aequitas, when, in fact both companies were obligated to make substantial ongoing payments to Aequitas and dependent on continued Aequitas financing to fund and support their operations; and

e. The disclosures that: (1) "The Managing Principals of the General Partner and the Chief Executive Officer of ACM are primarily responsible for the investment activities of the Partnership, in conjunction with the Investment Committee. The Investment Advisor employs senior professionals in addition to Messrs. Froude, Ruh and Jesenik, who have complementary skills and extensive experience relevant to making and managing the investments of the Partnership" (page 26); and (2) "with a team of industry experts and years of experience in these markets, the Investment Advisor believes that the Partnership is well-positioned to experience capital appreciation over the Partnership's term." (page 4); were materially false and misleading in that they omitted and failed to disclose the material fact that that ACM and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A), *supra.*

**<u>ANSWER:</u>** Paragraph 153 purports to characterize and make arguments about an ACOF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in Paragraph 153 and, on that basis, denies such allegations.

154. The August 2014 First Supplement to the February 2014 PPM issued by ACOF in connection with the sale of ACOF Limited Partnership Interests incorporates by reference the ACOF February 2014 PPM and thereby makes the same untrue and misleading statements identified previously herein.

**ANSWER:** Paragraph 154 purports to characterize and make arguments about a supplement to an ACOF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 154 and, on that basis, denies such allegations.

155. The November 2014 Second Supplement to the February 2014 PPM issued by ACOF in connection with the sale of ACOF Limited Partnership Interests incorporates by reference the ACOF February 2014 PPM and thereby makes the same untrue and misleading statements identified previously herein.

**ANSWER:** Paragraph 155 purports to characterize and make arguments about a supplement to an ACOF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 155 and, on that basis, denies such allegations.

156. The February 2015 Third Supplement to the February 2014 PPM issued by ACOF in connection with the sale of ACOF Limited Partnership Interests incorporates by reference the ACOF February 2014 PPM and thereby makes the same untrue and misleading statements identified previously herein.

**ANSWER:** Paragraph 156 purports to characterize and make arguments about a supplement to an ACOF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient

to form a belief as to the truth of the allegations contained in Paragraph 156 and, on that basis, denies such allegations.

157. Aequitas and AIM provided prospective investors with an "Aequitas Capital Opportunities Fund, LP Confidential Fund Summary" (ACOF Fund Summary), which was intended to be used to promote and market the sale of the ACOF Limited Partnership Interests. The ACOF Fund Summary identified Deloitte as the provider of tax and accounting services to ACOF and Sidley as the provider of legal services to ACOF. The ACOF Fund Summary was dated March 9, 2014. The ACOF Fund Summary contained an overview, summary of growth opportunities, and performance information for each of the ACOF portfolio companies, including EDPlus, CPT, MotoLease, ETCGlobal, and Strategic Capital Alternatives, LLC. The performance information included, but was not limited to, revenue, assets under management ("Total AUM"), and income values for each of the ACOF portfolio companies. The ACOF Fund Summary contained numerous untrue statements of material fact and omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

a. The value shown in the ACOF Fund Summary to reflect Aequitas' initial contribution to ACOF was misleading because, for the reasons explained in the above sections of this Complaint, the company ownership interests that comprise that initial contribution were overvalued.

b. The value reported as the "Total AUM" for EDPlus was misleading because the receivables to which the performance summary referred were not actually owned by EDPlus—rather, they were owned by other Aequitas companies outside of ACOF, which companies had pledged those receivables as collateral for senior secured debt. The "Total AUM" value was also misleading because it reflected the face value of the outstanding receivables; the ACOF Fund Summary omitted and failed to disclose the fair value or liquidation value of the EDPlus receivables.

c. The value reported as "Platform Revenue" for EDPlus was misleading because that value reflected the revenue of other Aequitas companies outside of ACOF, which companies actually funded the purchase of the EDPlus receivables.

d. All of the values reflected in the ACOF Fund Summary's performance information for EDPlus, as well as the overview of EDPlus and its growth opportunities, was misleading because the ACOF Fund Summary omitted and failed to disclose the fact that the existence and continued operation of EDPlus depended upon its continuing relationship with, and ongoing financing from, Aequitas.

e. The value reported as the "Total AUM" for CPT was misleading because the receivables to which the performance summary referred were not actually owned by CPT—rather, they were owned by other Aequitas companies outside of ACOF, which companies had pledged those receivables as collateral for senior secured debt. The "Total AUM" value was also misleading because it reflected the face value of the outstanding receivables; the ACOF Fund

Summary omitted and failed to disclose the fair value or liquidation value of the CPT receivables.

f. The value reported as "Platform Revenue" for CPT was misleading because that value reflected the revenue of other Aequitas companies outside of ACOF, which companies actually funded the purchase of the CPT receivables.

g. All of the values reflected in the ACOF Fund Summary's performance information for CPT, as well as the overview of CPT and its growth opportunities, was misleading because the ACOF Fund Summary omitted and failed to disclose the fact that the existence and continued operation of CPT depended upon its continuing relationship with, and ongoing financing from, Aequitas.

h. The value reported as the "Total AUM" for MotoLease was misleading because the receivables to which the ACOF Fund Summary refers were not actually owned by MotoLease—rather, they were owned by other Aequitas companies outside of ACOF, which companies had pledged those receivables as collateral for senior secured debt. The "Total AUM" value was also misleading because the "Total AUM" value reflected the full performance value of the leases, even though the outstanding obligations on the leases were not likely to be fully performed, and Aequitas knew that those obligations were not likely to be fully performed.

i. All of the values reflected in the ACOF Fund Summary's performance information for MotoLease, as well as the overview of MotoLease and its growth opportunities, was misleading because the ACOF Fund Summary omitted and failed to disclose the fact that the existence and continued operation of MotoLease depended upon its continuing relationship with, and ongoing financing from, Aequitas.

j. All of the values reflected in the ACOF Fund Summary's performance information for ETCGlobal, as well as the overview of ETCGlobal and its growth opportunities, was misleading because the ACOF Fund Summary omitted and failed to disclose the fact that neither ACOF nor Aequitas owned ETCGlobal. ACOF owned less than 25 percent of the equity interest in ETCGlobal.

k. All of the values reflected in the ACOF Fund Summary's performance information for Strategic Capital Alternatives, LLC, as well as the overview of Strategic Capital Alternatives, LLC and its growth opportunities, was misleading because the ACOF Fund Summary omitted and failed to disclose the fact that the existence and continued operation of Strategic Capital Alternatives, LLC depended upon its continuing relationship with, and ongoing financing from, Aequitas.

**ANSWER:** Paragraph 157 purports to characterize and make arguments about an ACOF Fund Summary, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 157 and, on that basis, denies such allegations.

**F. False and Misleading Statements Regarding AIPF**

158. The September 30, 2011 Confidential Private Placement Memorandum ("PPM") issued by AIPF in connection with the sale of AIPF Preferred Non-voting Limited Liability Company Interests includes a Directory that identifies Tonkon as AIPF's legal counsel and Harb, Levy & Weiland LLP (the predecessor of EisnerAmper) as AIPF's auditor. This PPM contained numerous untrue statements of material fact (and omissions of material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading), including the following:

a. The disclosures regarding "Use of Proceeds" and "Sources of Return on Investment and Membership Interest Redemptions" are misleading because the PPM omits to disclose the company's dependence upon (a) proceeds from sales of new investments and (b) renewals of prior investments on maturity, to pay for redemptions of prior investments;

b. The disclosures that AIPF "intends to make investments on an opportunistic basis" (page 11); that AIPF "expects to be able to capitalize on a variety of existing conditions that contribute to favorable deal structure and pricing." (page 11); and "The Chief Executive Officer of the Manager is Robert J. Jesenik. Aequitas employs senior professionals in addition to Mr. Jesenik who have complementary skills and extensive experience relevant to making and managing the investments of the Fund" (page 27) were materially false and misleading in that they falsely portrayed Aequitas and AIM has having significant expertise in education receivables, when they plainly lacked such expertise. Additionally, these disclosures were also false and misleading because they omitted the material fact that Aequitas and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A), *supra*;

c. The disclosure that "[t]he forward flow loans will be purchased on a full recourse basis such that, in the event of a payment default by a loan obligor, the for-profit college is required to repurchase the loan for the unrecovered portion of the original purchase price" (page 13) was materially false and misleading because the entirety of its education credit receivables were from Corinthian Colleges, which was in financial distress such that any contractual "recourse" protection was illusory;

d. The disclosures that "Series A Interests have not been registered under the Securities Act or any state securities laws and must be held indefinitely unless a transfer of the Series A Interests is subsequently registered or an exemption from such registration is available. The Fund is not obligated to register the Series A Interests and does not intend to do so." (page 37) were misleading because the PPM omitted to disclose the corresponding risk to investors if the AIPF Interests did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the AIPF Interests; (ii) refunding all such rescission requests would cause AIPF to face severe financial demands and reputational harm that could materially adversely affect its

business and operations; (iii) AIPF would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law;

e. The disclosures that "[t]he Fund will be subject to economic, investment and market risk" (Appendix A, page 4); "[e]ducational loan reform efforts may impact the Fund" (Appendix A, page 4) were misleading when made because they identified these issues as a *potential* problem that could occur at an unknown future date, but omitted to disclose that these problems were *already* impacting AIPF.

**ANSWER:** Paragraph 158 purports to characterize and make arguments about the contents of an AIPF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper denies them.

159. The December 14, 2011 Confidential Private Placement Memorandum ("PPM") issued by AIPF in connection with the sale of AIPF Preferred Non-voting Limited Liability Company Interests includes a Directory that identifies Tonkon as AIPF's legal counsel and Harb, Levy & Weiland LLP (the predecessor of EisnerAmper) as AIPF's auditor. This PPM contained numerous untrue statements of material fact (and omissions of material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading), including the following:

a. The disclosures regarding "Use of Proceeds" and "Sources of Return on Investment and Membership Interest Redemptions" are misleading because the PPM omits to disclose the company's dependence upon (a) proceeds from sales of new investments and (b) renewals of prior investments on maturity, to pay for redemptions of prior investments;

b. The disclosures that AIPF "intends to make investments on an opportunistic basis" (page 11); that AIPF "expects to be able to capitalize on a variety of existing conditions that contribute to favorable deal structure and pricing." (page 11); and "The Chief Executive Officer of the Manager is Robert J. Jesenik. Aequitas employs senior professionals in addition to Mr. Jesenik who have complementary skills and extensive experience relevant to making and managing the investments of the Fund" (page 27) were materially false and misleading in that they falsely portrayed Aequitas and AIM has having significant expertise in education receivables, when they plainly lacked such expertise. Additionally, these disclosures were also false and misleading because they omitted the material fact that Aequitas and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A), *supra*;

c. The disclosure that "[t]he forward flow loans will be purchased on a full recourse basis such that, in the event of a payment default by a loan obligor, the for-profit college is required to repurchase the loan for the unrecovered portion of the original purchase price" (page 12) was materially false and misleading because the entirety of its education credit receivables were from Corinthian Colleges, which was in financial distress such that any contractual "recourse" protection was illusory;

d. The disclosures that "Offers and sales of Series A Interests will be made on a "best efforts" basis by employees of the Manager and by broker-dealers who are members of the Financial Industry Regulatory Authority, Inc., or F1NRA. The Manager may pay selling commissions to registered broker-dealers with respect to sales of Series A Interests made by them. Certain broker-dealers may also receive from the Fund a fee for wholesaling, marketing, training and due diligence investigation" (page 35); were materially false and misleading because they omitted and failed to disclose that the Notes were being sold through "finders" who were paid fees in spite of not being licensed as broker dealers or agents, in violation of securities laws, which subjected ACF to significant potential penalties, including allowing investors who purchased Secured Notes in transactions in which finders' fees were paid having the right to rescind their purchases and subjecting ACF to additional liability under state and federal laws;

e. The disclosure that "Series A Interests have not been registered under the Securities Act or any state securities laws and must be held indefinitely unless a transfer of the Series A Interests is subsequently registered or an exemption from such registration is available. The Fund is not obligated to register the Series A Interests and does not intend to do so." (page 36) was misleading because it omitted to disclose the corresponding risk to investors if the AIPF Interests did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the AIPF Interests; (ii) refunding all such rescission requests would cause AIPF to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) AIPF would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law;

f. The disclosures that "[t]he Fund will be subject to economic, investment and market risk" (Appendix A, page 4); "[e]ducational loan reform efforts may impact the Fund" (Appendix A, page 4) were misleading when made because they identified these issues as a *potential* problem that could occur at an unknown future date, but omitted to disclose that these problems were *already* impacting AIPF.

**ANSWER:** Paragraph 159 purports to characterize and make arguments about an AIPF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper denies them.

