**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Jeffrey M. Edelson, OSB #880407**
JeffEdelson@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1211 SW Fifth Avenue, Suite 3000
Portland, OR  97204-3730
Telephone: (503) 295-3085
Facsimile: (503) 323-9105

**Brad D. Brian** (*admitted pro hac vice*)
Brad.Brian@mto.com
**Bruce A. Abbott** (*admitted pro hac vice*)
Bruce.Abbott@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, CA  90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Defendant and Third-Party
Plaintiff Sidley Austin LLP

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| LAWRENCE P. CIUFFITELLI, for himself and as Trustee of CIUFFITELLI REVOCABLE TRUST, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>SIDLEY AUSTIN LLP;<br><br>Defendant / Third-Party Plaintiff,<br><br>v.<br><br>STRATEGIC CAPITAL GROUP, LLC; RP CAPITAL, LLC; and PRIVATE ADVISORY GROUP.<br><br>Third-Party Defendants. | Case No. 3:16-cv-00580-AC<br><br>**SIDLEY AUSTIN LLP'S THIRD-PARTY COMPLAINT FOR CONTRIBUTION**<br><br><u>JURY TRIAL DEMANDED</u> |

**Page 1 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION**

Defendant and Third-Party Plaintiff Sidley Austin LLP ("Sidley"), alleges the following in support of its Third-Party Complaint for contribution against Third-Party Defendants Strategic Capital Group, LLC; RP Capital, LLC; and Private Advisory Group (collectively, "Third-Party Defendants"):

## INTRODUCTION

1.      Plaintiffs filed this action against Sidley and other Defendants on April 4, 2016. On September 8, 2017, Plaintiffs filed their Second Amended Class Action Complaint (the "SAC"), which is the operative complaint.  In their SAC, Plaintiffs purport to represent a putative class of investors who bought securities issued by various entities affiliated with Aequitas Capital Management, Inc. ("ACM"), Aequitas Holdings, LLC, and related entities. According to the United States Securities and Exchange Commission ("SEC"), the Aequitas group of companies were founded by Robert J. Jesenik ("Jesenik") and controlled by, among others, Aequitas's chief fundraiser Brian A. Oliver ("Oliver") and Chief Financial Officer ("CFO") N. Scott Gillis ("Gillis").

2.      Plaintiffs allege that the Aequitas entities[1] violated the Oregon Securities Laws by, among other things, selling securities without registering them under Oregon law.  Plaintiffs further allege that the Aequitas entities sold securities by means of materially false or misleading statements.  Plaintiffs allege that the Aequitas entities misrepresented their financial health,

---

[1] In what appears to be a strategic choice, Plaintiffs' SAC consistently refers to "Aequitas" or "Aequitas securities"—rather than the individual Aequitas-related entities whose securities sales Plaintiffs are challenging.  Each Aequitas entity, however, is functionally and legally distinct. Moreover, each Aequitas entity sold securities pursuant to different offering documents, which contained different representations about, *inter alia*, their securities, the risks associated with an investment in those securities, and other issues.  Sidley uses the term "Aequitas" herein only as short-hand and not to obscure the important distinctions between the various entities and securities offerings.

**Page 2 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION**

failed to disclose their growing insolvency, and overvalued the collateral that backed the securities they issued to investors. (SAC ¶¶ 3–4.) Plaintiffs further allege that the Aequitas entities used new investor funds in a manner that was inconsistent with their representations to investors. (SAC ¶ 5.) Plaintiffs further allege that rather than using investor funds to buy income-generating assets, the Aequitas entities used proceeds from their securities sales to cover operating expenses and repay principal and interest owed to earlier investors. (SAC ¶¶ 70–71.)

3.    Plaintiffs do not bring claims against persons who were directly involved in practices Plaintiffs claim were fraudulent or misleading, as a temporary litigation stay in the related SEC matter prevents them from doing so. (SAC ¶ 2.) Absent from the SAC are claims against Jesenik, Oliver, and Gillis, whom the SEC has accused of operating a "Ponzi-like" scheme to mislead investors. Nor do Plaintiffs sue other executives, insiders, and advisors who participated in Aequitas's securities sales. Also absent from Plaintiffs' SAC are Registered Investment Advisors ("RIAs"), like Private Advisory Group and Strategic Capital Group, which recommended Aequitas securities to Plaintiffs and other investors.

4.    Instead, Plaintiffs have sued only accounting firms, law firms, and other outside service providers.[2] Plaintiffs allege that Defendants are jointly and severally liable with the Aequitas entities because they "participated" or "materially aided" in Aequitas's securities sales. Plaintiffs allege that Defendants "materially aided" sales because, in certain cases, the Aequitas entities referenced Defendants in their Private Placement Memoranda ("PPMs"). (SAC ¶¶ 189– 92, 195.) According to Plaintiffs' allegations—which Sidley has denied in its Answer to Plaintiffs' SAC, filed on November 26, 2018—Aequitas's identification of Defendants in the

---

[2] Plaintiffs' SAC names as Defendants Deloitte & Touche LLP; EisnerAmper, LLP; Sidley; Tonkon Torp, LLP; TD Ameritrade, Inc.; Integrity Bank & Trust; and Duff & Phelps, LLC.

**Page 3 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION**

PPMs fostered an illusion of success and legitimacy, which built confidence in prospective

investors.  (SAC ¶¶ 189–90, 192, 195.)  Plaintiffs further allege that Defendants "materially

aided" in the challenged sales by providing legal, accounting, or other services to certain

Aequitas entities.  (SAC ¶¶ 189–95.)  Notably, many of the services that Plaintiffs characterize

as "material aid" have no connection to any of the securities at issue in this litigation.  Sidley, for

instance, is alleged to be secondarily liable because it provided legal services to an Aequitas

entity to obtain two credit facilities from separate banks.  Yet the entity that borrowed money

under those agreements was not a fund and did not sell securities; it was an operating company

whose business involved buying and servicing patient debt from partner hospitals.[3]

     5.     Sidley has denied in its Answer to Plaintiffs' SAC that it "participated" or

"materially aided in" the challenged securities sales.  Sidley has also denied that it is in any

manner responsible for any injuries or damages alleged in Plaintiffs' SAC.[4]  If, and only if,

Plaintiffs prove that their alleged damages are attributable to Sidley's alleged participation or

material aid in the sales of Aequitas securities, then, as described herein, the Third-Party

Defendants directly participated and materially aided in the sale of Aequitas securities to a far

greater extent than Sidley is alleged to have done.  Further, in that circumstance, any damages

sustained by Plaintiffs are wholly or partially attributable to conduct by the Third-Party

---

[3] Plaintiffs assert secondary liability claims relating to other legal services provided by Sidley as well.  Sidley's responses to Plaintiffs' allegations are reflected in Sidley's recently filed Answer to the SAC.

