# EXHIBIT A

**Robert C. Weaver, Jr.**, OSB #801350
E-Mail: rweaver@gsblaw.com
**Gary I. Grenley**, OSB #751380
E-Mail: ggrenley@gsblaw.com
**Eryn Karpinski Hoerster**, OSB #106126
E-Mail: ehoerster@gsblaw.com
**Daniel L. Keppler**, OSB #923537
E-Mail: dkeppler@gsblaw.com
Garvey Schubert Barer, P.C.
121 SW Morrison Street, Eleventh Floor
Portland, Oregon 97204-3141
Telephone: (503) 228-3939

**Peter A. Wald (admitted *pro hac vice*)**
E-Mail: peter.wald@lw.com
**Gavin M. Masuda (admitted *pro hac vice*)**
E-Mail: gavin.masuda@lw.com
**Nicole C. Valco (admitted *pro hac vice*)**
E-Mail: nicole.valco@lw.com
**Marcy C. Priedeman (admitted *pro hac vice*)**
E-Mail: marcy.priedeman@lw.com
Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 391-0600

**Attorneys for Defendant and Third-Party Plaintiff Deloitte & Touche LLP**
*(Additional Counsel Listed on Signature Page)*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| LAWRENCE P. CIUFFITELLI, for himself and as Trustee of CIUFFITELLI REVOCABLE TRUST, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>DELOITTE & TOUCHE LLP;<br><br>        Defendant / Third-Party Plaintiff,<br><br>        v. | Case No. 3:16-cv-00580-AC<br><br>**DELOITTE & TOUCHE LLP'S THIRD-PARTY COMPLAINT FOR CONTRIBUTION**<br><br><u>DEMAND FOR JURY TRIAL</u> |

THIRD-PARTY COMPLAINT FOR CONTRIBUTION

STRATEGIC CAPITAL GROUP, LLC; RP
CAPITAL, LLC; and PRIVATE ADVISORY
GROUP, LLC.

                Third-Party Defendants.

Defendant and Third-Party Plaintiff Deloitte & Touche LLP ("Deloitte"), alleges the

following in support of its Third-Party Complaint for contribution against Third-Party

Defendants Strategic Capital Group, LLC; RP Capital, LLC; and Private Advisory Group, LLC

(collectively, "Third-Party Defendants"):

## INTRODUCTION

1.      Plaintiffs filed this action against Deloitte and other Defendants on April 4, 2016.

On September 8, 2017, Plaintiffs filed their Second Amended Class Action Complaint (the

"SAC"), which is the operative complaint.  In their SAC, Plaintiffs purport to represent a

putative class of investors who bought securities issued by various entities affiliated with

Aequitas Capital Management, Inc. ("ACM"), Aequitas Holdings, LLC, and related entities.

According to the United States Securities and Exchange Commission ("SEC"), the Aequitas

group of companies were founded by Robert J. Jesenik ("Jesenik") and controlled by, among

others, Aequitas's chief fundraiser Brian A. Oliver ("Oliver") and Chief Financial Officer

("CFO") N. Scott Gillis ("Gillis").

2.      Plaintiffs allege that the Aequitas entities[1] violated the Oregon Securities Laws

---

[1] In what appears to be a strategic choice, Plaintiffs' SAC consistently refers to "Aequitas" or
"Aequitas securities"—rather than the individual Aequitas-related entities whose securities sales
Plaintiffs are challenging.  Each Aequitas entity, however, is functionally and legally distinct.
Moreover, each Aequitas entity sold securities pursuant to different offering documents, which
contained different representations about, *inter alia*, their securities, the risks associated with an
investment in those securities, and other issues.  Deloitte uses the term "Aequitas" herein only as
short-hand and not to obscure the important distinctions between the various entities and
securities offerings.

by, among other things, selling securities without registering them under Oregon law.  Plaintiffs

further allege that the Aequitas entities sold securities by means of materially false or misleading

statements.  Plaintiffs allege that the Aequitas entities misrepresented their financial health,

failed to disclose their growing insolvency, and overvalued the collateral that backed the

securities they issued to investors.  (SAC ¶¶ 3–4.)  Plaintiffs further allege that the Aequitas

entities used new investor funds in a manner that was inconsistent with their representations to

investors.  (SAC ¶ 5.)  Plaintiffs further allege that rather than using investor funds to buy

income-generating assets, the Aequitas entities used proceeds from their securities sales to cover

operating expenses and repay principal and interest owed to earlier investors.  (SAC ¶¶ 70–71.)

3.     Plaintiffs do not bring claims against persons who were directly involved in

practices Plaintiffs claim were fraudulent or misleading, as a temporary litigation stay in the

related SEC matter prevents them from doing so.  (SAC ¶ 2.)  Absent from the SAC are claims

against Jesenik, Oliver, and Gillis, whom the SEC has accused of operating a "Ponzi-like"

scheme to mislead investors.  Nor do Plaintiffs sue other executives, insiders, and advisors who

participated in Aequitas's securities sales.  Also absent from Plaintiffs' SAC are Registered

Investment Advisors ("RIAs"), like Private Advisory Group and Strategic Capital Group, which

recommended Aequitas securities to Plaintiffs and other investors.

4.     Instead, Plaintiffs have sued only accounting firms, law firms, and other outside

service providers.[2]  Plaintiffs allege that Defendants are jointly and severally liable with the

Aequitas entities because they "participated" or "materially aided" in Aequitas's securities sales.

Plaintiffs allege that Defendants "materially aided" sales because, in certain cases, the Aequitas

---

[2] Plaintiffs' SAC names as Defendants Deloitte; Sidley Austin LLP; EisnerAmper, LLP; Tonkon
Torp, LLP; TD Ameritrade, Inc.; Integrity Bank & Trust; and Duff & Phelps, LLC.

entities referenced Defendants in their Private Placement Memoranda ("PPMs").  (SAC ¶¶ 189–92, 195.)  According to Plaintiffs' allegations—which Deloitte has denied in its Answer to Plaintiffs' SAC, filed on November 19, 2018—Aequitas's identification of Defendants in the PPMs fostered an illusion of success and legitimacy, which built confidence in prospective investors.  (SAC ¶¶ 189–90, 192, 195.)  Plaintiffs further allege that Defendants "materially aided" in the challenged sales by providing legal, accounting, or other services to certain Aequitas entities.  (SAC ¶¶ 189–95.)