160. The February 15, 2012 Confidential Private Placement Memorandum ("PPM") issued by AIPF in connection with the sale of AIPF Preferred Non-voting Limited Liability Company Interests includes a Directory that identifies Tonkon as AIPF's legal counsel and Harb, Levy & Weiland LLP (the predecessor of EisnerAmper) as AIPF's auditor. This PPM contained numerous untrue statements of material fact (and omissions of material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading), including the following:

a. The disclosures regarding "Use of Proceeds" and "Sources of Return on Investment and Membership Interest Redemptions" are misleading because the PPM omits to

disclose the company's dependence upon (a) proceeds from sales of new investments and (b) renewals of prior investments on maturity, to pay for redemptions of prior investments;

b. The disclosures that AIPF "intends to make investments on an opportunistic basis" (page 11); that AIPF "expects to be able to capitalize on a variety of existing conditions that contribute to favorable deal structure and pricing." (page 11); and "The Chief Executive Officer of the Manager is Robert J. Jesenik. Aequitas employs senior professionals in addition to Mr. Jesenik who have complementary skills and extensive experience relevant to making and managing the investments of the Fund" (page 27) were materially false and misleading in that they falsely portrayed Aequitas and AIM has having significant expertise in education receivables, when they plainly lacked such expertise. Additionally, these disclosures were also false and misleading because they omitted the material fact that Aequitas and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A), *supra*;

c. The disclosure that "[t]he forward flow loans will be purchased on a full recourse basis such that, in the event of a payment default by a loan obligor, the for-profit college is required to repurchase the loan for the unrecovered portion of the original purchase price" (page 12) was materially false and misleading because the entirety of its education credit receivables were from Corinthian Colleges, which was in financial distress such that any contractual "recourse" protection was illusory;

d. The disclosures that "Offers and sales of Series A Interests will be made on a "best efforts" basis by employees of the Manager and by broker-dealers who are members of the Financial Industry Regulatory Authority, Inc., or F1NRA. The Manager may pay selling commissions to registered broker-dealers with respect to sales of Series A Interests made by them. Certain broker-dealers may also receive from the Fund a fee for wholesaling, marketing, training and due diligence investigation" (page 35); were materially false and misleading because they omitted and failed to disclose that the Notes were being sold through "finders" who were paid fees in spite of not being licensed as broker dealers or agents, in violation of securities laws, which subjected ACF to significant potential penalties, including allowing investors who purchased Secured Notes in transactions in which finders' fees were paid having the right to rescind their purchases and subjecting ACF to additional liability under state and federal laws;

e. The disclosure that "Series A Interests have not been registered under the Securities Act or any state securities laws and must be held indefinitely unless a transfer of the Series A Interests is subsequently registered or an exemption from such registration is available. The Fund is not obligated to register the Series A Interests and does not intend to do so." (page 36) was misleading because it omitted to disclose the corresponding risk to investors if the AIPF Interests did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the AIPF Interests; (ii) refunding all such rescission requests would cause AIPF to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) AIPF would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law; and

f. The disclosures that "[t]he Fund will be subject to economic, investment and market risk" (Appendix A, page 4); "[e]ducational loan reform efforts may impact the Fund" (Appendix A, page 4) were misleading when made because they identified these issues as a *potential* problem that could occur at an unknown future date, but omitted to disclose that these problems were *already* impacting AIPF.

**ANSWER:** Paragraph 160 purports to characterize and make arguments about an AIPF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper denies them.

161. The June 1, 2012 Confidential Private Placement Memorandum ("PPM") issued by AIPF in connection with the sale of AIPF Preferred Non-voting Limited Liability Company Interests includes a Directory that identifies Tonkon as AIPF's legal counsel and EisnerAmper as AIPF's auditor. This PPM contained numerous untrue statements of material fact (and omissions of material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading), including the following:

a. The disclosures regarding "Use of Proceeds" and "Sources of Return on Investment and Membership Interest Redemptions" are misleading because the PPM omits to disclose the company's dependence upon (a) proceeds from sales of new investments and (b) renewals of prior investments on maturity, to pay for redemptions of prior investments;

b. The disclosures that AIPF "intends to make investments on an opportunistic basis" (page **12);** that AIPF "expects to be able to capitalize on a variety of existing conditions that contribute to favorable deal structure and pricing." (page 12); and "The Chief Executive Officer of the Manager is Robert J. Jesenik. Aequitas employs senior professionals in addition to Mr. Jesenik who have complementary skills and extensive experience relevant to making and managing the investments of the Fund" (page 29) were materially false and misleading in that they falsely portrayed Aequitas and AIM has having significant expertise in education receivables, when they plainly lacked such expertise. Additionally, these disclosures were also false and misleading because they omitted the material fact that Aequitas and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A), *supra*;

c. The disclosure that "[t]he forward flow loans will be purchased on a full recourse basis such that, in the event of a payment default by a loan obligor, the for-profit college is required to repurchase the loan for the unrecovered portion of the original purchase price" (page 13) was materially false and misleading because the entirety of its education credit receivables were from Corinthian Colleges, which was in financial distress such that any contractual "recourse" protection was illusory;

d. The disclosures that "Offers and sales of Series A Interests will be made on a "best efforts" basis by employees of the Manager and by broker-dealers who are members of the Financial Industry Regulatory Authority, Inc., or F1NRA. The Manager may pay selling commissions to registered broker-dealers with respect to sales of Series A Interests made by

them. Certain broker-dealers may also receive from the Fund a fee for wholesaling, marketing, training and due diligence investigation" (page 37); were materially false and misleading because they omitted and failed to disclose that the Notes were being sold through "finders" who were paid fees in spite of not being licensed as broker dealers or agents, in violation of securities laws, which subjected ACF to significant potential penalties, including allowing investors who purchased Secured Notes in transactions in which finders' fees were paid having the right to rescind their purchases and subjecting ACF to additional liability under state and federal laws;

e. The disclosure that "Series A Interests have not been registered under the Securities Act or any state securities laws and must be held indefinitely unless a transfer of the Series A Interests is subsequently registered or an exemption from such registration is available. The Fund is not obligated to register the Series A Interests and does not intend to do so." (page 38) was misleading because it omitted to disclose the corresponding risk to investors if the AIPF Interests did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the AIPF Interests; (ii) refunding all such rescission requests would cause AIPF to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) AIPF would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law;

f. The disclosures that "[t]he Fund will be subject to economic, investment and market risk" (Appendix A, page 4); "[e]ducational loan reform efforts may impact the Fund" (Appendix A, page 4) were misleading when made because they identified these issues as a *potential* problem that could occur at an unknown future date, but omitted to disclose that these problems were *already* impacting AIPF.

**ANSWER:** Paragraph 161 purports to characterize and make arguments about an AIPF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper denies them.

162. The December 31, 2012 Confidential Private Placement Memorandum ("PPM") issued by AIPF in connection with the sale of AIPF Preferred Non-voting Limited Liability Company Interests includes a Directory that identifies Tonkon as AIPF's legal counsel and EisnerAmper as AIPF's auditor. This PPM contained numerous untrue statements of material fact (and omissions of material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading), including the following:

a. The disclosures regarding "Use of Proceeds" and "Sources of Return on Investment and Membership Interest Redemptions" are misleading because the PPM omits to disclose the company's dependence upon (a) proceeds from sales of new investments and (b) renewals of prior investments on maturity, to pay for redemptions of prior investments;

b. The disclosures that "the Fund follows a value investing approach by directly acquiring or investing in SPEs that acquire receivables or debt assets that the Fund

believes have an intrinsic worth that is undervalued by the market. The Fund accomplishes this by originating or participating (taking a *pari passu* or subordinate position) in the financing of **receivables**, loans, and leases, often at discounted prices, through the Aequitas platform" (page 12); "Aequitas has established itself within large and inefficient credit markets such as education, healthcare, and private credit, where it provides unique financing solutions to companies and their consumers through its proprietary platforms." (page 12); and "The Chief Executive Officer of the Manager is Robert J. Jesenik. Aequitas employs senior professionals in addition to Mr. Jesenik who have complementary skills and extensive experience relevant to making and managing the investments of the Fund" (page 26) were materially false and misleading in that they falsely portrayed Aequitas and AIM has having significant expertise in education receivables, when they plainly lacked such expertise. Additionally, these disclosures were also false and misleading because they omitted the material fact that Aequitas and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A), *supra*;

c. The disclosures that "[t]he Fund focuses solely on receivables and debt assets that enjoy recourse protection" (page 12) and "[b]y structuring the purchase of the loans at a significant discount which provides substantial over-collateralization, Aequitas is able to mitigate the risk of a school not meeting its obligation to repurchase severely delinquent loans." (page 12) were materially false and misleading because the entirety of its education credit receivables were from Corinthian Colleges, which was in financial distress such that any contractual "recourse" protection was illusory;

d. The disclosures that "Offers and sales of Series A Interests will be made on a "best efforts" basis by employees of the Manager and by broker-dealers who are members of the Financial Industry Regulatory Authority, Inc., or F1NRA. The Manager may pay selling commissions to registered broker-dealers with respect to sales of Series A Interests made by them. Certain broker-dealers may also receive from the Fund a fee for wholesaling, marketing, training and due diligence investigation" (page 36); were materially false and misleading because they omitted and failed to disclose that the securities were being sold through "finders" who were paid fees in spite of not being licensed as broker dealers or agents, in violation of securities laws, which subjected AIPF to significant potential penalties, including allowing investors who purchased in transactions in which finders' fees were paid having the right to rescind their purchases and subjecting AIPF to additional liability under state and federal laws;

e. The disclosure that "Series A Interests have not been registered under the Securities Act or any state securities laws and must be held indefinitely unless a transfer of the Series A Interests is subsequently registered or an exemption from such registration is available. The Fund is not obligated to register the Series A Interests and does not intend to do so." (page 37) was misleading because it omitted to disclose the corresponding risk to investors if the AIPF Interests did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the AIPF Interests; (ii) refunding all such rescission requests would cause AIPF to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) AIPF would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law;

f. The disclosures that "[t]he Fund will be subject to economic, investment and market risk" (Appendix A, page 4); "[e]ducational loan reform efforts may impact the Fund" (page 5) were misleading when made because they identified these issues as a *potential* problem that could occur at an unknown future date, but omitted to disclose that these problems were *already* impacting AIPF.

**ANSWER:** Paragraph 162 purports to characterize and make arguments about an AIPF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 162 and, on that basis, denies such allegations.

**G. False and Misleading Statements Regarding AEIF**

163. The October 1, 2014 Confidential Private Placement Memorandum ("PPM") issued by AEIF in connection with the sale of AEIF Preferred Non-voting Limited Liability Company Interests includes a Directory that identifies Deloitte as AEIF's auditor and Tonkon as its legal counsel. This PPM contained numerous untrue statements of material fact (and omissions of material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading), including the following:

a. The disclosures regarding "Use of Proceeds" are misleading because the PPM omits to disclose that the company and/or ACF would use proceeds to pay for redemptions of prior investments;

b. The disclosures regarding "Sources of Return on Investment and Membership Interest Redemptions" are misleading because the PPM omits to disclose the company's and ACF's dependence upon (a) proceeds from sales of new investments and (b) renewals of prior investments on maturity, to pay for redemptions of prior investments;

c. The disclosures that AEIF "will finance, directly or indirectly, in whole or in part, the purchase of portfolios of Credit Strategy Receivables (as defined below) by Aequitas Commercial Finance, LLC (the "Special Member") or subsidiaries or affiliates (each such subsidiary or affiliate, an "SPE")" (page 12) and that AEIF "will invest in promissory notes issued by the Special Member or applicable SPE, ... the proceeds of which the Special Member or SPE will use to acquire portfolios of Credit Strategy Receivables" (page 12) were misleading in that they omitted to disclose that the value of the Credit Strategy Receivables was materially overstated by ACF, rendering AEIF's security interest ineffective, in whole or in part, and that the Special Master or SPE would use proceeds to pay redemptions to other investors;

d. The disclosure that "Aequitas has established itself within large and inefficient credit markets such as education, healthcare, and private credit, where it provides unique financing solutions to companies and their consumers through its proprietary platforms"

(page 13) was false because Aequitas lacked expertise in these areas, and was further misleading because it omitted to disclose the material fact that Aequitas and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A), *supra*;

e. The disclosures regarding "Educational Credit Strategies (such as Unigo Group)" are misleading because the PPM omits to disclose the failures experienced by Aequitas with respect to Corinthian, as detailed in Section IV(A).

f. The disclosure that AEIF "is not obligated to register the Series Notes and does not intend to do so" (page 43) was misleading because it omitted to disclose the corresponding risk to investors if the AEIF Interests did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the AEIF Interests; (ii) refunding all such rescission requests would cause AEIF to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) AEIF would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law;

**ANSWER:** Paragraph 163 purports to characterize and make arguments about an AEIF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 163 and, on that basis, denies such allegations.

164. The January 1, 2015 Confidential Private Placement Memorandum ("PPM") issued by AEIF in connection with the sale of AEIF Preferred Non-voting Limited Liability Company Interests includes a Directory that identifies Deloitte as AEIF's auditor and Tonkon as its Legal Counsel. This PPM contained numerous untrue statements of material fact (and omissions of material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading), including the following:

a. The disclosures regarding "Use of Proceeds" are misleading because the PPM omits to disclose that the company and/or ACF would use proceeds to pay for redemptions of prior investments;

b. The disclosures regarding "Sources of Return on Investment and Membership Interest Redemptions" are misleading because the PPM omits to disclose the company's and ACF's dependence upon (a) proceeds from sales of new investments and (b) renewals of prior investments on maturity, to pay for redemptions of prior investments;

c. The disclosure that AEIF "will finance, directly or indirectly, in whole or in part, the purchase of portfolios of Credit Strategy Receivables (as defined below) by Aequitas Commercial Finance, LLC (the "Special Member") or subsidiaries or affiliates (each such

subsidiary or affiliate, an "SPE")" (page 14) and that AEIF "will invest in promissory notes issued by the Special Member or applicable SPE..., the proceeds of which the Special Member or SPE will use to acquire portfolios of Credit Strategy Receivables" (page 14) were misleading in that they omitted to disclose that the value of the Credit Strategy Receivables was materially overstated by ACF, rendering AEIF's security interest ineffective, in whole or in part and that the Special Member or SPE would use proceeds to pay redemption to other investors;

d. The disclosure that "Aequitas has established itself within large and inefficient credit markets such as education, healthcare, and private credit, where it provides unique financing solutions to companies and their consumers through its proprietary platforms" (page 15) was false because Aequitas lacked expertise in these areas, and was further misleading because it omitted to disclose the material fact that Aequitas and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A), *supra*;

e. The disclosures regarding "Educational Credit Strategies (such as Unigo Group)" are misleading because the PPM omits to disclose the failures experienced by Aequitas with respect to Corinthian, as detailed in Section IV(A);

f. The disclosure that AEIF "is not obligated to register the Series Notes and does not intend to do so" (page 47) was misleading because it omitted to disclose the corresponding risk to investors if the AEIF Interests did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the AEIF Interests; (ii) refunding all such rescission requests would cause AEIF to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) AEIF would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law;

**ANSWER:** Paragraph 164 purports to characterize and make arguments about an AIEF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 164 and, on that basis, denies such allegations.