[4] As reflected in Sidley's recently filed Answer to Plaintiffs' SAC, Sidley currently has no factual basis to admit or deny Plaintiffs' allegations concerning Aequitas's "primary liability"— *i.e.*, whether Aequitas itself violated the Oregon Securities Laws as alleged.  Plaintiffs bear the burden of proving these allegations, and discovery necessary to assess the truth of the allegations is unavailable because the stay in the SEC Action bars discovery against the Aequitas entities that are in receivership or their officers, directors, employees, and agents.

Defendants, upon whom Plaintiffs relied in buying the relevant securities.  As alleged more fully

below, the Oregon Securities Laws require that any liability imposed on Sidley in connection

with Plaintiffs' Aequitas investments be borne, in whole or in part, by Third-Party Defendants

under principles of contribution.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over Plaintiffs' claims in this action

pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The amount in controversy

exceeds $5,000,000, exclusive of interest and costs, and there is a diversity of citizenship

between certain Plaintiffs and certain Defendants.  This Court has subject matter jurisdiction

over the claims asserted in this Third-Party Complaint pursuant to 28 U.S.C. § 1367(a).  The

claims in this Third-Party Complaint are so related to the claims asserted by Plaintiffs in this

action that they form part of the same case or controversy.

7.      Venue in the District of Oregon is proper under 28 U.S.C. § 1391 because a

substantial part of the events and omissions giving rise to Plaintiffs' claims, and to Sidley's

claims against the Third-Party Defendants, occurred in this District.

## PARTIES

8.      Sidley is a law firm with offices in the United States and abroad, which has been

named as a Defendant in the SAC.  Plaintiffs allege that Sidley "participated" or "materially

aided" in the sale of Aequitas securities.

9.      Strategic Capital Group, LLC ("SCG") was an RIA firm headquartered in Gig

Harbor, Washington.  SCG was founded by N. Gary Price ("Price"), Ron Robertson

("Robertson"), and Timothy Feehan, Jr. ("Feehan"), in 1997, and was registered with the SEC in

2004.  SCG began its relationship with Aequitas in or around 2009 and advised up to 330

persons, including at least five of the seven named Plaintiffs in this action (Plaintiffs Larry

Ciuffitelli, Greg Julien, James MacDonald, RF MacDonald Co., and William Ramstein), to

purchase Aequitas securities.  On September 18, 2014, the SEC issued an Order Instituting

Administrative and Cease-and-Desist Proceedings against SCG and its founder, Price, in an

administrative proceeding, *In the Matter of Strategic Capital Group, LLC and N. Gary Price,*

*SEC Administrative Proceeding*, File No. 3-16138 (the "SEC Cease-and-Desist Order").  At or

around the time of this Order, SCG sold its assets to Private Advisory Group, and terminated its

registration with the SEC in March 2015.  SCG was administratively dissolved by the

Washington Secretary of State on April 3, 2018 due to failure to file its annual report due on

November 3, 2017

      10.    RP Capital, LLC ("RP Capital") was a SEC registered broker-dealer located in

Gig Harbor, Washington, that was affiliated with SCG through common ownership.  Price

owned 50% of RP Capital and is one of its managing members.  RP Capital was registered with

the SEC as a broker-dealer in 2005.  On information and belief, RP Capital worked closely with

SCG, executing many of its trades.  RP Capital terminated its registration with the SEC in

February 2017 and was administratively dissolved by the Washington Secretary of State on

April , 2018 due to failure to file an annual report.

      11.    Private Advisory Group, LLC ("PAG") is an RIA firm headquartered in

Redmond, Washington that was created in or around September 2014, by a transaction, described

in more detail below, whereby PAG acquired all of SCG's assets (including its customer

relationships) and accepted a substantial capital contribution from the Aequitas-related entity

Aspen Grove Equity Solutions ("Aspen Grove").  Following the transaction, Aspen Grove

owned 68% of PAG and Bean Holdings, LLC, and Aaron Douglas Maurer ("Doug Maurer")

**Page 6 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION**

owned the remaining equity.  Aspen Grove was in turn majority owned by ACM along with

Price, Feehan, and Robertson.  ACM was further owned in part by Aequitas insiders, including

Jesenik, Oliver, Chief Compliance Officer Andrew MacRitchie ("MacRitchie"), and President of

Aequitas Consumer Services Craig Froude.  PAG was managed by S. Christopher Bean ("Chris

Bean"), its Chief Executive Officer, Douglas R. Bean ("Doug Bean"), its Chief Operating

Officer, and Jon Bishopp, its General Manager.  Both Chris Bean and Doug Bean were members

of Bean Holdings, LLC.

## FACTUAL ALLEGATIONS

12.    On March 10, 2016, the SEC initiated a securities fraud action against Aequitas

Management, LLC and related entities, as well as three Aequitas executives: Jesenik, Oliver, and

Gillis.  *See SEC v. Aequitas Management, LLC, et al.*, No. 3:16-cv-00438-PK (D. Or.) (the "SEC

Action").  The SEC's Complaint alleges that the Aequitas defendants operated "a scheme to

defraud and misuse client assets in connection with investments offered through the Aequitas

group of companies."