5.    Deloitte has denied in its Answer to Plaintiffs' SAC, that it "participated" or "materially aided in" the challenged securities sales.  Deloitte has also denied that it is in any manner responsible for any injuries or damages alleged in Plaintiffs' SAC.[3]  If, however, liability is imposed on Deloitte as a result of any matter alleged in the SAC, that liability can only be derivative of or concurrent with the liability of other parties, who played a far more critical role in selling securities to Plaintiffs and the members of the putative class.  As alleged more fully below, the Oregon Securities Laws require that any liability imposed on Deloitte in connection with Plaintiffs' Aequitas investments be borne, in whole or in part, by Third-Party Defendants under principles of contribution.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over Plaintiffs' claims in this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there is a diversity of citizenship

---

[3] As reflected in Deloitte's recently filed Answer to Plaintiffs' SAC, Deloitte currently has no factual basis to admit or deny Plaintiffs' allegations concerning Aequitas's "primary liability"—*i.e.*, whether Aequitas itself violated the Oregon Securities Laws as alleged.  Plaintiffs bear the burden of proving these allegations, and discovery necessary to assess the truth of the allegations is unavailable because the stay in the SEC Action bars discovery against the Aequitas entities that are in receivership or their officers, directors, employees, and agents.

between certain Plaintiffs and certain Defendants.  This Court has subject matter jurisdiction over the claims asserted in this Third-Party Complaint pursuant to 28 U.S.C. § 1367(a).  The claims in this Third-Party Complaint are so related to the claims asserted by Plaintiffs in this action that they form part of the same case or controversy.

7.     Venue in the District of Oregon is proper under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiffs' claims, and to Deloitte's claims against the Third-Party Defendants, occurred in this District.

## PARTIES

8.     Deloitte is an accounting firm with offices in the United States and abroad, which has been named as a Defendant in the SAC.  Plaintiffs allege that Deloitte "participated" or "materially aided" in the sale of Aequitas securities.

9.     Strategic Capital Group, LLC ("SCG") was an RIA firm headquartered in Gig Harbor, Washington.  SCG was founded by N. Gary Price ("Price"), Ron Robertson ("Robertson"), and Timothy Feehan, Jr. ("Feehan"), in 1997, and was registered with the SEC in 2004.  SCG began its relationship with Aequitas in or around 2009 and advised up to 330 persons, including at least five of the seven named Plaintiffs in this action (Plaintiffs Larry Ciuffitelli, Greg Julien, James MacDonald, RF MacDonald Co., and William Ramstein), to purchase Aequitas securities.  On September 18, 2014, the SEC issued an Order Instituting Administrative and Cease-and-Desist Proceedings against SCG and its founder, Price, in an administrative proceeding, *In the Matter of Strategic Capital Group, LLC and N. Gary Price, SEC Administrative Proceeding*, File No. 3-16138 (the "SEC Cease-and-Desist Order").  At or around the time of this Order, SCG sold its assets to Private Advisory Group, and terminated its registration with the SEC in March 2015.  SCG was administratively dissolved by the Washington Secretary of State on April 3, 2018 due to failure to file its annual report due on

Page 4 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION

November 3, 2017

10.     RP Capital, LLC ("RP Capital") was a SEC registered broker-dealer located in Gig Harbor, Washington, that was affiliated with SCG through common ownership.  Price owned 50% of RP Capital and is one of its managing members.  RP Capital was registered with the SEC as a broker-dealer in 2005.  On information and belief, RP Capital worked closely with SCG, executing many of its trades.  RP Capital terminated its registration with the SEC in February 2017 and was administratively dissolved by the Washington Secretary of State on April 3, 2018 due to failure to file an annual report.

11.     Private Advisory Group, LLC ("PAG") is an RIA firm headquartered in Redmond, Washington that was created in or around September 2014, by a transaction, described in more detail below, whereby PAG acquired all of SCG's assets (including its customer relationships) and accepted a substantial capital contribution from the Aequitas-related entity Aspen Grove Equity Solutions ("Aspen Grove").  Following the transaction, Aspen Grove owned 68% of PAG and Bean Holdings, LLC, and Aaron Douglas Maurer ("Doug Maurer") owned the remaining equity.  Aspen Grove was in turn majority owned by ACM along with Price, Feehan, and Robertson.  ACM was further owned in part by Aequitas insiders, including Jesenik, Oliver, Chief Compliance Officer Andrew MacRitchie ("MacRitchie"), and President of Aequitas Consumer Services Craig Froude.  PAG was managed by S. Christopher Bean ("Chris Bean"), its Chief Executive Officer, Douglas R. Bean ("Doug Bean"), its Chief Operating Officer, and Jon Bishopp, its General Manager.  Both Chris Bean and Doug Bean were members of Bean Holdings, LLC.

## FACTUAL ALLEGATIONS

12.     On March 10, 2016, the SEC initiated a securities fraud action against Aequitas Management, LLC and related entities, as well as three Aequitas executives: Jesenik, Oliver, and

Page 5 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION

Gillis.  *See SEC v. Aequitas Management, LLC, et al*., No. 3:16-cv-00438-PK (D. Or.) (the "SEC Action").  The SEC's Complaint alleges that the Aequitas defendants operated "a scheme to defraud and misuse client assets in connection with investments offered through the Aequitas group of companies."

13.     The SEC obtained a preliminary injunction and the appointment of a Receiver over the Aequitas entities.  Since his appointment, the Aequitas Receiver has been consolidating control of the Aequitas entities, liquidating their assets, and verifying the claims of creditors against the Aequitas estate.  Securities issued by various Aequitas entities are now in default, and the Receiver estimates that approximately $617.6 million in principal and interest payments remain due to investors in those securities.