165. The December 14, 2015 Confidential Private Placement Memorandum ("PPM") issued by AEIF in connection with the sale of AEIF Preferred Non-voting Limited Liability Company Interests includes a Directory that identifies Deloitte as AEIF's auditor and Integrity as its Custodian. This PPM contained numerous untrue statements of material fact (and omissions of material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading), including the following:

a. The disclosures regarding "Use of Proceeds" are misleading because the PPM omits to disclose that the company and/or ACF would use proceeds to pay for redemptions of prior investments;

b. The disclosures regarding "Sources of Return on Investment and Membership Interest Redemptions" are misleading because the PPM omits to disclose the company's and ACF's dependence upon (a) proceeds from sales of new investments and (b) renewals of prior investments on maturity, to pay for redemptions of prior investments;

c. The disclosure that AEIF "will finance, directly or indirectly, in whole or in part, the purchase of portfolios of Credit Strategy Receivables (as defined below) by Aequitas Commercial Finance, LLC (the "Special Member") or subsidiaries or affiliates (each such subsidiary or affiliate, an "SPE")" (page 14) and that AEIF "will invest in promissory notes issued by the Special Member or applicable SPE" (page 14) were misleading in that they omitted to disclose that the value of the Credit Strategy Receivables was materially overstated by ACF, rendering AEIF's security interest ineffective, in whole or in part;

d. The disclosure that "Aequitas has established itself within large and inefficient credit markets such as education, healthcare, and private credit, where it provides unique financing solutions to companies and their consumers through its proprietary platforms" (page 15) was false because Aequitas lacked expertise in these areas, and was further misleading because it omitted to disclose the material fact that Aequitas and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A), *supra*;

e. The disclosures regarding "Educational Credit Strategies" are misleading because the PPM omits to disclose the failures experienced by Aequitas with respect to Corinthian, as detailed in Section IV(A);

f. The disclosure that AEIF "is not obligated to register the Series Notes and does not intend to do so" (page 32) was misleading because it omitted to disclose the corresponding risk to investors if the AEIF Interests did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the AEIF Interests; (ii) refunding all such rescission requests would cause AEIF to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) AEIF would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law;

g. The disclosure that "[t]his Offering is made in the United States to certain selected offerees who qualify as accredited investors" is misleading because it omits to disclose the material information that the securities were being sold through "finders" who were paid fees in spite of not being licensed as broker dealers or agents, in violation of securities laws, which subjected APCF to significant potential penalties, including allowing investors who purchased in transactions in which finders' fees were paid having the right to rescind their purchases and subjecting ACF to additional liability under state and federal laws;

**ANSWER:** Paragraph 165 purports to characterize and make arguments about an AEIF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 165 and, on that basis, denies such allegations.

### H. False and Misleading Statements Regarding Aequitas Private Client Fund, LLC

166. The July 31, 2015 Confidential Private Placement Memorandum ("PPM") issued by APCF in connection with the sale of APCF Enhanced Yield Notes includes a Directory that identifies Tonkon as APCF's legal counsel and Deloitte as AIPF's auditor. This PPM contained numerous untrue statements of material fact (and omissions of material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading), including the following:

a. The disclosures that "the Aequitas integrated operating platform (the "Platform"), that identifies and qualifies attractive investment opportunities, designs innovative financing structures, and then adds deep expertise in management and technology. The Platform optimizes business and investment outcomes" (page 11), that APCF "intends to make opportunistic investments in non-market correlated, niche income-yielding strategies that exist in inefficient markets that are underserved by traditional lenders" (page 12); that APCF "expects to be able to capitalize on a variety of conditions favorable to deal structure and pricing" (page 12); and that "[t]he Chief Executive Officer of the Manager and of the Investment Advisor is Robert J. Jesenik. Aequitas employs senior professionals in addition to Mr. Jesenik who have complementary skills and extensive experience relevant to making and managing the investments and financial operations of the Fund" were materially false and misleading because they falsely portrayed Aequitas and AIM has having significant expertise in education receivables, when they plainly lacked such expertise. Additionally, these disclosures were also false and misleading because they omitted the material fact that Aequitas and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A), *supra*;

b. The disclosure that APCF "is not obligated to register the Series Notes and does not intend to do so" (page 32) was materially false and misleading when made because AIPF was required to register the Secured Notes. This disclosure was further misleading because it omitted to disclose the corresponding risk to investors if the AIPF Interests did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the APCF Interests; (ii) refunding all such rescission requests would cause APCF to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) APCF would be subject to significant fines and penalties imposed by the SEC or state

regulators; and (iv) additional remedies to purchasers could be available under applicable state law;

c. The disclosure that "[t]his Offering is made in the United States to certain selected offerees who qualify as accredited investors" is misleading because it omits to disclose the material information that the securities were being sold through "finders" who were paid fees in spite of not being licensed as broker dealers or agents, in violation of securities laws, which subjected APCF to significant potential penalties, including allowing investors who purchased in transactions in which finders' fees were paid having the right to rescind their purchases and subjecting ACF to additional liability under state and federal laws;

d. "The disclosures that APCF "may be unable to generate sufficient cash flow to meet debt service" (Appendix A, page 10) and that "collateral may be insufficient or unavailable" (Appendix A, page 11) were misleading when made because they identified these issues as a *potential* problem that could occur at an unknown future date, but omitted to disclose that these problems were *already* impacting APCF.

**ANSWER:** Paragraph 167 purports to characterize and make arguments about an APCF PPM, which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 167 and, on that basis, denies such allegations.

**I. False and Misleading Quarterly Summaries**

167. Holdings and its affiliates provided an "Aequitas Capital // Quarterly Update - Performance Summary // Q4.2011" (the "Q4 2011 Performance Summary") to investors and prospective investors. The Q4 2011 Performance Summary contains numerous untrue statements of material fact and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

a. The statement that the "Collateral Value of Assets" exceeded the "Book Value of Assets" by nearly 18% (more than $42 million) was materially false and misleading because it omitted and failed to disclose that "Collateral Value" did not reflect the fair value or liquidation value of the assets;

b. The statement that the "Collateral Value of Assets" was greater than $283 million was materially false and misleading because it omitted and failed to disclose that the "Collateral Value of Assets" reflected the full face value of the Corinthian receivables even though the full face value of those receivables would not be realized, either through collection or through recourse to Corinthian. For example, under the terms of several separate "one-off" purchases of receivables from Corinthian, Aequitas would be required to pay Corinthian more

than $44 million if Aequitas actually collected the full face value of the receivables acquired in those purchases;

c. The statement that ACF held "Corporate Debt" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Debt" assets were made up entirely (or almost entirely) of loans to various Aequitas affiliated companies, most of which were insolvent or losing copious amounts of money, and the stated value of the "Corporate Debt" assets was materially false and misleading because the stated value reflected the full face value of those intercompany loans even though even though the ultimate repayment of the loans was unlikely;

d. The statement that ACF held "Corporate Equity" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Equity" assets were made up entirely (or almost entirely) of equity interests in various Aequitas affiliated companies dependent on Aequitas for their continued operations and existence, the value of which was subjectively assigned by Aequitas management;

e. The statement that "ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from educational providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities, and secured liquidity lines to affiliates for general corporate purposes" was materially false and misleading because it failed to disclose that a substantial portion of the proceeds would be used to repay prior investors with maturing ACF Notes as well as investors with maturing investments in other Aequitas securities.

**ANSWER:** Paragraph 167 purports to characterize and make arguments about a "Q4 2011 Performance Summary," which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 167 and, on that basis, denies such allegations.

168. Holdings and its affiliates provided an "Aequitas Capital // Quarterly Update - Performance Summary // Q2.2012" (the "Q2 2012 Performance Summary") to investors and prospective investors. The Q2 2012 Performance Summary contains numerous untrue statements of material fact and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

a. The statement that the "Collateral Value of Assets" exceeded the "Book Value of Assets" by nearly 25% (more than $71 million) was materially false and misleading because it omitted and failed to disclose that "Collateral Value" did not reflect the fair value or liquidation value of the assets;

b. The statement that the "Collateral Value of Assets" was greater than $358 million was materially false and misleading because it omitted and failed to disclose that the "Collateral Value of Assets" reflected the full face value of the Corinthian receivables even though the full face value of those receivables would not be realized, either through collection or through recourse to Corinthian. For example, under the terms of several separate "one-off" purchases of receivables from Corinthian, Aequitas would be required to pay Corinthian more than $44 million if Aequitas actually collected the full face value of the receivables acquired in those purchases;

c. The statement that ACF held "Corporate Debt" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Debt" assets were made up entirely (or almost entirely) of loans to various Aequitas affiliated companies, most of which were insolvent or losing copious amounts of money, and the stated value of the "Corporate Debt" assets was materially false and misleading because the stated value reflected the full face value of those intercompany loans even though even though the ultimate repayment of the loans was unlikely;

d. The statement that ACF held "Corporate Equity" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Equity" assets were made up entirely (or almost entirely) of equity interests in various Aequitas affiliated companies dependent on Aequitas for their continued operations and existence, the value of which was subjectively assigned by Aequitas management;

e. The statement that "ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from educational providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities, and secured liquidity lines to affiliates for general corporate purposes" was materially false and misleading because it failed to disclose that a substantial portion of the proceeds would be used to repay prior investors with maturing ACF Notes as well as investors with maturing investments in other Aequitas securities.

**ANSWER:** Paragraph 168 purports to characterize and make arguments about a "Q2 2012 Performance Summary," which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 168 and, on that basis, denies such allegations.

169. Holdings and its affiliates provided an "Aequitas Capital // Quarterly Update - Performance Summary // Q3.2012" (the "Q3 2012 Performance Summary") to investors and prospective investors. The Q3 2012 Performance Summary contains numerous untrue statements of material fact and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

a. The statement that the "Collateral Value of Assets" exceeded the "Book Value of Assets" by nearly 38% (more than $124 million) was materially false and misleading because it omitted and failed to disclose that "Collateral Value" did not reflect the fair value or liquidation value of the assets;

b. The statement that the "Collateral Value of Assets" was greater than $454 million was materially false and misleading because it omitted and failed to disclose that the "Collateral Value of Assets" reflected the full face value of the Corinthian receivables even though the full face value of those receivables would not be realized, either through collection or through recourse to Corinthian. For example, under the terms of several separate "one-off" purchases of receivables from Corinthian, Aequitas would be required to pay Corinthian more than $44 million if Aequitas actually collected the full face value of the receivables acquired in those purchases;

c. The statement that ACF held "Corporate Debt" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Debt" assets were made up entirely (or almost entirely) of loans to various Aequitas affiliated companies, most of which were insolvent or losing copious amounts of money, and the stated value of the "Corporate Debt" assets was materially false and misleading because the stated value reflected the full face value of those intercompany loans even though even though the ultimate repayment of the loans was unlikely;

d. The statement that ACF held "Corporate Equity" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Equity" assets were made up entirely (or almost entirely) of equity interests in various Aequitas affiliated companies dependent on Aequitas for their continued operations and existence, the value of which was subjectively assigned by Aequitas management;

e. The statement that "ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from educational providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities, and secured liquidity lines to affiliates for general corporate purposes" was materially false and misleading because it failed to disclose that a substantial portion of the proceeds would be used to repay previous investors with maturing ACF Notes as well as investors with maturing investments in other Aequitas securities;

**ANSWER:** Paragraph 169 purports to characterize and make arguments about a "Q3 2012 Performance Summary," which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 169 and, on that basis, denies such allegations.

170. Holdings and its affiliates provided an "Aequitas Capital // Quarterly Update - Performance Summary // Q4.2012" (the "Q4 2012 Performance Summary") to investors and prospective investors. The Q4 2012 Performance Summary contains numerous untrue statements of material fact and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

a. The statement that the "Collateral Value of Assets" exceeded the "Book Value of Assets" by nearly 33% (more than $117 million) was materially false and misleading because it omitted and failed to disclose that "Collateral Value" did not reflect the fair value or liquidation value of the assets;

b. The statement that the "Collateral Value of Assets" was greater than $472 million was materially false and misleading because it omitted and failed to disclose that the "Collateral Value of Assets" reflected the full face value of the Corinthian receivables even though the full face value of those receivables would not be realized, either through collection or through recourse to Corinthian. For example, under the terms of several separate "one-off' purchases of receivables from Corinthian, Aequitas would be required to pay Corinthian more than $44 million if Aequitas actually collected the full face value of the receivables acquired in those purchases;

c. The statement that ACF held "Corporate Debt" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Debt" assets were made up entirely (or almost entirely) of loans to various Aequitas affiliated companies, most of which were insolvent or losing copious amounts of money, and the stated value of the "Corporate Debt" assets was materially false and misleading because the stated value reflected the full face value of those intercompany loans even though even though the ultimate repayment of the loans was unlikely;

d. The statement that ACF held "Corporate Equity" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Equity" assets were made up entirely (or almost entirely) of equity interests in various Aequitas affiliated companies dependent on Aequitas for their continued operations and existence, the value of which was subjectively assigned by Aequitas management;

e. The statement that "ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from educational providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities, and secured liquidity lines to affiliates for general corporate purposes" was materially false and misleading because it failed to disclose that a substantial portion of the proceeds would be used to repay previous investors with maturing ACF Notes as well as investors with maturing investments in other Aequitas securities.

**ANSWER:** Paragraph 170 purports to characterize and make arguments about a "Q4 2012 Performance Summary," which document speaks for itself, such that no answer is required. To

the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 170 and, on that basis, denies such allegations.