13.    The SEC obtained a preliminary injunction and the appointment of a Receiver

over the Aequitas entities.  Since his appointment, the Aequitas Receiver has been consolidating

control of the Aequitas entities, liquidating their assets, and verifying the claims of creditors

against the Aequitas estate.  Securities issued by various Aequitas entities are now in default, and

the Receiver estimates that approximately $617.6 million in principal and interest payments

remain due to investors in those securities.

14.    Recently, the Receiver concluded an investigation concerning the Aequitas

entities.  On November 21, 2018, the Receiver filed a "Report Regarding the Investigation of the

Receivership Entity's Business Conduct" (the "Forensic Report").  The Forensic Report alleges,

in part, that the Aequitas entities were insolvent "from at least July 3, 2014 onward" and operated in a "Ponzi-like" manner. The Forensic Report further alleges that, at times, Aequitas's "only source of capital was new investor funds," and Aequitas was incapable of generating sufficient profits to pay returns it promised to investors. The Receiver also identified alleged "instances of self-dealing" and preferential treatment afforded to executives and other insiders and advisors.

### Aequitas Executives

15.     A stay issued in the SEC Action enjoins Sidley from initiating litigation against any of the Aequitas entities or their officers, directors, employees, or agents. This order currently prevents Sidley from asserting claims against the individual defendants in the SEC Action—Jesenik, Oliver, and Gillis—or other insiders and advisors who were involved in Aequitas's securities sales. Sidley includes the following allegations regarding the Aequitas insiders and advisors for background purposes only and not to assert claims against these individuals in this litigation until further order of the Court overseeing the SEC Action. Sidley reserves the right to seek leave of Court to assert claims against the Aequitas executives after the stay and injunction are lifted.

### Bob Jesenik

16.     Jesenik was the founder of the Aequitas group of entities formed in 1993 and served as its President and Chief Executive Officer for over two decades. Jesenik was a 35% owner of Aequitas Management, LLC, which owns 84% of Aequitas Holdings, LLC ("Aequitas Holdings"). Aequitas Holdings was the sole owner and member of Aequitas Commercial Finance, LLC ("ACF"), an entity which sold securities to Plaintiffs in this litigation. Aequitas's

marketing materials touted Jesenik's "over 30 years of experience in corporate finance and investment management."

17.     Jesenik served in Aequitas's leadership at all times, and was involved in every aspect of Aequitas's business operations.  He effectively controlled the entire Aequitas enterprise, including Aequitas Management (the ultimate parent company for the Aequitas group of entities), Aequitas Holdings, and ACF.  Jesenik drove Aequitas's business decisions and strategy.  Jesenik was aided in this endeavor by various Aequitas insiders, including Oliver and Gillis—both of whom are discussed below.

18.     In addition to serving as Aequitas's President and CEO, Jesenik was involved in nearly every committee responsible for conducting Aequitas's business operations.  Jesenik was the Chief Investment Officer of ACM and Aequitas Investment Management, LLC ("AIM").  Jesenik also served as the Chair of Aequitas's Investment Committee.  The Aequitas Receiver has described the Investment Committee as "Aequitas's primary decision-making body."  Among other things, the Investment Committee was responsible for selecting and approving the investments Aequitas made with investor money.  It also approved valuations of Aequitas's equity positions—valuations which Aequitas disclosed to existing and prospective investors.  By chairing the Investment Committee, Jesenik played a critical role in deciding how Aequitas valued its assets and deployed capital that it received from the individuals who bought Aequitas securities.

19.     The SEC alleges that in exchange for his services, Jesenik was paid a salary of $685,000 with a bonus target of 100% of his salary.  In September 2014, Jesenik revised this salary amount from $450,000, and made this adjustment retroactive to January 1, 2014, as described in the Forensic Report.

**Page 9 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION**

20.    The SEC also alleges that Jesenik was closely involved in the solicitation and sale of Aequitas securities to investors.  Jesenik met regularly with investors and potential investors—both at Aequitas's Lake Oswego headquarters and at destinations across the country. Such in-person investor meetings were both formal and informal and included expensive dinners, wine tastings, charity events, golf outings, sports events, and a range of other activities.  In addition to in-person meetings, Jesenik responded to questions about Aequitas's securities through letters to investors, email communications, and phone calls.  At the same time, Jesenik is alleged to have tightly controlled the diligence information that Aequitas provided to investors, forcing investors to sign non-disclosure agreements to access certain facts and data, and—even then—allowing investors to receive only limited information.

21.    Jesenik participated personally in sales of securities to Plaintiffs in this action, including Larry Ciuffitelli, Andrew Nowak, James MacDonald, and William Ramstein, each of whom made substantial investments in various securities over time.  Jesenik directed other Aequitas personnel, such as Oliver and others on Aequitas's sales team to sell or solicit the sale of securities to these Plaintiffs.  Jesenik was regularly apprised of the status of these sales efforts and became personally involved when necessary to convince these Plaintiffs to invest.  As just one example, when Plaintiff Nowak (a long-time "business client" of Jesenik) "struggle[d] with pulling the trigger" on a securities purchase in 2012, Aequitas sales personnel requested that Jesenik personally contact Nowak to close the investment.  Oliver played a critical role in this effort as well, authorizing special terms to Nowak based on his prior relationship to Jesenik.  On information and belief, Nowak would not have invested in this particular security had Jesenik not personally intervened, and had Oliver not offered him special terms.  On information and belief, Jesenik engaged in similar conduct with other Aequitas investors.

**Page 10 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION**

22.     More generally, Jesenik was identified as Aequitas's Chief Executive Officer in every PPM alleged in the SAC to have been materially false or misleading:  June 9, 2010 ACF PPM, December 1, 2011 ACF PPM, November 30, 2012 ACF PPM, November 30, 2013 ACF PPM, September 9, 2015 ACF PPM, October 27, 2015 ACF PPM, July 11, 2011 Aequitas Income Opportunity Fund ("AIOF") PPM, March 1, 2012 AIOF PPM, December 31, 2012 AIOF PPM, February 15, 2012 Aequitas Income Opportunity Fund II ("AIOF-II") PPM, October 1, 2014 AIOF-II PPM, October 31, 2014 AIOF-II PPM, February 2014 Aequitas Capital Opportunities Fund ("ACOF") PPM, September 30, 2011 Aequitas Income Protection Fund ("AIPF") PPM, December 12, 2014 AIPF PPM, February 15, 2012 AIPF PPM, June 1, 2012 AIPF PPM, December 31, 2012 AIPF PPM, October 1, 2014 Aequitas Enhanced Income Fund ("AEIF") PPM, January 1, 2015 AEIF PPM, December 14, 2015 AEIF PPM, and the July 31, 2015 Aequitas Private Client Fund ("APCF") PPM.  Each of these PPMs touted Jesenik's "over 30 years of experience in corporate finance and investment management," his "business background" in "commercial lending at U.S. Bancorp" and as "VP Finance/CFO in technology and distribution firms," and his accounting degree and MBA.