14.     Recently, the Receiver concluded an investigation concerning the Aequitas entities.  On November 21, 2018, the Receiver filed a "Report Regarding the Investigation of the Receivership Entity's Business Conduct" (the "Forensic Report").  The Forensic Report alleges, in part, that the Aequitas entities were insolvent "from at least July 3, 2014 onward" and operated in a "Ponzi-like" manner.  The Forensic Report further alleges that, at times, Aequitas's "only source of capital was new investor funds," and Aequitas was incapable of generating sufficient profits to pay returns it promised to investors.  The Receiver also identified alleged "instances of self-dealing" and preferential treatment afforded to executives and other insiders and advisors.

**<u>Aequitas Executives</u>**

15.     A stay issued in the SEC Action enjoins Deloitte from initiating litigation against any of the Aequitas entities or their officers, directors, employees, or agents.  This order currently prevents Deloitte from asserting claims against the individual defendants in the SEC Action—Jesenik, Oliver, and Gillis—or other insiders and advisors who were involved in

Aequitas's securities sales.  Deloitte includes the following allegations regarding the Aequitas insiders and advisors for background purposes only and not to assert claims against these individuals in this litigation until further order of the Court overseeing the SEC Action.  Deloitte reserves the right to seek leave of Court to assert claims against the Aequitas executives after the stay and injunction are lifted.

**Bob Jesenik**

16.     Jesenik was the founder of the Aequitas group of entities formed in 1993 and served as its President and Chief Executive Officer for over two decades.  Jesenik was a 35% owner of Aequitas Management, LLC, which owns 84% of Aequitas Holdings, LLC ("Aequitas Holdings").  Aequitas Holdings was the sole owner and member of Aequitas Commercial Finance, LLC ("ACF"), an entity which sold securities to Plaintiffs in this litigation.  Aequitas's marketing materials touted Jesenik's "over 30 years of experience in corporate finance and investment management."

17.     Jesenik served in Aequitas's leadership at all times, and was involved in every aspect of Aequitas's business operations.  He effectively controlled the entire Aequitas enterprise, including Aequitas Management (the ultimate parent company for the Aequitas group of entities), Aequitas Holdings, and ACF.  Jesenik drove Aequitas's business decisions and strategy.  Jesenik was aided in this endeavor by various Aequitas insiders, including Oliver and Gillis—both of whom are discussed below.

18.     In addition to serving as Aequitas's President and CEO, Jesenik was involved in nearly every committee responsible for conducting Aequitas's business operations.  Jesenik was the Chief Investment Officer of ACM and Aequitas Investment Management, LLC ("AIM").  Jesenik also served as the Chair of Aequitas's Investment Committee.  The Aequitas Receiver has described the Investment Committee as "Aequitas's primary decision-making body."

Page 7 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION

Among other things, the Investment Committee was responsible for selecting and approving the investments Aequitas made with investor money. It also approved valuations of Aequitas's equity positions—valuations which Aequitas disclosed to existing and prospective investors. By chairing the Investment Committee, Jesenik played a critical role in deciding how Aequitas valued its assets and deployed capital that it received from the individuals who bought Aequitas securities.

19.    The SEC alleges that in exchange for his services, Jesenik was paid a salary of $685,000 with a bonus target of 100% of his salary. In September 2014, Jesenik revised this salary amount from $450,000, and made this adjustment retroactive to January 1, 2014, as described in the Forensic Report.

20.    The SEC also alleges that Jesenik was closely involved in the solicitation and sale of Aequitas securities to investors. Jesenik met regularly with investors and potential investors—both at Aequitas's Lake Oswego headquarters and at destinations across the country. Such in-person investor meetings were both formal and informal and included expensive dinners, wine tastings, charity events, golf outings, sports events, and a range of other activities. In addition to in-person meetings, Jesenik responded to questions about Aequitas's securities through letters to investors, email communications, and phone calls. At the same time, Jesenik is alleged to have tightly controlled the diligence information that Aequitas provided to investors, forcing investors to sign non-disclosure agreements to access certain facts and data, and—even then—allowing investors to receive only limited information.

21.    Jesenik participated personally in sales of securities to Plaintiffs in this action, including Larry Ciuffitelli, Andrew Nowak, James MacDonald, and William Ramstein, each of whom made substantial investments in various securities over time. Jesenik directed other

Aequitas personnel, such as Oliver and others on Aequitas's sales team to sell or solicit the sale

of securities to these Plaintiffs. Jesenik was regularly apprised of the status of these sales efforts

and became personally involved when necessary to convince these Plaintiffs to invest. As just

one example, when Plaintiff Nowak (a long-time "business client" of Jesenik) "struggle[d] with

pulling the trigger" on a securities purchase in 2012, Aequitas sales personnel requested that

Jesenik personally contact Nowak to close the investment. Oliver played a critical role in this

effort as well, authorizing special terms to Nowak based on his prior relationship to Jesenik. On

information and belief, Nowak would not have invested in this particular security had Jesenik not

personally intervened, and had Oliver not offered him special terms. On information and belief,

Jesenik engaged in similar conduct with other Aequitas investors.

      22.    More generally, Jesenik was identified as Aequitas's Chief Executive Officer in

every PPM alleged in the SAC to have been materially false or misleading: June 9, 2010 ACF

PPM, December 1, 2011 ACF PPM, November 30, 2012 ACF PPM, November 30, 2013 ACF

PPM, September 9, 2015 ACF PPM, October 27, 2015 ACF PPM, July 11, 2011 Aequitas

Income Opportunity Fund ("AIOF") PPM, March 1, 2012 AIOF PPM, December 31, 2012 AIOF

PPM, February 15, 2012 Aequitas Income Opportunity Fund II ("AIOF-II") PPM, October 1,

2014 AIOF-II PPM, October 31, 2014 AIOF-II PPM, February 2014 Aequitas Capital

Opportunities Fund ("ACOF") PPM, September 30, 2011 Aequitas Income Protection Fund

("AIPF") PPM, December 12, 2014 AIPF PPM, February 15, 2012 AIPF PPM, June 1, 2012

AIPF PPM, December 31, 2012 AIPF PPM, October 1, 2014 Aequitas Enhanced Income Fund

("AEIF") PPM, January 1, 2015 AEIF PPM, December 14, 2015 AEIF PPM, and the July 31,

2015 Aequitas Private Client Fund ("APCF") PPM. Each of these PPMs touted Jesenik's "over

30 years of experience in corporate finance and investment management," his "business

background" in "commercial lending at U.S. Bancorp" and as "VP Finance/CFO in technology and distribution firms," and his accounting degree and MBA.