171. Holdings and its affiliates provided an "Aequitas Capital // Quarterly Update - Performance Summary // Q1.2013" (the "Q1 2013 Performance Summary") to investors and prospective investors. The Q1 2013 Performance Summary contains numerous untrue statements of material fact and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

a. The statement that the "Collateral Value of Assets" exceeded the "Book Value of Assets" by nearly 34% (more than $128 million) was materially false and misleading because it omitted and failed to disclose that "Collateral Value" did not reflect the fair value or liquidation value of the assets;

b. The statement that the "Collateral Value of Assets" was greater than $512 million was materially false and misleading because it omitted and failed to disclose that the "Collateral Value of Assets" reflected the full face value of the Corinthian receivables even though the full face value of those receivables would not be realized, either through collection or through recourse to Corinthian. For example, under the terms of several separate "one-off" purchases of receivables from Corinthian, Aequitas would be required to pay Corinthian more than $44 million if Aequitas actually collected the full face value of the receivables acquired in those purchases;

c. The statement that ACF held "Corporate Debt" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Debt" assets were made up entirely (or almost entirely) of loans to various Aequitas affiliated companies, most of which were insolvent or losing copious amounts of money, and the stated value of the "Corporate Debt" assets was materially false and misleading because the stated value reflected the full face value of those intercompany loans even though even though the ultimate repayment of the loans was unlikely;

d. The statement that ACF held "Corporate Equity" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Equity" assets were made up entirely (or almost entirely) of equity interests in various Aequitas affiliated companies dependent on Aequitas for their continued operations and existence, the value of which was subjectively assigned by Aequitas management;

e. The statement that "ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from educational providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities, and secured liquidity lines to affiliates for general corporate purposes" was materially false and misleading because it failed to disclose that a substantial portion of the proceeds would be used to repay previous investors

with maturing ACF Notes as well as investors with maturing investments in other Aequitas securities.

**ANSWER:** Paragraph 171 purports to characterize and make arguments about a "Q1 2013 Performance Summary," which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 171 and, on that basis, denies such allegations.

172. Holdings and its affiliates provided an "Aequitas Capital // Quarterly Update - Performance Summary // Q2.2013" (the "Q2 2013 Performance Summary") to investors and prospective investors. The Q2 2013 Performance Summary contains numerous untrue statements of material fact and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

a. The statement that the "Collateral Value of Assets" exceeded the "Book Value of Assets" by 33% (more than $139 million) was materially false and misleading because it omitted and failed to disclose that "Collateral Value" did not reflect the fair value or liquidation value of the assets;

b. The statement that the "Collateral Value of Assets" was greater than $559 million was materially false and misleading because it omitted and failed to disclose that the "Collateral Value of Assets" reflected the full face value of the Corinthian receivables even though the full face value of those receivables would not be realized, either through collection or through recourse to Corinthian. For example, under the terms of several separate "one-off" purchases of receivables from Corinthian, Aequitas would be required to pay Corinthian more than $44 million if Aequitas actually collected the full face value of the receivables acquired in those purchases;

c. The statement that ACF held "Corporate Debt" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Debt" assets were made up entirely (or almost entirely) of loans to various Aequitas affiliated companies, most of which were insolvent or losing copious amounts of money, and the stated value of the "Corporate Debt" assets was materially false and misleading because the stated value reflected the full face value of those intercompany loans even though even though the ultimate repayment of the loans was unlikely;

d. The statement that ACF held "Corporate Equity" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Equity" assets were made up entirely (or almost entirely) of equity interests in various Aequitas affiliated companies dependent on Aequitas for their continued operations and existence, the value of which was subjectively assigned by Aequitas management;

e. The statement that "ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from educational providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities, and secured liquidity lines to affiliates for general corporate purposes" was materially false and misleading because it failed to disclose that a substantial portion of the proceeds would be used to repay previous investors with maturing ACF Notes as well as investors with maturing investments in other Aequitas securities.

**ANSWER:** Paragraph 172 purports to characterize and make arguments about a "Q2 2013 Performance Summary," which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 172 and, on that basis, denies such allegations.

173. Holdings and its affiliates provided an "Aequitas Capital // Quarterly Update - Performance Summary // Q3.2013" (the "Q3 2013 Performance Summary") to investors and prospective investors. The Q3 2013 Performance Summary contains numerous untrue statements of material fact and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

a. The statement that the "Collateral Value of Assets" exceeded the "Book Value of Assets" by more than 33% (nearly $145 million) was materially false and misleading because it omitted and failed to disclose that "Collateral Value" did not reflect the fair value or liquidation value of the assets;

b. The statement that the "Collateral Value of Assets" was greater than $578 million was materially false and misleading because it omitted and failed to disclose that the "Collateral Value of Assets" reflected the full face value of the Corinthian receivables even though the full face value of those receivables would not be realized, either through collection or through recourse to Corinthian. For example, under the terms of several separate "one-off' purchases of receivables from Corinthian, Aequitas would be required to pay Corinthian more than $44 million if Aequitas actually collected the full face value of the receivables acquired in those purchases;

c. The statement that ACF held "Corporate Debt" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Debt" assets were made up entirely (or almost entirely) of loans to various Aequitas affiliated companies, most of which were insolvent or losing copious amounts of money, and the stated value of the "Corporate Debt" assets was materially false and misleading because the stated value reflected the full face value of those intercompany loans even though even though the ultimate repayment of the loans was unlikely;

d. The statement that ACF held "Corporate Equity" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Equity" assets were made up entirely (or almost entirely) of equity interests in various Aequitas affiliated companies dependent on Aequitas for their continued operations and existence, the value of which was subjectively assigned by Aequitas management;

e. The statement that "ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from educational providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities, and secured liquidity lines to affiliates for general corporate purposes" was materially false and misleading because it failed to disclose that a substantial portion of the proceeds would be used to repay previous investors with maturing ACF Notes as well as investors with maturing investments in other Aequitas securities.

**ANSWER:** Paragraph 173 purports to characterize and make arguments about a "Q3 2013 Performance Summary," which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 173 and, on that basis, denies such allegations.

174. Holdings and its affiliates provided an "Aequitas Capital // Quarterly Update - Performance Summary // Q4.2013" (the "Q4 2013 Performance Summary") to investors and prospective investors. The Q4 2013 Performance Summary contains numerous untrue statements of material fact and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

a. The statement that the "Collateral Value of Assets" exceeded the "Book Value of Assets" by more than 33% (more than $157 million) was materially false and misleading because it omitted and failed to disclose that "Collateral Value" did not reflect the fair value or liquidation value of the assets;

b. The statement that the "Collateral Value of Assets" was greater than $632 million was materially false and misleading because it omitted and failed to disclose that the "Collateral Value of Assets" reflected the full face value of the Corinthian receivables even though the full face value of those receivables would not be realized, either through collection or through recourse to Corinthian. By that time, Corinthian's business had begun to collapse and it was already failing on its recourse obligations with respect to the student loan receivables that Aequitas had purchased. Moreover, under the terms of several separate "one-off" purchases of receivables from Corinthian, Aequitas would be required to pay Corinthian more than $44 million if Aequitas actually collected the full face value of the receivables acquired in those purchases. For the same reasons, the "Book Value" stated for ACF's "Education Credit" was also materially false and misleading;

c. The statement that ACF held "Corporate Debt" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Debt" assets were made up entirely (or almost entirely) of loans to various Aequitas affiliated companies, most of which were insolvent or losing copious amounts of money, and the stated value of the "Corporate Debt" assets was materially false and misleading because the stated value reflected the full face value of those intercompany loans even though even though the ultimate repayment of the loans was unlikely;

d. The statement that ACF held "Corporate Equity" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Equity" assets were made up entirely (or almost entirely) of equity interests in various Aequitas affiliated companies dependent on Aequitas for their continued operations and existence, the value of which was subjectively assigned by Aequitas management;

e. The statement that "ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from educational providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities, and secured liquidity lines to affiliates for general corporate purposes" was materially false and misleading because it failed to disclose that a substantial portion of the proceeds would be used to repay previous investors with maturing ACF Notes as well as investors with maturing investments in other Aequitas securities.

**ANSWER:** Paragraph 174 purports to characterize and make arguments about a "Q4 2013 Performance Summary," which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 174 and, on that basis, denies such allegations.

175. Holdings and its affiliates provided an "Aequitas Capital // Quarterly Update - Performance Summary // Q1.2014" (the "Q1 2014 Performance Summary") to investors and prospective investors. The Q1 2014 Performance Summary contains numerous untrue statements of material fact and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

a. The statement that the "Collateral Value of Assets" exceeded the "Book Value of Assets" by more than 34% (more than $158 million) was materially false and misleading because it omitted and failed to disclose that "Collateral Value" did not reflect the fair value or liquidation value of the assets;

b. The statement that the "Collateral Value of Assets" was greater than $617 million was materially false and misleading because it omitted and failed to disclose that the "Collateral Value of Assets" reflected the full face value of the Corinthian receivables even

though the full face value of those receivables would not be realized, either through collection or through recourse to Corinthian. By that time, Corinthian's business had begun to collapse and it was already failing on its recourse obligations with respect to the student loan receivables that Aequitas had purchased. Moreover, under the terms of several separate "one-off' purchases of receivables from Corinthian, Aequitas would be required to pay Corinthian more than $44 million if Aequitas actually collected the full face value of the receivables acquired in those purchases. For the same reasons, the "Book Value" stated for ACF's "Education Credit" was also materially false and misleading;

c. The statement that ACF held "Corporate Debt" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Debt" assets were made up entirely (or almost entirely) of loans to various Aequitas affiliated companies, most of which were insolvent or losing copious amounts of money, and the stated value of the "Corporate Debt" assets was materially false and misleading because the stated value reflected the full face value of those intercompany loans even though even though the ultimate repayment of the loans was unlikely;

d. The statement that ACF held "Corporate Equity" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Equity" assets were made up entirely (or almost entirely) of equity interests in various Aequitas affiliated companies dependent on Aequitas for their continued operations and existence, the value of which was subjectively assigned by Aequitas management; and

e. The statement that "ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from educational providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities, and secured liquidity lines to affiliates for general corporate purposes" was materially false and misleading because it failed to disclose that a substantial portion of the proceeds would be used to repay previous investors with maturing ACF Notes as well as investors with maturing investments in other Aequitas securities.

**ANSWER:** Paragraph 175 purports to characterize and make arguments about a "Q1 2014 Performance Summary," which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 175 and, on that basis, denies such allegations.

176. Holdings and its affiliates provided an "Aequitas Capital // Quarterly Update - Performance Summary // Q2.2014" (the "Q2 2014 Performance Summary") to investors and prospective investors. The Q2 2014 Performance Summary contains numerous untrue statements of material fact and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

a. The statement that the "Collateral Value of Assets" exceeded the "Book Value of Assets" by more than 34% (more than $164 million) was materially false and misleading because it omitted and failed to disclose that "Collateral Value" did not reflect the fair value or liquidation value of the assets;

b. The statement that the "Collateral Value of Assets" was greater than $646 million was materially false and misleading because it omitted and failed to disclose that the "Collateral Value of Assets" reflected the full face value of the Corinthian receivables even though the full face value of those receivables would not be realized, either through collection or through recourse to Corinthian. By that time, Corinthian's business had begun to collapse and it was already failing on its recourse obligations with respect to the student loan receivables that Aequitas had purchased. Moreover, under the terms of several separate "one-off" purchases of receivables from Corinthian, Aequitas would be required to pay Corinthian more than $44 million if Aequitas actually collected the full face value of the receivables acquired in those purchases. For the same reasons, the "Book Value" stated for ACF's "Education Credit" was also materially false and misleading;

c. The statement that ACF held "Corporate Debt" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Debt" assets were made up entirely (or almost entirely) of loans to various Aequitas affiliated companies, most of which were insolvent or losing copious amounts of money, and the stated value of the "Corporate Debt" assets was materially false and misleading because the stated value reflected the full face value of those intercompany loans even though even though the ultimate repayment of the loans was unlikely;

d. The statement that ACF held "Corporate Equity" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Equity" assets were made up entirely (or almost entirely) of equity interests in various Aequitas affiliated companies dependent on Aequitas for their continued operations and existence, the value of which was subjectively assigned by Aequitas management; and

e. The statement that "ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from educational providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities, and secured liquidity lines to affiliates for general corporate purposes" was materially false and misleading because it failed to disclose that a substantial portion of the proceeds would be used to repay previous investors with maturing ACF Notes as well as investors with maturing investments in other Aequitas securities.

**ANSWER:** Paragraph 176 purports to characterize and make arguments about a "Q2 2014 Performance Summary," which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information

sufficient to form a belief as to the truth of the allegations contained in Paragraph 176 and, on that basis, denies such allegations.

177. Holdings and its affiliates provided an "Aequitas Capital // Quarterly Update - Performance Summary // Q3.2014" (the "Q3 2014 Performance Summary") to investors and prospective investors. The Q3 2014 Performance Summary contains numerous untrue statements of material fact and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

a. The statement that the "Collateral Value of Assets" exceeded the "Book Value of Assets" by more than 31% (more than $162 million) was materially false and misleading because it omitted and failed to disclose that "Collateral Value" did not reflect the fair value or liquidation value of the assets;

b. The statement that the "Collateral Value of Assets" was greater than $674 million was materially false and misleading because it omitted and failed to disclose that the "Collateral Value of Assets" reflected the full face value of the Corinthian receivables even though the full face value of those receivables would not be realized, either through collection or through recourse to Corinthian. By that time, Corinthian's business had collapsed and it could not perform on its recourse obligations with respect to the student loan receivables that Aequitas had purchased. Moreover, under the terms of several separate "one-off" purchases of receivables from Corinthian, Aequitas would be required to pay Corinthian more than $44 million if Aequitas actually collected the full face value of the receivables acquired in those purchases. For the same reasons, the "Book Value" stated for ACF's "Education Credit" was also materially false and misleading;

c. The statement that ACF held "Corporate Debt" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Debt" assets were made up entirely (or almost entirely) of loans to various Aequitas affiliated companies, most of which were insolvent or losing copious amounts of money, and the stated value of the "Corporate Debt" assets was materially false and misleading because the stated value reflected the full face value of those intercompany loans even though even though the ultimate repayment of the loans was unlikely;

d. The statement that ACF held "Corporate Equity" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Equity" assets were made up entirely (or almost entirely) of equity interests in various Aequitas affiliated companies dependent on Aequitas for their continued operations and existence, the value of which was subjectively assigned by Aequitas management; and

e. The statement that "ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from educational providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities, and secured liquidity lines to affiliates for general corporate purposes" was materially false and misleading because it failed to disclose that a substantial portion of the proceeds would be used to repay previous investors

with maturing ACF Notes as well as investors with maturing investments in other Aequitas securities.