23.     On information and belief, Jesenik played a critical role in reviewing, commenting on, and approving the contents of the PPMs at issue in the SAC.  The SEC alleges that Jesenik maintained final approval of the contents of the PPMs, giving him final say over Aequitas's publication of the statements that Plaintiffs allege to have been false or materially misleading.  Jesenik also maintained authority over their distribution and, on information and belief, personally distributed certain of these PPMs to investors to solicit additional investment in the Aequitas entities.

24.    In addition to PPMs, Aequitas developed and distributed other marketing materials, such as quarterly reports known as "tear sheets," some of which are alleged in the SAC to have been materially false or misleading.  On information and belief, Jesenik was also responsible for approving the content of these materials.

25.    The SEC sued Jesenik in the SEC Action, and its complaint alleges that Jesenik perpetrated a scheme to defraud investors and misuse their assets.  The SEC further alleges that since 2014, Jesenik, together with his longtime chief fundraiser, Oliver, has defrauded investors into thinking that they were investing in a portfolio of trade receivables in the healthcare, education, transportation, or consumer credit sectors.  In reality, Jesenik, Oliver, and—after he joined Aequitas in early 2015, Gillis—allegedly used the majority of investor funds to repay prior investors and to pay the operating expense of the Aequitas enterprise, which allegedly exceeded the fees Aequitas told investors they would charge for managing investments.  The SEC further alleges that Jesenik is personally liable for violating the antifraud provisions of the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 ("Exchange Act"), and the Investment Advisers Act of 1940 ("Advisers Act") in connection with the offer and sale of Aequitas securities, and for the conduct described in this paragraph.

**Brian Oliver**

26.    Oliver joined Aequitas in 1997.  According to the SEC, Oliver, along with Jesenik, played an instrumental role in Aequitas's formation and development, serving as Aequitas's Executive Vice President and participating in every aspect of Aequitas's business operations and fundraising.

27.    The SEC alleges that Oliver was the primary fundraiser for the Aequitas entities. Oliver allegedly worked closely with investors, potential investors, and investment professionals,

**Page 12 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION**

including RIAs to solicit the Aequitas securities.  Oliver allegedly met frequently with investors,

potential investors, and their RIAs to recommend the Aequitas offerings, to answer questions,

and to oversee the distribution of Aequitas offering documents and marketing materials.  At

times, Oliver allegedly distributed offering documents to investors, including PPMs and

subscription agreements.  The SEC alleges that, like Jesenik, Oliver was involved in Aequitas's

investor appreciation and outreach events, which included expensive dinners, charity events, golf

outings, sports games, and a range of other activities.

28.    Oliver worked closely on the sales for certain of the named Plaintiffs.  For

example, Oliver communicated with Plaintiff Lawrence P. Ciuffitelli, both in person and over

email, prior to his investment.  Similarly, Oliver communicated with Plaintiff Greg Julien and

worked to close his initial Aequitas investment.  Regarding Julien's investment in 2012, Doug

Maurer, a PAG representative, acknowledged that Oliver was giving Julien a "break on the yield

and liquidity" and agreed that Oliver "backdate" the investment date to make the "accounting life

a little easier."  Oliver also discussed potential Aequitas investments with Plaintiff James

MacDonald and Michael MacDonald from Plaintiff R.F. MacDonald Co.  Finally, Oliver

communicated with Plaintiff Nowak and his son Nick Nowak about their investment, both over

the telephone and in person.  On information and belief, Oliver engaged in similar conduct with

other Aequitas investors.

29.    In addition to his direct outreach to Plaintiffs, Oliver worked closely with the

Plaintiffs' investment advisors, communicating with the RIA representatives sometimes multiple

times a day.  Oliver frequently communicated with SCG and PAG representatives and provided

them with inside information about Aequitas's fundraising needs.  In 2014, Plaintiff William

Ramstein sought to buy Aequitas securities in amounts that exceeded SCG's portfolio allocation

recommendations.  Together, Oliver and SCG arranged for Aequitas to accept Ramstein's investment directly from Ramstein, structuring the investment to appear as if SCG was not involved.  Both SCG and PAG recommended that clients invest no more than 10% of their investment portfolio in Aequitas securities.  On information and belief, Ramstein may have invested closer to 100% of his investment portfolio in Aequitas.

30.    Other than his direct interactions with investors and their advisors, Oliver was identified as Aequitas's Executive Vice President in every PPM that the SAC alleges was false or misleading:  June 9, 2010 ACF PPM, December 1, 2011 ACF PPM, November 30, 2012 ACF PPM, November 30, 2013 ACF PPM, September 9, 2015 ACF PPM, October 27, 2015 ACF PPM, July 11, 2011 AIOF PPM, March 1, 2012 AIOF PPM, December 31, 2012 AIOF PPM, February 15, 2012 AIOF-II PPM, October 1, 2014 AIOF-II PPM, October 31, 2014 AIOF-II PPM, February 2014 ACOF PPM, September 30, 2011 AIPF PPM, December 12, 2014 AIPF PPM, February 15, 2012 AIPF PPM, June 1, 2012 AIPF PPM, December 31, 2012 AIPF PPM, October 1, 2014 AEIF PPM, January 1, 2015 AEIF PPM, December 14, 2015 AEIF PPM, and the July 31, 2015 APCF PPM.  Each of these PPMs touted Oliver's "over 15 years [of] corporate banking" experience "where he utilized his expertise in financing middle-market companies in a wide variety of industries," his consulting, structuring, and refinancing experience, and his degree in finance.