23.    On information and belief, Jesenik played a critical role in reviewing, commenting on, and approving the contents of the PPMs at issue in the SAC.  The SEC alleges that Jesenik maintained final approval of the contents of the PPMs, giving him final say over Aequitas's publication of the statements that Plaintiffs allege to have been false or materially misleading.  Jesenik also maintained authority over their distribution and, on information and belief, personally distributed certain of these PPMs to investors to solicit additional investment in the Aequitas entities.

24.    In addition to PPMs, Aequitas developed and distributed other marketing materials, such as quarterly reports known as "tear sheets," some of which are alleged in the SAC to have been materially false or misleading.  On information and belief, Jesenik was also responsible for approving the content of these materials.

25.    The SEC sued Jesenik in the SEC Action, and its complaint alleges that Jesenik perpetrated a scheme to defraud investors and misuse their assets.  The SEC further alleges that since 2014, Jesenik, together with his longtime chief fundraiser, Oliver, has defrauded investors into thinking that they were investing in a portfolio of trade receivables in the healthcare, education, transportation, or consumer credit sectors.  In reality, Jesenik, Oliver, and—after he joined Aequitas in early 2015, Gillis—allegedly used the majority of investor funds to repay prior investors and to pay the operating expense of the Aequitas enterprise, which allegedly exceeded the fees Aequitas told investors they would charge for managing investments.  The SEC further alleges that Jesenik is personally liable for violating the antifraud provisions of the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 ("Exchange

Act"), and the Investment Advisers Act of 1940 ("Advisers Act") in connection with the offer and sale of Aequitas securities, and for the conduct described in this paragraph.

**Brian Oliver**

26.     Oliver joined Aequitas in 1997.  According to the SEC, Oliver, along with Jesenik, played an instrumental role in Aequitas's formation and development, serving as Aequitas's Executive Vice President and participating in every aspect of Aequitas's business operations and fundraising.

27.     The SEC alleges that Oliver was the primary fundraiser for the Aequitas entities. Oliver allegedly worked closely with investors, potential investors, and investment professionals, including RIAs to solicit the Aequitas securities.  Oliver allegedly met frequently with investors, potential investors, and their RIAs to recommend the Aequitas offerings, to answer questions, and to oversee the distribution of Aequitas offering documents and marketing materials.  At times, Oliver allegedly distributed offering documents to investors, including PPMs and subscription agreements.  The SEC alleges that, like Jesenik, Oliver was involved in Aequitas's investor appreciation and outreach events, which included expensive dinners, charity events, golf outings, sports games, and a range of other activities.

28.     Oliver worked closely on the sales for certain of the named Plaintiffs.  For example, Oliver communicated with Plaintiff Lawrence P. Ciuffitelli, both in person and over email, prior to his investment.  Similarly, Oliver communicated with Plaintiff Greg Julien and worked to close his initial Aequitas investment.  Regarding Julien's investment in 2012, Doug Maurer, a PAG representative, acknowledged that Oliver was giving Julien a "break on the yield and liquidity" and agreed that Oliver "backdate" the investment date to make the "accounting life a little easier."  Oliver also discussed potential Aequitas investments with Plaintiff James MacDonald and Michael MacDonald from Plaintiff R.F. MacDonald Co.  Finally, Oliver

communicated with Plaintiff Nowak and his son Nick Nowak about their investment, both over

the telephone and in person. On information and belief, Oliver engaged in similar conduct with

other Aequitas investors.

29.    In addition to his direct outreach to Plaintiffs, Oliver worked closely with the

Plaintiffs' investment advisors, communicating with the RIA representatives sometimes multiple

times a day. Oliver frequently communicated with SCG and PAG representatives and provided

them with inside information about Aequitas's fundraising needs. In 2014, Plaintiff William

Ramstein sought to buy Aequitas securities in amounts that exceeded SCG's portfolio allocation

recommendations. Together, Oliver and SCG arranged for Aequitas to accept Ramstein's

investment directly from Ramstein, structuring the investment to appear as if SCG was not

involved. Both SCG and PAG recommended that clients invest no more than 10% of their

investment portfolio in Aequitas securities. On information and belief, Ramstein may have

invested closer to 100% of his investment portfolio in Aequitas.

30.    Other than his direct interactions with investors and their advisors, Oliver was

identified as Aequitas's Executive Vice President in every PPM that the SAC alleges was false

or misleading: June 9, 2010 ACF PPM, December 1, 2011 ACF PPM, November 30, 2012 ACF

PPM, November 30, 2013 ACF PPM, September 9, 2015 ACF PPM, October 27, 2015 ACF

PPM, July 11, 2011 AIOF PPM, March 1, 2012 AIOF PPM, December 31, 2012 AIOF PPM,

February 15, 2012 AIOF-II PPM, October 1, 2014 AIOF-II PPM, October 31, 2014 AIOF-II

PPM, February 2014 ACOF PPM, September 30, 2011 AIPF PPM, December 12, 2014 AIPF

PPM, February 15, 2012 AIPF PPM, June 1, 2012 AIPF PPM, December 31, 2012 AIPF PPM,

October 1, 2014 AEIF PPM, January 1, 2015 AEIF PPM, December 14, 2015 AEIF PPM, and

the July 31, 2015 APCF PPM. Each of these PPMs touted Oliver's "over 15 years [of] corporate

banking" experience "where he utilized his expertise in financing middle-market companies in a wide variety of industries," his consulting, structuring, and refinancing experience, and his degree in finance.

31.    On information and belief, Oliver, like Jesenik, had approval authority over the disclosures contained in these PPMs and over their distribution to investors.  The SEC alleges that Oliver himself personally distributed certain PPMs to investors during meetings or over email to solicit additional investment in the Aequitas entities.  Oliver also distributed subscription agreements and other marketing materials

32.    The SEC alleges that, along with Jesenik, Oliver was also responsible for approving the content of the quarterly financial updates that the Aequitas entities shared with investors and potential investors.  Plaintiffs' SAC addresses these quarterly financial statements, which Plaintiffs contend were false or materially misleading.