**ANSWER:** Paragraph 177 purports to characterize and make arguments about a "Q3 2014 Performance Summary," which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 177 and, on that basis, denies such allegations.

178. Holdings and its affiliates provided an "Aequitas Capital // Quarterly Update - Performance Summary // Q4.2014" (the "Q4 2014 Performance Summary") to investors and prospective investors. The Q4 2014 Performance Summary contains numerous untrue statements of material fact and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

a. The statement that the "Collateral Value of Assets" exceeded the "Book Value of Assets" by more than 29% (more than $163 million) was materially false and misleading because it omitted and failed to disclose that "Collateral Value" did not reflect the fair value or liquidation value of the assets;

b. The statement that the "Collateral Value of Assets" was greater than $718 million was materially false and misleading because it omitted and failed to disclose that the "Collateral Value of Assets" reflected the full face value of the Corinthian receivables even though the full face value of those receivables would not be realized, either through collection or through recourse to Corinthian. By that time, Corinthian's business had collapsed and it could not perform on its recourse obligations with respect to the student loan receivables that Aequitas had purchased. Moreover, under the terms of several separate "one-off" purchases of receivables from Corinthian, Aequitas would be required to pay Corinthian more than $44 million if Aequitas actually collected the full face value of the receivables acquired in those purchases. For the same reasons, the "Book Value" stated for ACF's "Education Credit" was also materially false and misleading;

c. The statement that ACF held "Corporate Debt" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Debt" assets were made up entirely (or almost entirely) of loans to various Aequitas affiliated companies, most of which were insolvent or losing copious amounts of money, and the stated value of the "Corporate Debt" assets was materially false and misleading because the stated value reflected the full face value of those intercompany loans even though even though the ultimate repayment of the loans was unlikely;

d. The statement that ACF held "Corporate Equity" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Equity" assets were made up entirely (or almost entirely) of equity interests in various Aequitas affiliated

companies dependent on Aequitas for their continued operations and existence, the value of which was subjectively assigned by Aequitas management; and

e. The statement that "ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from educational providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities, and secured liquidity lines to affiliates for general corporate purposes" was materially false and misleading because it failed to disclose that a substantial portion of the proceeds would be used to repay previous investors with maturing ACF Notes as well as investors with maturing investments in other Aequitas securities.

**ANSWER:** Paragraph 178 purports to characterize and make arguments about a "Q4 2014 Performance Summary," which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 178 and, on that basis, denies such allegations.

179. Holdings and its affiliates provided an "Aequitas Capital // Quarterly Update - Performance Summary // Q2.2015" (the "Q2 2015 Performance Summary") to investors and prospective investors. The Q2 2015 Performance Summary contains numerous untrue statements of material fact and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

a. The "Book Value" stated for ACFs "Education Credit" was materially false and misleading because it omitted and failed to disclose the fact that the value of ACFs student loan receivables depended on collection or recourse on the receivables purchased from Corinthian. By that time, however, Corinthian's business had collapsed and it could not perform its recourse obligations with respect to the student loan receivables that Aequitas had purchased;

b. The statement that ACF held "Corporate Debt" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Debt" assets were made up entirely (or almost entirely) of loans to various Aequitas affiliated companies, most of which were insolvent or losing copious amounts of money, and the stated value of the "Corporate Debt" assets was materially false and misleading because the stated value reflected the full face value of those intercompany loans even though even though the ultimate repayment of the loans was unlikely;

c. The statement that ACF held "Corporate Equity" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Equity" assets were made up entirely (or almost entirely) of equity interests in various Aequitas affiliated companies dependent on Aequitas for their continued operations and existence, the value of which was subjectively assigned by Aequitas management; and

d. The statement that "ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from educational providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities, and secured liquidity lines to affiliates for general corporate purposes" was materially false and misleading because it failed to disclose that a substantial portion of the proceeds would be used to repay previous investors with maturing ACF Notes as well as investors with maturing investments in other Aequitas securities.

**ANSWER:** Paragraph 179 purports to characterize and make arguments about a "Q2 2015 Performance Summary," which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 179 and, on that basis, denies such allegations.

180. Holdings and its affiliates provided an "Aequitas Capital // Quarterly Update - Performance Summary // Q3.2015" (the "Q3 2015 Performance Summary") to investors and prospective investors. The Q3 2015 Performance Summary contains numerous untrue statements of material fact and/or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

a. The "Book Value" stated for ACF's "Education Credit" was materially false and misleading because it omitted and failed to disclose the fact that the value of ACF's student loan receivables depended on collection or recourse on the receivables purchased from Corinthian. By that time, however, Corinthian's business had collapsed and it could not perform its recourse obligations with respect to the student loan receivables that Aequitas had purchased;

b. The statement that ACF held "Corporate Debt" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Debt" assets were made up entirely (or almost entirely) of loans to various Aequitas affiliated companies, most of which were insolvent or losing copious amounts of money, and the stated value of the "Corporate Debt" assets was materially false and misleading because the stated value reflected the full face value of those intercompany loans even though even though the ultimate repayment of the loans was unlikely;

c. The statement that ACF held "Corporate Equity" assets was materially misleading because it omitted and failed to disclose that the referenced "Corporate Equity" assets were made up entirely (or almost entirely) of equity interests in various Aequitas affiliated companies dependent on Aequitas for their continued operations and existence, the value of which was subjectively assigned by Aequitas management; and

d. The statement that "ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from educational providers, patient-pay

receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities, and secured liquidity lines to affiliates for general corporate purposes" was materially false and misleading because it failed to disclose that a substantial portion of the proceeds would be used to repay previous investors with maturing ACF Notes as well as investors with maturing investments in other Aequitas securities.

**ANSWER:** Paragraph 180 purports to characterize and make arguments about a "Q3 2015 Performance Summary," which document speaks for itself, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 180 and, on that basis, denies such allegations.

**J. False and Misleading Statements Regarding AMLF Notes**

181. The AMLF Note investment documentation represented that the investment was secured by a senior security interest in the assets of AMLF, *i.e.*, motorcycle leases. This representation was untrue because, in fact, the security interest was or would be subordinated to other senior secured lenders, and misleading because it omitted to disclose the information alleged in Section IV (A) regarding MotoLease.

**ANSWER:** Paragraph 181 contains characterizations and conclusions of law, and purports to characterize unidentified documents, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 181 and, on that basis, denies such allegations.

182. The AMLF Note investment documentation represented that the investment was guaranteed by ACF. This representation was misleading because it omitted to disclose the information alleged herein regarding ACF, and because it implied that ACF was and would be able to satisfy its obligations under the guaranty when, in fact, ACF was not and would not be able to satisfy those obligations.

**ANSWER:** Paragraph 182 contains characterizations and conclusions of law, and purports to characterize unidentified documents, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 182 and, on that basis, denies such allegations.

## V. THE COLLAPSE OF AEQUITAS AND PLAINTIFFS' DISCOVERY OF THE BASIS FOR THEIR CLAIMS

183. The truth of the untrue and misleading statements alleged herein was not disclosed to Plaintiffs.

**ANSWER:** Paragraph 183 is vague as to time period and contains arguments to which no answer is required. To the extent that this paragraph makes factual allegations relating to statements made during the period of EisnerAmper's engagement, EisnerAmper denies those allegations. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of any other allegations and, on that basis, denies them.

184. Plaintiffs only discovered that Aequitas had potentially committed securities law violations when they received a February 2, 2016, letter that ACF sent to investors informing them that ACF had not been able to satisfy redemption requests since November 2015 and was preparing to liquidate ACF's assets. Plaintiffs did not know of the untruths and omissions and, in the exercise of reasonable care, could not have known of the untruths or omission before receiving that letter. While that letter did not indicate that Aequitas had committed securities violations, it was the first indication that Aequitas may have made material untrue and misleading statements.

**ANSWER:** Paragraph 184 contains characterizations and conclusions of law, and purports to quote from a February 2, 2016 letter, which document speaks for itself, such that no answer is required. To the extent that this paragraph makes factual allegations relating to alleged securities violations by Aequitas funds during the period of EisnerAmper's engagement, EisnerAmper denies those allegations. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of any other allegations and, on that basis, denies them.

185. On February 8, 2016, ACM disclosed that it had retained FTI Consulting (a forensic and investigative financial consulting firm) to take over management control of the portfolio and to advise on financial matters and potential restructuring of the Aequitas entities.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 185 and, on that basis, denies such allegations.

186. On February 16, 2016, Aequitas told Oregon state officials that it intended to lay off 80 employees, and told each of these employees that the "layoff is intended to be permanent in nature."

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 186 and, on that basis, denies such allegations.

187. On March 10, 2016, the U.S. Securities and Exchange Commission filed suit in this District against Aequitas, Jesenik, and Oliver charging them with securities fraud in connection with their sales of securities.

**ANSWER:** Admitted.

188. Soon thereafter, the SEC and the Aequitas entity defendants asked the Court to appoint Ronald Greenspan of FTI as receiver for the Aequitas entities.

**ANSWER:** Admitted.

## VI. DEFENDANTS PARTICIPATED AND MATERIALLY AIDED IN THE SALE OF AEQUITAS SECURITIES

189. EisnerAmper participated and materially aided in the sales of securities by Aequitas until at least March 24, 2014.

a. EisnerAmper acted as the auditor for numerous Aequitas investment vehicles, including ACF; AIPF; AIOF; AETC; Aequitas Carepayment Founders Fund, LLC; Aequitas Carepayment Fund, LLC; Aequitas Catalyst Fund, LLC; Aequitas Commodities Fund, LLC; Aequitas Hybrid Fund, LLC; Aequitas Income Fund, LLC; and Aequitas Insurance Fund I, LLC. EisnerAmper audited the consolidated financial statements of ACF, which encompassed ACF as well as the following Aequitas entities: CarePayment, LLC; CP Funding I, LLC; CA Medical, LLC; ASFG, LLC; CR Funding I, LLC; Destination Capital Equipment Finance, LLC; EC Hangar, LLC; Aequitas North American Finance, Inc.; Aequitas Equipment Finance, LLC; CP Leverage I, LLC; Aequitas CarePayment Fund, LLC; Aequitas Income Fund, LLC; AIOF; AIPF; and AMLF.

b. EisnerAmper's auditing services enabled the Aequitas group to conduct its securities business. EisnerAmper's willingness to audit Aequitas only below the level of Holdings gave Aequitas the freedom it needed to undertake the transfers and transactions with the entities outside the Deloitte-audited fundraising group that allowed it to create and perpetuate the illusion of financial health. Aequitas needed the stamp of legitimacy provided by a "clean" audit opinion from an established and reputable audit firm in order to attract, secure, and retain investors and their funds. And Aequitas needed the audited annual reports in order to comply with an exception to the standard custody requirements of the Investment Advisers Act of 1940, an exception that allowed Aequitas to continue to raise and use investor funds free of outside scrutiny.

c. EisnerAmper's working papers acknowledge that SEC rules required the distribution of audited financials and that the audited financials would be used by potential and current investors.

d. Aequitas identified EisnerAmper as its auditor in connection with the sale of securities. EisnerAmper is identified as the auditor in the PPMs for various Aequitas securities, as alleged herein. For example, the March 30, 2012, Form ADV for AIM, which EisnerAmper held in its audit files, publicly identified EisnerAmper as the auditor for AIOF; AIPF; AETC; Aequitas CarePayment Founders Fund, LLC; Aequitas CarePayment Fund, LLC; Aequitas Catalyst Fund, LLC; Aequitas Commodities Fund, LLC; Aequitas Insurance Fund I, LLC; Aequitas Hybrid Fund, LLC; and Aequitas Income Opportunity Fund II, LLC. And the October 23, 2013, Form ADV for AIM publicly identified EisnerAmper as the auditor for AIOF; AIPF; AETC; Aequitas CarePayment Fund, LLC; Aequitas Hybrid Fund, LLC; and Aequitas Commodities Fund, LLC. EisnerAmper also was identified as auditor for the various funds in the Form ADVs for AIM dated March 30, 2011; July 30, 2012; September 11, 2012; and April 1, 2013.

e. EisnerAmper was identified as "Auditor/Tax Advisor" in marketing materials for Aequitas securities. EisnerAmper had some or all of these marketing materials in its audit files.

f. Because it acted as its own investment advisor, Aequitas was subject to the Investment Advisers Act of 1940 and the rules issued thereunder, including Rule 206(4)-2. That rule generally requires that client assets be maintained with a "qualified custodian" and subjected to annual surprise audits, the results of which are reported to the SEC. Given its business and fundraising model, Aequitas could not adhere to this requirement. Instead, Aequitas took advantage of the only available exception to the rule, which required Aequitas (i) to obtain an annual audit for each of the Aequitas Funds by an independent PC AOB-inspected accounting firm, and (ii) to distribute the annual audited financial statements to investors. In other words, Aequitas could not have continued to sell securities without EisnerAmper's annual audits, nor could Aequitas have continued to sell securities without distributing the annual EisnerAmper-audited financial statements to investors. Because the Aequitas advisor and the Aequitas Funds were all part of the integrated group of affiliated Aequitas companies, the Aequitas advisor was deemed to have custody of client assets and was therefore subject to the requirements of Rule 206(4)-2.

g. EisnerAmper's audit workpapers state that "Aequitas relies on distributing financials to investors within 120 days to satisfy custody rule. Users include investors and potential investors who may want to invest in the fund."