31.    On information and belief, Oliver, like Jesenik, had approval authority over the disclosures contained in these PPMs and over their distribution to investors.  The SEC alleges that Oliver himself personally distributed certain PPMs to investors during meetings or over email to solicit additional investment in the Aequitas entities.  Oliver also distributed subscription agreements and other marketing materials

**Page 14 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION**

32.    The SEC alleges that, along with Jesenik, Oliver was also responsible for approving the content of the quarterly financial updates that the Aequitas entities shared with investors and potential investors.  Plaintiffs' SAC addresses these quarterly financial statements, which Plaintiffs contend were false or materially misleading.

33.    Oliver also allegedly played a significant role in monitoring what information was received by investors such as financial information and diligence information relating to the Aequitas entities.

34.    Oliver allegedly was also heavily involved at all relevant times in Aequitas's business decisions and strategy.  Oliver served on Aequitas's Investment Committee, as disclosed in PPMs discussed in Plaintiffs' SAC.  According to the Receiver's reports, Oliver was one of three individuals who were authorized to vote on investment decisions.  The others were Jesenik and MacRitchie.  On information and belief, by serving on the Investment Committee, Oliver played a critical role in deciding how Aequitas valued its assets and deployed capital received from the individuals who bought Aequitas securities.

35.    Oliver was also a voting member of the Board of ACM, an active participant in Aequitas's Management Committee, and a voting member of Aequitas's Audit Committee.  The SEC alleges that Oliver attended frequent meetings addressing reviews of Aequitas's financial statements, cash management, and similar issues.

36.    The SEC alleges that, in exchange for his services, Oliver received a salary of $350,000 with a bonus target of 100% of his salary.

37.    The Forensic Report alleges that Oliver was aware of Aequitas's significant debt obligations, including debt that Aequitas entities owed to outside investors.  In an October 2015 email quoted in the Forensic Report, Oliver stated: "Unfortunately, we have a history of building

**Page 15 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION**

what we think are 'conservative' plans, making business/spending/investing decisions based on those plans, not achieving those plans, and as a result creating a wider and wider gap between cash revenue and cash expenses. . . .  Since converting to an asset management firm, we've virtually never been profitable, and have now accumulated nearly $100MM of aggregate losses over our history."  The Forensic Report suggests that despite his awareness of certain financial challenges facing Aequitas, Oliver continued to raise funds from investors, both by soliciting investors directly and by working with RIAs.

38.     Like Jesenik, the SEC has sued Oliver in the SEC Action, and its complaint alleges that Oliver perpetrated a scheme to defraud investors and misuse their assets.  It further alleges that since 2014, Oliver, together with Jesenik, has defrauded investors into thinking that they were investing in a portfolio of trade receivables in the healthcare, education, transportation, or consumer credit sectors.  In reality, Jesenik, Oliver, and—after he joined Aequitas in early 2015, Gillis—allegedly used the majority of investor funds to repay prior investors and to pay the operating expenses of the Aequitas enterprise, which exceeded the fees Aequitas's affiliated entities told investors they would charge for managing investments.  The SEC further alleges that Oliver is personally liable for violating the antifraud provisions of the Securities Act, the Exchange Act, and the Advisers Act in connection with the offer and sale of Aequitas securities, and for the conduct described in this paragraph.

**N. Scott Gillis**

39.     Gillis joined Aequitas in January 2015 as the Executive Vice President Chief Operating Officer ("COO") for ACF, ACM, and AIM.  In the role of COO, Gillis reported directly to Jesenik and was responsible for "planning, implementing, managing and controlling all financial-related activities of the company."  Following the departure of Aequitas's former

CFO, Olaf Janke ("Janke"), Gillis also served as Aequitas's acting CFO.  Gillis was also named

an Executive Vice President of Aequitas.  Gillis was a 10% owner of Aequitas Management.  He

received a salary of $400,000 with a bonus target of 100%.

40.    In 2015, Gillis was responsible for the financial information prepared and

distributed through Aequitas's quarterly updates.  These quarterly updates included Aequitas's

total assets and a breakdown of asset allocations.

41.    The SEC alleges that Jesenik, Oliver, and Gillis were aware in 2015 that

Aequitas's financial position was deteriorating.  The SEC further alleges that on a daily basis,

Jesenik and Gillis received internal cash models and projections, which demonstrated significant

liquidity issues.  Jesenik and Gillis allegedly discussed ACF's cash needs on a near-daily basis.

Nonetheless, Aequitas continued selling securities throughout 2015 and into early 2016.

42.    The SEC alleges that, as Aequitas's CFO, Gillis was (or should have been) aware

that Aequitas Holdings lacked the ability to repay its intercompany loan to ACF (the "Holdings

Note")—an issue kept closely between the Aequitas insiders.  According to allegations in the

SEC's Complaint, Aequitas internal records showed an increasing gap between the amount of the

Holdings Note and its available collateral.  The SEC asserts that by June 2015, the balance of

this loan was $147.4 million and the collateral was $65.3 million.  The SEC further alleges that

Gillis held meetings in 2015 to address the shortfall in collateral, and was involved in Aequitas's

Office of the Chief Investment Officer meetings where the Holdings Note was discussed. According

to the SEC's allegations, Gillis was also aware that in April 2015, the Holdings Note well exceeded

its allowable line of credit ($80 million) under the Promissory Note agreement between ACF and

Aequitas Holdings, and that Aequitas backdated an amendment to that Promissory Note to

January 2014.