33.    Oliver also allegedly played a significant role in monitoring what information was received by investors such as financial information and diligence information relating to the Aequitas entities.

34.    Oliver allegedly was also heavily involved at all relevant times in Aequitas's business decisions and strategy.  Oliver served on Aequitas's Investment Committee, as disclosed in PPMs discussed in Plaintiffs' SAC.  According to the Receiver's reports, Oliver was one of three individuals who were authorized to vote on investment decisions.  The others were Jesenik and MacRitchie.  On information and belief, by serving on the Investment Committee, Oliver played a critical role in deciding how Aequitas valued its assets and deployed capital received from the individuals who bought Aequitas securities.

35.    Oliver was also a voting member of the Board of ACM, an active participant in

Aequitas's Management Committee, and a voting member of Aequitas's Audit Committee.   The
SEC alleges that Oliver attended frequent meetings addressing reviews of Aequitas's financial
statements, cash management, and similar issues.

36.    The SEC alleges that, in exchange for his services, Oliver received a salary of
$350,000 with a bonus target of 100% of his salary.

37.    The Forensic Report alleges that Oliver was aware of Aequitas's significant debt
obligations, including debt that Aequitas entities owed to outside investors.  In an October 2015
email quoted in the Forensic Report, Oliver stated: "Unfortunately, we have a history of building
what we think are 'conservative' plans, making business/spending/investing decisions based on
those plans, not achieving those plans, and as a result creating a wider and wider gap between
cash revenue and cash expenses. . . .  Since converting to an asset management firm, we've
virtually never been profitable, and have now accumulated nearly $100MM of aggregate losses
over our history."  The Forensic Report suggests that despite his awareness of certain financial
challenges facing Aequitas, Oliver continued to raise funds from investors, both by soliciting
investors directly and by working with RIAs.

38.    Like Jesenik, the SEC has sued Oliver in the SEC Action, and its complaint
alleges that Oliver perpetrated a scheme to defraud investors and misuse their assets.  It further
alleges that since 2014, Oliver, together with Jesenik, has defrauded investors into thinking that
they were investing in a portfolio of trade receivables in the healthcare, education, transportation,
or consumer credit sectors.  In reality, Jesenik, Oliver, and—after he joined Aequitas in early
2015, Gillis—allegedly used the majority of investor funds to repay prior investors and to pay
the operating expenses of the Aequitas enterprise, which exceeded the fees Aequitas's affiliated
entities told investors they would charge for managing investments.  The SEC further alleges that

Oliver is personally liable for violating the antifraud provisions of the Securities Act, the

Exchange Act, and the Advisers Act in connection with the offer and sale of Aequitas securities,

and for the conduct described in this paragraph.

**N. Scott Gillis**

39.    Gillis joined Aequitas in January 2015 as the Executive Vice President Chief

Operating Officer ("COO") for ACF, ACM, and AIM.  In the role of COO, Gillis reported

directly to Jesenik and was responsible for "planning, implementing, managing and controlling

all financial-related activities of the company."  Following the departure of Aequitas's former

CFO, Olaf Janke ("Janke"), Gillis also served as Aequitas's acting CFO.  Gillis was also named

an Executive Vice President of Aequitas.  Gillis was a 10% owner of Aequitas Management.  He

received a salary of $400,000 with a bonus target of 100%.

40.    In 2015, Gillis was responsible for the financial information prepared and

distributed through Aequitas's quarterly updates.  These quarterly updates included Aequitas's

total assets and a breakdown of asset allocations.

41.    The SEC alleges that Jesenik, Oliver, and Gillis were aware in 2015 that

Aequitas's financial position was deteriorating.  The SEC further alleges that on a daily basis,

Jesenik and Gillis received internal cash models and projections, which demonstrated significant

liquidity issues.  Jesenik and Gillis allegedly discussed ACF's cash needs on a near-daily basis.

Nonetheless, Aequitas continued selling securities throughout 2015 and into early 2016.

42.    The SEC alleges that, as Aequitas's CFO, Gillis was (or should have been) aware

that Aequitas Holdings lacked the ability to repay its intercompany loan to ACF (the "Holdings

Note")—an issue kept closely between the Aequitas insiders.  According to allegations in the

SEC's Complaint, Aequitas internal records showed an increasing gap between the amount of the

Holdings Note and its available collateral.  The SEC asserts that by June 2015, the balance of

Page 15 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION

this loan was $147.4 million and the collateral was $65.3 million.  The SEC further alleges that Gillis held meetings in 2015 to address the shortfall in collateral, and was involved in Aequitas's Office of the Chief Investment Officer meetings where the Holdings Note was discussed. According to the SEC's allegations, Gillis was also aware that in April 2015, the Holdings Note well exceeded its allowable line of credit ($80 million) under the Promissory Note agreement between ACF and Aequitas Holdings, and that Aequitas backdated an amendment to that Promissory Note to January 2014.

43.    In July 2015, Gillis was closely involved in ACF's actions to comply with the Investment Company Act of 1940 ("1940 Act").  The 1940 Act requires certain entities to register as an "investment company" unless they qualify for an exemption from registration. One exemption applies when 55% or more of a company's assets are so-called "good assets"— *i.e.*, notes and accounts receivable that represent the value of merchandise, insurance, or services. Gillis understood in the spring of 2015 that ACF did not have sufficient "good assets" and was relying on a one-year safe harbor for "transient investment companies."  Gillis also understood that an institutional lender to one of the Aequitas entities, Wells Fargo, required ACF to bring itself back within the 55% standard by June 30, 2015, and to obtain a written opinion from counsel to that effect.  To achieve this goal, Gillis implemented transactions that adjusted ACF's asset composition.  On information and belief, Gillis also instructed an employee simply to write down the value of certain "bad assets," thereby improving ACF's ratios in Aequitas's books.  Gillis issued these instructions without informing Aequitas's outside counsel, Wells Fargo, or others, and the valuation change was completed.  After Aequitas provided a written 1940 Act opinion to Wells Fargo, Gillis approved a second change, which returned the ACF valuations to their original levels and increased the company's overall valuation.  These changes did not become known until early February 2016.  On information and belief, Gillis was responsible for other

Page 16 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION

transactions and bookkeeping adjustments to comply with the 1940 Act, which were also not disclosed to outside counsel, Wells Fargo, or others.