**ANSWER:** As to Paragraph 189(a), EisnerAmper admits that it performed auditing services for ACF (fiscal year ended December 31, 2011); Aequitas ETC Founders Fund (fiscal years ended December 31, 2011 and December 31, 2012); AIPF (fiscal years ended December 31, 2011 and December 31, 2012); Aequitas Carepayment Founders Fund, LLC (fiscal years ended

December 31, 2011 and December 31, 2012); Aequitas Carepayment Fund, LLC (fiscal years ended December 31, 2011 and December 31, 2012); AIOF (fiscal years ended December 31, 2011 and December 31, 2012); Aequitas Catalyst Fund, LLC (fiscal year ended December 31, 2011); Aequitas Commodities Fund, LLC (fiscal year ended December 31, 2012); Aequitas Hybrid Fund, LLC (fiscal years ended December 31, 2011 and December 31, 2012); and Aequitas Income Opportunity Fund II (fiscal year ended December 31, 2012). As to Paragraphs 189(c), (d), (e), and (g), EisnerAmper denies any allegations regarding unidentified sources and documents, whereas the few identified documents (such as the Forms ADV) and partially identified documents (such as "EisnerAmper's audit workpapers") will speak for themselves, such that no answer is required. EisnerAmper denies all other allegations in Paragraph 189, including the entirety of Paragraph 189(b), including because they are argument, characterizations, and conclusions of law, such that no answer is required.

190. Deloitte participated and materially aided in the sales of securities by Aequitas beginning no later than September 13, 2013.

a. Deloitte acted as the auditor for numerous Aequitas investment vehicles, including ACF; AIPF; AIOF; AIOF-II; ACOF; AETC; AEIF; Aequitas Carepayment Fund, LLC; Aequitas Hybrid Fund, LLC; and Aequitas WRFF I, LLC. Deloitte audited the consolidated financial statements of ACF, which encompassed ACF as well as the following Aequitas entities: CarePayment, LLC; CP Funding I, LLC; CA Medical, LLC; Campus Student Funding, LLC; Destination Capital Equipment Finance, LLC; The Hill Land Company, LLC; EC Hangar, LLC; Aequitas North American Finance, Inc.; Aequitas Equipment Finance, LLC; CP Leverage I, LLC; CSF Leverage I, LLC; Aequitas CarePayment Fund, LLC; Aequitas Income Fund, LLC; AIOF; AIOF-II; AIPF; AEIF; ACOF; and AMLF.

b. Deloitte's auditing services enabled the Aequitas group to conduct its securities business as a whole. Deloitte's willingness to audit Aequitas only below the level of Holdings gave Aequitas the freedom it needed to undertake the transfers and transactions with the entities outside the Deloitte-audited fundraising group that allowed it to create and perpetuate the illusion of financial health. Aequitas needed the stamp of legitimacy provided by a "clean" audit opinion from an established and reputable audit firm in order to attract, secure, and retain investors and their funds. And Aequitas needed the audited annual reports in order to comply with an exception to the standard custody requirements of the Investment Advisers Act of 1940, an exception that allowed Aequitas to continue to raise and use investor funds free of outside scrutiny.

c. Aequitas informed Deloitte that it wished to transition auditing services from EisnerAmper to Deloitte because of Aequitas' desire to have a more prominent audit firm with a national reputation. In addition, Aequitas informed Deloitte that Aequitas was not satisfied with EisnerAmper's industry qualifications, and Deloitte was selected for its qualifications relating to Aequitas' industry. Having Deloitte as the auditor of its securities business gave Aequitas clout with prospective and existing investors, and the Deloitte-audited financial statements were a material part of the information made available to prospective and existing investors. Deloitte replaced EisnerAmper as Aequitas' auditor no later than September 12, 2013.

d. Aequitas provided the financial statements audited by Deloitte to prospective and existing investors who were deciding whether to invest or re-invest in Aequitas securities. For example, AIM's Form ADV Part 2A (the firm disclosure brochure) dated March 24, 2014, stated:

> Each year, each of our Funds delivers to its investors the previous year's audited financial statements, including a balance sheet, an income statement, and a statement of investors' capital. An independent accounting firm that is registered with and subject to inspection by the Public Accounting Oversight Board audits our Funds' annual financial statements.

Deloitte was aware that Aequitas was subject to this requirement and that the audited financial statements would be used in this way and for this purpose.

e. Deloitte's working papers acknowledge that SEC rules required the distribution of audited financials and that the audited financials would be used by potential and current investors.

f. Aequitas identified Deloitte as the auditor in the PPMs for various Aequitas securities, as alleged herein. Aequitas also identified Deloitte as the auditor for the Aequitas Funds in public disclosures filed with the SEC. Deloitte is identified as auditor in the Form ADVs (Part 1 A) filed by AIM with the SEC dated March 24, 2014; May 27, 2014; and March 31, 2015.

g. For the reasons discussed in Paragraph 189 with respect to EisnerAmper, Aequitas could not have continued to sell securities without Deloitte's annual audits, nor could Aequitas have continued to sell securities without distributing the annual Deloitte-audited financial statements to investors.

h. Deloitte was identified as auditor in marketing materials for Aequitas securities, and Deloitte approved Aequitas forwarding its contact details to potential investors conducting due diligence.

**ANSWER:** EisnerAmper admits that Deloitte replaced EisnerAmper as Aequitas' auditor no later than September 12, 2013. Beyond this, EisnerAmper lacks knowledge or information

sufficient to form a belief about the truth of the allegations in Paragraph 190 and, on that basis, denies such allegations.

191. Tonkon participated and materially aided in the sales of securities by Aequitas beginning no later than June 9, 2010.

a. Tonkon provided legal services to Aequitas in connection with the sale of its securities, including through ACF; AIOF; AIOF-II; AIPF; AEIF; ACOF; and AMLF, and prepared legal papers necessary for Aequitas to complete the sale of its securities, including through ACF; AIOF; AIOF-II; AIPF; AEIF; ACOF; and AMLF.

b. Tonkon provided a legal opinion, dated June 21, 2011, regarding ACF's qualification for an exemption from the Investment Company Act of 1940. Absent an exemption, unregistered investment companies cannot engage in any business in interstate commerce, or control any company engaged in interstate commerce. Tonkon opined that ACF appeared to be in compliance, but cautioned Aequitas to seek guidance from the SEC, which Tonkon knew that Aequitas did not do.

c. Tonkon is identified as legal counsel in the Directory of various PPMs for Aequitas securities, as alleged herein. Tonkon drafted these PPMs and had copies of these PPMs in its files.

d. Tonkon provided legal services to AIM in connection with AIM's role as an SEC-registered investment advisor and the manager of numerous Aequitas investment vehicles, including ACF; AIPF; AIOF; AIOF-II; ACOF (through its role as manager of ACOFGP); AETC; AEIF; APCF; Aequitas Carepayment Founders Fund, LLC; Aequitas Carepayment Fund, LLC; Aequitas Catalyst Fund, LLC; Aequitas Commodities Fund, LLC; Aequitas Hybrid Fund, LLC; Aequitas Income Fund, LLC; Aequitas Insurance Fund I, LLC; and Aequitas WRFF I, LLC.

e. When Aequitas sought to retain Deloitte in order to have a more prominent audit firm, Tonkon vouched that it could "see no reason why [Deloitte] wouldn't want to be associated with Aequitas."

**ANSWER:** EisnerAmper admits that Tonkon was listed as legal counsel in certain Aequitas entities' PPMs and provided a legal opinion, dated June 21, 2011, regarding ACF's qualification for an exemption from the Investment Company Act of 1940. EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 191 and, on that basis, denies such allegations.

192. Sidley participated and materially aided in the sales of securities beginning no later than April 5, 2013.

a. Sidley's initial engagement letter dated March 1, 2012, identifies ACF as Sidley's general client in all matters. Sidley provided legal services to ACF and other Aequitas entities in connection with the sale of its securities.

b. Sidley prepared legal papers necessary for Aequitas to complete the sale of its securities.

c. Sidley prepared offering documents required for Aequitas to complete the sale of its securities, including ACOF securities. As reflected on invoices, Sidley billed Aequitas more than $350,000 for its services relating to the ACOF securities offering, including the following services: Drafting PPMs and at least three supplements thereto, drafting subscription documents, drafting the administration agreement, drafting marketing materials, drafting the term sheet, revising the pitch book, drafting the fact sheet, and drafting the fund limited partnership agreement.

d. The PPMs for ACF securities identified the issue of compliance with the Investment Company Act as a material issue. EisnerAmper, and later Deloitte, also identified this material issue. As a result, the auditors required Aequitas to obtain legal opinions confirming Aequitas' compliance with the Investment Company Act. In response to EisnerAmper, by Memorandum dated April 5, 2013, Sidley provided a written opinion and analysis confirming ACF's compliance. Without this legal opinion, EisnerAmper would not have issued a clean audit opinion and Aequitas would not have been able to sell securities.

e. Aequitas, Deloitte, and Sidley knew, at the end of 2014, that ACF did not comply with the exemption it had relied upon to avoid registration under the Investment Company Act. SEC rules provide a one-year transition period to regain compliance with the Investment Act of 1940. Sidley advised Aequitas how to regain compliance, and Deloitte relied on this fact in proceeding with its audit engagement. Deloitte also relied on Sidley's repeated assurances with respect to the SEC investigation of Aequitas, an investigation that Sidley disclosed to Deloitte in May 2015.

f. Sidley advised Aequitas how to structure its arrangement with Integrity so as to enable Integrity to act as an aggregator of individual investments in an effort to circumvent the Investment Company Act. Integrity became involved with Aequitas in connection with AIPF. Integrity told Aequitas that they could create a structure using a trust (having IB AT, a general partnership, as nominee) that would allow Integrity to act as a pass-through for many different investors that would count as only one investor for purposes of the exemption from the Investment Company Act on which AIPF relied. Under this arrangement, Integrity would count as a single investor against the maximum allowable 99 investors. Aequitas and Sidley learned that Integrity was wrong and, in July 2014, Aequitas informed the SEC that AIPF failed to satisfy the exemption, and Aequitas proceeded with the process of liquidating AIPF. During 2014, Sidley worked with Aequitas to create a structure that would allow Integrity to do what was originally intended—that is, to act as an aggregator of individual investments—via AIOF-II. AIOF-II was set up specifically for the purpose of retaining AIPF investor money in order to avoid a liquidity crisis, by having the investments in AIPF transfer over to IOF-II.

g. Sidley was engaged by ASFG LLC, the Aequitas entity that purchased loans from Corinthian, by letter dated July 18, 2012. Sidley also represented CP Lending I, LLC, and its affiliates, entities used by Aequitas to leverage its healthcare receivables, as well as AMLF, which Aequitas used to leverage its motorcycle leases.

h. Sidley provided legal advice to Aequitas regarding what Aequitas called its "Note Manufacturing Program," including advising Aequitas regarding what constitutes a "security" and advice regarding 1940 Act compliance. Sidley advised Aequitas that these notes were not securities and that Aequitas was not required to comply with securities laws as to these notes. Based upon Sidley's legal advice, Aequitas did not provide a PPM or other disclosures in connection with its Note Manufacturing Program and was able to sell the subject securities. In fact, the notes are securities.

i. Sidley provided legal services to AIM in connection with AIM's role as an SEC-registered investment advisor and the manager of numerous Aequitas investment vehicles, including ACF; AIPF; AIOF; AIOF-II; ACOF (through its role as manager of ACOFGP); AETC; AEIF; Aequitas Carepayment Fund, LLC; Aequitas Hybrid Fund, LLC; and Aequitas WRFF I, LLC.

j. Sidley provided other legal services to Aequitas, including legal opinions and other legal services that enabled Aequitas to isolate its health care receivable assets from investors and to pledge those assets as collateral securing Aequitas' loan facilities with Bank of America and Wells Fargo Bank, which promoted the illusion of success and legitimacy that Aequitas required in order to perpetuate its ongoing efforts to take money from investors. Among the opinions provided by Sidley was a 2015 opinion to Wells Fargo regarding ACF's status under the Investment Company Act.

**ANSWER:** EisnerAmper admits that by Memorandum dated April 5, 2013, Sidley provided a written opinion and analysis confirming ACF's compliance with the Investment Company Act. Beyond this, EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 192 and, on that basis, denies such allegations.