**Page 17 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION**

43.    In July 2015, Gillis was closely involved in ACF's actions to comply with the Investment Company Act of 1940 ("1940 Act").  The 1940 Act requires certain entities to register as an "investment company" unless they qualify for an exemption from registration. One exemption applies when 55% or more of a company's assets are so-called "good assets"— *i.e.*, notes and accounts receivable that represent the value of merchandise, insurance, or services. Gillis understood in the spring of 2015 that ACF did not have sufficient "good assets" and was relying on a one-year safe harbor for "transient investment companies."  Gillis also understood that an institutional lender to one of the Aequitas entities, Wells Fargo, required ACF to bring itself back within the 55% standard by June 30, 2015, and to obtain a written opinion from counsel to that effect.  To achieve this goal, Gillis implemented transactions that adjusted ACF's asset composition.  On information and belief, Gillis also instructed an employee simply to write down the value of certain "bad assets," thereby improving ACF's ratios in Aequitas's books.  Gillis issued these instructions without informing Aequitas's outside counsel, Wells Fargo, or others, and the valuation change was completed.  After Aequitas provided a written 1940 Act opinion to Wells Fargo, Gillis approved a second change, which returned the ACF valuations to their original levels and increased the company's overall valuation.  These changes did not become known until early February 2016.  On information and belief, Gillis was responsible for other transactions and bookkeeping adjustments to comply with the 1940 Act, which were also not disclosed to outside counsel, Wells Fargo, or others.

44.    Gillis was identified in the September 9, 2015 ACF PPM, October 27, 2015 ACF PPM, and the July 31, 2015 APCF PPM as Aequitas's Chief Operating Officer and in the AEIF December 14, 2015 AEIF PPM as Aequitas's Executive Vice President, Chief Operating Officer. Each of these PPMs touted Gillis as a CPA and CFP, and boasted of his experience as former

CFO of AIG Retirement Services, Director of "dozens of AIG subsidiaries," and his successes in pushing SunAmerica Life Companies' "market-leading growth, 30% annually for 15 years," as its former Vice President and Controller before its merger with AIG.

45.     Like Jesenik and Oliver, the SEC has sued Gillis in the SEC Action, and its complaint alleges that Gillis perpetrated a scheme to defraud investors and misuse their assets.  It further alleges that since 2014, Jesenik, together with Oliver, has defrauded investors into thinking that they were investing in a portfolio of trade receivables in the healthcare, education, transportation, or consumer credit sectors.  In reality, Jesenik, Oliver, and—after he joined Aequitas in early 2015, Gillis—allegedly used the majority of investor funds to repay prior investors and to pay the operating expenses of the Aequitas enterprise, which exceeded the fees Aequitas's affiliated entities told investors they would charge for managing investments.  The SEC further alleges that Gillis is personally liable for violating the antifraud provisions of the Securities Act, the Exchange Act, and the Advisers Act in connection with the offer and sale of Aequitas securities, and for the conduct described in this paragraph.

**Additional Aequitas Executives**

46.     On information and belief, Jesenik, Oliver, and Gillis were not the only executives who were involved in the sale of Aequitas securities.  As described in the Forensic Report, other executives, insiders, and advisors played important roles in overseeing the challenged securities offerings, soliciting sales, and directing Aequitas's use of funds raised by outside investors.  As with Jesenik, Oliver, and Gillis, a stay and injunction entered in the SEC Action prevents Sidley from asserting claims against these individuals at this time.  Counsel for the Receiver has informed Sidley that he is of the opinion that the injunction extends to every Aequitas executive and prevents Sidley from asserting claims against the executives until further

order of the Court overseeing the SEC Action.  Sidley reserves the right to seek leave of Court to assert claims against additional third parties—including additional officers or directors of Aequitas—once the stay and injunction are lifted.

### Aequitas Advisory Board

47.     As reflected in the Forensic Report, Aequitas engaged the services of an Advisory Board, which was comprised of "experienced business men and women," who advised Aequitas on various issues.  Aequitas identified the Advisory Board in documents it used to sell securities to investors, including many of the PPMs that the SAC alleges to have been false or misleading.  Each of these PPMs touted the Advisory Board as providing "insight and guidance on market opportunities and product developments."  In addition, the Forensic Report suggests that certain Advisory Board members worked as "finders" by referring individuals to Aequitas as prospective investors.  It also describes the Advisors as "insiders of Aequitas."  As with the Aequitas executives, a stay and injunction entered in the SEC Action prevents Sidley from asserting claims against members of the Advisory Board at this time.  Counsel for the Receiver has informed Sidley that he is of the opinion that the injunction extends to member of the Advisory Board and prevents Sidley from asserting claims against those individuals until further order of the Court overseeing the SEC Action.  Sidley reserves the right to seek leave of Court to assert claims against additional third parties—including individual Advisors—once the stay and injunction are lifted.

### Registered Investment Advisors

#### SCG, PAG, and RP Capital

48.     RP Capital was a defendant in an action brought by a putative class of Aequitas investors, which was recently resolved through a settlement.  *See Brown, et al. v. Price, et al.*,

**Page 20 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION**

No. 3:17-cv-00869-HZ (D. Or.).  The *Brown* Plaintiffs alleged that RP Capital facilitated sales of Aequitas securities without disclosing material facts about the Aequitas entities.  The *Brown* Plaintiffs made similar allegations against SCG and PAG, alleging that both entities sold Aequitas securities without disclosing their extensive connections to the Aequitas entities or potential conflicts of interest stemming from those connections.[5]

49.     SCG and PAG were RIAs who recommended Aequitas securities to their clients, and therefore had duties to perform adequate due diligence before recommending an investment, to recommend investments suitable to their clients' risk tolerances, and to act at all times in good faith and in their clients' best interests.

50.     The *Brown* Plaintiffs alleged that SCG and PAG held themselves out to their clients as independent RIAs acting in accord with these duties.  Representatives of SCG and PAG presented themselves as having the financial expertise necessary to evaluate the riskiness of the Aequitas securities, and as having performed the due diligence necessary to recommend their clients to purchase the securities.  Allegedly, representatives of SCG and PAG claimed to recommend investments that were suitable to their clients' financial needs and risk tolerances.  Representatives of SCG and PAG also allegedly claimed to act in their clients' best interests and to disclose conflicts of interest.

51.     On information and belief, the recommendations that SCG and PAG personnel provided to their clients were the decisive factor in their clients' (including five of seven named Plaintiffs in this action) decisions to purchase Aequitas securities.