44.      Gillis was identified in the September 9, 2015 ACF PPM, October 27, 2015 ACF PPM, and the July 31, 2015 APCF PPM as Aequitas's Chief Operating Officer and in the AEIF December 14, 2015 AEIF PPM as Aequitas's Executive Vice President, Chief Operating Officer. Each of these PPMs touted Gillis as a CPA and CFP, and boasted of his experience as former CFO of AIG Retirement Services, Director of "dozens of AIG subsidiaries," and his successes in pushing SunAmerica Life Companies' "market-leading growth, 30% annually for 15 years," as its former Vice President and Controller before its merger with AIG.

45.      Like Jesenik and Oliver, the SEC has sued Gillis in the SEC Action, and its complaint alleges that Gillis perpetrated a scheme to defraud investors and misuse their assets.  It further alleges that since 2014, Jesenik, together with Oliver, has defrauded investors into thinking that they were investing in a portfolio of trade receivables in the healthcare, education, transportation, or consumer credit sectors.  In reality, Jesenik, Oliver, and—after he joined Aequitas in early 2015, Gillis—allegedly used the majority of investor funds to repay prior investors and to pay the operating expenses of the Aequitas enterprise, which exceeded the fees Aequitas's affiliated entities told investors they would charge for managing investments.  The SEC further alleges that Gillis is personally liable for violating the antifraud provisions of the Securities Act, the Exchange Act, and the Advisers Act in connection with the offer and sale of Aequitas securities, and for the conduct described in this paragraph.

**Additional Aequitas Executives**

46.      On information and belief, Jesenik, Oliver, and Gillis were not the only executives who were involved in the sale of Aequitas securities.  As described in the Forensic Report, other executives, insiders, and advisors played important roles in overseeing the

challenged securities offerings, soliciting sales, and directing Aequitas's use of funds raised by outside investors.  As with Jesenik, Oliver, and Gillis, a stay and injunction entered in the SEC Action prevents Deloitte from asserting claims against these individuals at this time.  Counsel for the Receiver has informed Deloitte that he is of the opinion that the injunction extends to every Aequitas executive and prevents Deloitte from asserting claims against the executives until further order of the Court overseeing the SEC Action.  Deloitte reserves the right to seek leave of Court to assert claims against additional third parties—including additional officers or directors of Aequitas—once the stay and injunction are lifted.

### Aequitas Advisory Board

47.      As reflected in the Forensic Report, Aequitas engaged the services of an Advisory Board, which was comprised of "experienced business men and women," who advised Aequitas on various issues.  Aequitas identified the Advisory Board in documents it used to sell securities to investors, including many of the PPMs that the SAC alleges to have been false or misleading.  Each of these PPMs touted the Advisory Board as providing "insight and guidance on market opportunities and product developments."  In addition, the Forensic Report suggests that certain Advisory Board members worked as "finders" by referring individuals to Aequitas as prospective investors.  It also describes the Advisors as "insiders of Aequitas."  As with the Aequitas executives, a stay and injunction entered in the SEC Action prevents Deloitte from asserting claims against members of the Advisory Board at this time.  Counsel for the Receiver has informed Deloitte that he is of the opinion that the injunction extends to member of the Advisory Board and prevents Deloitte from asserting claims against those individuals until further order of the Court overseeing the SEC Action.  Deloitte reserves the right to seek leave of Court to assert claims against additional third parties—including individual Advisors—once the stay and injunction are lifted.

Page 18 –THIRD-PARTY COMPLAINT FOR CONTRIBUTION

<u>Registered Investment Advisors</u>

<u>SCG, PAG, and RP Capital</u>

48.      RP Capital was a defendant in an action brought by a putative class of Aequitas investors, which was recently resolved through a settlement.  *See Brown, et al. v. Price, et al*., No. 3:17-cv-00869-HZ (D. Or.).  The *Brown* Plaintiffs alleged that RP Capital facilitated sales of Aequitas securities without disclosing material facts about the Aequitas entities.  The *Brown* Plaintiffs made similar allegations against SCG and PAG, alleging that both entities sold Aequitas securities without disclosing their extensive connections to the Aequitas entities or potential conflicts of interest stemming from those connections.[4]

49.      SCG and PAG were RIAs who recommended Aequitas securities to their clients, and therefore had duties to perform adequate due diligence before recommending an investment, to recommend investments suitable to their clients' risk tolerances, and to act at all times in good faith and in their clients' best interests.

50.      The *Brown* Plaintiffs alleged that SCG and PAG held themselves out to their clients as independent RIAs acting in accord with these duties.  Representatives of SCG and PAG presented themselves as having the financial expertise necessary to evaluate the riskiness of the Aequitas securities, and as having performed the due diligence necessary to recommend their clients to purchase the securities.  Allegedly, representatives of SCG and PAG claimed to recommend investments that were suitable to their clients' financial needs and risk tolerances.  Representatives of SCG and PAG also allegedly claimed to act in their clients' best interests and to disclose conflicts of interest.

51.      On information and belief, the recommendations that SCG and PAG personnel

---

[4] The *Brown* Plaintiffs did not name SCG or PAG as defendants because, at the time that case was filed, both entities were owned by Aequitas and subject to the litigation stay.

provided to their clients were the decisive factor in their clients' (including five of seven named Plaintiffs in this action) decisions to purchase Aequitas securities.

52.    The *Brown* Plaintiffs alleged that representatives of SCG and PAG introduced their clients to Aequitas and its securities offerings, characterized the Aequitas securities as "safe and secure" investments, facilitated communications and meetings between their clients and Aequitas personnel, and assisted their clients to complete documents to consummate the sales.

53.    The *Brown* Plaintiffs alleged that representatives of SCG and PAG solicited and sold Aequitas securities not because those were good investment choices for their clients, but because of the conflicted relationship between SCG, PAG, and Aequitas.  For instance, SCG was allegedly conflicted because its clients' purchases of Aequitas securities were executed through RP Capital.  RP Capital, which was affiliated with SCG through common ownership, allegedly entered into formal referral agreements with Aequitas entities.  Under those agreements, RP Capital allegedly received referral fees for introducing Aequitas securities to investors.  In this way, RP Capital allegedly gained revenue through SCG's sales of Aequitas securities, which RP Capital shared with SCG representatives who advised several named Plaintiffs.  On information and belief, this revenue amounted to approximately 2% of the value of each securities purchase.