193. Ameritrade participated and materially aided in the sales of securities by Aequitas beginning no later than June 2010. Ameritrade, as part of its "Advisor Direct" financial advisor referral program, recommended and referred investors to financial advisors for the purpose of purchasing Aequitas securities. Ameritrade also served the critical role of providing custodial services for its customers to hold Aequitas securities in their accounts.

a. The Advisor Direct program included a small number of investment advisors. Before including them in the program, Ameritrade performed extensive due diligence on the advisors. Ameritrade began its practice of recommending and referring investors to financial advisors for the purpose of purchasing Aequitas securities at least as early as June 2010. By contract, advisors participating in the Advisor Direct program paid Ameritrade 25% of all advisory fees received from customers Ameritrade referred to the advisors, and family members

of those customers. If the participating advisor suggested that a client move the client's assets to a financial institution other than Ameritrade, the advisor was required to pay Ameritrade a one-time fee of 0.75% of the value of the referred client's assets under management. The participating advisors agreed to pay to Ameritrade a minimum of $10,000 per year in fees. Strategic Capital, an investment advisor affiliated with Aequitas, was one of the advisors in Advisor Direct. Ameritrade knew that Strategic Capital was heavily selling Aequitas securities. Ameritrade representatives attended meetings between clients of Ameritrade and representatives of Strategic Capital, at which Aequitas securities were sold to Ameritrade customers. Ameritrade representatives were also present when Strategic Capital advisors presented the Aequitas securities and documentation to Ameritrade clients. These meetings frequently occurred in Ameritrade's offices. Ameritrade had Aequitas offering documents and promotional materials in its offices. Ameritrade representatives knew that customers found the Aequitas securities to be very attractive because of the interest rates that Aequitas offered. Plaintiff Ciuffitelli was referred to Strategic Capital by his Ameritrade account representative, Tim Kenton, in September 2010. Mr. Kenton promoted Aequitas to Mr. Ciuffitelli as a great investment with a big return and told Mr. Ciuffitelli that many of his other clients were investing with Aequitas.

b. Ameritrade participated directly with Aequitas in marketing Aequitas securities to Ameritrade customers. For example, in April 2011, Aequitas executives held a training dinner for TD Ameritrade Investment Consultants, followed by a prospect dinner. Aequitas was introduced as a vehicle to move investor assets from other custodians and "draw them to TD and to the Advisor Direct channel." One participant in the Advisor Direct program was highlighted for having made four times the average Ameritrade investment consultant salary by placing his customers in Aequitas securities.

c. Ameritrade's agreement to allow its customers to hold their Aequitas securities in their Ameritrade accounts was critical to Aequitas' ability to sell securities. Without this accommodation, Aequitas investors could not hold Aequitas securities in their Ameritrade accounts, because Aequitas securities were "nonconventional" investments without a market. Internal Aequitas documents detail the material impact of Ameritrade's custodial services on Aequitas' business.

d. Ameritrade's participation and aid was critical to Aequitas' success in selling securities. Ameritrade customers purchased and held in their Ameritrade accounts approximately $140 million in Aequitas securities between 2010 and 2015.

e. Ameritrade also participated and aided in Aequitas' sales of securities, including agreements by investors to purchase new securities rather than redeem on maturity, y failing to disclose its concerns about Aequitas. In January 2015, Ameritrade declined to custody additional Aequitas securities. In October 2015, Ameritrade removed Aequitas from its custody platform entirely. Ameritrade did not notify its customers of the reasons for its actions. By its actions, Ameritrade forestalled the demise of Aequitas and enabled Aequitas to continue to sell securities.

**ANSWER:** Paragraph 193 contains characterizations, and purports to quote from an unidentified Aequitas executive, such that no answer is required. To the extent that this

paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 193 and, on that basis, denies such allegations.

194. Integrity participated and materially aided in Aequitas' sales of more than $90 million worth of ACF Notes, AIPF Interests and AIOF-II Notes, beginning no later than December 1, 2011.

a. As alleged in paragraph 192(f), Integrity participated and materially aided in Aequitas' sales of AIPF Interests.

b. Integrity later acted pursuant to several contracts with Aequitas and promoted the sale of these securities. The first contract is an Aequitas Financial Services Network Partner Subscription Agreement ("Network Agreement") between Integrity and Aequitas Capital Management, effective date of September 20, 2014. The subject network (the "Network") was organized by Aequitas Capital Management ("ACM") and its Aequitas affiliates to sell Aequitas securities. The Network "exists for the benefit of, and offers membership to, independent firms composed of sophisticated financial services professionals, each of whom devotes a significant portion of its activities to marketing to advisors of high net worth and corporate clients". By entering into the Network Agreement, Integrity agreed to "offer the Network". Integrity received Network commissions, labeled referral fees, for referring purchasers to Aequitas or to other Network partners participating in the program to sell Aequitas securities. These commissions were not disclosed to investors. Pursuant to this contractual arrangement, Aequitas provided Integrity with access to Aequitas' confidential business information. The terms of the Network Agreement allowed Integrity to distribute pooled investment vehicles through the Network or with one or more Network partners.

c. The second contract is an Administrative Services Agreement between Integrity and Aequitas Commercial Finance, LLC ("ACF") effective July 21, 2014. Pursuant to this agreement, Integrity purchased ACF Notes from ACF on behalf of Integrity's clients. Integrity and ACF agreed that "each Private Note issued in accordance with this Agreement will be issued on the terms and conditions described in the offering memorandum and offering materials provided by Aequitas". Integrity agreed to provide each prospective investor with the offering documents in the form provided by Aequitas, and to provide each prospective investor the opportunity to ask questions an obtain information about the ACF Notes. Integrity expressly acknowledged that "the offer and sale of the Private Notes will not be registered with the U.S. Securities and Exchange Commission or any other state regulatory agency". The mechanics of the sales of securities pursuant to the Administrative Services Agreement were as follows:

> Bank will provide to Aequitas a properly executed subscription agreement, and such other documents as may be required by Aequitas, and such documents will apply to the future purchase of Private Notes on behalf of [Integrity] Bank and its Participating Clients. With respect to Participating Clients, Bank will obtain properly executed subscription agreements in a form approved by Aequitas and will provide Aequitas with copies of the same upon Aequitas' request. ...

The Administrative Services Agreement acknowledge that Integrity is Aequitas' agent in connection with all transactions pursuant thereto. Aequitas agreed to provide quarterly updates to Integrity as to the status of each ACF Note. Integrity agreed to provide specific services to purchasers of ACF Notes, including direct support regarding client accounts and the status of participation in ACF Notes, serving as point of contact for questions about ACF Notes and Aequitas, preparation of distribution statements and performance reporting on a monthly or quarterly basis, annual tax reporting and billing support.

d. The third contract is an Administrative Services Agreement between Integrity and AIOF-II effective October 15, 2014. Pursuant to this agreement, Integrity purchased AIOF-II Notes from AIOF-II on behalf of Integrity's clients. Integrity and AIOF-II agreed that "each IOF II Note issued in accordance with this Agreement will be issued on the terms and conditions described in the offering memorandum and offering materials provided by the Fund". Integrity agreed to provide each prospective investor with the offering documents in the form provided by Aequitas, and to provide each prospective investor the opportunity to ask questions an obtain information about the AIOF II Notes. Integrity expressly acknowledged that "the offer and sale of the AIOF II Notes will not be registered with the U.S. Securities and Exchange Commission or any other state regulatory agency". The mechanics of the sales of securities pursuant to the Administrative Services Agreement were as follows:

> Bank will provide to the Fund a properly executed subscription agreement, and such other documents as may be required by the Fund, and such documents will apply to the future purchase of IOF II Notes on behalf of [Integrity] Bank and its Participating Clients. With respect to Participating Clients, Bank will obtain properly executed subscription agreements in a form approved by the Fund and will provide the Fund with copies of the same upon the Fund's request. ...

The Administrative Services Agreement acknowledge that Integrity is Aequitas' agent in connection with all transactions pursuant thereto. Aequitas agreed to provide quarterly updates to Integrity as to the status of each AIOF-II Note. Integrity agreed to provide specific services to purchasers of AIOF-II Notes, including direct support regarding client accounts and the status of participation in AIOF-II Notes, serving as point of contact for questions about ACF Notes and Aequitas, preparation of distribution statements and performance reporting on a monthly or quarterly basis, annual tax reporting and billing support.

e. A promotional document titled "Aequitas Capital Income Opportunity Fund II" describes an investment opportunity offered by Aequitas Capital. The document states that the security is "Presented by: Integrity Bank & Trust" and provides Integrity's address and telephone and fax numbers. The document states that "Aequitas Capital or 'Aequitas' refers to the entities and activities of Aequitas Holdings, LLC and its affiliates." The document bears the copyright "2014 Aequitas Capital Management." The promotional document describes an "opportunity" to invest in a "value-oriented, diversified private credit fund" that invests in receivables or debt assets "that the Fund believes have an intrinsic worth that is undervalued by the market;" claims that it offers predictable, stable returns; and touts the "transparency" of the fund and that "Investors have visibility into all Fund assets."

f. Integrity served as the custodian for certain Aequitas fundraising vehicles, including ACF; AIOF; AIPF; ACOF; AEIF; AETC; Aequitas Hybrid Fund, LLC; and Aequitas WRFF I, LLC.

**ANSWER:** Paragraph 194 contains characterizations and conclusions of law, and refers to documents which speak for themselves, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 194 and, on that basis, denies such allegations.

195. Duff & Phelps participated and materially aided in the sales of Aequitas securities during and after 2014. Aequitas used Duff & Phelps' name and valuations in marketing ACOF securities.

a. Duff & Phelps' December 4, 2013 engagement letter with AIM acknowledged and consented to the use of Duff & Phelps' name, the services provided by it and a description of its business in PPMs and other marketing materials to be provided to investors.

b. Duff & Phelps prepared appraisal reports that it agreed could be provided to potential investors and were, in fact given to potential investors.

c. Duff & Phelps provided analyses of the value of ACOF's investments, including Carepayment, EDPlus and ETC, in December 2013, July 2014, and February-March 2015. The valuations provided by Duff & Phelps were disclosed and explicitly referenced in ACOF's February 2014 PPM. The Duff & Phelps valuations were used by Aequitas in the PPM to give investors confidence in the values of ACOF's assets, which were referred to as the "existing portfolio investments." These values were critical because the existing portfolio investments were ACOF's only assets.

d. Duff & Phelps's valuations were also used by Aequitas to support the asserted value of ACF and to present ACF as a low-risk investment. The ACOF assets valued by Duff & Phelps were included on ACF's consolidated financial statements and in summaries **given** to investors to encourage them to invest in ACF and ACOF. For example, June 2014 marketing materials for ACF stated that ACF's total assets had a book value of more than $482 million and were secured by collateral valued at more than $646 million, which included the purported value of ACOF and reflected Duff & Phelps' valuation. Duff & Phelps' valuations of ACOF enabled ACF to market its multi-million-dollar interest in ACOF as a significant asset backing the Private Notes ACF was selling.

e. Duff & Phelps' valuations created the illusion that Aequitas was a stable investment with valuable assets.

f. By agreement, the statute of limitations for Plaintiffs' claims against Duff & Phelps was tolled between February 21, 2017 and September 8, 2017.

**ANSWER:** Paragraph 195 contains characterizations and conclusions of law, and refers to documents which speak for themselves, such that no answer is required. To the extent that this paragraph asserts facts, EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 195 and, on that basis, denies such allegations.

## VII. PLAINTIFFS' PURCHASES OF AEQUITAS

196. Plaintiff Ciuffitelli purchased the following securities from Aequitas:

a. In May 2013, Ciuffitelli purchased three ACF Notes from Aequitas, each in the total principal amount of $750,000, all with interest at the annual rate of 11 percent, and with maturity dates of May 2016, May 2017, to May 2018, respectively.

b. In February 2015, Ciuffitelli purchased ACOF Interests from Aequitas in the total principal amount of $750,000.

c. In September 2015, Ciuffitelli purchased an AMLF Note from Aequitas in the principal amount of $1.0 million. In December 2015, Aequitas induced Ciuffitelli to extend the maturity date of that AMLF Note.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 196 and, on that basis, denies such allegations.

197. In 2012, plaintiffs the Juliens purchased an AIOF Note from Aequitas in the principal amount of $375,000. In October 2015, the Juliens used the funds they had invested in that AIOF Note to purchase an ACF Note from Aequitas, again in the amount of $375,000, with interest at the annual rate of 11 percent and an October 2019 maturity date.

**ANSWER:** EisnerAmper admits that Greg Julien had a principal debt balance of $375,000 as of December 31, 2012. EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 197 and, on that basis, denies such allegations.

198. Plaintiff RFMC purchased the following securities from Aequitas:

a. In March 2013, RFMC purchased an AIOF Note from Aequitas in the total principal amount of $300,000, with interest at the annual rate of 10 percent and an April 2016 maturity date.

b. In February 2015, RFMC purchased an ACF Note from Aequitas in the total principal amount of $3,134,781.18, with interest at the annual rate of 10 percent and a February 2016 maturity date.

c. In April 2015, RFMC purchased an additional ACF Note from Aequitas in the principal amount of $300,000, with interest at the annual rate of 11 percent and a maturity date of November 2017.

d. In September 2015, RFMC purchased an AMLF Note from Aequitas in the principal amount of $1,000,000, with interest at the annual rate of 13 percent to be paid at its December 2015 maturity. In December 2015, Aequitas induced RFMC to extend the maturity date of that AMLF Note to June 2016.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 198 and, on that basis, denies such allegations.

199. Plaintiffs the MacDonalds purchased the following securities from Aequitas:

a. In April 2015, the MacDonalds purchased two ACF Notes from Aequitas in the total principal amount of $1.0 million, with interest at annual rates of 9.5 and 11 percent and maturity dates of December 2015 and November 2017, respectively.

b. In July 2012, the MacDonalds purchased an AIOF Note from Aequitas in the principal amount of $500,000, with interest at the annual rate of 10 percent and an April 2016 maturity date.

c. In September 2015, the MacDonalds purchased an AMLF Note from Aequitas in the principal amount of $500,000, with interest at the annual rate of 13 percent and a December 2015 maturity date. In December 2015, Aequitas induced the MacDonalds to extend the maturity date of that AMLF Note to June 2016.

**ANSWER:** EisnerAmper admits that the MacDonalds had a principal debt balance of $500,000 as of December 31, 2012. EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 199 and, on that basis, denies such allegations.

200. Plaintiff Nowak purchased the following securities from Aequitas:

a. In February 2013, Nowak purchased AIPF Interests in the total principal amount of $500,000. In May 2015, following the redemption of those AIPF Interests, Aequitas induced Nowak to purchase an ACF Note from Aequitas in the total principal amount of $500,000.

b. In May 2014, Nowak purchased an ACF Note from Aequitas in the principal amount of $1.6 million, with interest at the annual rate of 11 percent and a May 2018 maturity date.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 200 and, on that basis, denies such allegations.