_____

[5] The *Brown* Plaintiffs did not name SCG or PAG as defendants because, at the time that case was filed, both entities were owned by Aequitas and subject to the litigation stay.

**Page 21 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION**

52.    The *Brown* Plaintiffs alleged that representatives of SCG and PAG introduced their clients to Aequitas and its securities offerings, characterized the Aequitas securities as "safe and secure" investments, facilitated communications and meetings between their clients and Aequitas personnel, and assisted their clients to complete documents to consummate the sales.

53.    The *Brown* Plaintiffs alleged that representatives of SCG and PAG solicited and sold Aequitas securities not because those were good investment choices for their clients, but because of the conflicted relationship between SCG, PAG, and Aequitas.  For instance, SCG was allegedly conflicted because its clients' purchases of Aequitas securities were executed through RP Capital.  RP Capital, which was affiliated with SCG through common ownership, allegedly entered into formal referral agreements with Aequitas entities.  Under those agreements, RP Capital allegedly received referral fees for introducing Aequitas securities to investors.  In this way, RP Capital allegedly gained revenue through SCG's sales of Aequitas securities, which RP Capital shared with SCG representatives who advised several named Plaintiffs.  On information and belief, this revenue amounted to approximately 2% of the value of each securities purchase.

54.    The *Brown* Plaintiffs alleged that SCG sold its assets to PAG, a new entity created via an agreement between Aspen Grove, Bean Holdings LLC (which did business as Private Advisory Group), and Doug Maurer.  Pursuant to the PAG formation agreement, Aspen Grove—which was majority-owned by an Aequitas affiliate—allegedly acquired a 68% ownership interest in PAG.  According to the *Brown* Plaintiffs, SCG's investment adviser representatives moved to PAG, and PAG accepted all of SCG's approximately $110 million of Aequitas investments.

55.    The *Brown* Plaintiffs alleged that PAG was conflicted in advising its clients to purchase Aequitas securities, at a minimum, because it was majority-owned by Aequitas,

through Aspen Grove.  But even further, PAG allegedly was directly controlled by Aequitas personnel.  As the *Brown* Plaintiffs alleged, PAG's July 2015 Form ADV lists the following direct control persons:  Jesenik, Oliver, MacRitchie, Janke, and President of Aequitas Consumer Services Craig Froude.  The *Brown* Plaintiffs further alleged that documents filed with the SEC reveal that ACM is also a direct control person of PAG.  According to the *Brown* Plaintiffs, those relationships explain why PAG's SEC Form ADV filed with the SEC on July 14, 2015 includes a long list of Aequitas affiliates as the indirect controllers of PAG, including Aequitas Holdings and Aequitas Wealth Management.  SEC filings did not disclose the close relationship between PAG and Aequitas until July 2015.

56.    The conflicts alleged in the *Brown* Plaintiffs' complaint allegedly resulted in SCG, then PAG, engaging in aggressive sales practices to sell Aequitas securities.  Among other things, SCG and PAG representatives allegedly downplayed the risk associated with the investments—risks which were often clearly disclosed in Aequitas's PPMs.  SCG and PAG representatives allegedly described Aequitas investments as "safe and secure" and touted the high interest rates offered by the Aequitas entities.  On information and belief, when investors pressed SCG and PAG for information about Aequitas, representatives of these entities would accept Aequitas's explanations at face value rather than performing any independent investigation or diligence.  At times, representatives would simply refer inquiring clients directly to Aequitas personnel, who would convince those individuals to invest new funds in Aequitas securities or refrain from redeeming existing investments.  According to the *Brown* Plaintiffs, representatives of SCG and PAG continued advising their clients to purchase Aequitas securities despite receiving information reflecting financial challenges that faced the Aequitas entities.  On information and belief, because of their relationship with Aequitas, SCG and PAG were often

**Page 23 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION**

able to offer their clients "special" pricing (in the form of higher interest rates) on securities

offerings.  On information and belief, such pricing breaks facilitated purchases by investors who

would not have bought Aequitas securities without the "special" rates.

57.    All these practices occurred with respect to all five SCG/PAG clients who are

named Plaintiffs in this action.  With respect to Plaintiff Lawrence P. Ciuffitelli, representatives

of SCG facilitated and attended a meeting with Ciuffitelli and Aequitas personnel as early as

January 2011.  Around the time of that meeting, the SCG representatives described Aequitas

executives as "brilliant financiers" and described Aequitas as a "good, safe, stable investment."

Ciuffitelli made his first investment in an ACF Note shortly thereafter.  Representatives of SCG

stayed in close contact with Ciuffitelli in the years following his initial investment, advising him

to make additional investments and renew maturing investments.  Representatives of SCG also

encouraged Ciuffitelli to make investments at "special terms"—*i.e.*, short-term, particularly high-

yielding investments that Aequitas used to cover cash shortages.  Ciuffitelli continued as a PAG

client after PAG acquired SCG's assets.  Representatives of PAG continued to encourage

Ciuffitelli to make larger and different investments with the Aequitas entities, for example to

invest in ACOF and Motolease Financial.  On information and belief, SCG and PAG

representatives were the decisive factor in Ciuffitelli's decisions to purchase all the securities

upon which he bases his claims in this action.

58.    With respect to Plaintiff Gregory and Angela Julien Revocable Trust U/A

7/2/2012, SCG representatives assisted Julien (as trustee) with diligence he performed prior to

making the trust's first investment in an ACF Note in November 2010, including by helping

Julien interpret information provided by Aequitas and attending calls with Aequitas personnel.

When Julien redeemed his initial investment, representatives of SCG communicated with

**Page 24 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION**

Aequitas personnel, including Oliver, about how SCG "might be able to round up another $1M [short term private note] from Greg Julien, who just cashed out his $1M note." Julien, on SCG's recommendation, made the $1 million investment. Over time, SCG representatives advised Julien to make larger and different investments, for example to invest in AIOF. Julien and his trust continued as PAG clients after PAG acquired SCG's assets. On information and belief, SCG and PAG representatives were the decisive factor in Julien's decisions to purchase all the securities upon which he (as trustee) bases his claims in this action.