54.    The *Brown* Plaintiffs alleged that SCG sold its assets to PAG, a new entity created via an agreement between Aspen Grove, Bean Holdings LLC (which did business as Private Advisory Group), and Doug Maurer.  Pursuant to the PAG formation agreement, Aspen Grove—which was majority-owned by an Aequitas affiliate—allegedly acquired a 68% ownership interest in PAG.  According to the *Brown* Plaintiffs, SCG's investment adviser representatives moved to PAG, and PAG accepted all of SCG's approximately $110 million of Aequitas investments.

55.    The *Brown* Plaintiffs alleged that PAG was conflicted in advising its clients to purchase Aequitas securities, at a minimum, because it was majority-owned by Aequitas, through Aspen Grove.  But even further, PAG allegedly was directly controlled by Aequitas personnel.  As the *Brown* Plaintiffs alleged, PAG's July 2015 Form ADV lists the following direct control persons:  Jesenik, Oliver, MacRitchie, Janke, and President of Aequitas Consumer Services Craig Froude.  The *Brown* Plaintiffs further alleged that documents filed with the SEC reveal that ACM is also a direct control person of PAG.  According to the *Brown* Plaintiffs, those relationships explain why PAG's SEC Form ADV filed with the SEC on July 14, 2015 includes a long list of Aequitas affiliates as the indirect controllers of PAG, including Aequitas Holdings and Aequitas Wealth Management.  SEC filings did not disclose the close relationship between PAG and Aequitas until July 2015.

56.    The conflicts alleged in the *Brown* Plaintiffs' complaint allegedly resulted in SCG, then PAG, engaging in aggressive sales practices to sell Aequitas securities.  Among other things, SCG and PAG representatives allegedly downplayed the risk associated with the investments—risks which were often clearly disclosed in Aequitas's PPMs.  SCG and PAG representatives allegedly described Aequitas investments as "safe and secure" and touted the high interest rates offered by the Aequitas entities.  On information and belief, when investors pressed SCG and PAG for information about Aequitas, representatives of these entities would accept Aequitas's explanations at face value rather than performing any independent investigation or diligence.  At times, representatives would simply refer inquiring clients directly to Aequitas personnel, who would convince those individuals to invest new funds in Aequitas securities or refrain from redeeming existing investments.  According to the *Brown* Plaintiffs, representatives of SCG and PAG continued advising their clients to purchase Aequitas securities

despite receiving information reflecting financial challenges that faced the Aequitas entities.  On information and belief, because of their relationship with Aequitas, SCG and PAG were often able to offer their clients "special" pricing (in the form of higher interest rates) on securities offerings.  On information and belief, such pricing breaks facilitated purchases by investors who would not have bought Aequitas securities without the "special" rates.

57.     All these practices occurred with respect to all five SCG/PAG clients who are named Plaintiffs in this action.  With respect to Plaintiff Lawrence P. Ciuffitelli, representatives of SCG facilitated and attended a meeting with Ciuffitelli and Aequitas personnel as early as January 2011.  Around the time of that meeting, the SCG representatives described Aequitas executives as "brilliant financiers" and described Aequitas as a "good, safe, stable investment." Ciuffitelli made his first investment in an ACF Note shortly thereafter.  Representatives of SCG stayed in close contact with Ciuffitelli in the years following his initial investment, advising him to make additional investments and renew maturing investments.  Representatives of SCG also encouraged Ciuffitelli to make investments at "special terms"—*i.e.*, short-term, particularly high-yielding investments that Aequitas used to cover cash shortages.  Ciuffitelli continued as a PAG client after PAG acquired SCG's assets.  Representatives of PAG continued to encourage Ciuffitelli to make larger and different investments with the Aequitas entities, for example to invest in ACOF and Motolease Financial.  On information and belief, SCG and PAG representatives were the decisive factor in Ciuffitelli's decisions to purchase all the securities upon which he bases his claims in this action.

58.     With respect to Plaintiff Gregory and Angela Julien Revocable Trust U/A 7/2/2012, SCG representatives assisted Julien (as trustee) with diligence he performed prior to making the trust's first investment in an ACF Note in November 2010, including by helping

Julien interpret information provided by Aequitas and attending calls with Aequitas personnel.

When Julien redeemed his initial investment, representatives of SCG communicated with

Aequitas personnel, including Oliver, about how SCG "might be able to round up another $1M

[short term private note] from Greg Julien, who just cashed out his $1M note."  Julien, on SCG's

recommendation, made the $1 million investment.  Over time, SCG representatives advised

Julien to make larger and different investments, for example to invest in AIOF.  Julien and his

trust continued as PAG clients after PAG acquired SCG's assets.  On information and belief,

SCG and PAG representatives were the decisive factor in Julien's decisions to purchase all the

securities upon which he (as trustee) bases his claims in this action.

      59.     Representatives of SCG contacted Plaintiff William Ramstein, several months

before he made his first investment in an ACF Note in August 2011.  Representatives of SCG

requested information from Aequitas personnel on Ramsteins' behalf and provided their analysis

of that information to Ramstein.  For example, in or around April 2012, SCG representatives told

Ramstein that "Aequitas is in better financial condition than ever and making strong quarterly

gains."  Representatives of SCG also arranged for Ramstein to attend "client appreciation"

dinners, where Aequitas was described as "a well run equity firm."  In early 2014, SCG

facilitated Ramstein making a "direct" investment with Aequitas that increased his "exposure to

Aequitas in excess of 50% of his new worth."  Although Ramstein had reservations about this

investment, SCG personnel "prepare[d] the paperwork" for the sale and "facilitate[d] the

investment."  Ramstein continued as a PAG client after PAG acquired SCG's assets.  On

information and belief, SCG and PAG representatives were the decisive factor in Ramstein's

decisions to purchase all the securities upon which he bases his claims in this action.