201. Plaintiff Ramstein purchased the following securities from Aequitas:

a. In July 2012, Ramstein purchased an ACF Note from Aequitas in the principal amount of $400,000, with interest at the annual rate of 10 percent and a July 2016 maturity date.

b. In August 2013, Ramstein purchased an ACF Note from Aequitas in the principal amount of $520,000, with interest at the annual rate of 11 percent and an August 2017 maturity date.

c. In March 2014, Ramstein purchased an ACF Note from Aequitas in the principal amount of $400,000, with interest at the annual rate of 10 percent and a March 2018 maturity date.

d. In September 2015, Ramstein purchased an ACF Note from Aequitas in the principal amount of $625,000, with interest at the annual rate of 5 percent and a March 2016 maturity date.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 201 and, on that basis, denies such allegations.

202. Plaintiffs Greg and Susan Warrick purchased the following securities from Aequitas, all of which Integrity solicited on Aequitas' behalf:

a. In September 2015, Greg and Susan Warrick, acting as co-trustees of the Warrick Family Trust, purchased from Aequitas an interest in an AIOF-II Note in the principal amount of $94,000, with interest at the annual rate of 10 percent.

b. In September 2015, Greg Warrick purchased from Aequitas an interest in an AIOF-II Note in the principal amount of $57,200, with interest at the annual rate of 10 percent.

**ANSWER:** EisnerAmper lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 202 and, on that basis, denies such allegations.

## CLASS ACTION ALLEGATIONS

203. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased Aequitas securities on or after June 9, 2010 (the "Class"). The Class does not include: (a) Defendants; (b) the past and present officers and directors of the Aequitas affiliated companies, including without limitation Robert Jesenik, Brian Oliver, Craig Froude, Scott Gillis, Andrew MacRitchie, Olaf Janke, Brian Rice, William Ruh, Steve Hedberg, Brett Brown, Tom Goila, Patricia Brown, Bill Malloy, and Thomas Szabo, and their respective families and affiliates; (c) the past and present members of the Aequitas Advisory Board, including without limitation William McCormick, L. Martin Brantley, Patrick Terrell, Edmund Jensen, Donna Miles, William Glasgow, Keith Barnes, Bob Zukis, and their respective families and affiliates; and (d) registered investment advisors and investment advisor representatives; and (e) any investor who received finder's fees or other consideration from Aequitas in connection with referring investors to Aequitas.

**ANSWER:** Paragraph 203 contains conclusions of law to which no answer is required. EisnerAmper admits that Plaintiffs purport to bring this action as a class action, but denies that Plaintiffs are entitled to do so.

204. Members of these Classes are so numerous that joinder is impracticable. Plaintiffs believe that the Class exceeds 1,500 members. Further, the Class is readily identifiable from information and records kept in the possession of Aequitas and/or the Class.

**ANSWER:** Paragraph 204 contains conclusions of law to which no answer is required. EisnerAmper admits that Plaintiffs purport to bring this action as a class action, but deny that Plaintiffs are entitled to do so. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

205. Plaintiffs' claims are typical of the claims of the Class in that the claims are based upon a common set of written representations, all Class members were damaged by the same wrongful conduct, and the relief sought is common to the Class.

**ANSWER:** Paragraph 205 contains conclusions of law to which no answer is required. EisnerAmper admits that Plaintiffs purport to bring this action as a class action, but denies that Plaintiffs are entitled to do so. EisnerAmper denies the remaining allegations of Paragraph 205.

206. Numerous common questions of law or fact arise from Defendants' conduct, including:

a. whether the Aequitas securities were sold in violation of the registration requirements of the Oregon Securities Law;

b. whether the Aequitas securities were sold by means of false statements of fact or omissions of material fact;

c. whether Defendants EisnerAmper, Deloitte, Sidley, Tonkon, Ameritrade, Integrity and Duff & Phelps participated in or materially aided the sales of Aequitas securities; and

d. whether Defendant Integrity successfully solicited sales of Aequitas securities.

**ANSWER:** Paragraph 206 contains conclusions of law to which no answer is required. EisnerAmper admits that Plaintiffs purport to bring this action as a class action, but denies that Plaintiffs are entitled to do so.

207. These common questions of law or fact predominate over any other questions affecting only individual Class members.

**ANSWER:** Paragraph 207 contains conclusions of law to which no answer is required. EisnerAmper admits that Plaintiffs purport to bring this action as a class action, but denies that Plaintiffs are entitled to do so.

208. Plaintiffs will fairly and adequately represent the interests of the Class in that they are typical persons that purchased Aequitas securities, and have no conflicts with any other member of either Class. Plaintiffs have retained competent counsel experienced in class action litigation.

**ANSWER:** Paragraph 208 contains conclusions of law to which no answer is required. EisnerAmper admits that Plaintiffs purport to bring this action as a class action, but denies that Plaintiffs are entitled to do so. EisnerAmper lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies such allegations.

209. A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy, as the burden of individual litigation makes it impracticable for Class members to seek individual redress for the wrongful conduct alleged herein.

**ANSWER:** Paragraph 209 contains conclusions of law to which no answer is required. EisnerAmper admits that Plaintiffs purport to bring this action as a class action, but denies that Plaintiffs are entitled to any relief. EisnerAmper denies the remaining allegations of Paragraph 209.

210. Plaintiffs reserve the right to expand, modify, or alter the Class definition in response to information learned during discovery.

**ANSWER:** Paragraph 210 contains conclusions of law to which no answer is required.

## CLAIM FOR RELIEF

**(Violations of Oregon Securities Law)**
**(Against All Defendants)**

211. Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

**ANSWER:** EisnerAmper repeats and reasserts its answers to each of Paragraphs 1 through 210 as if fully set forth herein.

212. Securities were sold by Aequitas, as alleged herein, to Plaintiffs and the Class in violation of ORS 59.115(1).

**ANSWER:** Paragraph 212 states a conclusion of law, such that no answer is required. To the extent that the allegations in Paragraph 212 are deemed factual, EisnerAmper denies each and every such allegation.

213. Within three years before this action was commenced, Aequitas sold unregistered securities in violation of ORS 59.055 and 59.115(l)(a).

**ANSWER:** Paragraph 213 states a conclusion of law, such that no answer is required. To the extent that the allegations in Paragraph 213 are deemed factual, EisnerAmper denies each and every such allegation.

214. On and after June 9, 2010, Aequitas sold securities in violation of ORS 59.135(2) and 59.115(1 )(a), by making untrue statements of material facts and by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Plaintiffs and the Class did not know of the untruths or

omissions and, in the exercise of reasonable care, could not have known of the untruths or omissions.

**ANSWER:** Paragraph 214 states a conclusion of law, such that no answer is required. To the extent that the allegations in Paragraph 214 are deemed factual, EisnerAmper denies each and every such allegation.

215. On and after June 9, 2010, Aequitas sold securities by means of untrue statements of material facts and omission to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of ORS 59.115(1)(b). Plaintiffs and the Class did not know of the untruths or omissions.

**ANSWER:** Paragraph 215 states a conclusion of law, such that no answer is required. To the extent that the allegations in Paragraph 215 are deemed factual, EisnerAmper denies each and every such allegation.

216. All Defendants are liable pursuant to ORS 59.115(3) because they participated in and materially aided unlawful sales of securities.

**ANSWER:** Paragraph 216 states a conclusion of law, such that no answer is required. To the extent that the allegations in Paragraph 216 are deemed factual, EisnerAmper denies each and every such allegation.

217. Defendant Integrity is liable pursuant to ORS 59.115(1)(b) because it sold or successfully solicited the unlawful sale of ACF Notes, AIPF Interests and AIOF-II Notes.

**ANSWER:** Paragraph 217 states a conclusion of law, such that no answer is required. To the extent that the allegations in Paragraph 217 are deemed factual, EisnerAmper denies each and every such allegation.

218. Pursuant to ORS 59.115(2)(a), upon tender of the securities, Defendants are jointly and severally liable for the consideration paid for the securities, plus interest from the date of payment equal to the greater of the rate of interest provided in the security or 9%, less any amounts Plaintiffs and the Class received on the securities.

**ANSWER:** Paragraph 218 states a conclusion of law, such that no answer is required. To the extent that the allegations in Paragraph 218 are deemed factual, EisnerAmper denies each and every such allegation.

219. Pursuant to ORS 59.115(10), Defendants should be required to pay the reasonable attorney fees of Plaintiffs and the Class.

**ANSWER:** Paragraph 219 states a conclusion of law, such that no answer is required. To the extent that the allegations in Paragraph 219 are deemed factual, EisnerAmper denies each and every such allegation.

## AFFIRMATIVE DEFENSES

For further and separate affirmative defenses to the causes of action brought by Plaintiffs—and without admitting that it has the burden of proof on any fact, issue, element of a claim, or any of these matters, or that anything stated herein is intended or shall be construed as an acknowledgment that any particular issue or subject is relevant to Plaintiffs' allegations—EisnerAmper alleges as follows. EisnerAmper further reserves the right to amend this Answer, including to raise impleader, cross, or counter-claims, and to assert additional defenses as such additional claims or defenses may become apparent, as the result of discovery or otherwise, to the full extent permitted by the Federal Rules of Civil Procedure.

### FIRST AFFIRMATIVE DEFENSE

Each Plaintiff's allegations fail to state a claim upon which relief can be granted, as required by the Federal Rules of Civil Procedure.

### SECOND AFFIRMATIVE DEFENSE

Each Plaintiff's claims against EisnerAmper are barred, in whole or in part, by the applicable statutes of limitations and other applicable periods of repose.

**THIRD AFFIRMATIVE DEFENSE**

Each Plaintiff's claims against EisnerAmper are barred, in whole or in part, because EisnerAmper did not know and, in the exercise of reasonable care, could not have known of the existence of facts on which each Plaintiff's claims are based, as required by ORS 59.115(3).

**FOURTH AFFIRMATIVE DEFENSE**

Each Plaintiff's claims against EisnerAmper are barred, in whole or in part, by the doctrine of *in pari delicto*.

**FIFTH AFFIRMATIVE DEFENSE**

Each Plaintiff, by acts, omissions, and/or conduct—including but not limited to their and/or their agents' failure to perform due diligence before purchasing their claimed-upon securities, despite being obliged and having been warned to do same—has waived, in whole or in part, his/her claims against EisnerAmper.

**SIXTH AFFIRMATIVE DEFENSE**

Each Plaintiff's claims against EisnerAmper are barred, in whole or in part, by the doctrine of estoppel or other related equitable defenses including assumption of risk.

**SEVENTH AFFIRMATIVE DEFENSE**

Any and all damages claimed by each Plaintiff must be reduced, eliminated, diminished, and/or barred in proportion to the wrongful or negligent conduct of persons or entities other than EisnerAmper, under the principles of comparative fault or proportional liability.

**EIGHTH AFFIRMATIVE DEFENSE**

Each Plaintiff's claims against EisnerAmper are barred, in whole or in part, by the unclean hands doctrine.

**NINTH AFFIRMATIVE DEFENSE**

Each Plaintiff's claims against EisnerAmper are barred because each Plaintiff's alleged losses and/or damages, if any, were caused by superseding or intervening causes, and/or the conduct of others, other defendants and/or third parties, or other factors for which EisnerAmper is not responsible, and did not result from any acts or omissions by EisnerAmper.

**TENTH AFFIRMATIVE DEFENSE**

Each Plaintiff's claims against EisnerAmper are barred, in whole or in part, by the doctrine of laches.

**ELEVENTH AFFIRMATIVE DEFENSE**

Any recovery for damages allegedly incurred by each Plaintiff, if any, is subject to equitable reduction, including offset in the amount of any benefit actually received, recovered, or anticipated by each Plaintiff through his/her investments through judgment, settlement, or other agreement with any other party or third party.

**TWELFTH AFFIRMATIVE DEFENSE**

Each Plaintiff's claims against EisnerAmper are barred, in whole or in part, because any alleged statements of material fact, alleged omissions of material fact, or other challenged statements were contained or were made in the context of sufficient cautionary language or risk disclosures and thus are rendered non-actionable including under the "bespeaks caution" doctrine.

**THIRTEENTH AFFIRMATIVE DEFENSE**

Plaintiffs have each failed to mitigate their respective damages, thus barring or reducing their recovery.

**FOURTEENTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred to the extent that they rest on any act or omission by Harb Levy & Weiland LLP, to which EisnerAmper is not the "successor by merger" (*supra* ¶ 17) and for which EisnerAmper bears no other responsibility.

**FIFTEENTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims based on non-registration of the securities are barred on the ground that the securities in question are "federal covered securities" and thus exempt from registration under Rule 506 of Regulation D under the Securities Act.

**SIXTEENTH AFFIRMATIVE DEFENSE**

EisnerAmper hereby adopts and incorporates by reference any and all other defenses asserted, or that may hereafter by asserted, by any other Defendants to the extent such defense may be applicable to EisnerAmper.

**RIGHT TO ATTORNEY FEES**

If EisnerAmper prevails on any of Plaintiffs' claims under the Oregon Securities Law, the Court should award EisnerAmper reasonable attorney fees pursuant to ORS 59.115(10).

**PRAYER FOR RELIEF**

**WHEREFORE**, EisnerAmper prays that Plaintiffs take and be awarded nothing from or against EisnerAmper by way of their Second Amended Complaint, that judgment be entered against Plaintiffs and in favor of EisnerAmper, that EisnerAmper be awarded its costs and attorneys' fees, and that EisnerAmper be awarded all other relief just and proper.

Dated: November 19, 2018

WINSTON & STRAWN LLP

/s/ Joanna Rubin Travalini
Linda T. Coberly (admitted *pro hac vice*)
Joanna Rubin Travalini (admitted *pro hac vice*)
35 West Wacker Drive
Chicago, Illinois 60601
Tel: (312) 558-5600
lcoberly@winston.com
jtravalini@winston.com

– And –

William P. Ferranti, OSB No. 160069
THE FERRANTI FIRM LLC
1819 SW 5th Ave. #403
Portland, Oregon 97201
Tel: (503) 877-9220
wpf@ferrantiappeals.com

*Attorneys for Defendant EisnerAmper LLP*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Joanna Rubin Travalini