59.     Representatives of SCG contacted Plaintiff William Ramstein, several months before he made his first investment in an ACF Note in August 2011. Representatives of SCG requested information from Aequitas personnel on Ramsteins' behalf and provided their analysis of that information to Ramstein. For example, in or around April 2012, SCG representatives told Ramstein that "Aequitas is in better financial condition than ever and making strong quarterly gains." Representatives of SCG also arranged for Ramstein to attend "client appreciation" dinners, where Aequitas was described as "a well run equity firm." In early 2014, SCG facilitated Ramstein making a "direct" investment with Aequitas that increased his "exposure to Aequitas in excess of 50% of his new worth." Although Ramstein had reservations about this investment, SCG personnel "prepare[d] the paperwork" for the sale and "facilitate[d] the investment." Ramstein continued as a PAG client after PAG acquired SCG's assets. On information and belief, SCG and PAG representatives were the decisive factor in Ramstein's decisions to purchase all the securities upon which he bases his claims in this action.

60.     As for Plaintiffs R.F. MacDonald Co. ("RFMC") and the MacDonald Family Trust, representatives of SCG met with Jim MacDonald ("MacDonald") in person weeks before RFMC's initial ACF Note purchase in March 2011. Representatives of SCG continued to

**Page 25 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION**

encourage MacDonald to make larger and different investments with the Aequitas entities on behalf of both RMFC and the MacDonald Family Trust. RFMC, for example, expanded its investments by purchasing securities issued by AIPF in 2012 and AIOF in March 2013. The MacDonald Family Trust purchased a security issued by AIOF in 2012, and MotoLease Financial in 2015. RFMC and the MacDonald Family trust both continued as PAG clients after PAG acquired SCG's assets. On information and belief, SCG and PAG representatives were the decisive factor in the decisions by RFMC and the MacDonald Family Trust to purchase all the securities upon which they base their claims in this action.

61.    The *Brown* Plaintiffs alleged that SCG and PAG's sales tactics worked: when PAG acquired SCG's assets in 2014, SCG's clients allegedly owned approximately $110 million in Aequitas securities, or about 25% of the entire SCG assets under management. By the time Aequitas collapsed, PAG allegedly had put approximately 330 of its 600 clients in Aequitas securities, selling an additional $128 million in Aequitas notes and funds.

62.    In the SAC, Plaintiffs contend that Sidley should be liable for participating or materially aiding in the sales of Aequitas securities. While Sidley disputes any such claims of participation or material aid as to itself, to the extent Plaintiffs prevail on these (or similar) claims, then SCG, RP Capital, and PAG also participated or materially aided in the sales of Aequitas securities for the reasons alleged herein.

### FIRST CLAIM FOR RELIEF – CONTRIBUTION (ORS 59.115(3))

(Against All Third-Party Defendants)

63.    Sidley realleges and incorporates by reference Paragraphs 1-62 above.

64.    While Sidley has denied Plaintiffs' claims against it, if and only if Plaintiffs' claims, as asserted in the SAC, are proven and Sidley is found liable to Plaintiffs for Oregon

Securities Law violations, Third-Party Defendants are each jointly and severally liable for those violations pursuant to ORS 59.115.

65.     If, and only if, Plaintiffs prove that their alleged damages are attributable to Sidley's alleged participation or material aid in the sales of Aequitas securities, then, as described herein, the Third-Party Defendants directly participated and materially aided in the sale of Aequitas securities to a far greater extent than Sidley is alleged to have done.  Further, any damages sustained by Plaintiffs are wholly or partially attributable to conduct by the Third-Party Defendants, upon whom Plaintiffs relied in buying the relevant securities.

66.     Pursuant to ORS 59.115(3), if and only if Sidley is found liable to Plaintiffs for Oregon Securities Law violations, which liability Sidley denies, Sidley is entitled to contribution from Third-Party Defendants.

## RESERVATION OF CLAIMS AGAINST OTHER THIRD PARTIES

67.     Sidley reserves the right to assert any and all claims against additional third parties.  Discovery necessary to reveal the liability of additional parties is currently unavailable because of a stay imposed in the SEC Action.  Moreover, as detailed elsewhere in this Third-Party Complaint, the stay order includes an injunction, which prevents Sidley (or any other party) from initiating litigation against any of the Aequitas entities or their officers, directors, employees, or agents.  Counsel for the Receiver has informed Sidley that he is of the opinion that the injunction extends to a wide range of individuals affiliated with the Aequitas entities including, among others, Aequitas executives and members of the Advisory Board.  Sidley reserves the right to seek leave of Court to assert claims against additional third parties once the stay and injunction are lifted.

## RIGHT TO ATTORNEY'S FEES

68.     If Sidley prevails in its claims against one or more Third-Party Defendants, the Court should award Sidley reasonable attorney's fees pursuant to ORS 59.115(10).

## PRAYER FOR RELIEF

WHEREFORE, in the event Sidley is found liable to Plaintiffs with respect to any matters alleged in the SAC, Sidley requests that the Court:

1.     Enter a judgment in favor of Sidley and against each of the foregoing Third-Party Defendants for contribution;

2.     Enter a judgment apportioning the liability of Sidley, if any, and each Third-Party Defendant on the basis of comparative fault;

3.     Award Sidley its attorney's fees and costs incurred in this action;

4.     Award Sidley such other and further relief that the Court deems just and proper.

DATED this 10th day of December, 2018.

MARKOWITZ HERBOLD PC

By:     *s/ Jeffrey M. Edelson*
     David B. Markowitz, OSB #742046
     DavidMarkowitz@MarkowitzHerbold.com
     Jeffrey M. Edelson, OSB #880407
     JeffEdelson@MarkowitzHerbold.com
     (503) 295-3085

     Brad D. Brian
     Brad.Brian@mto.com
     Bruce A. Abbott
     Bruce.Abbott@mto.com
     MUNGER, TOLLES & OLSON LLP
     (admitted *pro hac vice*)

     Attorneys for Defendant and Third-Party
     Plaintiff Sidley Austin LLP