      60.     As for Plaintiffs R.F. MacDonald Co. ("RFMC") and the MacDonald Family

Trust, representatives of SCG met with Jim MacDonald ("MacDonald") in person weeks before RFMC's initial ACF Note purchase in March 2011.  Representatives of SCG continued to encourage MacDonald to make larger and different investments with the Aequitas entities on behalf of both RMFC and the MacDonald Family Trust.  RFMC, for example, expanded its investments by purchasing securities issued by AIPF in 2012 and AIOF in March 2013.  The MacDonald Family Trust purchased a security issued by AIOF in 2012, and MotoLease Financial in 2015.  RFMC and the MacDonald Family trust both continued as PAG clients after PAG acquired SCG's assets.  On information and belief, SCG and PAG representatives were the decisive factor in the decisions by RFMC and the MacDonald Family Trust to purchase all the securities upon which they base their claims in this action.

61.    The *Brown* Plaintiffs alleged that SCG and PAG's sales tactics worked: when PAG acquired SCG's assets in 2014, SCG's clients allegedly owned approximately $110 million in Aequitas securities, or about 25% of the entire SCG assets under management.  By the time Aequitas collapsed, PAG allegedly had put approximately 330 of its 600 clients in Aequitas securities, selling an additional $128 million in Aequitas notes and funds.

62.    In the SAC, Plaintiffs contend that Deloitte should be liable for participating or materially aiding in the sales of Aequitas securities.  While Deloitte disputes any such claims of participation or material aid as to itself, to the extent Plaintiffs prevail on these (or similar) claims, then SCG, RP Capital, and PAG also participated or materially aided in the sales of Aequitas securities for the reasons alleged herein.

### FIRST CLAIM FOR RELIEF – CONTRIBUTION (ORS 59.115(3))

(Against All Third-Party Defendants)

63.    Deloitte realleges and incorporates by reference Paragraphs 1-62 above.

64.    While Deloitte has denied Plaintiffs' claims against it, if and only if Plaintiffs'

claims, as asserted in the SAC, are proven and Deloitte is found liable to Plaintiffs for Oregon Securities Law violations, Third-Party Defendants are each jointly and severally liable for those violations pursuant to ORS 59.115.

65.    If, and only if, Plaintiffs prove that their alleged damages are attributable to Deloitte's alleged participation or material aid in the sales of Aequitas securities, then, as described herein, the Third-Party Defendants directly participated and materially aided in the sale of Aequitas securities to a far greater extent than Deloitte is alleged to have done.  Further, any damages sustained by Plaintiffs are wholly or partially attributable to conduct by the Third-Party Defendants, upon whom Plaintiffs relied in buying the relevant securities.

66.    Pursuant to ORS 59.115(3), if and only if Deloitte is found liable to Plaintiffs for Oregon Securities Law violations, which liability Deloitte denies, Deloitte is entitled to contribution from Third-Party Defendants.

## **RESERVATION OF CLAIMS AGAINST OTHER THIRD PARTIES**

67.    Deloitte reserves the right to assert any and all claims against additional third parties.  Discovery necessary to reveal the liability of additional parties is currently unavailable because of a stay imposed in the SEC Action.  Moreover, as detailed elsewhere in this Third-Party Complaint, the stay order includes an injunction, which prevents Deloitte (or any other party) from initiating litigation against any of the Aequitas entities or their officers, directors, employees, or agents.  Counsel for the Receiver has informed Deloitte that he is of the opinion that the injunction extends to a wide range of individuals affiliated with the Aequitas entities including, among others, Aequitas executives and members of the Advisory Board.  Deloitte reserves the right to seek leave of Court to assert claims against additional third parties once the stay and injunction are lifted.

## RIGHT TO ATTORNEY'S FEES

68.    If Deloitte prevails in its claims against one or more Third-Party Defendants, the

Court should award Third-Party Plaintiffs reasonable attorney's fees pursuant to

ORS 59.115(10).

## PRAYER FOR RELIEF

WHEREFORE, in the event Deloitte is found liable to Plaintiffs with respect to any

matters alleged in the SAC, Deloitte requests that the Court:

1.    Enter a judgment in favor of Deloitte and against each of the foregoing Third-

Party Defendants for contribution;

2.    Enter a judgment apportioning the liability of Deloitte, if any, and each Third-

Party Defendant on the basis of comparative fault;

3.    Award Deloitte its attorney's fees and costs incurred in this action;

4.    Award Deloitte such other and further relief that the Court deems just and proper.

DATED this ___ day of December, 2018.

LATHAM & WATKINS LLP

By:  s/ Peter A. Wald
      **Peter A. Wald (admitted *pro hac vice*)**
      **Gavin M. Masuda (admitted *pro hac vice*)**
      **Nicole C. Valco (admitted *pro hac vice*)**
      **Marcy C. Priedeman (admitted *pro hac vice*)**
      505 Montgomery Street, Suite 2000
      San Francisco, CA 94111-6538
      Telephone: (415) 391-0600
      Email: peter.wald@lw.com
             gavin.masuda@lw.com
             nicole.valco@lw.com
             marcy.priedeman@lw.com

–And–

      **Nicholas J. Siciliano (admitted *pro hac vice*)**
      LATHAM & WATKINS LLP
      330 North Wabash Avenue, Suite 2800
      Chicago, IL 60611
      Telephone: (312) 876-7700
      Email: nicholas.siciliano@lw.com

–And–

      **Robert C. Weaver, Jr.**, OSB No. 801350
      **Gary I. Grenley**, OSB No. 751380
      **Paul H. Trinchero**, OSB No. 014397
      **Eryn Karpinski Hoerster**, OSB No. 106126
      **Daniel L. Keppler**, OSB No. 923537
      GARVEY SCHUBERT BARER, P.C.
      121 SW Morrison Street, 11th Floor
      Portland, OR 97204
      Telephone: (503) 228-3939
      Facsimile: (503) 226-0259
      Email: rweaver@gsblaw.com
             ggrenley@gsblaw.com
             ptrinchero@gsblaw.com
             ehoerster@gsblaw.com
             dkeppler@gsblaw.com

      **Attorneys for Defendant and Third-Party
      Plaintiff Deloitte & Touche LLP**